1987 WL 16123
Only the Westlaw citation is currently available.

SEE COURT OF APPEALS RULES 11 AND 12

Court of Appeals of Tennessee,
Middle Section at Nashville.

ADVANTAGE SALES AND LEASING COMPANY,
INC., Plaintiff, Counter-Defendant-Appellees,
v.
Terry Frank TOWNSEND and wife,
Linda E. Townsend, Defendants,
Counter-Plaintiffs-Appellants.

Aug. 28, 1987.

No. 87-69-II, Rutherford Law, Appealed From the
Circuit Court of Rutherford County at Murfreesboro,
Tennessee.
J.S. Daniel, Judge.

**Attorneys and Law Firms**

William W. Burton, Murfreesboro, for appellee.

David W. Kious, Henry, Kious and Hall, Murfreesboro,
for appellants.

OPINION

CANTRELL, Judge.

 **\*1** In this action involving the lease of an automobile the
lessees insist that the transaction is governed by Article 2
of the Uniform Commercial Code and that parts of the
lease agreement are unconscionable. Further, the lessees
contend that the lessor failed to mitigate its damages when
it resold the automobile.

On June 12, 1984 the appellants, Mr. and Mrs. Townsend,
leased a 1984 Mercury Topaz from Advantage Sales and
Leasing Company. Mr. Townsend was a salesman; he
used the car in his business and chose to lease a car for that
purpose because a lease provided certain tax advantages
to him. He had previously leased another automobile; the
record is unclear whether he leased it from the appellee in
this case or someone else.

The lease agreement was a forty-eight month "closed end"
lease which is described in the record as one in which the
lessee at the end of the lease period delivers the car back
to the lessor with no further obligations either way as long
as the car had not been driven an excessive number of
miles and was in reasonably good condition. Under the
lease provisions, most of which appear on the back of the
document, the lessees agreed to pay for all maintenance
and repairs to keep the vehicle in good working order
and to keep the manufacturer's warranty in force. The
provisions also contained an acknowledgement that the
title was to remain at all times in the lessor. In the event
of a default the total amount of the remaining monthly
payments would become immediately due and payable.

Mr. and Mrs. Townsend testified that the car gave them
trouble from the beginning. It would not start, it did not
run smoothly, and the tires wore excessively because of
improper alignment. Nevertheless, in nine months they
drove the car 32,000 miles. In April of 1985, tired of the
constant worry with the car, they turned it back over to
the lessor. The lessor resold the car for $3,500.

DOES THE UNIFORM COMMERCIAL
CODE APPLY TO THIS TRANSACTION?

The appellants insist that Article 2 of the UCC, with its
warranty and unconscionability provisions, governs the
rights of the parties under this lease agreement. While
Article 2 of the UCC, the "Sales" article, has traditionally
been applied in cases involving a sale of goods some
courts have invoked its provisions in cases involving a
lease of personal property. Such a result was possible
because Section 2-102 (T.C.A. 47-2-102) says "Unless
the context otherwise requires this chapter applies to
transactions in goods;". The term "transactions" has
been interpreted as encompassing a broader range of
commercial relationships than those described as "sales"
which is described in 47-2-106 as consisting of "the passing
of title from the seller to the buyer for a price." *Capital
Associates, Inc. v. Hudgins,* 455 So.2d 651 (Fla.App.1984).

In addition some courts have held that the sales article
is applicable to leases where the provisions of the lease
are "analogous to a sale", *Sawyer v. Pioneer Leasing
Corp.,* 244 Ark. 943, 428 S.W.2d 46 (1968), or where the
transaction is a sale of goods "under the guise of a lease."

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

*Redfern Meats, Inc. v. Hertz Corporation,* 134 Ga.App. 381, 215 S.E.2d 10 (1957).

**\*2** Our Supreme Court in *Baker v. Promark Products West, Inc.,* 692 S.W.2d 844 (Tenn.1985) considered this precise question. Arguably the Court came to a position somewhere between applicability and nonapplicability of the UCC to a lease of personal property. The Court interpreted the UCC along with the products liability statute, T.C.A. 29-28-102, and concluded that a cause of action existed for a breach of warranty arising out of a lease or bailment transaction *but only if* the claim was one for personal injury or property damage as defined in the products liability statute. The Court said, "Of course, if the action is not a products liability action for personal injury or property damage as defined in 29-28-102(6), then the provisions of the Uniform Commercial Code would control and an actual 'sale' would be required." 692 S.W.2d at 847. Therefore, since the appellants' action in this case was not for property damage as described in the products liability statute, the sales article would not apply to this transaction.

### B. ARE THE PROVISIONS OF
### THE LEASE UNCONSCIONABLE?

Since we have held that the provisions of the UCC do not apply to this lease transaction the unconscionability provisions in T.C.A. 47-2-302 would not apply. However, unconscionability is not an idea that sprang from the UCC. Rather, it is a doctrine that has been recognized-primarily in courts of equity-and applied to allow courts to refuse to enforce unreasonably harsh or oppressive contractual terms. *Campbell Soup Company v. Wentz,* 172 F.2d 80 (3rd Cir.1948). The doctrine has two facets, one procedural and one substantive, although the courts do not always distinguish between the two. Procedural unconscionability has been defined as "a lack of a meaningful choice" and usually deals with the *process* of contract formation. *See Henningsen v. Bloomfield Motors, Inc.,* 32 N.J. 358, 161 A.2d 69 (1960). It is usually "founded upon a recipe consisting of one or more parts of assumed consumer ignorance and several parts of seller's guile." White and Summers, Uniform Commercial Code, Section 4-3. Substantive unconscionability, on the other hand, deals with contract *terms,* terms so harsh "as no man in his senses and not under delusion would make on the one hand, and as no honest and fair man would accept

on the other." *Earl of Chesterfield v. Janssen,* 2 Ves.Sen. 125, 155, 28 Eng.Rep. 82, 100 (Ch.1750). In the Tennessee case of *Haun v. King,* the Eastern Section of this Court quoted from *Brenner v. Little Red School House,* 302 N.C. 207, 274 S.E.2d 206 (1981) which refers to both aspects of unconscionability:

A court will generally refuse to enforce a contract on the ground of unconscionability only when the inequality of the bargain is so manifest as to shock the judgment of a person of common sense, and where the terms are so oppressive that no reasonable person would make them on the one hand, and no honest and fair person would accept them on the other.... In determining whether a contract is unconscionable, a court must consider all the facts and circumstances of a particular case. If the provisions are then viewed as so one sided that the contracting party is denied an opportunity for a meaningful choice, the contract should be found unconscionable.

**\*3** *Haun v. King,* 690 S.W.2d 869, 872 (Tenn.App.1985).

In this case the appellants insist that the provision in the contract dealing with the right to terminate and the obligations upon termination are unconscionable. The provisions complained of appear on the reverse side of the lease form and the appellants both testified that they were not aware of the requirement that they would have to pay the remaining balance of the lease payments in the event they terminated the lease. However, there is no hint in the record that they were in any way prevented from reading the lease or that the agent of the appellee used any sleight of hand to induce them to sign the agreement without knowing its provisions. Mr. and Mrs. Townsend are well educated people; Mr. Townsend finished a year and a half of college and Mrs. Townsend has a college degree in English. Mr. Townsend had leased a car previously, and so had experience in such transactions. Thus we are persuaded that the two factors necessary for a finding of procedural unconscionability, the guile of one party and ignorance on the part of the other, are not present in this case.

Nor do we think that the provision requiring payment of the remaining installments in the event of termination is so harsh or oppressive as to amount to substantive unconscionability. Such provisions are common in leases of real property. And the degree of enforcement they receive in the courts depends on the circumstances of each

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

case. *Re Barnett,* 12 F.2d 73 (2d Cir.1926); *Logan v. Green,* 53 S.W.2d 119 (Tex.Civ.App.1932). Such provisions will likely be enforced where the amount of damage to the lessor is not shown to be disproportionate to the total amount of rent accruing after the breach. *Erickson v. O'Leary,* 127 Kan. 12, 273 P. 414 (1929). *See also* 52 C.J.S. *Landlord and Tenant,* Section 568.

Such provisions have also been recognized by this Court as enforceable when included in a lease of personal property. *Preston Lincoln Mercury v. Kilgore,* 525 S.W.2d 155 (Tenn.App.1975). Therefore, we find this issue to be without merit.

Finally, the appellants insist that the appellee failed to mitigate its damages when it resold the automobile for $3,500 without repairing it so that it would bring a better price or so that it could be re-released. The appellants cite no authority for the proposition that the lessor is obligated to expend its own funds to repair an automobile that has been returned to it by a lessee. We do not think there is such an obligation.

In addition we find the appellants argument to be inconsistent on this point. Most of the record consists of the appellant's description of the numerous deficiencies in the car. A car in such a condition would be almost worthless. Yet, the lessor resold the car for $3,500. There is no proof that the car was worth more than that. Therefore, we cannot see how the lessor failed to mitigate its damages.

The judgment of the court below is affirmed and the cause is remanded to the Circuit Court of Rutherford County for the enforcement of its judgment and any other proceedings necessary. Tax the costs on appeal to the appellants.

TODD, P.J. (M.S.), and KOCH, J., concur.

**All Citations**

Not Reported in S.W.2d, 1987 WL 16123

---

**End of Document**

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 5873039
Only the Westlaw citation is currently available.
United States District Court,
D. New Jersey.

ALBOYACIAN, et al., Plaintiffs,

v.

BP PRODUCTS NORTH
AMERICA, INC., Defendant.

Civ. No. 9–5143.
|
Nov. 22, 2011.

**Attorneys and Law Firms**

Marc J. Gross, Greenbaum, Rowe, Smith & Davis, LLP, Roseland, NJ, Richard Lloyd Hertzberg, Greenbaum, Rowe, Smith, & Davis, LLP, Woodbridge, NJ, for Plaintiffs.

Lauri A. Mazzuchetti, Ilona I. Korzha, Kelley, Drye & Warren, LLP, Parsippany, NJ, for Defendant.

**OPINION**

WILLIAM J. MARTINI, District Judge.

**\*1** This matter come before the Court on Defendant's Federal Rule of Civil Procedure 12(b)(6) motion to dismiss the Complaint for failure to state a claim upon which relief may be granted. For the reasons stated below, the Court will grant the motion in part and dismiss Counts Two, Five, Six, Seven, Eight, and Ten of the Complaint. And the Court will dismiss the remaining Counts for lack of ripeness.

**I. Factual and Procedural Background**

Defendant BP Products North America, Inc. ("BP") is a refiner and marketer of gasoline and other petroleum products. The Plaintiffs operate BP service stations throughout New Jersey pursuant to the Commissioner Marketer Agreement ("CMA"). This Court has previously recognized that the CMA creates a legal franchise under the New Jersey Franchise Practices Act, N.J.S.A. § 56:10–1, et seq., ("NJFPA"), between BP and the signatory, see, e.g., Sarwari v. BP Products North America, Inc., 2007 WL 1118344 (D.N.J. Apr.9, 2007),

and the parties do not contest that issue. Under the CMA, a franchisee does not purchase the BP fuel they dispense; rather, BP provides the fuel and the franchisee earns a commission on each gallon sold. In the present cases, the Plaintiffs also leased their respective service stations from BP pursuant to certain lease agreements. The CMA at issue in this case explicitly provides that the agreement lasts for a term of four years, and also explicitly provides that the franchisee shall have the option of renewing the agreement for two additional terms of four years each. At various points after September 2006, the Plaintiffs and BP executed various CMA renewal agreements that extended the franchises for four years (collectively with the CMA and the lease agreements, the "Franchise Agreements").

In August 2009, BP informed the Plaintiffs that it intended to withdraw from the CMAs at the expiration of the term of each individual agreement. As an alternative, BP offered all of the Plaintiffs the opportunity to purchase their service stations and act as dealers who purchased fuel products directly from BP and then sold them to customers—an arrangement BP refers to as Dealer Owned Dealer Operated stations. BP also offered the alternative of becoming Company Owned Dealer Operated stations, where BP would still own the service station property. Under either alternative, a franchise relationship likely would no longer exist under the NJFPA. See Sarwari v. BP Products North America, Inc., No. 06–2976, 2007 WL 1118344, at * (D.N.J. filed Sept. 15, 2006) (preliminarily enjoining BP from changing nature of business arrangement with New Jersey franchisees).

On August 18, 2009, BP filed a complaint against Hillside Service, Inc., Mike Yigitkuri, and Vinod Oberoi seeking a declaration from this Court that it has no obligation to continue business with the defendants, that it is not obligated to renew the underlying CMAs, and that it is not responsible for any claimed lost value of the defendants' businesses (the "Hillside Action"). On October 7, 2009, Ara Alboyacian, Mike Agolia, Ared Anac, Hagop Baga, Edward Balloutine, David Chong, Sevan Curukcu, Alfred Deppe, Joseph Klein, Raffi Korogluyan, Paul Lopes, Mary Lou Lopes, Abraham Manjikian, Imad Saleh, Walter Steele, Jayed Suddal, Aret Tokatlioglu, Richard Walter, Gregory Yigitkurt, Mike Yigitkurt, and Sahin Yigitkurt, (collectively, the "Franchisees") filed the present action against BP seeking, among other relief, a declaration that BP's failure to renew the underlying CMAs would constitute a violation of

WESTLAW © 2018 Thomson Reuters. No claim to original U.S. Government Works.
1

the NJFPA (the "Alboyacian Action"). The Alboyacian Action also stated nine other causes of action. The parties subsequently moved for summary judgment on the issue of whether the terminations would violate the NJFPA in both cases, and BP also filed a motion to dismiss in the Alboyacian Action seeking to dismiss that complaint in its entirety. After an attempt at mediation failed, this Court found that the terminations would violate the NJFPA, and the Court granted summary judgment against BP in both cases, thereby dismissing the Hillside Action in its entirety. *BP Products North America, Inc. v. Hillside Service, Inc.,* Nos. 9–4210, 9–5143, 2011 WL 4343452 (D.N.J. Sept.14, 2011).

**\*2** The Court now construes BP's motion to dismiss in this, the Alboyacian Action, as to the nine remaining counts of the Franchisees' complaint.

## II. Legal Analysis

### A. Ripeness

This Court has an obligation to determine its own subject-matter jurisdiction *sua sponte. U.S. Express Lines Ltd. v. Higgins,* 281 F.3d 383, 388–89 (3d Cir.2002). This includes an obligation to address Article III standing issues, including ripeness, where such issues exist. *Peachlum v. City of York, Pennsylvania,* 333 F.3d 429, 433 (3d Cir.2003). The purpose of the ripeness doctrine is to determine whether a party has brought an action prematurely, and it counsels abstention until such time as a dispute is sufficiently concrete to satisfy the constitutional and prudential requirements of the doctrine. *Id.* A dispute is not ripe for judicial determination if it rests upon contingent future events that may not occur as anticipated or may not occur at all. *Wyatt, Virgin Islands, Inc.,* 385 F.3d 801, 806.

To the extent that the ripeness of any of the Franchisees' claims is contingent upon BP actually terminating any of the Franchises, those claims are unripe because no terminations have yet occurred, and, indeed the terminations may not occur at all. This is especially true in light of this Court's prior opinion resolving the motions for summary judgment.

Counts Three, Four, and Nine rely on the termination occurring in order for them to be ripe, and so the Court must dismiss them. Count Three alleges BP fraudulently induced the Franchisees into renewing their CMA

agreements by making oral and written representations signaling its intent to renew the franchises beyond the renewal periods specifically provided in the franchise agreements. Count Four alleges a claim against BP for negligent misrepresentation based on the same conduct, and Count Nine alleges a claim for equitable estoppel based on the same conduct. With regards to each Count, this Court sees no basis for harm unless the intended termination occurs. As alleged, the harm arises because the Franchisees invested in their franchises assuming the franchise-relationship would continue. If it continues, the Franchisees' will be in the exact same position they had believed they were in when they made those investments. Thus, the Court will dismiss Counts Three, Four, and Nine, [1] without prejudice, as unripe, because their justiciability rests on contingent future events which may not occur as anticipated.

[1] To the extent that Count Nine seeks specific performance or an injunction forcing BP to continue the franchise relationship, such relief is not available to the Franchisees. Though it is a proper remedy in many equitable estoppel actions, specific performance, by definition, does not apply to create new contractual rights; rather, specific performance only encompasses performance of contractual duties. *See* Restatement (Second) of Contracts § 357 (1981). And the Court, having ruled that the intended terminations would violate the NJFPA, does not see a basis for injunctive relief. Assuming BP terminates and the Franchisees succeed on their claim under a theory of equitable estoppel, no irreparable harm will have occurred as monetary damages could adequately compensate the Franchisees for any losses. *See, e.g., Kos Pharmaceuticals, Inc. v. Andrx Corp.,* 369 F.3d 700, 728 (3d Cir.2004).

### B. Motion to Dismiss Standard

In deciding a motion to dismiss under Rule 12(b)(6), a court must take all allegations in the complaint as true and view them in the light most favorable to the plaintiff. *See Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts Inc.,* 140 F.3d 478, 483 (3d Cir.1998). This assumption of truth is inapplicable, however, to legal conclusions couched as factual allegations or to "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009).

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

**\*3** Although a complaint need not contain detailed factual allegations, "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). Thus, the factual allegations must be sufficient to raise a plaintiff's right to relief above a speculative level, such that it is "plausible on its face." *See id.* at 570; *see also Umland v. PLANCO Fin. Serv., Inc.,* 542 F.3d 59, 64 (3d Cir.2008). A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 129 S.Ct. at 1949 (2009) (citing *Twombly,* 550 U.S. at 556). While "[t]he plausibility standard is not akin to a 'probability requirement' ... it asks for more than a sheer possibility." *Iqbal,* 129 S.Ct. at 1949 (2009).

### C. Count One: Violation of the NJFPA

This Court's prior decision on the motions for summary judgment resolved Count One, and so the Court will not revisit that Count here. *BP Products North America, Inc., 2011 WL 4343452 at \*4–5.* There were no ripeness concerns as to that Count because the Franchisees were seeking declaratory relief. For the purposes of declaratory relief, an actual controversy existed that was sufficient for this Court to exercise jurisdiction over the dispute.

### D. Count Two: Breach of the Implied Covenant of Good Faith and Fair Dealing

"A covenant of good faith and fair dealing is implied in every contract in New Jersey"—including franchise agreements. *Wilson v. Amerada Hess Corp.,* 168 N.J. 236, 773 A.2d 1121, 1126 (N.J.2001). The Franchisees allege that BP violated the implied covenant by: (1) indicating an intent to terminate the franchise agreement; (2) failing to advise the Franchisees of its intent to abandon the franchises before accepting the benefit of the Franchisees' continued investments in their business; (3) failing to disclose its intent to "circumvent" the *Sarwari* ruling and thereby leading the Franchisees to believe the franchise relationship would continue; (4) providing the Franchisees with "unrealistic" purchase options for post-termination in constructive violation of the NJFPA; and (5) "circumventing the letter and spirit"

of the *Sarwari* ruling by requiring the Franchisees to meet "unreasonable" conditions of performance.

BP argues that the Franchisees cannot succeed as a matter of law on their claims for breach of the implied covenant of good faith and fair dealing because its actions and intended actions would not prevent them from receiving their reasonably expected fruits under the contract. BP is correct. Here, the Franchisees have failed to allege with any specificity how the alleged failures to disclose have prevented them from enjoying any fruits of the franchise agreement. *Wilson v. Amerada Hess Corp.,* 168 N.J. 236, 244, 773 A.2d 1121 (2001); *Sons of Thunder, Inc. v. Borden, Inc.* 148 N.J. 396, 420, 690 A.2d 575 (1997). While the Franchisees are correct that the exercise of a contractual right may lead to a breach of the implied covenant, *see id.,* that argument misses the mark. It is the NJFPA—not the contracts at issue—that prevents BP from terminating the franchise relationship without paying just compensation where the franchisees are substantially complying with the franchise agreement. Indeed, the contracts at issue implicitly contemplate that the franchise relationships would end after a set date, and only the NJFPA prevents that termination. The expected continuation of the franchise is not a fruit of the contract, but a fruit of the NJFPA. And the Franchisees have not alleged or explained how anything in the NJFPA, the Franchise Agreements, or the implied covenant created any duties of disclosure that BP violated. As such, none of the alleged breaching conduct destroys any fruits of the underlying contracts and the Plaintiffs' claim for breach of the implied covenant cannot succeed. Similarly, any alleged obligations arising from the NJFPA or the "letter and spirit" of *Sarwari* are not fruits of the contract such that they would give rise to actionable conduct under the breach of the implied covenant doctrine. And so the Court will dismiss Count Two.

### E. Counts Five and Six: Tortious Interference

**\*4** The Franchisees allege that BP tortuously interfered with their contracts with third parties and with their prospective economic advantages by determining to terminate the franchises and by subjecting the Franchisees to onerous standards of performance. BP argues that Franchisees' claims for tortious interference must fail because the factual allegations, even if taken as true, are insufficient to support a finding of malice. Again, BP is correct.

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Malice is an element of a prima facie case for a cause of action for tortious interference, regardless of whether the allegations are interference with an economic advantage or with an existing contract. *Luso,* 2009 WL 1873583, at *6 (citing cases). "Malice is not used here in its literal sense to mean 'ill will;' rather, it means that harm was inflicted intentionally and without justification or excuse." *Lamorte Burns & Co., Inc. v. Walters,* 167 N.J. 285, 770 A.2d 1158, 1170 (N.J.2001). "The conduct must be both injurious and transgressive of generally accepted standards of common morality or of law." *Id.* at 1170–71. "The line clearly is drawn at conduct that is fraudulent, dishonest, or illegal." *Id.* at 1170.

Here, even assuming the allegations of the Complaint are true, BP's conduct cannot be characterized as malicious under this standard. True, BP's allegations could support a finding of ill will, but this is insufficient. There are no allegations even suggesting that BP has engaged in fraudulent, dishonest, or illegal activity with respect to either the decision to terminate the franchises or the decision to shift certain responsibilities of performance onto the franchise owners. Whether these decisions violate the NJFPA does not matter, as the Franchisees have failed to allege specific facts tending to show that BP has done anything than argue in good faith that the decisions do not violate the act. And allegations that these actions are disadvantageous to the Franchisees and advantageous to BP are similarly insufficient—actions taken for business reasons are not unjustified. Thus, the Court will dismiss Counts Five and Six.

*F. Count Seven: Unjust Enrichment*
"To establish a claim for unjust enrichment, a plaintiff must show both that defendant received a benefit and that retention of that benefit without payment would be unjust." *Iliadis v. Wal–Mart Stores, Inc.,* 191 N.J. 88, 922 A.2d 710, 723 (N.J.2007) (quotation omitted). The plaintiff must also "show that it expected remuneration from the defendant at the time it performed or conferred a benefit on defendant and that the failure of remuneration enriched defendant beyond its contractual rights." *Id.* The key here is the phrase "beyond its contractual rights." Where a contractual agreement already binds the parties to certain courses of conduct, the defendant might accept plaintiff's performance as part of that agreement. *See, e.g.,* *St. Paul Fire & Marine Ins. Co. v. Indemnity Ins. Co. of North America,* 32 N.J. 17, 158 A.2d 825, 828 (N.J.1960)

(finding no basis for quasi-contractual liability where insurance agreement governed parties' performance).

**\*5** The Franchisees argue that they invested time, money, and resources to market and sell BP's products, thereby unjustly enriching BP; this argument makes little sense. In fact, the allegations of the Complaint, read in coordination with the Franchise Agreements, suggest only that the Franchisees investments were in line with the terms of the agreements, and that any benefit BP received was—justly—part of its contractual rights. *See also Luso,* 2009 WL 1873583, at *6. Thus, the Court will dismiss Count Seven.

*G. Count Eight: Quantum Meruit*
The Franchisees also allege that BP is liable under a theory of quantum meruit because, in making these investments to their businesses, they expected reasonable compensation. BP argues that any claim sounding in quantum meruit must fail because a valid agreement existed governing the parties' relationship. Again, BP is correct.

The theory of quantum meruit liability arises as an alternative to a breach of contract action. Where a plaintiff is unable to prove the existence of a valid, enforceable agreement, the plaintiff may instead attempt to collect compensation for its services under quantum meruit. *See Weichert Co. Realtors v. Ryan,* 128 N.J. 427, 608 A.2d 280, 285–86 (N.J.1992) (finding that no enforceable agreement existed but allowing plaintiff to proceed under theory of quantum meruit). The goal of such quasi-contract recovery is to bring justice to the parties without reference to their intentions. *Id.* (quotations omitted).

Here, the intentions of the parties are clear because they entered binding, agreements governing their relationships. Neither party has challenged the enforceability of those agreements. And while the mere existence of a contract may not be sufficient to defeat a claim for quantum meruit, the Franchisees have failed to allege that they engaged in any activity above and beyond what was required of them as part of those contracts; rather, it appears as though the Franchisees have merely performed their contractual duties. [2] And if the Franchisees felt as though BP had not adequately performed under the Franchise agreements, the appropriate cause of action

would be for breach of contract; they cannot succeed on a claim under the doctrine of quantum meruit. *See, e.g., Blue Sky MLS, Inc. v. RSG Systems, LLC,* No. 00–3832, 2002 WL 1065873, at *7 (D.N.J. Mar.28, 2002)* (dismissing quantum meruit claim "to the extent it seeks to recover for work performed by RSG that was contemplated" by enforceable agreements between the parties).

2    Even assuming that the value of BP's franchise and good-will were increased by the Franchisees, this hardly seems like something that is outside the realm of the Franchise Agreements. Indeed, such benefits flow naturally from the franchise relationship to both the franchisor and the franchisee over the course of the franchise agreement. *See, e.g., Neptune T.V. & Appliance Service, Inc. v. Litton Microwave Cooking Products Div.,* 190 N.J.Super. 153, 462 A.2d 595, 600 (N.J.Super.A.D.1983)* (discussing mutual benefits of franchise relationship). And while a franchisee is especially vulnerable to the loss of goodwill that accompanies termination, the Court does not see how that gives rise to an action under the doctrine of quantum meruit. Fortunately for franchisees in this state, the NJFPA provides protection from such losses. *Id.* at 600–01.

For all these reasons, the Court will dismiss Count Eight.

### *H. Count Ten: Unconscionability*

Finally, the Franchisees allege that the Franchise Agreements are unconscionable contracts of adhesion. But they also, somewhat confusingly, request as relief that the Court enjoin BP from terminating the franchises established by those agreements. BP argues that the Franchisees have failed to establish that unconscionability is actually a cause of action that a plaintiff may bring in the affirmative. The Franchisees have conceded as much in their opposition brief. As such, the Court will dismiss Count Ten.

### III. Conclusion

**\*6** For the foregoing reasons, the Court will grant BP's motion to dismiss. And the Court will dismiss Counts Two, Five, Six, Seven, Eight, and Ten of the Complaint with prejudice. The Court will also dismiss Counts Three, Four, and Nine without prejudice as unripe. An appropriate order follows.

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 5873039

---

**End of Document**                                              © 2017 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 2133946
Only the Westlaw citation is currently available.

SEE TX R RAP RULE 47.2 FOR
DESIGNATION AND SIGNING OF OPINIONS.

***MEMORANDUM OPINION***
Court of Appeals of Texas,
Austin.

Carolyn BARNES, Appellant

v.

UNIVERSITY FEDERAL CREDIT UNION AND
GOVERNMENT EMPLOYEES INSURANCE
COMPANY/GEICO INSURANCE, Appellees.

No. 03-09-00003-CV.
|
May 27, 2010.

From the District Court of Travis County, 201st Judicial
District, No. D-1-GN-08-003727, Suzanne Covington,
Judge Presiding.

**Attorneys and Law Firms**

Carolyn Barnes, Leander, TX, pro se appellant.

Jeffrey R. Jury, Burns, Anderson, Jury & Brenner, LLP,
Austin, TX, for appellee-Geico.

Greg White, Naman, Howell, Smith & Lee, PLLC, Waco,
TX, for appellee.

Before Justices PATTERSON, PURYEAR and
HENSON.

***MEMORANDUM OPINION***

DIANE M. HENSON, Justice.

**\*1** Appellant Carolyn Barnes appeals from the trial
court's order granting summary judgment in favor of
appellees University Federal Credit Union (UFCU) and
Government Employees Insurance Company (GEICO).
Barnes also appeals from the trial court's order of
severance. We affirm both the summary judgment and the
order of severance.

**BACKGROUND**

In 2004, Barnes obtained a loan for $14,066 from UFCU,
using two personal vehicles as collateral. As part of
the loan agreement, Barnes signed a document entitled,
"Agreement to Provide Insurance," which included
the following language: "I understand that one of
the lender's requirements is that I provide adequate
insurance coverage on the property securing my loan.
This insurance must at least provide comprehensive and
collision coverage. The policy must contain a loss payable
clause endorsement naming the lender as lienholder."

From March 25, 2005 to June 17, 2005, UFCU sent
Barnes a number of letters requesting a copy of the
required comprehensive and collision insurance policy on
the two vehicles. In the last of these letters, UFCU stated,
"If we do not receive evidence of insurance meeting our
requirements, collateral protection insurance (CPI) may
be issued through our insurance program." The letter went
on to state that if CPI is issued, the premium will be added
to the loan balance. Barnes did not provide the required
proof of insurance in response to these notices. Barnes's
insurance policy statements from the relevant time period
indicate that she had liability coverage on the vehicles,
but did not have comprehension or collision coverage and
had not named UFCU as a lienholder as required.[1] On
July 6, 2005, Barnes called UFCU to ask about paying off
the loan in anticipation of selling one of the vehicles. At
that time, she learned that CPI had been issued and that
premiums in the amount of $1,600 had been added to the
loan balance.[2] The next day, UFCU sent Barnes written
notice regarding the CPI and the $1,600 in premiums.

[1] Barnes also had personal injury protection and
uninsured motorist coverage for each vehicle.

[2] This amount represented a $1,030 premium for one
vehicle and a $570 premium for the other.

Barnes filed suit against UFCU and GEICO, her
insurance carrier, for breach of contract, fraud, deceptive
trade practices, negligence, and gross negligence.[3] She
also brought claims specifically against UFCU for fraud
in the inducement and "unconscionable contract of
adhesion." She took the position that GEICO had misled
her regarding the scope of her coverage and had conspired
with UFCU to wrongfully charge her the $1,600 premium.

Barnes later amended her petition to add claims for retaliation, defamation, invasion of privacy, malice, and intentional infliction of emotional distress.

[3]     There appears to have been some dispute in the trial court as to whether GEICO was properly named as Barnes's insurance carrier, or whether a related entity, Colonial County Mutual Insurance Company, should have been named as the insurance carrier. The parties do not address this issue on appeal, so we will assume that GEICO was properly named.

Barnes requested and obtained a temporary restraining order preventing GEICO or UFCU from taking any action to collect on the loans or from reporting her to a credit agency until a hearing could be held on her request for a temporary injunction. After a hearing, the trial court dissolved the temporary restraining order and denied Barnes's request for a temporary injunction. Over the course of the litigation, a number of discovery disputes arose between the parties, leading to numerous motions to compel and requests for sanctions on both sides.

**\*2** On April 5, 2006, UFCU sent Barnes a settlement proposal, stating that in return for $8,000, UFCU would consider the relevant loans to be paid in full, release the liens on her vehicles, and forego collection of any late fees, penalties, interest, or attorneys' fees . [4] The proposal further states, "UFCU and Barnes will execute reasonable and mutually agreeable full releases and other settlement documentation necessary to fully resolve and dismiss the current proceedings." In response, Barnes sent UFCU a cashier's check for $8,000, accompanied by a letter stating, "I am in receipt of your extortion demand with threats of additional economic and financial terrorism if I do not comply with your demands. This ransom and extortion money is being paid under extreme economic and financial duress and not because it is due and owing." The letter goes on to state that the funds were being tendered "with all rights reserved." UFCU then sent notice that it would not accept Barnes's check unless she signed a release of all claims. Barnes did not sign a release, and UFCU declined to negotiate the $8,000 check. Barnes filed UFCU's letter with the trial court as a Rule 11 Agreement, although the filed letter does not include Barnes's signature. On June 26, 2006, Barnes filed a "supplemental original petition," alleging that UFCU had breached the parties' Rule 11 agreement by proceeding with litigation after receiving her cashier's check for $8,000.

[4]     According to Barnes, the principal balance on the two loans, exclusive of fees, interest, and the CPI premiums, was $7,328.80 at the time of the settlement offer.

On July 5, 2006, the trial court granted UFCU's motion to compel and for sanctions against Barnes, assessing her $500 in sanctions related to discovery abuses. Eventually all parties filed motions for summary judgment, and a summary-judgment hearing was held on December 21, 2006.

On January 24, 2007, the trial court issued an order on summary judgment, granting GEICO's and UFCU's motions in part, denying them in part, and denying Barnes's motion. Specifically, the trial court granted summary judgment in favor of UFCU on all of Barnes's claims other than breach of contract [5] and granted summary judgment in favor of GEICO on all of Barnes's claims other than deceptive trade practices. [6]

[5]     It is not clear from the trial court's order whether the denial of summary judgment as to Barnes's breach-of-contract claim referred to the alleged breach of the loan agreement or to the alleged breach of the Rule 11 agreement. At the jury trial on the non-severed claims, Barnes was allowed to proceed on both claims, so we will assume that summary judgment was denied as to both.

[6]     In addition, the trial court denied UFCU's motion for summary judgment with respect to its counterclaims against Barnes for breach of contract, quantum meruit, unjust enrichment, and conversion. Barnes's no-evidence motion on UFCU's counterclaims was also denied.

Additional summary judgment motions and supplemental pleadings were then filed, and on October 17, 2007, GEICO filed a motion to sever the causes of action resolved by the trial court's order granting partial summary judgment. Barnes filed a response in opposition to the motion to sever and sought sanctions against GEICO for filing the motion.

In November 2007, the trial court placed the matter on the docket of cases to be dismissed for want of prosecution. Barnes filed a motion to retain, which the trial court granted over the opposing parties' objections. In September 2008, UFCU and GEICO filed a joint motion to dismiss on the grounds that Barnes had

not taken steps to schedule and complete mediation as required in the order of retention. At the hearing on the motion to dismiss, the trial court entered an order of severance, severing out those causes of action that had already been decided on summary judgment and assigning them to cause number D-1-GN-08-003727, the cause number giving rise to this appeal. The order of severance also included the following language: "It is further ORDERED that the only remaining issues in this existing litigation are Plaintiff's claims for Deceptive Trade Practices Act against [GEICO] and breach of contract against [UFCU]." The order of severance had the effect of making the trial court's grant of summary judgment final and appealable, and this appeal followed. *See Pierce v. Reynolds,* 329 S.W.2d 76, 78-79 (Tex.1959) ("A judgment which fully adjudicates one of the severed causes is appealable even though the entire controversy as it existed prior to the severance is not determined thereby.").

**\*3** In four issues on appeal, Barnes argues that the trial court erred by (1) granting the motion to sever, (2) denying her motion for summary judgment, (3) assessing discovery sanctions against her in the amount of $500, and (4) granting summary judgment in favor of UFCU and GEICO.

### STANDARD OF REVIEW

Severance of claims under the Texas Rules of Civil Procedure rests within the sound discretion of the trial court. *Liberty Nat'l Fire Ins. Co. v. Akin,* 927 S.W.2d 627, 629 (Tex.1996) (orig.proceeding); *see also* Tex.R. Civ. P. 174. A claim is properly severable if (1) the controversy involves more than one cause of action, (2) the severed claim is one that would be the proper subject of a lawsuit if independently asserted, and (3) the severed claim is not so interwoven with the remaining action that they involve the same facts and issues. *Guaranty Fed. Savs. Bank v. Horseshoe Operating Co.,* 793 S.W.2d 652, 658 (Tex.1990) (op. on reh'g). An order of severance is reviewable on appeal, but we will not disturb the trial court's decision to grant a severance absent an abuse of discretion. *Id.*

We review a trial court's imposition of sanctions for an abuse of discretion. *Cire v. Cummings,* 134 S.W.3d 835, 838 (Tex.2004). The ruling will be reversed only if it was arbitrary or unreasonable. *Id.* at 839.

Summary judgments are reviewed de novo. *Valence Operating Co. v. Dorsett,* 164 S.W.3d 656, 661 (Tex.2005). To prevail on a motion for summary judgment, the movant must show that there is no issue of material fact and that it is entitled to judgment as a matter of law. *TX Far West, Ltd. v. Texas Invs. Mgmt., Inc.,* 127 S.W.3d 295, 301 (Tex.App.-Austin 2004, no pet.). Evidence favorable to the non-movant is taken as true and every reasonable inference must be indulged in favor of the non-movant and any doubts resolved in its favor. *Id.* In reviewing a no-evidence summary judgment, we examine the entire record in the light most favorable to the non-movant to determine whether more than a scintilla of probative evidence was presented to raise a genuine issue of material fact. *See Perdue v. Patten Corp.,* 142 S.W.3d 596, 604 (Tex.App.-Austin 2004, no pet.). When the evidence supporting a finding rises to a level that would enable reasonable, fair-minded persons to differ in their conclusions, more than a scintilla of evidence exists. *See id.*

### DISCUSSION

*Procedural Posture of this Appeal*

As a preliminary matter, we address the procedural posture of this appeal. The record and briefs filed in this appeal identify the trial court's cause number as D-1-GN-05-003010. However, at the time this appeal was filed, there was no final and appealable judgment in cause number D-1-GN-05-003010. Barnes's notice of this appeal states that she seeks to appeal from the order of severance and, if the order of severance is upheld, from those summary-judgment rulings deemed final and appealable as a result of the severance. Thus, the trial court cause number giving rise to this appeal is D-1-GN-08-003727, the cause number that was created by the trial court in the order of severance and to which the claims resolved by summary judgment were assigned. [7]

[7]     A final and appealable judgment in D-1-GN-05-003010 was signed on October 9, 2009. Barnes's appeal from that judgment is currently pending before this Court as appellate cause number 03-10-00147-CV. We have granted Barnes's motion to allow the record in this appeal to also serve as the record in 03-10-00147-CV, subject to any necessary supplementation.

*Order of Severance*

**\*4** In her first issue on appeal, Barnes argues that the trial court erred in issuing the order of severance because the severed causes of action are so interwoven with the remaining claims that they involve the same facts and issues. *See Horseshoe Operating,* 793 S.W.2d at 658. Specifically, the severed causes of action were Barnes's claims against GEICO and UFCU for fraud, negligence, gross negligence, retaliation, defamation, invasion of privacy, malice, and intentional infliction of emotional distress, as well as her claims against UFCU for "unconscionable contract of adhesion," deceptive trade practices, and fraud in the inducement, and her claim against GEICO for breach of contract. Barnes's breach of contract claim against UFCU and deceptive trade practices claim against GEICO both remained pending in the original cause, trial court cause number D-1-GN-08-003010, and ultimately went to trial.

Barnes argues that the severed claims involve the same facts and issues as the non-severed claims, and therefore that the trial court abused its discretion in ordering a severance. However, our forthcoming discussion on the merits of the summary judgment confirms that the severed claims implicate different issues and require proof of different elements than those claims that survived summary judgment. In addition, many of the severed claims, including retaliation, invasion of privacy, and malice, do not represent valid causes of action in the manner that Barnes has pleaded them. The purpose of granting a severance is to ensure justice is done, prejudice is avoided, and convenience is furthered. *City of Dallas v. Redbird Dev. Corp.,* 143 S.W.3d 375, 386 (Tex.App.-Dallas 2004, no pet.). Given the trial court's broad discretion in matters of severance, as well as the underlying purpose of allowing a severance, we cannot conclude that the order to sever in this case was an abuse of discretion. *See Horseshoe Operating,* 793 S.W.2d at 658. For that matter, even if the order of severance was issued in error, it is not readily apparent what remedy would be available. There would be no practical effect to reversing the order, as the severed claims have been resolved on summary judgment and final judgment has been entered based on a jury verdict as to the non-severed claims.

Barnes also contends that the severance order was issued in violation of due process because she did not have prior notice that the motion to sever would be taken up during the hearing on the joint motion to dismiss. While the trial court did address the motion to sever during a hearing on a different motion, Barnes was not deprived of a reasonable opportunity to respond to the motion to sever, as she had previously filed a response and objections to the motion. Further, despite her lack of prior notice that the motion to sever would be addressed at the hearing, Barnes did attend and present argument in opposition to the severance. Because Barnes had notice that the motion to sever was pending and had an opportunity to file written objections, we conclude that no violation of due process occurred. *See Peralta v. Heights Med. Ctr., Inc.,* 485 U .S. 80, 84 (1988) (holding that in a proceeding "which is to be accorded finality," due process requires notice that is reasonably calculated to apprise interested parties of pendency of action and afford them opportunity to present objections). [8]

[8] It is not abundantly clear that the due-process requirements of *Peralta* even apply to this case, as it is the trial court's order on summary judgment, rather than the order of severance, that "is to be accorded finality" for purposes of the severed claims. The order of severance merely rendered the summary-judgment order final and appealable.

**\*5** Finally, Barnes argues that the trial court's order improperly severed certain claims that she had raised for the first time in supplemental pleading after the order granting summary judgment was issued. Barnes's first, second, and third supplemental petitions raise new claims of breach of fiduciary duty and breach of fair debt collection laws. The record in this appeal includes a transcript of the August 2009 jury trial on Barnes's non-severed causes of action. This transcript reflects that the trial court determined that Barnes was entitled to proceed at trial on claims that were raised for the first time after the summary judgment order. [9] Therefore, even if the order of severance improperly severed claims that had not been resolved on summary judgment, that issue was remedied when the trial court permitted Barnes to proceed with those claims at trial.

[9] We note that UFCU also proceeded at trial on its counterclaims against Barnes.

We overrule Barnes's first issue on appeal.

*Barnes's Motion for Summary Judgment*

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

In her second issue on appeal, Barnes argues that the trial court erred in denying her motion for summary judgment with respect to her claims related to breach of the Rule 11 agreement. Absent certain exceptions not applicable here, the denial of a motion for summary judgment is interlocutory and cannot be appealed. *See Novak v. Stevens,* 596 S.W.2d 848, 849 (Tex.1980). This is not a situation where the parties filed cross-motions for summary judgment and the trial court granted one and denied the other, in which case we would review all summary-judgment evidence and determine all questions presented. *See Texas Workers' Comp. Comm'n v. Patient Advocates of Tex.,* 136 S.W.3d 643, 648 (Tex.2004). While UFCU's summary-judgment motion did address Barnes's Rule 11 claims in its discussion of the breach-of-contract claim, UFCU's motion was denied as to the breach-of-contract claim. As a result, Barnes's claims related to the Rule 11 agreement were not disposed of on summary judgment and therefore could not have been rendered final and appealable by the order of severance. [10] Furthermore, our review of the August 2009 trial transcript in the non-severed action reflects that Barnes proceeded at trial on her claims related to breach of the Rule 11 agreement. As a result, we cannot address the denial of her motion for summary judgment on that issue.

[10] While the record is less than clear, it appears that Barnes's motion for summary judgment on her Rule 11 claims was filed on September 19, 2006, heard on October 23, 2006, and denied by an order on March 7, 2007. Thus, Barnes's request for summary judgment on her Rule 11 claims was not even addressed in connection with the summary judgment proceeding before us in this appeal. The order of severance states that "Plaintiff's Motion for Summary Judgment" should be included in the record for cause number D-1-GN-08-003727. Presumably, this refers to Barnes's no-evidence motion on UFCU's counterclaims, which was filed December 4, 2006, and denied by the trial court in the same January 24, 2007 order that granted in part and denied in part UFCU's and GEICO's motions for summary judgment.

*Discovery Sanctions*

In a third issue on appeal, Barnes argues that the trial court erred in issuing a discovery order dated July 5, 2006, granting UFCU's motion to enforce and assessing $500 in sanctions against Barnes. The July 5, 2006 discovery order was issued in trial court cause number D-1-GN-08-003010. This appeal is limited to those matters

that were severed to trial court cause number D-1-GN-08-003727 by the order of severance. Thus, we cannot address Barnes's issue related to the sanctions order in this appeal. The sanctions order may, however, be properly addressed in Barnes's appeal from the final judgment in cause number D-1-GN-08-003010, currently pending before this Court as appellate cause number 03-10-00147-CV, assuming it is properly raised in appellate briefing.

*Summary Judgment*

**\*6** In her fourth issue on appeal, Barnes argues that the trial court erred in granting summary judgment in favor of UFCU and GEICO on the severed claims. GEICO filed a motion for summary judgment on Barnes's claims for deceptive trade practices, fraud, breach of contract, negligence, gross negligence, retaliation, defamation, invasion of privacy, malice, and intentional infliction of emotional distress, asserting that there was no issue of material fact and that Barnes could not prove her claims as a matter of law. UFCU moved for summary judgment on both traditional and no-evidence grounds on Barnes's claims for breach of contract, fraud, fraud in the inducement, deceptive trade practices, negligence, gross negligence, retaliation, defamation, invasion of privacy, malice, intentional infliction of emotional distress, and "unconscionable contract of adhesion." *See* Tex.R. Civ. P. 166a(c), (i).

In reviewing a summary judgment, we must take all evidence favorable to the non-movant as true and indulge every reasonable inference in favor of the non-movant. *See Nixon v. Mr. Prop. Mgmt. Co.,* 690 S.W.2d 546, 548-49 (Tex.1985). Viewing the record in this light, the evidence reflects that Barnes signed an agreement to obtain comprehensive and collision insurance on two vehicles used as collateral for a loan from UFCU. Subsequently, a representative of GEICO informed Barnes that she had "full coverage," when in fact she did not have comprehensive or collision coverage on the vehicles in question. Barnes's policy documents, attached to GEICO's motion for summary judgment, indicate that her policy covered bodily injury liability, property damage liability, uninsured motorist bodily injury and property damage, and personal injury protection, but did not include comprehensive or collision coverage. The documents further reflect that no lienholder was named on the policy. Based on the inadequate insurance coverage, UFCU issued retroactive insurance and charged Barnes $1,600 in premiums.

Barnes's evidence in response to UFCU's and GEICO's motions for summary judgment consists primarily of her own 25-page affidavit, detailing her allegations. While self-serving affidavits are not necessarily improper summary-judgment evidence, affidavits consisting only of conclusions are insufficient to raise an issue of fact. *See Trico Techs. Corp. v. Montiel,* 949 S.W.2d 308, 310 (Tex.1997); *Life Ins. Co. of Va. v. Gar-Dal, Inc.,* 570 S.W.2d 378, 382 (Tex.1978). Barnes also relies on letters of complaint that she wrote to UFCU, her own testimony at prior hearings, and documentation regarding the rates she paid for car insurance from a new insurance carrier after leaving GEICO.

The trial court determined that the only claims for which questions of fact existed were the claims that UFCU breached the loan agreement and/or the parties' Rule 11 agreement, and the claim that GEICO committed deceptive trade practices. We agree that the summary-judgment record contains no evidence of a defamatory statement that would support her defamation claim, no evidence of any actionable invasion of privacy, and no evidence of the type of extreme and outrageous conduct necessary to support a claim of intentional infliction of emotional distress. *See Kroger Tex. Ltd. P'ship v. Suberu,* 216 S.W.3d 788, 796 (Tex.2006) (holding that in order to support claim of intentional infliction of emotional distress, conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community") (quoting *Twyman v. Twyman,* 855 S.W.2d 619, 621 (Tex.1993)).

**\*7** The summary-judgment record also contains no evidence that UFCU committed fraud. With respect to Barnes's fraud claim against GEICO, there is no summary-judgment evidence that GEICO's statement regarding Barnes's insurance coverage was made with knowledge of its falsity or made recklessly without knowledge of its truth. *See Ernst & Young, L.L.P. v. Pacific Mut. Life Ins. Co.,* 51 S.W.3d 573, 577 (Tex.2001) (elements of common-law fraud). Barnes maintains that GEICO told her she had "full coverage." While this statement may have been misleading as to the extent of her coverage, there is no evidence that it was made with knowledge of its falsity or made recklessly without any knowledge of the truth. [11] For that matter, there is no summary-judgment evidence that this statement was definitively false, as Barnes did have liability insurance in

excess of the minimum requirements imposed by the State of Texas.

[11]    For purposes of Barnes's deceptive trade practices claim against GEICO, Barnes was not required to establish that GEICO had an intent to misrepresent the scope of her coverage or that GEICO had knowledge that its representation was untrue. *See Eagle Props., Ltd. v. Scharbauer,* 807 S.W.2d 714, 724 (Tex.1990).

With respect to the negligence and gross negligence claims, Barnes has presented no evidence that UFCU breached any duty imposed by law, as opposed to a duty imposed solely by the contract. *See Southwestern Bell Tel. Co. v. Delaney,* 809 S.W.2d 493, 495 (Tex.1991) (where duty arose solely from contract, claim for breach of that duty sounded in contract, rather than tort). As for the negligence claims against GEICO, the summary-judgment evidence, specifically the insurance policy documents clearly noting the absence of collision and comprehensive insurance, negates the element of foreseeability as a matter of law. *See Doe v. Boys Clubs,* 907 S.W.2d 472, 477 (Tex.1995) (stating that proximate cause, which includes component of foreseeability, is required element of negligence). *But see id.* at 481 ("For DTPA claims, the plaintiffs need only show producing cause, and need not establish that the harm was foreseeable.") (internal citation omitted). To prove foreseeability, a plaintiff must establish that a person of ordinary intelligence should have anticipated the danger created by the negligent act. *Id.* at 478. The law presumes that a party to a contract has read and understood the contract. *See American Employers' Ins. Co. v. Aiken,* 942 S.W.2d 156, 161 (Tex.App.-Fort Worth 1997, no writ). Thus, it would not have been reasonably foreseeable that based on a statement that she had "full coverage," Barnes would ignore her insurance policy statements indicating that she did not have collision and comprehensive coverage, and that she would then suffer damages in the form of retroactive collateral insurance premiums.

Barnes presented no evidence that UFCU employed trickery or artifice to convince her to execute the loan agreement as required to prevail on her claim for fraud in the inducement. *See Caraway v. Land Design Studio,* 47 S.W.3d 696, 698 (Tex.App.-Austin 2001, no pet.). Her claim for deceptive trade practices against UFCU also fails as a matter of law because lending activities do not constitute goods or services that would trigger

the protections of the Texas Deceptive Trade Practices Act, unless the goods or services ultimately sought by the borrower form the basis of the complaint. *See Riverside Nat'l Bank v. Lewis,* 603 S.W.2d 169, 174-75 (Tex.1980); *see also Walker v. FDIC,* 970 F.2d 114, 123 (5th Cir.1992). Because Barnes does not allege any complaint regarding the goods she sought to acquire with the loan proceeds, she is not a "consumer" subject to statutory protection in connection with her transaction with UFCU. *See id.* Further, Barnes produced no evidence of any breach of contract by GEICO. Finally, Barnes's remaining claims of "unconscionable contract of adhesion," retaliation, [12] and malice do not appear to be independent causes of action under Texas law.

[12]   While statutory causes of action for retaliation do exist in the employment context, no employer/employee relationship is implicated here. *See, e.g.,* Tex. Health & Safety Code Ann. § 161 .134 (West 2001).

**\*8** Barnes also argues that the trial court erred in granting no-evidence summary judgment because she had not yet had adequate time for discovery at the time the motion was granted. A no-evidence motion is only proper after there has been "adequate time for discovery." Tex.R. Civ. P. 166a(i). We review a trial court's determination that an adequate time for discovery has passed under an abuse-of-discretion standard. *Madison v. Williamson,* 241 S.W.3d 145, 155 (Tex.App.-Houston [1st Dist.] 2007, pet.

denied). In the present case, litigation had been ongoing for over a year before the no-evidence motion was filed. It is clear that discovery was conducted during that time, as the record contains a number of UFCU's and GEICO's responses to Barnes's discovery requests. While the case appears to have been plagued with discovery disputes, the record before us reflects that these disputes were resolved by the trial court in favor of UFCU and GEICO, twice resulting in sanctions against Barnes. Given this procedural history, we cannot say that the trial court erred in determining that an adequate time for discovery had passed to rule on a no-evidence motion for summary judgment.

Based on the foregoing, we hold that the trial court did not err in granting summary judgment in favor of UFCU and GEICO on the severed claims. We overrule Barnes's fourth issue on appeal.

## CONCLUSION

We affirm the summary judgment and the order of severance.

**All Citations**

Not Reported in S.W.3d, 2010 WL 2133946

---

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 5041174
Only the Westlaw citation is currently available.
United States District Court, N.D. California,
San Francisco Division.

Mark S. BUZA, Plaintiff,

v.

YAHOO!, INC., Defendant.

No. C 11–4422 RS.
|
Oct. 24, 2011.

**Attorneys and Law Firms**

Mark S. Buza, San Francisco, CA, pro se.

Michele D. Floyd, Yahoo! Inc., San Francisco, CA,
Robert Sturtevant Eaton, Mintz Levin Cohn Ferris
Glovsky and Popeo, Palo Alto, CA, for Defendant.

### ORDER GRANTING MOTION TO DISMISS FEDERAL CLAIMS AND REMANDING STATE CLAIMS

RICHARD SEEBORG, District Judge.

**\*1** Plaintiff Mark S. Buza alleges that he is the founder
and leader of the National Psychoanalytic Movement
("NPSM"), a political group. Buza filed this action in
San Francisco Superior Court, alleging that defendant
Yahoo!, Inc. wrongfully terminated two NPSM-related
websites that he had created and maintained on Yahoo!
servers, through services it provides. Yahoo! removed the
action to this Court based on claims in the complaint
arising under federal law, and now moves to dismiss.
Pursuant to Civil Local Rule 7–1(b), the motion to
dismiss this action is suitable for disposition without oral
argument, and the hearing set for October 27, 2011 is
hereby vacated. The motion to dismiss will be granted as
to the federal claims in the complaint, and the remaining
state law claims will be remanded to state court.

#### 1. *Federal Claims*

The second count [1] of Buza's complaint asserts that
Yahoo! violated his rights under the First Amendment of
the United States Constitution by removing the expressive

material posted on the NPSM websites. Yahoo! correctly
contends that because it is not a state actor, it cannot be
held liable under the First Amendment for suppressing
speech. Buza's response that Yahoo!'s services should be
seen as a "public forum" in which the guarantees of the
First Amendment apply is not tenable under federal law.
As a private actor, Yahoo! has every right to control
the content of material on its servers, and appearing
on websites that it hosts. *See Hudgens v. NLRB,* 424
U.S. 507, 513, 96 S.Ct. 1029, 47 L.Ed.2d 196 (1976)
("It is, of course, a commonplace that the constitutional
guarantee of free speech is a guarantee only against
abridgment by government, federal or state.... Thus,
while statutory or common law may in some situations
extend protection or provide redress against a private
corporation or person who seeks to abridge the free
expression of others, no such protection or redress is
provided by the Constitution itself." (citation omitted)).
Accordingly, the federal constitutional claim must be
dismissed.

[1]  Consistent with state court practice, the counts of the
complaint are labeled as "causes of action."

The fifth count of the complaint is labeled "unlawful
access to stored communications." In his opposition to
the motion to dismiss, Buza clarifies that he intends to
bring this claim under 18 U.S.C. § 2701 [2], which provides
for criminal penalties to be imposed where a person
"intentionally accesses without authorization a facility
through which an electronic communication service is
provided ... and thereby obtains, alters, or prevents
authorized access to a wire or electronic communication
while it is in electronic storage in such system...." Yahoo!
argues this provision is inapplicable because it applies
to *disclosure* of electronic communications, which Buza
has not alleged. The section, however, expressly extends
to conduct that prevents an authorized person from
*accessing* the communications, which is exactly what Buza
alleges Yahoo! did when it terminated the websites.

[2]  Miscited in Yahoo!'s reply brief as 18 U.S.C. § 1701.

Nevertheless, Buza has not stated, and cannot state
a claim under this law, because, even assuming there
is a private right of action, subdivision (c) of §
2701 provides that the prohibitions against accessing
and interfering with electronic communications do not
apply to "the person or entity providing a wire
or electronic communications service." The allegations

WESTLAW © 2015 Thomson Reuters. No claim to original U.S. Government Works.

1

of the complaint establish that Yahoo! falls within that exemption. Accordingly, this claim must also be dismissed.

### 2. *State Law Claims*

**\*2** The first count of the complaint asserts a violation of the free speech guarantees of the California Constitution. Cal. Const. Art. I, Sec. 2. The California Supreme Court has held that "state action for purposes of California's free speech clause is not the same as state action for purposes of the First Amendment." *Golden Gateway Center v. Golden Gateway Tenants Assn.,* 26 Cal.4th 1013, 1031, 111 Cal.Rptr.2d 336, 29 P.3d 797 (2001). Rather, the actions of a private property owner may constitute state action for purposes of California's free speech clause, "if the property is freely and openly accessible to the public." *Id.* at 1033, 111 Cal.Rptr.2d 336, 29 P.3d 797.

It is perhaps doubtful that California courts would apply the principles discussed in *Golden Gateway* to conclude that Yahoo! is subject to the free speech guarantees of the California Constitution, particularly since *Golden Gate* arguably represented a retreat from a more expansive view of the scope of those guarantees expressed in earlier California decisions. *See id .* at 1021–23, 111 Cal.Rptr.2d 336, 29 P.3d 797 (discussing *Robins v. Pruneyard Shopping Center,* 23 Cal.3d 899, 153 Cal.Rptr. 854, 592 P.2d 341 (1979)). Particularly in the absence of any viable federal claims, however, it is far preferable to leave the issue to the California courts to decide. Even where no novel state law issue is presented, remand of state claims upon dismissal of the federal claims is appropriate where retaining jurisdiction serves no compelling purpose. *See Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 351, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine-judicial economy, convenience, fairness, and comity-will point toward declining to exercise jurisdiction over the remaining state-law claims.").

Yahoo! contends that the third count of the complaint, entitled "trespass to chattels," fails in light of its Terms of Service ("TOS"), in which it reserves the right to remove materials from its servers and hosted websites.[3] As the claim sounds solely in state law, however, it will be remanded to the state courts to decide.

---

[3]    Yahoo! requests judicial notice of the TOS. Because the TOS is mentioned in the complaint, and given that Buza does not dispute that the document submitted by Yahoo! accurately reflects the applicable TOS, it likely would be permissible to consider it, and its effect on the viability of the claims, in this motion to dismiss. Indeed, Buza appears to concede that the document, *if enforceable,* bars his claims. Because the state claims are being remanded, however, the issue need not be decided at this juncture, and the request for judicial notice is moot.

### 3. *"Intellectual Property"*

The fourth count of the complaint is labeled "intellectual property," but does not clearly state any theory of liability. Buza's opposition merely asserts that the material on the websites in dispute plainly constituted "intellectual property." While the unauthorized taking or use of "intellectual property"—like that of any form of property —likely is actionable under one or more theories, Buza may ultimately be required to articulate more clearly the basis of this claim.[4] At this juncture, however, the only relevant issue is whether this claim is potentially federal in nature. While federal law governs certain forms of intellectual property such as patents and copyrights, nothing in the allegations suggests Buza is attempting to, or could, state a claim under such laws. Accordingly, this claim will also be remanded.

---

[4]    Misappropriation of intellectual property, unlike theft of tangible property, ordinarily does not deprive the owner of its use. Here, Buza alleges that he has no other copies of the materials that were stored on Yahoo!'s servers, and that appears to be a significant component of his claimed injury. Without suggesting that Yahoo! necessarily has any legal obligation to do so, it might be in its interest to determine whether it can provide any or all of the material to Buza from backup sources.

**\*3** Finally, Buza has requested leave to amend to allege a "contract of adhesion claim." A contention that a particular contract is one of "adhesion" is a potential defense to the enforceability of that contract, not an affirmative claim. Additionally, contracts of adhesion are not automatically unenforceable—other factors must also exist. In any event, it is not a federal claim. To the extent Buza intends to argue that the TOS does not bar his claims because it is an unenforceable contract of adhesion, it will be for the state court to determine whether additional

WEST... © 2017 Thomson Reuters. No claim to original U.S. Government Works.

factual allegations are necessary or appropriate to support such an argument.

4. *Conclusion and Order*

The second and fifth "causes of action" of the complaint are dismissed without leave to amend. The action and the remaining claims are remanded to the San Francisco Superior Court.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 5041174

---

**End of Document**

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 2106727
Only the Westlaw citation is currently available.
United States District Court,
N.D. Alabama,
Southern Division.

Rachel CAMP and Ben Burgess, Plaintiffs,
v.
ALABAMA TELCO CREDIT UNION, Defendant.

No. 2:12–cv–2237–LSC.
|
May 13, 2013.

**Attorneys and Law Firms**

Mitchell G. Allen, The Allen Law Firm, Robert J. Camp, The Cochran Firm, Birmingham, AL, for Plaintiffs.

E. Berton Spence, Lisha Xiao Li, Rumberger Kirk & Caldwell, Birmingham, AL, Scott Eric Zweigel, William J. Holley, II, Parker Hudson Rainer & Dobbs LLP, Atlanta, GA, for Defendant.

MEMORANDUM OF OPINION

L. SCOTT COOGLER, District Judge.

I. Introduction

**\*1** This case is based on Alabama state law. Rachel Camp and Ben Burgess (collectively, "Plaintiffs") allege that Alabama Telco Credit Union ("Telco") has illegally charged them overdraft fees on their Joint Checking Accounts for the last several years. The Court has for its consideration Telco's Motion to Dismiss Plaintiffs' Amended Complaint. (Doc. 12.) The motion has been fully briefed and is ripe for decision.

II. Background

Plaintiffs are joint checking account holders with Telco, a state-chartered, federally insured, Alabama credit union with all of its branches in Alabama. As a credit union, Telco is a non-profit banking organization owned and operated by its members. Plaintiffs are Telco members pursuant to a Membership and Account Agreement ("Account Agreement").

Since August 15, 2010, Telco has charged Plaintiffs overdraft fees for ATM and daily debit card purchases as a part of its overdraft protection plan (hereinafter "Courtesy Pay"), despite Plaintiffs never affirmatively opting in to Courtesy Pay, and Plaintiff Burgess even attempting to opt out of Courtesy Pay. In addition, one of Telco's Courtesy Pay practices is to reorder transactions from the largest amount to smallest before they are processed. This practice causes members to incur more overdraft fees than they would if the transactions were posted in chronological order because the larger amounts deplete the account funds quicker.

Plaintiffs filed a Class Action Complaint on June 21, 2012 (Doc. 1), and a Second Amended Class Action Complaint (the "Amended Complaint") on August 13, 2012. (Doc. 11.) Plaintiffs assert four claims against Telco: (1) breach of contract, (2) conversion, (3) unconscionability, and (4) unjust enrichment and restitution. [1]

[1] Plaintiffs do not bring a claim under 15 U.S.C. § 1693m, the private right of action for damages against violators of Regulation E, the FDIC's electronic funds transfer regulation. The recently amended regulations limit the ability of a financial institution such as Telco to assess overdraft fees in certain contexts. See 12 C.F.R. § 205.17. Telco does not move the Court to dismiss Plaintiffs' claims based on preemption by the federal regulations, but it specifically reserves this defense. (Doc. 13 at 11 n. 10.)

III. Standard

A defendant may move to dismiss a complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) if the plaintiff has failed to state a claim upon which relief may be granted. "When considering a motion to dismiss, all facts set forth in the plaintiff's complaint 'are to be accepted as true and the court limits its consideration to the pleadings and exhibits attached thereto.' " *Grossman v. Nationsbank, N.A.,* 225 F.3d 1228, 1231 (11th Cir.2000) (quoting *GSW, Inc. v. Long County,* 999 F.2d 1508, 1510 (11th Cir.1993)). Further, all "reasonable inferences" are drawn in favor of the plaintiff. *St. George v. Pinellas County,* 285 F .3d 1334, 1337 (11th Cir.2002).

> While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the "grounds" of his "entitle[ment]

WESTLAW © 2021 Thomson Reuters. No claim to original U.S. Government Works. 1

to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact).

**\*2** *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007) (internal citations omitted). [2] The plaintiff must plead "enough facts to state a claim that is plausible on its face." *Id.* at 570. Unless a plaintiff has "nudged [his] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Id* .

[2]     In *Bell Atlantic Corp. v. Twombly,* the U.S. Supreme Court abrogated the oft-cited standard that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief" set forth in *Conley v. Gibson,* 355 U.S. 41 (1957). *Bell Atl. Corp.,* 550 U.S. at 560–63. The Supreme Court stated that the "no set of facts" standard "is best forgotten as an incomplete, negative gloss on an accepted pleading standard: once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Id.* at 563.

"[U]nsupported conclusions of law or of mixed fact and law have long been recognized not to prevent a Rule 12(b)(6) dismissal." *Dalrymple v. Reno,* 334 F.3d 991, 996 (11th Cir.2003) (quoting *Marsh v. Butler County, Ala.,* 268 F.3d 1014, 1036 n. 16 (11th Cir .2001)). And, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1950 (2009) (quoting Fed.R.Civ.P. 8(a)(2)). Therefore, the Supreme Court suggested that courts adopt a "two-pronged approach" when considering motions to dismiss: "1) eliminate any allegations in the complaint that are merely legal conclusions; and 2) where there are well-pleaded factual allegations, 'assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.' " *American Dental Ass'n v. Cigna Corp.,* 605 F.3d 1283, 1290 (11th Cir.2010) (quoting *Iqbal,* 129 S.Ct. at 1950).

Importantly, "courts may infer from the factual allegations in the complaint 'obvious alternative explanation[s],' which suggest lawful conduct rather than the unlawful conduct the plaintiff would ask the court to infer." *Id.* (quoting *Iqbal,* 129 S.Ct. at 1951–52). However, "[a] complaint may not be dismissed because the plaintiff's claims do not support the legal theory he relies upon since the court must determine if the allegations provide for relief on any possible theory." *Brooks v. Blue Cross & Blue Shield of Fla., Inc.,* 116 F.3d 1364, 1369 (11th Cir.1997).

## IV. Discussion

**A. Appropriateness of Issues for** Rule 12(b)(6)
As a threshold matter, Plaintiffs argue that the issues before the Court are not appropriate grounds for dismissal under Rule 12(b)(6). Telco has provided a copy of an Account Agreement (Doc. 13–1), and website pages describing Courtesy Pay, with its motion to dismiss. (Doc. 13–2.) Plaintiffs contend that it is unlikely that the Account Agreement provided by Telco covered the entire six-year liability period, and the Account Agreement references several other documents that may or may not be attached to the motion. In light of this, Plaintiffs argue that Telco's motion to dismiss is more akin to a motion for summary judgment and—prior to any discovery—is inappropriate at this early stage. (Doc. 21 at 6.)

In the Amended Complaint, Plaintiffs reference both an Account Agreement (Doc. 11, ¶ 59–60), and the website pages describing Courtesy Pay. (*Id.,* ¶ 66.) "[W]here the plaintiff refers to certain documents in the complaint and those documents are central to the plaintiff's claim, then the Court may consider the documents part of the pleadings for purposes of Rule 12(b)(6) dismissal, and the defendant's attaching such documents to the motion to dismiss will not require conversion of the motion into a motion for summary judgment." *Brooks,* 116 F.3d at 1369. Furthermore, even if the attached Account Agreement was not the actual Account Agreement during the entire six-year liability period, the Court's rationale for granting or denying Telco's motion to dismiss does not turn on its interpretation. Thus, the issues before the Court are appropriately considered in a motion to dismiss under Rule 12(b)(6).

**B. Plaintiffs' Claims**

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

### 1. Breach of Contract

**\*3**  In the first count of the Amended Complaint, Plaintiffs allege that Telco breached the Account Agreement by breaching the duty of good faith and fair dealing, what Plaintiffs contend is an element of every contract under Alabama law. (Doc. 11, ¶¶ 81–94.) In response, Telco argues that Alabama law does not recognize a claim for breach of the duty of good faith and fair dealing. (Doc. 13 at 11.)

" 'T he elements of a breach-of-contract claim under Alabama law are (1) a valid contract binding the parties; (2) the plaintiff's performance under the contract; (3) the defendant's nonperformance; and (4) resulting damages.' " *Shaffer v. Regions Fin. Corp.,* 29 So.3d 872, 880 (Ala.2009) (quoting *Reynolds Metals Co. v. Hill,* 825 So.2d 100, 105 (Ala.2002)). Under Alabama law, every contract imposes an obligation of good faith in its performance and enforcement. Ala.Code § 7–1–304 (originally enacted as Ala.Code § 7–1–203). *See also Tanner v. Church's Fried Chicken, Inc.,* 582 So.2d 449, 451–52 (Ala.1991). However, the violation of this obligation does not give rise to a cause of action as the statute was intended to be directive, not remedial. *Tanner,* 582 So.2d at 452 (citing *Chandler v. Hunter,* 340 So.2d 818, 821 (Ala.Civ.App.1976)). *See also Government Street Lumber Co., Inc. v. AmSouth Bank, N.A.,* 553 So.2d 68, 72 (Ala.1989) ("failure to act in good faith in the performance or enforcement of contracts arising out of Title 7A does not state a claim for relief that may be granted in Alabama, since § 7–1–203 is directive rather than remedial"). Thus, in order to prove a breach of contract on the part of the defendant, a plaintiff must prove that the defendant expressly breached a specific term of the contract. *Tanner,* 582 So.2d at 452.

Plaintiffs offer *Tanner* in support of their assertion that a claim of breach of the duty of good faith and fair dealing is actionable when a defendant has breached specific terms of the contract. (Doc. 21 at 7.) However, in *Tanner* the Alabama Supreme Court determined that there was *no* cause of action for breach of the duty of good faith. 582 So.2d at 452. Thus, Plaintiffs' claim for breach of the duty of good faith and fair dealing is due to be dismissed.

Plaintiffs next argue in their brief that Telco breached specific terms of the Account Agreement in three ways: (1) by charging overdraft fees even though Plaintiffs did not consent to the overdraft charges; (2) by charging overdraft fees when sufficient funds were available to cover the transaction; and (3) by ordering and posting transactions according to "amount," rather than "type" or "time." (Doc. 21 at 7–21.) Plaintiffs make this argument despite the fact that they only included a claim for breach of contract through a breach of the duty of good faith and fair dealing in their Amended Complaint. Regardless, the factual allegations in the Amended Complaint may support a claim for relief under these theories of breach of contract. Accordingly, the Court will not dismiss Plaintiffs' first count; however, Plaintiffs will be directed to further amend their complaint for the limited purpose of clarifying their breach of contract claim.

### 2. Conversion

**\*4**  In the second count of the Amended Complaint, Plaintiffs allege that Telco's collection of overdraft fees from their accounts constitutes conversion. (Doc. 11, ¶¶ 95 –98.) In response, Telco argues that Alabama law does not recognize as conversion the collection of funds from a bank account. (Doc. 13 at 12–13.) " 'The elements of conversion include a wrongful taking of specific property and an assumption of ownership or dominion over the separate and identifiable property of another.... Further, the plaintiff must have a right to immediate possession of such property and the taking must be in defiance of that right.' " *McGee v. McGee,* 91 So.3d 659, 667 (Ala.2012) (quoting *Young v. Norfolk Southern Ry.,* 705 So.2d 444, 446 (Ala.Civ.App.1997)). "Generally, an action will not lie for the conversion of cash. However, if the cash at issue is 'specific money capable of identification,' claims of conversion may be appropriate." *Covington v. Exxon Co., U.S.A.,* 551 So.2d 935, 938 (Ala.1989) (quoting *Hunnicutt v. Higginbotham,* 35 So. 469 (Ala.1903)). Specific money capable of identification includes "money in a bag, coins or notes that have been entrusted to the defendant's care, or funds that have otherwise been sequestered, and where there is an obligation to keep intact and deliver this specific money rather than to merely deliver a certain sum." *Gray v. Liberty National Life Insurance Company,* 623 So.2d 1156, 1160 (Ala.1993).

In *Gray,* the Alabama Supreme Court found that money paid on pre-authorized checks the defendant drew monthly against the plaintiff's bank account was "identifiable." 623 So.2d at 1160. The overdraft charges on Plaintiffs' joint checking accounts, however, were not drawn on physical checks like the ones in *Gray,* but were merely assessed anytime there was an overdraft. This is more akin to a false debt, rather than a conversion

of funds. *See Lewis v. Fowler,* 479 So.2d 725, 727 (Ala.1985) ("When there is no obligation to return the identical money, but only a relationship of debtor or creditor, an action for conversion of funds representing the indebtedness will not lie against the debtor.")

Plaintiffs contend that a claim of conversion is available for overdrafts charged by a bank on existing accounts based on the Alabama Supreme Court's decision in *Covington.* (Doc. 21 at 32.) The language relied on by Plaintiffs is from the Eleventh Circuit's opinion in *Limbaugh v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 732 F.2d 859 (11th Cir.1984). In *Limbaugh,* the court found that funds in a "Ready Assets Trust account" were sufficiently identifiable to support a conversion claim when the defendant liquidated the funds and charged the plaintiff's account for money he owed the defendant. *Id.* at 862–63. The court reached this determination because the funds in the Ready Assets Trust account were in the form of shares, like a stock account. *Id.* A joint checking account, on the other hand, is not structured into shares like the Ready Assets Trust account. Thus, the rationale in *Limbaugh* does not apply to overdraft fees taken from Plaintiffs' account. Accordingly, Plaintiffs have failed to state a claim for conversion in the Amended Complaint.

### 3. Unconscionability

**\*5** In the third count of the Amended Complaint, Plaintiffs seek a declaration that certain terms Telco may rely upon in the Account Agreement [3] are unconscionable, and request that each overdraft charge derived from the unconscionable terms be rescinded and refunded to Plaintiffs as well as those similarly situated. (Doc. 11, ¶¶ 99–103.) In response, Telco argues that Alabama law does not recognize an affirmative claim for relief under an unconscionability theory (Doc. 13 at 12), and declaratory relief cannot be granted because there is no justiciable controversy. (Doc. 22 at 8.)

[3] Although Plaintiffs purport to attach an Account Agreement to their Amended Complaint (Doc. 11, ¶ 59), no such document was attached. However, this does not affect this Court's determination that no affirmative right to relief arises under Alabama law for unconscionability.

Under Alabama law, unconscionability is an affirmative defense and not available for use in obtaining affirmative relief. *Sanders v. Colonial Bank of Alabama,* 551 So.2d 1045, 1045 (Ala .1989); *Cowin Equipment Co., Inc. v. General Motors Corp.,* 734 F.2d 1581, 1582–83 (11th Cir.1984); *Winecoff v. Compass Bank,* 876 So.2d 1145, 1148 (Ala.Civ.App.2003). *See also Blue Cross Blue Shield of Alabama v. Rigas,* 923 So.2d 1077, 1086 (Ala.2005). Plaintiffs argue that these cases are limited to actions involving unconscionability provisions of the U.C.C., not common law; however, Plaintiffs fail to cite any Alabama case law supporting an affirmative claim for relief under a common law theory of unconscionability. In fact, the Eleventh Circuit determined that a finding of no affirmative right to relief under the U.C.C. unconscionability provision was "consistent with traditional common law unconscionability theory." *Cowin,* 734 F.2d at 1582. While the allegations in the Amended Complaint may be sufficient to establish a defense of unconscionability, no such affirmative claim exists under Alabama law.

Plaintiffs argue that even if unconscionability is an affirmative defense, they can still seek a declaratory judgment declaring that the contract is unconscionable. It is unclear whether Plaintiffs seek declaratory relief under Alabama's Declaratory Judgments Act, Ala.Code § 6–6–220 *et seq.,* or the Federal Declaratory Judgment Act, 28 U.S.C. § 2201. However, because unconscionability is merely an affirmative defense, there is no actual controversy between the parties, and a declaratory judgment would not be appropriate. *See City of Mobile v. Scott,* 178 So.2d 545, 546 (Ala.1960) ( " '[T]here must be a bona fide existing controversy of a justiciable character to confer upon the court jurisdiction to grant declaratory relief under declaratory judgment statutes.' ") (quoting *Shadix v.. City of Birmingham,* 38 So.2d 851, 851 (Ala.1949)); *Angora Enterprises, Inc. v. Condominium Ass'n of Lakeside Village, Inc.,* 769 F.2d 384, 386 n. 2 (11th Cir.1983) (the Court "lack[s] jurisdiction in a declaratory judgment case where the plaintiff [seeks] adjudication with respect to an affirmative defense.").

### 4. Unjust Enrichment and Restitution

Finally, in their fourth count, Plaintiffs allege that Telco's assessment of overdraft fees on their joint checking accounts constitutes unjust enrichment. (Doc. 11, ¶¶ 104–07.) In response, Telco argues that an unjust enrichment claim is not viable in this case because the Account Agreement defines the duties and obligations that exist between Plaintiffs and Telco. (Doc. 13 at 13–15.) "It has long been recognized in Alabama that the existence

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

4

of an express contract generally excludes an implied agreement relative to the same subject matter." *Vardaman v. Florence City Bd. Of Educ.,* 544 So.2d 962, 965 (Ala.1989). However, "the law may recognize an implied contract where the existence of an express contract on the same subject matter is not proven." *Kennedy v. Polar–BEK & Baker Wildwood Partnership,* 682 So.2d 443, 447 (Ala.1996).

**\*6** Plaintiffs contend that their unjust enrichment claim is pled in the alternative pursuant to Federal Rule of Civil Procedure 8(d). (Doc. 21 at 38.) Indeed, Plaintiffs' claims of breach of contract and unjust enrichment are inconsistent, and must necessarily be pled in the alternative. Although Plaintiffs' unjust enrichment claim in the Amended Complaint specifically refers to an Account Agreement, they likewise contend that any express contract is unconscionable. *See Sullivan v. Mazak Corp.,* 805 So.2d 674, 674 (Ala.2000) (See, J., concurring in part and dissenting in part) (emphasis added) ("A party cannot recover on a claim of unjust enrichment where there is an *enforceable* express contract between the parties concerning the same subject matter on which the unjust-enrichment claim rests."). While no affirmative claim of unconscionability exists under Alabama law, it has been used as a defense by plaintiffs to render a contract unenforceable. *See American General Finance, Inc. v. Branch,* 793 So.2d 738, (Ala.2000). Accordingly,

Telco's argument is premature and Plaintiffs have stated a claim for unjust enrichment in the Amended Complaint.

V. Conclusion

For the aforementioned reasons, Telco's Motion to Dismiss Plaintiffs' Amended Complaint is due to be GRANTED IN PART and DENIED IN PART. Plaintiffs have failed to state a claim for conversion and unconscionability. Therefore, Telco's motion to dismiss is due to be GRANTED as to the second and third counts. However, because Plaintiffs have stated a claim for unjust enrichment, Telco's motion to dismiss is due to be DENIED as to the fourth count. Further, although Plaintiffs have failed to state a claim of breach of contract based on a breach of the duty of good faith and fair dealing, they have alleged enough facts to support a claim of breach of contract based on a breach of the specific terms of the Account Agreement. Thus, Telco's motion to dismiss is due to be DENIED as to the first count, but Plaintiffs will be DIRECTED to amend their complaint for the limited purpose of asserting a breach of contract claim that is consistent with the specific theories they argue in their brief. A separate order consistent with this opinion will be entered.

All Citations

Not Reported in F.Supp.2d, 2013 WL 2106727

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works. 5

KeyCite Yellow Flag - Negative Treatment

Declined to Follow by Skaggs v. HSBC Bank USA, N.A., D.Hawai'i,
December 22, 2010

203 Or.App. 399

Court of Appeals of Oregon.

David Lee CAREY and Tanya Maria
Carey, husband and wife, Appellants,

v.

LINCOLN LOAN CO., an Oregon
corporation, Respondent.

9706–04753; A117696.
|
Argued and submitted June 27, 2005.
|
Decided Dec. 28, 2005.

**Synopsis**

**Background:** Installment land sale contract vendees
sought declaratory relief, challenging enforceability of
several provisions in contract which allegedly made it
impossible for them to sell the house. The trial granted
summary judgment for vendees, and vendor appealed.
The Court of Appeals, 165 Or.App. 657, 998 P.2d 724,
reversed. On remand, the Circuit Court, Multnomah
County, Henry Kantor, J, ruled against vendees, and they
appealed.

**Holdings:** The Court of Appeals, Brewer, C.J., held that:

[1] any flaw in constitutional amendment authorizing
Legislature to create Court of Appeals was cured by
subsequent amendment;

[2] vendees were entitled to seek relief under doctrine of
unconscionability;

[3] provision restricting vendees' right to assign contract
was unconscionable; and

[4] provision giving vendor power to impose limits on
prepayments of principal was unconscionable.

Reversed and remanded.

**Attorneys and Law Firms**

**\*\*816** John M. Berman, Tigard, argued the cause
for appellants. With him on the briefs was Damon J.
Petticord, Tigard.

Steven E. Benson argued the cause and filed the brief for
respondent.

Before LANDAU, Presiding Judge, and BREWER, Chief
Judge, [*] and ARMSTRONG, Judge.

[*]     Brewer, C.J., vice Richardson, S.J.

**Opinion**

BREWER, C.J.

**\*401** Plaintiffs David Lee Carey (David) and Tanya
Marie Carey (Tanya) brought this declaratory judgment
action to challenge the enforceability of several provisions
in a land sale contract by which they purchased a
house from defendant. They alleged that the **\*\*817**
provisions together make it impossible for them to sell the
house. The trial court originally ruled that the provisions
violated statutes that apply to loan agreements and that a
limitation on prepayment was an impermissible restraint
on alienation. We reversed that decision and remanded
for the trial court to decide plaintiffs' argument that the
provisions are unconscionable. *Carey v. Lincoln Loan Co.,*
165 Or.App. 657, 998 P.2d 724 (2000). On remand, the
trial court ruled against plaintiffs, and they appeal. We
reverse.

[1]     The first issue that we must resolve is defendant's
challenge to our jurisdiction over this or any other
case. [1] According to defendant, the only legitimate courts
are those named in Article VII (Original), section 1,
of the Oregon Constitution. [2] Because the legislature
does not have the constitutional authority to create
any additional court, including an intermediate court
of appeals, defendant argues, this court has no legal
existence. We first describe the facts that are relevant to
defendant's arguments and then discuss those arguments.
After explaining why we reject defendant's position, we
will turn to the facts that are relevant to the merits of the
appeal. [3]

1    Defendant first raised this issue before filing its brief by a motion to dismiss the appeal. We denied the motion by an order. Defendant raised the issue again in its brief. Because the issue affects our jurisdiction, defendant was entitled to renew its arguments in its brief and at oral argument without leave of the court. ORAP 7.15(3).

2    Those courts are the Supreme Court, circuit courts, county courts, municipal courts, and justices of the peace.

3    Defendant has also moved to dismiss the appeal as moot. It notes that plaintiffs have dissolved their marriage and that Tanya has filed a Chapter 13 bankruptcy proceeding, through which she was able to avoid the provisions in dispute and obtain the ability to sell the house. As plaintiffs point out, however, a substantial part of the claims against Tanya in the bankruptcy arise from this litigation and would lose their validity if plaintiffs are successful. The parties dispute whether that would benefit Tanya, but it appears to be at least possible that it would. The case, therefore, is not moot. We do not need to decide at this point what other claims either plaintiff retains.

**\*402** Article VII (Amended), section 1, of the Oregon Constitution (section 1), provides that the "judicial power of the state shall be vested in one supreme court and in such other courts as may from time to time be created by law." It thereby authorizes the legislature to create this and other courts inferior to the Supreme Court. However, before the adoption of Article VII (Amended) in 1910, Article VII (Original), section 1, vested the judicial power of the state in the courts that it specifically named, which did not include an intermediate court of appeals. Because the list of courts was exclusive, the legislature was without power to create additional courts. Section 1 removed the establishment of lower courts from the constitution and gave the authority to make that determination to the legislature. "[U]nder § 1 of Art VII, as amended in 1910, the Supreme Court is the only court created by the constitution itself; all other courts are to be created by legislative act." *State ex rel Madden v. Crawford,* 207 Or. 76, 82, 295 P.2d 174 (1956).[4] Article VII (Amended), section 2, retained the existing judicial system only until the legislature exercised its authority under section 1 to modify the system or create a new one. *Id.* at 82–83, 295 P.2d 174.

4    Although the people did not repeal Article VII (Original) when they adopted Article VII (Amended), most if not all of the original article has lost its constitutional status and is, in effect, a statute. Article VII (Amended), section 2, provides that the provisions of Article VII (Original) concerning the "courts, jurisdiction, and judicial system" are effective only "until otherwise provided by law." Those provisions, thus, are subject to legislative amendment or repeal at any time. *See, e.g., State ex rel Wenmark v. Hopkins,* 213 Or. 669, 678, 327 P.2d 784 (1958).

Defendant recognizes that, if section 1 is part of the constitution, it authorizes the legislature to create this court. Defendant argues, however, that none of Article VII (Amended) is part of the constitution because the procedures that led to its purported adoption did not comply with constitutional standards. The consequence, according to defendant, is that Article VII (Original) is the only valid constitutional provision governing the judiciary. Thus, the courts that Article VII (Original), section 1, names are the only **\*\*818** constitutionally permissible courts and the legislature had no authority to create this court.[5]

5    If defendant were correct, then the decisions of this court since its creation in 1969 would remain effective as those of a court *de facto. See State ex rel Madden,* 207 Or. at 89–90, 295 P.2d 174. We would, however, have to stop functioning as a court with regard to cases in which we have not yet issued an appellate judgment.

**\*403**  Defendant argues that the adoption of Article VII (Amended) was procedurally flawed in three separate ways, each of which involved a failure to comply with one of the requirements for amending the constitution, and that any one of those defects is sufficient to invalidate the entire amended article. Defendant asserts, first, that F.W. Benson, who was the elected Secretary of State and who, in 1910, acted in both that capacity and as Governor in canvassing the votes and proclaiming the adoption of Article VII (Amended), was legally neither the Governor nor the Secretary of State. Thus, according to defendant, there never was a legal proclamation of the adoption of Article VII (Amended). Or Const, Art XVII, § 1. Second, defendant asserts that the petitions that voters signed to place Article VII (Amended) on the ballot did not contain "the full text of the proposed \* \* \* amendment to the Constitution." Or Const, Art IV, §

Case 3:17-cv-00013    Document 25-17    Filed 03/24/17    Page 25 of 171 PageID #: 282

1(2)(d). Finally, defendant asserts that the ballot presented Article VII (Amended) to the people in a way that required voters to vote for or against the article in its entirety, thereby violating the requirement that voters be able to vote separately on separate amendments. Or Const, Art XVII, § 1; *see, e.g., Armatta v. Kitzhaber,* 327 Or. 250, 959 P.2d 49 (1998). We consider each of defendant's arguments in turn.

[2]    We begin with the information in the record concerning the status of the governorship in 1910. F.W. Benson was elected Secretary of State in 1906 for a four-year term that began in January 1907. In 1909, the Governor, George W. Chamberlain, was elected to the United States Senate and thereupon resigned the governorship. Under the constitution as it then stood, Benson became the Governor. After assuming that office, Benson also continued to act as the Secretary of State. Benson eventually became ill and temporarily turned over the duties of the governorship to the president of the state Senate. He did not resign as Governor, and he retained his position as Secretary of State. Benson later indicated that he intended to resume the duties of Governor, but there is no record that he formally did so. However, on December 3, 1910, Benson acted both as Secretary of State when he canvassed the votes given at the November election and as Governor when he signed the proclamation declaring the adoption of Article VII (Amended).

**\*404**  Those facts may raise a question about whether Benson had the authority of governor *de jure* on December 3, 1910, given the lack of any record that he formally reassumed the duties of that office. We do not, however, need to decide that issue. Benson became Governor in 1909 as the constitutional successor to Chamberlain. He never resigned the office but only turned its duties over to the president of the senate. He retained the title of Governor until his successor took the oath of office. In light of those facts, we conclude that Benson had a sufficient claim to the office when he proclaimed the adoption of Article VII (Amended) that, in doing so, he at least exercised the duties of governor *de facto.* Well before 1910, the Supreme Court had established that the actions of an officer *de facto* are valid as to the public and third persons and are not subject to collateral attack. *Hamlin v. Kassafer,* 15 Or. 456, 463–64, 15 P. 778 (1887); *see also State ex rel Madden,* 207 Or. at 89–90, 295 P.2d 174 (discussing acts of judge *de facto* ); *Holman et al. v. Lutz*

*et al.,* 132 Or. 185, 217–22, 284 P. 825 (1930) (Coshaw, J., concurring) (same).

[3]    Defendant also challenges Benson's status as Secretary of State, arguing that, when he became Governor he necessarily ceased being Secretary of State. *See State ex rel O'Hara v. Appling,* 215 Or. 303, 310–11, 334 P.2d 482 (1959) (taking oath as Governor constitutes implied resignation as Secretary of State). Defendant may be correct as to Benson's status *de jure.* However, the **\*\*819**  term for which Benson was elected Secretary of State had not expired, he continued to act in that office after becoming Governor, and no one had purported to appoint a replacement. Thus, Benson was at least Secretary of State *de facto,* and his actions in that capacity are valid as to third parties for the same reason that his actions in his status as Governor *de facto* were valid. Both Benson's canvassing of the votes as Secretary of State and his proclamation of the adoption of Article VII (Amended) as Governor, therefore, were valid and effective.

[4]    We next consider defendant's argument that the 1910 initiative petition that proposed the adoption of Article VII (Amended) did not contain the full text of the proposed amendment. There is no dispute that the petition included **\*405**  the full text of what became Article VII (Amended). Defendant argues, however, that it should also have included the text of the existing Article VII as well as an explanation of what portions of the existing article would remain in effect and how the amended version would relate to the existing version. By not including those items, according to defendant, the petitioners violated the constitutional requirement that the petition set out the complete text of the proposed amendment. In essence, defendant argues that the full text of a proposed amendment includes the text of all provisions that the amendment might affect, not simply the text of the provisions that it would expressly add or amend.

Current Article IV, section 1(2)(d), of the Oregon Constitution was adopted in 1968 to replace Article IV, section 1, which was in effect in 1910. Those sections require that a petition for an initiated measure "shall include the full text of the measures so proposed," *former* Or Const Art IV, § 1 (*repealed by* 1967 Legislative Assembly, HJR 16, approved by the voters May 28, 1968), or "shall include the full text of the proposed

law or amendment to the Constitution." Or Const Art IV, § 1(2)(d). We do not see any distinction between those requirements that is relevant to this case. In both provisions, the constitution requires that the petition contain the full text of the measure to be adopted. However, the constitution does not refer to or establish any requirements relating to the text of any provisions to be repealed outright rather than amended, nor does it require an explanation of how the proposed changes would function with existing unamended provisions. The limited case law on the constitutional full text provision does not suggest that it encompasses either of those types of requirements.

In *Schnell v. Appling,* 238 Or. 202, 395 P.2d 113 (1964), a proposed initiative contained the entire text of the statutory sections that it would amend, showing the text to be deleted or added, but referred to sections that the initiative would repeal or leave unchanged only by section number. The Supreme Court held that that was sufficient: "Since such matter is no part of the proposed law, it need not be made a part of the initiating petition." 238 Or. at 204–05, 395 P.2d 113. "The full-text requirement of our constitution means exactly what it **\*406** says. The petition must carry the exact language of the proposed measure. It need include nothing more." *Id.* at 205, 395 P.2d 113.[6] In *Kerr v. Bradbury,* 193 Or.App. 304, 89 P.3d 1227, *rev. allowed,* 337 Or. 282, 96 P.3d 347 (2004), we held that an initiative petition that contained only the amendatory material, but not the existing text of the statutes to be amended, failed to comply with the constitutional full text requirement.

[6]    Defendant argues that those statements were *dicta.* They are part of the Supreme Court's explanation for its decision in *Schnell.* Even if they are technically *dicta,* they are the best guide to the court's thinking on the issue before us, and they are consistent with the text of the constitution.

This case is like *Schnell* and unlike *Kerr.* The 1910 initiative petition contained the full text of the proposed amendment to the constitution. It replaced rather than modified the text of the existing constitutional provisions and, thus, did not raise the issue that we decided in *Kerr.* We see nothing in the constitutional wording or purpose that would require petitioners to include the full text of provisions that the measure expressly repeals. Defendant would go even further than that, apparently requiring petitioners to **\*\*820** include the text of existing

provisions that would be unchanged but that might be affected in some fashion and also to provide a legal opinion describing the effect of the amendment on the existing but unchanged provisions. Nothing in the constitution suggests such a requirement. The constitution required the petitioners to provide potential signers with the full text of the proposed amendment in the petition; the petitioners did so. The potential legal effect of the amendment on other provisions of the constitution could well provide reasons to support or oppose the proposal, but it was not something that the petition itself had to describe. Indeed, the effect of a constitutional amendment might be sufficiently uncertain that it would be an issue in the debate over the measure. The initiative petition did not violate *former* Article IV, section 1.

 **[5]**   **[6]**   **[7]**   Defendant's most substantial argument against the validity of Article VII (Amended), section 1, is that its adoption violated the requirement of Article XVII, section 1, that, "[w]hen two or more amendments shall be submitted * * * to the voters of this state at the same election, they shall be so submitted that each amendment shall be voted on **\*407** separately." Defendant relies on the test for determining compliance with Article XVII, section 1, that the Supreme Court established in *Armatta:*

> "[T]he proper inquiry is to determine whether, if adopted, the proposal would make two or more changes to the constitution that are substantive and that are not closely related. If the proposal would effect two or more changes that are substantive and not closely related, the proposal violates the separate-vote requirement of Article XVII, section 1, because it would prevent the voters from expressing their opinions as to each proposed change separately."

*Armatta,* 327 Or. at 277, 959 P.2d 49. In applying that test the court looks at both the explicit and implicit changes that the proposed amendment would make to the constitution. *Id.* at 278, 959 P.2d 49; *Lehman v. Bradbury,* 333 Or. 231, 242–43, 37 P.3d 989 (2002).

Defendant identifies a number of ways in which, it believes, Article VII (Amended) violates Article XVII, section 1, under the *Armatta* test. Among other things,

Case 3:17-cv-00013   Document 25-17   Filed 03/24/17   Page 27 of 171 PageID #: 284

the amended article deleted from the constitution all references to courts other than the Supreme Court, as well as all references to the qualifications of judges. It also omitted the original article's description of the selection and duties of county and judicial clerks, sheriffs, and prosecuting attorneys. The amended article changed the standard of judicial review of jury verdicts, abolishing the previous authority to set aside a verdict on the ground that it was excessive or contrary to the clear weight of the evidence and substituting instead an "any evidence" standard of review. *See Van Lom v. Schneiderman,* 187 Or. 89, 98–99, 112, 210 P.2d 461 (1949). It also permitted criminal defendants to appeal convictions without fear of being found guilty, after a reversal, of a greater offense than the one being appealed. Those and other explicit and implicit modifications to the constitution as it existed before the 1910 amendment show, according to defendant, that Article VII (Amended) made two or more changes to the constitution that were both substantive and not closely related.

[8]  Defendant directs its argument solely at Article VII (Amended) as it was when the people adopted it in 1910. However, that article has itself been amended a number of times since its adoption in 1910. Because those amendments **\*408** may affect the present validity of the provisions at issue in defendant's motion to dismiss, we must take them into account in considering defendant's arguments. The issue before us is not whether defendant's challenge would have succeeded in 1910 but whether it will succeed today. That is a consideration that did not arise in other recent cases applying the separate vote requirement of Article XVII, section 1. In those cases, the challenges were to recently adopted constitutional amendments that were unchanged since their adoption.[7] In this **\*\*821** case, however, defendant challenges an amendment that has been in effect for 95 years and that has itself been amended on a number of occasions.[8] Each of those amendments was based on the premise that Article VII (Amended) is a valid part of the constitution and thus could be the subject of an amendment or repeal. We first consider, therefore, whether any of those amendments validated the portions of Article VII (Amended) that are relevant to the issue before us.

[7]  In *Lehman,* the Supreme Court held that a constitutional amendment adopted in 1992 that established term limits for state legislators and members of Congress violated the separate vote

provision of Article XVII, section 1. Although the challenged amendment was over nine years old at the time of the decision, it had only recently begun to affect legislators and thus, had only recently become ripe for a challenge. There had been no changes to the amendment since its adoption, and thus there was no basis for considering the effect of a later amendment on the original provision.

[8]  As adopted, Article VII (Amended) consisted of sections 1 through 7. In 1974 and 1996 the people amended section 3.1973 Legislative Assembly, HJR 71, approved by the voters Nov 5, 1974; 1995 Legislative Assembly, HJR 47, approved by the voters May 21, 1996. In 1958, they amended section 5.1957 Legislative Assembly, SJR 23, approved by the voters Nov 4, 1958. In 1974, they repealed the amended section 5 and replaced it with the current section 5.1973 Legislative Assembly, SJR 1, approved by the voters Nov 5, 1974. In 1960, they added section 1a. 1959 Legislative Assembly, SJR 3, approved by the voters Nov 8, 1960. In 1958, they added section 2a. 1958 Legislative Assembly, SJR 30, approved by the voters Nov 4, 1958. In 1962, they added section 2b. 1961 Legislative Assembly, SJR 34, approved by the voters Nov 6, 1962. In 1968, they added section 8 and amended it in 1976. 1967 Legislative Assembly, SJR 9, approved by the voters Nov 5, 1968; 1975 Legislative Assembly, SJR 48, approved by the voters May 25, 1976. In 1972, they added section 9.1971 Legislative Assembly, SJR 17, approved by the voters Nov 7, 1972.

The most significant amendment to Article VII (Amended) for the purposes of this case, and the one on which we will focus, was the adoption in 1962 of Article VII (Amended), section 2b (section 2b). That section is based on **\*409** and explicitly recognizes the authority of the legislature to create courts inferior to the Supreme Court. For the reasons that we discuss below, we conclude that it validated the grant of authority in section 1. Thus, even if the adoption of Article VII (Amended) was originally flawed—an issue that we do not decide—that portion of it is now firmly established against a challenge based on Article XVII, section 1. Because that conclusion resolves the issue before us on defendant's motion to dismiss, we do not need to consider the procedural validity of other portions of Article VII (Amended).

Section 2b arose, in part, from problems that the legislature encountered in exercising its authority under section 1 to create courts inferior to the Supreme Court. The legislature began exercising that authority in 1913,

WESTLAW © 2019 Thomson Reuters. No claim to original U.S. Government Works.

when it created a district court with jurisdiction limited to the City of Portland, giving Multnomah County the authority to extend that jurisdiction to the rest of the county. Or. Laws 1913, ch. 355. From that beginning, the legislature gradually established district courts in other counties; by 1961 there were district courts in 18 counties, including Multnomah, and the legislature had provided for the creation of district courts in three more counties by 1967. Reviser's notes to *former* ORS 46.020 (1961 replacement part) and *former* ORS 46.025 (1961 replacement part). District courts were courts of limited jurisdiction that primarily handled relatively minor cases, such as misdemeanors and civil cases involving relatively small amounts of money. They were inferior to the circuit courts and, where they existed, freed the circuit courts to focus on more significant cases.

The legislature intended to create district courts in specific counties and not in others. In order to do so after 1913, however, it had to comply with Article IV, section 23, of the Oregon Constitution, which prohibits special or local laws regulating the practice in courts of justice. In 1914, the Supreme Court interpreted that provision to prohibit naming the county involved in a legislative change to the judicial system of a particular county. *In re McCormick's Estate,* 72 Or. 608, 143 P. 915, *on reh'g,* 72 Or. 608, 144 P. 425 (1914). In order to satisfy that interpretation, the legislature described those counties where it wanted to establish district courts by population rather than by directly naming each county. As a result, by **\*410** 1961 the statutes provided for district courts, for example, in "[e]ach city having a population of 10,000 or more which is the county seat of a county having a population of 20,000 or more and **\*\*822** less than 24,000," *former* ORS 46.025(a) (1961 replacement part), and "[e]ach city which is the county seat of a county having a population of 13,000 or more and less than 16,000." *Former* ORS 46.025(c) (1961 replacement part). In using that method to identify a specific county or counties, the legislature created a scheme that was both inherently complex and subject to change by a new census.

To avoid those problems, as well as other problems that affected different courts, the 1961 legislature proposed adding section 2b to Article VII (Amended); the people approved the new section at the 1962 general election. In proposing section 2b, the legislature manifested its belief that all of Article VII (Amended), including section 1, was valid and that section 1 gave the legislature the

authority to create inferior courts. The enacting clause for the amendment provided that the "Constitution of the State of Oregon is amended by creating a new section to be added to and made part of Article VII (Amended)," a provision that is necessarily based on that premise. The body of section 2b provides:

> "Notwithstanding the provisions of section 23, Article IV of this Constitution, laws creating courts inferior to the Supreme Court or prescribing and defining the jurisdiction of such courts or the manner in which such jurisdiction may be exercised, may be made applicable:
>
> "(1) To all judicial districts or other subdivisions of this state; or
>
> "(2) To designated classes of judicial districts or other subdivisions; or
>
> "(3) To particular judicial districts or other subdivisions."

Both the explanation of the proposal in the voters' pamphlet and the argument of the legislative committee in favor [9] referred to the difficulty of writing general laws relying **\*411** on population that would respond to the different circumstances in different parts of the state. The statement explained:

[9]        There were no arguments in opposition.

> "Section 23 of Article IV * * * has been construed by the Supreme Court of Oregon to prohibit the Legislature from changing judicial practices or procedures in any particular county by name, and to require any such change to be made by a general law applicable to all counties in the state, or to all counties of a given class such as those having a population within stated limits. For example, if a particular county, for reasons peculiar to it, desires to have probate or juvenile jurisdiction transferred from the county court to the circuit court * * * the transfer could be accomplished only by a law applicable to all counties of the same general class, even though other counties in the same class may not desire the change. This rule has made it impossible in some instances to make changes desired by a particular county merely because the change was not wanted by another county in the same population class."

Case 3:17-cv-00013 Document 25-17 Filed 03/24/17 Page 29 of 171 PageID #: 286

"The present rule has also produced some unintended results. Classifications under section 23 of Article IV have been based, either wholly or partly, on population. Consequently, a change in the population of a particular county may automatically take that county out of its former class and place it in another without any change in the law itself. That happened recently as a result of the 1960 census when Clackamas County by an increase in population was placed in the same class as Marion County, although no one had proposed the change."

Official Voters' Pamphlet, General Election, Nov 6, 1962, Explanation of Measure No. 5. The legislative committee's argument in favor made similar points. *Id.,* Argument in Favor of Measure No. 5.

Section 2b applies to "laws creating courts inferior to the Supreme Court or prescribing and defining the jurisdiction of such courts or the manner in which such jurisdiction may be exercised[.]" It does not purport to give the legislature the authority to create inferior courts but, rather, assumes that section 1 gave it that authority. Without that assumption, section 2b would be meaningless. The question is whether the adoption of section 2b thereby cured any possible defects in the **\*\*823** adoption of section 1 that arose from a violation **\*412** of Article XVII, section 1. We have not found any cases specifically dealing with constitutional amendments that rely on defective existing constitutional provisions. However, the majority of courts hold that, if an amendment to an unconstitutional statute makes the statute as a whole constitutional, the amendment will be effective and the statute as a whole will be enforceable. Norman J. Singer, 1A *Sutherland Statutory Construction* § 22.4 at 254–56 (6th ed 2002 rev). "Amendment offers a convenient method of curing a defect in an unconstitutional act." *Id.* at 256.

More directly relevant to this issue is the doctrine of the implied validation of an unconstitutional statute by the subsequent adoption of a constitutional amendment. *Beck v. Beck,* 814 S.W.2d 745 (Texas 1991), provides a relatively recent example of the use of that doctrine. In *Beck,* the Texas courts had previously declared that a statute that authorized certain prenuptial agreements was invalid under the state constitution. The legislature proposed, and the people adopted, a constitutional amendment under which those agreements would be valid. The amendment did not expressly refer to the existing statute or to existing

agreements, but the Texas Supreme Court held that the amendment validated the statute and thereby validated the agreement at issue in the case. In doing so, the court described the doctrine of implied validation as providing that a constitutional amendment will impliedly validate an existing act that, without the amendment, would be beyond the legislature's power to enact, so long as the validation does not impair either the obligation of a contract or vested rights. *Id.* at 747–78. It is unnecessary for the amendment to refer to the statute being validated, although in *Beck* the legislative history persuaded the court that the legislature intended to cure the statute and validate existing agreements. *Id.* at 748. What matters is the effect of the new provision; if the existing statute would be valid under the new provision, that provision validates it.

The relevant Oregon case law, although limited, is consistent with this doctrine. In *Nottage v. City of Portland,* 35 Or. 539, 58 P. 883 (1899), the plaintiff sought to recover money that it had paid for a city street assessment on the ground that the assessment was procedurally defective. The **\*413** city defended by pointing out a provision in its amended charter, which the legislature had adopted the previous year, that authorized the city to bring an action to recover an assessment that had been adjudged invalid for any reason. The Supreme Court treated the provision as being intended to validate the assessment at issue and held that the provision was available to the city as a defense against the plaintiff's action. In doing so, the court noted that statutes designed to overcome irregularities or defects in procedures for street improvements were common and that the courts regard them with favor so long as they do not impair vested rights or take property without due process of law. *Id.* at 547–48, 58 P. 883. It is unnecessary for the later act expressly to validate the actions or legalize the irregularities; "defects of this character may be cured by implication." *Id.* at 556, 58 P. 883.

Two other cases apply similar principles to statutes that were invalid solely because of procedural defects in the method of their adoption and thus provide direct guidance for this case. In *Wrought–Iron Range Co. v. Carver,* 118 N.C. 328, 24 S.E. 352 (1896), the North Carolina legislature passed a tax bill, the governor signed it, and the secretary of state included it among the statutes adopted at the legislative session. However, it later appeared that the president of the senate and the speaker of the house had

failed to sign the bill, as the state constitution required. When the defendant sheriff attempted to collect the tax, the plaintiff challenged its validity. The North Carolina Supreme Court held that the tax was valid, despite the procedural defect, because a properly adopted act of the same legislative session expressly referred to the tax and treated it as effective. The court relied on a Kansas case, *Commissioners v. Higginbotham,* 17 Kan. 62 (1876), in which the president of the state senate failed to sign an 1865 act. Subsequent acts in 1866 and 1867 referred to the **824 1865 legislation and treated it as the law; the Kansas court therefore held that the 1865 act was valid. The North Carolina court agreed with the reasoning of the Kansas court and held that the reference to the defective act in a subsequent act of the same session constituted a validation of the defective law. *Wrought–Iron Range Co.,* 118 N.C. 328, 24 S.E. at 355–56. In both cases, no one had challenged the defective act before the adoption of the statutes that acted as validations.

[9]  [10]  *414 In both *Wrought–Iron Range Co.* and *Higginbotham,* the state legislature neither expressly intended to ratify the defective act nor even knew that there was a defect. The acts themselves did not contain any ratifying provisions. Rather, in each case the legislature manifested the belief that the previous act was valid and adopted an additional act based on that belief. The courts held that, despite the legislature's ignorance of the situation, its subsequent action constituted an implied validation of the defective act. Both cases thus apply principles comparable to the doctrine of implied validation to a context that is arguably similar to the one before us. Their reasoning is consistent with Oregon law and is as applicable to procedurally defective constitutional provisions as to procedurally defective statutes. Under that reasoning, when there is a procedural defect in a statute, and when the legislature thereafter adopts additional legislation that is necessarily based on the premise that the statute is valid, the additional legislation will validate the procedurally defective statute. In the same way, when a constitutional amendment has a procedural defect and a later amendment is based on the premise that the original amendment is valid, the later amendment will overcome the effect of the procedural defect. It is irrelevant whether those who propose and approve the later amendment know of the defect or intend to correct it; it is sufficient that they adopt the second amendment based on the premise that the original

amendment is valid. If they do so, they will thereby implicitly validate the original amendment.

In this case, section 1 had been in effect for more than 50 years before the legislature proposed and the people adopted section 2b, and no one had challenged its validity on procedural—or, so far as we can tell, any other—grounds. The legislature and the people both acted on the premise that section 1 authorized the legislature to create whatever courts inferior to the Supreme Court that it believed to be appropriate. One of the problems that section 2b resolved—the legislature's inability to create inferior courts by specifically naming counties—could be a problem only if the legislature had the authority to create such courts in the first place. Section 2b is meaningless unless section 1 is a valid part of the constitution. In adopting section 2b, the people impliedly validated the portion of section 1 that authorizes the legislature *415 to create inferior courts. If section 2b is itself valid, it validated any violation of Article XVII, section 1, that might have occurred in the adoption of section 1.

[11]  The remaining question is whether section 2b itself satisfied the separate vote requirement. It is clear that it did. Even assuming that the adoption of section 2b made two or more substantive changes to the constitution, those changes are closely related to each other and to section 1. Section 1 authorizes the legislature to enact laws creating courts inferior to the Supreme Court, and by necessary implication, laws defining the jurisdiction of those courts and the manner in which such jurisdiction may be exercised. Section 2b states that those laws need not be made applicable statewide but, instead, may be made applicable only to particular judicial districts or to certain classes of judicial districts. Thus, there is a strong logical connection between the provisions of section 2b and section 1 in that section 2b describes the manner in which the authority granted in section 1 may be carried out. The sections are also logically connected in that section 2b assumes the existence of section 1 and depends on it for its existence. As a result, the voters could not logically have adopted section 2b without implicitly accepting the validity of the relevant portions of section 1. Because of those essential logical connections, the provisions of section 2b are closely related to each other and to section 1, and the adoption of section 2b validates section 1.

WESTLAW © 2013 Thomson Reuters. No claim to original U.S. Government Works.

**\*\*825** We turn at last to the facts of this case. [10] For many years defendant has owned houses in Portland and rented them to tenants. In 1985, one of defendant's owners, Fred Benson, died in a car crash. Its remaining owner, Harry Benson, a lawyer, was ill and wanted to retire. He was also concerned about maintaining an adequate income flow for his wife if he should die. At least in part for those reasons, in 1987 defendant began selling houses on contract; there is **\*416** some suggestion in the record that defendant chose to sell those houses that were in the poorest repair. At the same time, plaintiffs, who had been married less than a year and were living in a small apartment, were interested in a larger residence in order to have a place for a family. Their options for housing were limited because David was working only 25 hours a week as a school bus driver and Tanya was unemployed. Among the houses that defendant wanted to sell was a house near where David's parents lived. That house had been vacant for several years, with only vagrants living in it, and it had deteriorated to a deplorable condition. Among other things, the house leaked from many locations and was filled with trash, diapers, needles, and drug paraphernalia. Plaintiffs did not know the details of the condition of the house, but they knew that it had serious problems.

[10]  In a declaratory judgment action, our standard of review of the facts depends on whether the action is equitable or legal in nature. <em>Ken Leahy Construction, Inc. v. Cascade General, Inc.,</em> 329 Or. 566, 571, 994 P.2d 112 (1999). Based on the supplemental relief that plaintiffs seek, this case is more likely equitable than legal. However, the trial court found that both parties had proved the facts that they described in their trial memoranda, and on <em>de novo</em> review we would agree. We therefore do not need to decide the underlying nature of this case. The facts that we describe are consistent with those that we described in our previous decision. <em>Carey,</em> 165 Or.App. at 659–62, 998 P.2d 724.

On May 20, 1987, plaintiffs and David's parents went to defendant's office, where Benson agreed to rent the house to them for three years with an option to purchase it within that period for $17,950. The lease expressly stated that the house had deficiencies and that plaintiffs accepted it as is. Plaintiffs agreed in the lease to make the house habitable. Plaintiffs and Benson also agreed orally that plaintiffs would perform any necessary maintenance on the house. For plaintiffs, the lease-option provided an opportunity to obtain housing by their own efforts that they could not

otherwise have afforded. During the three years that they rented the house, plaintiffs and David's parents worked to rehabilitate it, while plaintiffs and their growing family lived in it. During that period, David also obtained better-paying employment.

At the end of the term of the lease, Benson asked plaintiffs to exercise their option to purchase. They did so on June 14, 1990, purchasing the property by a land sale contract for a price that included some credit for the rent that they had paid. Benson prepared the contract, using a printed form but adding substantial material of his own. The crucial provisions are:

> "This agreement is personal by and between the parties hereto *and cannot be sold, assigned or hypothecated without written consent of first party [defendant].*

> **\*417** "The purchase price of $16,793.06 to be paid in monthly installments of not less than $225/mo including interest at the rate of twelve per cent per annum on the unpaid principal balance, said payments to be made on or before the 30th of each and every month beginning with the month of June, 1990 and continuing until the sum of $16,793.06 together with interest thereon has been paid in full.

> "In addition to be [*sic* ] above monthly payments, second party [plaintiffs] shall pay taxes and insurance premiums, estimated at this time of [*sic* ] amount to $44.00 per mo[nth], said payment to be adjusted as taxes and insurance premiums increase or decrease.

> "*Second party shall not pay more than $2,000.00 on the unpaid principal balance during any one calendar year.*"

(Emphasis added.) The material that Benson added to the form contract includes the emphasized provisions. Before plaintiffs signed the contract, Benson read it to them, but he did not discuss those provisions or **\*\*826** describe their effect on plaintiffs' ability to sell the house. Plaintiffs had no experience in real estate transactions and did not understand those things.

After purchasing the house, plaintiffs continued to make repairs, financing some of the work with mortgage loans from defendant and from the Portland Development Commission. Much of that work was necessary for the house to meet required habitability standards. During this period, David's employment situation and plaintiffs' finances improved. In 1996, plaintiffs decided to sell

the house and listed it with a realtor who specialized in lower-priced homes directed toward first-time buyers. That realtor reviewed the contract and identified the emphasized provisions as potential problems in selling the house. He found in practice that the provision restricting prepayment made it almost impossible to find interested buyers. Potential purchasers did not want to become responsible for the contract and its terms; some lost interest as soon as they learned that defendant was involved. In any case, financing was difficult or impossible to obtain for a purchase that involved accepting an assignment of the contract.

 **\*418** Despite these problems, plaintiffs' realtor was able to obtain a buyer in December; he testified that he could have sold the house to several other potential purchasers if it were not for the provisions at issue. However, the buyer who agreed to the purchase, like the others potentially interested, insisted that he be able to acquire the house free of defendant's interest. The realtor and plaintiffs attempted to get defendant to waive the limitations. Defendant agreed to do so only in return for a payment that included an additional $13,000 as consideration for the waiver. That amount was essentially equal to plaintiffs' equity in the house. It is not clear from the record how defendant arrived at the $13,000 figure; it does not assert that it did so by considering either the tax consequences of early payment, the loss of planned cash flow, or the need to ensure that the purchaser was financially responsible. Because of their inability to pay off the contract, plaintiffs were unable to complete the proposed sale or any other. As a result, they brought this declaratory judgment action attacking the validity of the contractual terms limiting payments on principal and requiring consent to an assignment. Among other things, they asked the court to determine the amount necessary to pay defendant in full and to declare that plaintiffs could pay that entire balance and receive title free of any interest of defendant's.

The trial court originally granted summary judgment to plaintiffs, holding that the provisions were void because defendant had not complied with the requirements of ORS 82.170 for loan agreements and because they constituted an unreasonable restraint on alienation. It did not rule on plaintiffs' assertion that the provisions were unconscionable. On appeal, we reversed. *Carey,* 165 Or.App. at 672, 998 P.2d 724. We held that the provisions neither came within the regulation of loan agreements in

ORS 82.170 nor violated common-law rules prohibiting unreasonable restraints on the alienation of land. In considering plaintiffs' argument that the provisions constituted an unreasonable restraint on alienation, we balanced the justification for the restraint against the amount of restraint that the provisions, separately or together, actually imposed. *Carey,* 165 Or.App. at 668, 998 P.2d 724. In doing so, we necessarily evaluated the provisions on their face rather than in the **\*419** context of the parties' situations; the question before us was whether the clauses were void in all circumstances.

We began our discussion of the unreasonable restraint issue with the provision that plaintiffs "shall not pay more than $2,000 on the unpaid principal balance during any one calendar year." [11] We stated that the justification for that restriction is to provide the vendor a fixed cash flow that would include **\*\*827** interest and minimize capital gains taxation. [12] We noted that the restriction could apply for as few as nine years [13] if plaintiffs made the maximum permitted payments and that, even during that period, plaintiffs could assign the contract and defendant could not unreasonably withhold consent to the assignment. The balance, therefore, favored the enforceability of the provision. 165 Or.App. at 668–69, 998 P.2d 724.

[11]    Defendant construes the provision to limit additional principal payments to an amount equal to $2,000 less the principal portion of plaintiffs' regular contractual payments. Defendant does not discuss how that construction meshes with the fact that, at least during the last calendar year under the contract, the required contract payments by themselves would include payments on principal greater than $2,000.

[12]    The evidence at trial indicates that that was defendant's expressed reason for including the clause in the contract. However, the evidence also indicates that it is questionable whether defendant would have capital gains tax liability on this house at the price at which it sold it to plaintiffs.

[13]    We apparently calculated that period by dividing the original loan amount by $2,000. However, if plaintiffs would not have to reduce the contractually required payments to avoid paying more than $2,000 a year on principal, *see* 203 Or.App. at 419, 125 P.3d at 826, n. 11, it would be theoretically possible to pay off the loan in fewer than eight years.

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.
10

We then turned to the provision that the contract "cannot be sold, assigned or hypothecated without written consent of first party." We noted that the justification for that provision was to protect defendant's interest in preventing the sale of the property to an irresponsible or insolvent third party. We recognized the rule that the parties to a contract must perform it in good faith in order to effectuate the reasonable expectations of the parties. In this context, we held, the good faith requirement meant that the provision did not give defendant an arbitrary right to refuse consent. In *Pacific First Bank v. New Morgan Park Corp.,* 319 Or. 342, 876 P.2d 761 (1994), the Supreme Court had applied the good faith rule to the assignment of a lease that contained a **\*420** restriction on assignment that was absolute in its terms. Because of the good faith requirement, the court held, there "is engrafted on this language by implication the phrase 'which consent shall not be unreasonably withheld.'" *Carey,* 165 Or.App. at 670, 998 P.2d 724, (quoting *Pacific First Bank,* 319 Or. at 353, 876 P.2d 761) (internal quotation marks omitted). We held that the same phrase is also engrafted on a consent to assignment clause in a land sale contract and that, with that addition, the provision was valid and enforceable. *Carey,* 165 Or.App. at 670–71, 998 P.2d 724. Finally, we concluded that the two provisions together were not unreasonable restraints on alienation, primarily because the limited restriction on assignment meant that plaintiffs could sell the house subject to the contract even if they could not fully pay off the contract as part of doing so. *Id.* at 671, 998 P.2d 724. Based on those conclusions, we remanded the case to the trial court for it to consider plaintiffs' arguments that the provisions are unconscionable. *Id.*

On remand, the court concluded, after a trial, that plaintiffs had not shown that the provisions were unconscionable and entered the judgment for defendant from which plaintiffs appeal. The court first concluded, relying on our decision in *Rosboro Lumber Co. v. EBI,* 65 Or.App. 679, 682, 672 P.2d 1336 (1983), *rev'd on other grounds,* 297 Or. 81, 680 P.2d 386 (1984), that unconscionability cannot be a basis for affirmative relief, which is what it believed plaintiffs were seeking. It then stated that, if it were to reach the issue, the relevant factors ultimately, but barely, weighed in favor of concluding that the clauses in question are not so unconscionable as to be unenforceable as a matter of law. We first discuss Oregon law concerning unconscionable contractual provisions, then explain why it was appropriate for plaintiffs to rely

on that law in this case, and finally conclude, on the merits, that the provisions as written are unconscionable and that we must limit their application in order for them to be enforceable.

Oregon courts have recognized their power to refuse to enforce unconscionable contracts since the nineteenth century. *See Caples v. Steel,* 7 Or. 491 (1879) (court may refuse specific performance if bargain is unconscionable); *Balfour v. Davis,* 14 Or. 47, 12 P. 89 (1886) (refusing to award attorney **\*421** fees because amount specified in contract was unconscionable). Since the adoption of the Uniform Commercial Code, the courts have relied on ORS 72.3020 and, later, *Restatement (Second) of Contracts* § 208 as providing the standard for determining whether a contractual provision is unconscionable. Although **\*\*828** the statute applies directly only to contracts for the sale of goods, it influenced the subsequent *Restatement,* which generally follows it. *See, e.g., W.L. May Co. v. Philco–Ford Corp.,* 273 Or. 701, 543 P.2d 283 (1975) (sale of goods); *Best v. U.S. National Bank,* 78 Or.App. 1, 10, 714 P.2d 1049 (1986), *aff'd on other grounds,* 303 Or. 557, 739 P.2d 554 (1987) (*Restatement* § 208 follows the UCC, and the UCC is generally influential in nonsales cases). ORS 72.3020 provides:

"(1) If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.

"(2) When it is claimed or appears to the court that the contract or any clause thereof may be unconscionable the parties shall be afforded a reasonable opportunity to present evidence as to its commercial setting, purpose and effect to aid the court in making the determination."

*Restatement* § 208 provides:

"If a contract or term thereof is unconscionable at the time the contract is made a court may refuse to enforce the contract, or may enforce the remainder of the contract without the unconscionable term, or may so limit the application

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works. 11

of any unconscionable term as to avoid any unconscionable result."

The terms of the statute and *Restatement* focus on providing a procedure for resolving unconscionability issues rather than providing direct guidance about whether a particular provision is unconscionable. However, the commentaries give some help on that point. The official commentary to UCC § 2–302, which is ORS 72.3020, states that

**\*422** "[t]he basic test is whether, in the light of the general commercial background and the commercial needs of the particular trade or case, the clauses involved are so one-sided as to be unconscionable under the circumstances existing at the time of the making of the contract. * * * The principle is one of the prevention of oppression and unfair surprise * * * and not of disturbance of allocation of risks because of superior bargaining power."

*Quoted* in *W.L. May,* 273 Or. at 707, 543 P.2d 283 (court's emphasis deleted). The commentary to the *Restatement* explains:

> "The determination that a contract or term is or is not unconscionable is made in the light of its setting, purpose and effect. Relevant factors include weaknesses in the contracting process like those involved in more specific rules as to contractual capacity, fraud, and other invalidating causes; the policy also overlaps with rules which render particular bargains or terms unenforceable on grounds of public policy."

*Restatement* at § 208 comment a. Other considerations include

> "gross inequality of bargaining power, together with terms unreasonably favorable to the stronger party, [which] may confirm indications that the transaction involved elements of deception or compulsion, or may show that the weaker party had no meaningful

choice, no real alternative, or did not in fact assent or appear to assent to the unfair terms."

*Id.* at 208, 543 P.2d 283 comment d. Oregon cases generally focus on the procedural issues, *see Best v. U.S. National Bank,* 303 Or. 557, 560, 739 P.2d 554 (1987), or involve provisions that the courts conclude are not unconscionable. *See Meyer v. Kesterson,* 151 Or.App. 378, 394, 950 P.2d 896 (1997), *rev. den,* 327 Or. 123, 966 P.2d 216 (1998).

**[12]** **[13]** It is not surprising that attempts to describe unconscionability lack precision; the concept is designed to cover a wide variety of situations. The primary focus, however, appears to be relatively clear: substantial disparity in bargaining power combined with terms that are unreasonably favorable to the party with the greater power may result in a contract or contractual provision being unconscionable. Unconscionability may involve deception, compulsion, or lack **\*423** of genuine consent, although usually not to the extent that would justify rescission under the principles applicable to that remedy. The substantive fairness of the challenged terms is always an essential issue.

**\*\*829** **[14]** Like the determination of unconscionability, the remedy for unconscionable contractual terms is flexible. Although one remedy under ORS 72.3020 and the *Restatement* is to refuse to enforce the contract, those authorities also permit the court to excise the unconscionable provision or to limit its applicability so that it is no longer unconscionable. The court can thereby keep the overall contract in effect and achieve the purposes of the parties in a fashion that is not unconscionable. It can thus provide the weaker party the benefit that it thought it would obtain when it agreed to the contract.

**[15]** Before discussing how those principles apply to the challenged provisions, we first consider the trial court's conclusion that plaintiffs were seeking to use the doctrine of unconscionability to obtain affirmative relief rather than as a defense and that their doing so was improper. The court relied on our decision in *Rosboro,* which we explained further in our decision in *Best.* In *Rosboro,* the plaintiff asserted a claim for relief for unconscionable conduct; it did not seek the remedies that the statute and *Restatement* provide if all or part of a contract is unconscionable. We rejected that attempt to make unconscionability an independent claim for

damages. We pointed out that *Restatement* § 208 permits a court to refuse to enforce an unconscionable contract, to enforce it without the unconscionable term, or to limit the application of the unconscionable term to avoid an unconscionable result. We could find no authority for holding that "an affirmative claim for damages may be maintained when unconscionability permeates a contract," and therefore concluded that, "although unconscionability may be a defense to the enforceability of a contract, it is not a basis for affirmative relief." *Rosboro,* 65 Or.App. at 682, 672 P.2d 1336. Our holding, thus, was that unconscionability is not a basis for a separate claim for relief.

In *Best,* we expanded on *Rosboro.* In *Best,* the plaintiffs asserted that the amounts that the defendant bank charged for nonsufficient funds checks were unconscionably **\*424** excessive. Based on that allegation, the plaintiffs sought restitution of the excessive charges. The trial court ruled, relying on *Rosboro,* that unconscionability could not be the basis for affirmative relief, and we affirmed that decision. In *Best,* we agreed with the trial court that the plaintiffs could not obtain restitution on that ground, citing a number of cases in support, 78 Or.App. at 10–13, 714 P.2d 1049, and concluded that "unconscionability is not a basis for affirmative relief[.]" *Id.* at 13, 714 P.2d 1049. On review, the Supreme Court pointed out that we had erred in considering the issue at all. The contract between the plaintiffs and the defendant bank did not include the amount that the bank would charge for NSF checks but simply noted that their accounts were subject to the bank's service charges. Thus, there was no basis for concluding that the contract was unconscionable at the time it was made, which is the proper time to evaluate it. *Best,* 303 Or. at 560–61, 739 P.2d 554. Because of its disposition of the issue, the court expressly refused to express an opinion on our conclusion that unconscionability cannot be the basis for affirmative relief. *Id.* at 561 n. 3, 739 P.2d 554.

The significant difference between *Rosboro* and *Best,* on the one hand, and this case, on the other, is that plaintiffs in this case do not seek to recover damages or otherwise obtain affirmative relief except under the contract itself. Both ORS 72.3020 and *Restatement* § 208 authorize the court to refuse to enforce an unconscionable contract, to delete the unconscionable provisions, or to limit the application of those provisions. If the court deletes or limits the unconscionable provisions, it can then enforce the contract in a way that is not unconscionable. It is

true that a deletion or limitation may give the previously disadvantaged party new rights *under the contract,* such as a claim for breach of contract that the party did not previously have. That claim for breach does not permit the plaintiff to recover separate damages for unconscionable conduct; rather, it simply permits the plaintiff to enforce the contract as altered so that it is no longer unconscionable. It is not the kind of affirmative relief that concerned us in *Rosboro* and *Best.* Rather, if we conclude in this case that the challenged provisions are unconscionable **\*425** and therefore alter them, plaintiffs may be able to assert contractual claims that would not have **\*\*830** previously existed. In doing so, they will not be claiming affirmative relief for defendant's imposition of unconscionable provisions on them; they will be asserting only the rights that the contract gives them. The trial court erred in ruling for defendant on this ground.

The final issue is whether the challenged provisions are, as a matter of law, unconscionable. That requires us to consider the conditions under which plaintiffs and defendant entered into the contract to purchase the house and the purpose of the provision in that context. The house was one of a number that defendant wanted to get off its hands. After years of neglect, finding a tenant, and then a purchaser, who would invest substantial effort into rehabilitating the house was probably the best way for defendant to get value from it. The low price for which defendant sold the house was a sign of its deteriorated condition. There is no reason to believe that the house was worth more than the price that defendant asked for it.

At the time of the contract, plaintiffs had lived in the house for three years as renters, during which they had worked to make it habitable, although there was still much to do. They had no other apparent choice for adequate housing for their family. Their need to purchase was far greater than defendant's need to sell. In addition, purchasing at a low price would enable them, when they sold the house, to benefit from the increased value that they had created through their efforts. Plaintiffs had no experience in buying houses, while Benson, defendant's principal, was a lawyer who had been in the business for many years. Defendant knew the effect of the challenged provisions, but plaintiffs did not. Even if plaintiffs had known the effect of those provisions, they were in no position to bargain with defendant over them. There was thus substantial inequality of bargaining power and knowledge between plaintiffs and defendant. In short,

WESTLAW © 2015 Thomson Reuters. No claim to original U.S. Government Works.

defendant imposed those provisions for its own benefit. Although there is no evidence of trickery or deceit, as there often is in unconscionability cases, the gross inequality in knowledge and **\*426** bargaining power is sufficient to require us to consider the substance of the challenged provisions.

**[16]** **[17]** We begin with the prohibition on assigning the contract without defendant's consent. As defendant points out, after our previous decision in this case it is clear that that provision is subject to the requirement that defendant may not unreasonably withhold its consent. In addition, it is also clear that the primary issue for defendant in deciding whether to consent is the financial responsibility of the putative assignee. *Carey,* 165 Or.App. at 670–71, 998 P.2d 724. We must, however, evaluate the challenged provisions as of June 1990, the time of contract formation, not 10 years later when we issued our previous decision. *Best,* 303 Or. at 560, 739 P.2d 554. At that time, Oregon law did not clearly provide that a requirement for consent to an assignment of a lease necessarily included a reasonableness component.[14] Indeed, the only case on point, *Abrahamson v. Brett,* 143 Or. 14, 21 P.2d 229 (1933), expressly held the opposite. In *Abrahamson,* the Supreme Court stated that, when there is no reasonableness clause, a landlord "may arbitrarily withhold his assent without giving any reasons, and in granting his assent may impose such conditions as he sees fit." *Id.* at 22, 21 P.2d 229. Little more than a year before the parties entered into this contract, we held that it was at least arguable that *Abrahamson* was still good law despite the trend in other states away from that position. *Chiles v. Robertson,* 94 Or.App. 604, 629–30, 767 P.2d 903, *modified on recons.,* 96 Or.App. 658, 774 P.2d 500, *rev. den.,* 308 Or 592 (1989). When plaintiffs sought to sell the house, defendant treated the provision as giving it the right to impose conditions that were unrelated to the purchaser's financial strength, an action that suggests that that was what defendant intended the provision to mean when it included it in the contract. Defendant apparently adhered to that understanding until plaintiffs began this litigation, which was after the Supreme Court's decision in *Pacific First* **\*\*831** *Bank.* At that point defendant argued that, as we ultimately held, the provision contained a reasonableness component as a matter **\*427** of law. We conclude that, at the time of the contract, defendant intended the restriction on assignment to be absolute.

[14] In our previous decision we treated the requirements for consent to assignment of a lease and consent to assignment of a land sale contract as identical for these purposes; we continue to adhere to that understanding.

If we construe the consent provision as defendant originally intended it, the provision is clearly unconscionable. There is no evidence of a commercial need for an absolute restriction on assignment in this situation; the only effect of the provision is to make it difficult for plaintiffs to sell the house and to give defendant an unwarranted opportunity to seek a windfall in return for letting them do so. If we had not already included a reasonableness condition as a matter of law for another reason, we would limit the operation of the provision in order to include a reasonableness condition. Because that condition is now part of the clause, we do not need to add it a second time. With the addition of that condition, this provision is no longer unconscionable.

**[18]** The second provision imposes limits on payments on principal. In our previous decision, we did not find it necessary to modify that provision in order to hold that such limitations are not *per se* unreasonable restraints on alienation. We hold now that this limitation is unconscionable in the context of this specific contract. In our previous decision, we described the purpose of the provision as being to "provide vendors with a fixed cash flow over a certain period of time 'with minimal taxation and with interest.' " *Carey,* 165 Or.App. at 669, 998 P.2d 724, *quoting Landura Corp. v. Schroeder,* 272 Or. 644, 651, 539 P.2d 150 (1975). We emphasized that the limitation could last for as few as nine years and that, even during that period, plaintiffs could assign the contract and defendant could not unreasonably withhold consent. *Id.* The evidence at trial places this contract provision in a somewhat different light. First, the evidence shows that, in this specific market—inexpensive housing for first-time buyers in this part of Portland—the financing necessary to permit a purchaser to assume the contract is difficult, if not impossible, to find, while financing for a straight purchase is available.[15] The likelihood of a purchaser being able to assume the contract **\*428** without financing also appears to be very low. Second, defendant offered no credible evidence that it would incur capital gains tax liability on this particular property. Its witness, who should have known, could not testify to the necessary information. Thus, defendant may not need to spread out payments for tax reasons. Third, the provision gives defendant the

Case 3:17-cv-00013 Document 25-17 Filed 03/24/17 Page 37 of 171 PageID #: 294

ability to require a payment in order for plaintiffs to be able to pay the contract and sell the house. It can set the amount of the payment arbitrarily, with no relationship to the reasons that we described for the provision. The amount that defendant actually demanded—$13,000—was, for all practical purposes, plaintiffs' entire equity in the house. Defendant has used similar provisions in other contracts to require substantial payments as a condition of permitting other purchasers to sell their houses.

15      We recognize that the evidence at trial concerns the situation at the time that plaintiffs attempted to sell, which was six years after they entered into the contract. However, in the absence of any contrary evidence, it is reasonable to infer that the situation in 1990 was the same as it was only six years later.

The power that the limitation on prepayment gives defendant, thus, is entirely disproportionate to its purpose. Because as a practical matter plaintiffs are unable to sell the house without paying the contract in full, this provision places plaintiffs at defendant's mercy. The contract that defendant created, thus, entirely fails to recognize plaintiffs' interest in selling the house and recovering the equity that they had accrued, equity that in substantial part was the result of their rehabilitating a house that defendant had permitted to deteriorate. [16] Rather, the contract **832 gives all of the power to defendant as a consequence of defendant's greater bargaining strength and knowledge. Such a result is inherently unconscionable. We must decide, therefore, how to give effect to the contract without the

unconscionable effect of this provision as written. We do not think that it is necessary to refuse to enforce the provision entirely; as we held in our previous opinion, it can serve a legitimate purpose. Rather, we will limit the provision to provide that defendant may enforce it only to the extent that it can show that the provision will fail to achieve its essential purpose if it is not enforced and  *429  that, even then, that its enforcement will not deprive plaintiffs of a substantial benefit of the contract—their ability to sell the house and receive all or the major portion of its increased value. Plaintiffs are entitled to a declaratory judgment that limits the applicability of the prepayment provision in that fashion and to whatever relief may presently flow from that limitation.

16      Again, although many of these things did not become clear until plaintiffs tried to sell the house, they were inherent in the contract from the time of its formation. The parties knew that plaintiffs would continue to work on the house. Defendant knew the power that the provisions gave it over a later sale and that the contract failed to protect plaintiffs' ability to preserve the equity that they would create. The unconscionability that we have identified existed at the formation of the contract.

Reversed and remanded.

**All Citations**

203 Or.App. 399, 125 P.3d 814

End of Document                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 3883242
Only the Westlaw citation is currently available.

SEE COURT OF APPEALS RULES 11 AND 12

Court of Appeals of Tennessee,
AT JACKSON.

The Cohn Law Firm, et al.
v.
YP Southeast Advertising & Publishing, LLC,
and YP Texas Region Yellow Pages, LLC

No. W2014–01871–COA–R3–CV
|
May 12, 2015 Session
|
June 24, 2015

Appeal from the Chancery Court for Shelby County, No.
CH1400953; Kenny W. Armstrong, Chancellor

**Attorneys and Law Firms**

William A. Cohn, Cordova, Tennessee, for the appellants,
The Cohn Law Firm, and William A. Cohn.

Robert Dale Grimes and Meredith M. Thompson,
Nashville, Tennessee, for the appellees, YP Southeast
Advertising & Publishing, LLC, and YP Texas Region
Yellow Pages, LLC.

**Opinion**

J. STEVEN STAFFORD, P.J., W.S., delivered the
opinion of the Court, in which ARNOLD B. GOLDIN,
J. and BRANDON O. GIBSON, J., joined.

**OPINION**

J. STEVEN STAFFORD, P.J.

**\*1** Plaintiff law firm and lawyer brought suit against
defendant advertising companies alleging, *inter alia,*
breach of contract and misrepresentation. Defendants
moved to dismiss the complaint because the parties'
contracts included a forum selection clause that provided
all litigation arising from the contracts would take place
in the state of Georgia. The trial court found the forum
selection clause enforceable and granted defendants'

motion to dismiss. On appeal, plaintiffs argue that the trial
court erred in enforcing the forum selection clause because
the contracts are adhesion contracts and unconscionable.
Discerning no error, we affirm.

**Background**

This appeal involves several contracts for advertising
services that Appellees YP Southeast Advertising &
Publishing, LLC and YP Texas Region Yellow Pages,
LLC ("Appellees") provided to The Cohn Law Firm and
Attorney William A. Cohn ("Appellants"). Appellants
filed their original complaint on January 20, 2014, and
their first amended complaint on February 14, 2014, to
include a mistakenly omitted page. In their first amended
complaint, Appellants alleged that they had entered into
annual contracts since the 1980s with Appellees wherein
they agreed to purchase advertising in the telephone
directory and some internet advertising when available.
Appellants contend that they timely paid all monthly
billings.

According to Appellants, Appellees also advised them
regarding whether the advertising was successful. In
the summer of 2008, Appellants noticed that the
advertising results had been decreasing and wanted
to lower the price and amount of print advertising;
however, Appellants assert that Appellees assured them
the advertising was indeed working. Appellants claimed
that Appellees provided false information and false
advice regarding the current business generated by the
advertisements. In sum, the allegations against Appellees
indicate that Appellants became dissatisfied with the
advertising results. Appellants requested that the trial
court rescind the 2013–2014 contract and the 2014–
2015 contract, or alternatively, reform the contracts.
Appellants did not specifically seek any relief with
regard to the parties' previous contracts. Additionally,
Appellants sought a declaratory judgment that the
contracts were adhesion contracts, that Appellees had
breached the contracts, and that the amount owed to
Appellees by Appellants be reduced from $7,800.00
monthly to $2,900.00 monthly. Appellants also requested
monetary damages in the amount allegedly overpaid to
Appellees and that Appellees be enjoined from recovering
any alleged debts. Notably, Appellants did not attach any
of the written contracts to either the initial complaint or
the first amended complaint.

WESTLAW © 2015 Thomson Reuters. No claim to original U.S. Government Works.

On March 31, 2014, Appellees filed a motion to dismiss, pursuant to Tennessee Rules of Civil Procedure 12.02(2) and (3), based on alleged lack of personal jurisdiction and improper venue. In their attached memorandum of law, they asserted that the parties' contract [1] contained a forum selection clause requiring all contract-related disputes to be filed in the United States District Court for the Northern District of Georgia or the Superior Court of DeKalb County, Georgia. Appellees attached the parties' 2013–2014 contract, titled "YP Advertiser General Terms and Conditions," and a "Summary Order Page," which incorporated the terms and conditions by reference. The contract titled YP Advertiser General Terms and Conditions includes the following paragraph:

**\*2 18. Miscellaneous; Exclusive Venue.** This Agreement and all claims and disputes arising under or relating to this Agreement will be governed by and construed in accordance with the laws of the State of Georgia, without giving effect to its conflicts of laws principles. Any action or proceeding arising under or relating to this Agreement shall be filed only in the United States District Court for the Northern District of Georgia or the Superior Court of DeKalb County, Georgia. Advertiser hereby consents and submits to the exclusive jurisdiction and venue of those courts and waives any objection based on the convenience of these exclusive venues.... If any provision of this Agreement is deemed unlawful, void, or for any reason unenforceable, then that provision shall be deemed severable from this Agreement and shall not affect the validity and enforceability of any remaining provisions.

The Summary Order Page provides that the customer's name is "Cohn Law Firm," and it was signed by Mr. Cohn.

[1]   We note that the parties in this case repeatedly refer to the contracts at issue in this case as a single contract, despite the fact that Mr. Cohn's complaint seeks rescission of two separate contracts. While it is clear from the record that the 2013–2014 contract contains a forum selection clause, no copy of the 2014–2015 contract is included in the record. Regardless, after a thorough review of both the record and Mr. Cohn's brief, we cannot discern any argument that the two contracts should be treated disparately or that the 2014–2015 contract does not contain a similar or identical forum selection clause. Accordingly, any

argument that the 2014–2015 contract is not also subject to a forum selection clause directing Mr. Cohn to file suit in Georgia is waived.

Approximately one month later, on April 25, 2014, Appellants filed their second amended complaint [2] and added Regions Bank as a defendant. Regions Bank was voluntarily non-suited by Appellants on October 30, 2014. Upon the filing of the second amended complaint, Appellees filed a renewed motion to dismiss, again citing the forum selection clause in the parties' contracts.

[2]   Appellants' second amended complaint is the operative complaint in this appeal and is referred to as the "complaint" in this Opinion.

Appellants responded to Appellees' motion to dismiss on May 31, 2014. Appellants alleged that the parties' contracts were adhesion contracts, that Georgia was an inconvenient forum, and that Mr. Cohn would not have knowingly agreed to litigate in Georgia. In support, Appellants filed the affidavit of Mr. Cohn. In the affidavit, Mr. Cohn states that the contracts are ones of adhesion because "[i]t was always sign this or you get nothing." He alleges that the terms were never negotiable, and he had no choice in the terms. The remainder of the affidavit explains that neither party has a substantial connection with the state of Georgia.

After a hearing on the motion to dismiss, [3] the trial court entered an order on August 1, 2014, granting Appellees' motion to dismiss. The trial court's order provides:

**\*3** Based upon the Motion and Memorandum filed by [Appellees], the Response in Opposition [ (to which Mr. Cohn's affidavit was attached) ] filed by [Appellees], the arguments of counsel at the hearing on this matter, and the entire record in this case, the Court finds [Appellees'] Motion to Dismiss is well-taken. After consideration of the factors set forth in Dyersburg Mach. Works, Inc. v. Rentenbach Eng'g Co., 650 S.W.2d 378 (Tenn.1983), the Court finds that the forum selection clause ... is valid and enforceable.

WEST LAW

From this order dismissing the complaint, Appellants timely filed their appeal.

3     The record does not include a transcript of this hearing or of any oral ruling by the trial court.

### Issue Presented

As we perceive it, this appeal presents one issue: whether the trial court erred in granting Appellees' motion to dismiss on the basis of the forum selection clause in the parties' contract?

### Discussion

#### Standard of Review

As an initial matter, we must determine the appropriate standard of review. Appellants contend that the motion before the trial court, although termed a motion to dismiss, was actually a motion for summary judgment. Appellants contend that, because the trial court considered items outside the pleadings, the motion to dismiss is converted to a motion for summary judgment.[4] We respectfully disagree.

4     Appellants' argument on this issue is unclear. Their brief suggests that the trial court could not have found the forum selection clause enforceable unless it failed to consider Appellants' affidavit. The trial court's order granting Appellees' motion to dismiss, however, indicates that the trial court considered "the entire record in this case," which includes the affidavit. Thus, it appears that Appellants are simply dissatisfied with how the trial court interpreted and applied the facts from the affidavit in deciding whether Appellees were entitled to dismissal. Still, as discussed *infra,* the consideration of the matters outside of the pleadings does not convert Appellees' motion into one for summary judgment.

Tennessee Rule of Civil Procedure 12.02 specifically provides, in relevant part:

> If, on a motion asserting the defense numbered (6) to dismiss for failure to state a claim upon which relief can be granted, matters outside

the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

Here, Appellees moved to dismiss Appellants' complaint based on Tennessee Rule of Civil Procedure 12.02(2) (lack of personal jurisdiction) and 12.02(3) (improper venue). Thus, while the language of Rule 12.02 specifies that a motion to dismiss brought pursuant to Rule 12.02(6) is converted to a motion for summary judgment when a trial court considers matters outside the pleadings, the same is not true for Appellees' motion brought pursuant to Rule 12.02(2) and (3). *See, e.g., Gordon v. Greenview Hosp., Inc.,* 300 S.W.3d 635, 643 (Tenn.2009) ("Unlike Tenn. R. Civ. P. 12.02(6) motions for failure to state a claim that are supported by or opposed by matters outside the pleadings ..., Tenn. R. Civ. P. 12.02(2) motions are not converted to motions for summary judgment when either or both parties submit matters outside the pleadings either in support of or in opposition to the motion.") (citing *Chenault v. Walker,* 36 S.W.3d 45, 55 (Tenn.2001); *Thomas v. Mayfield,* No. M2000–02533–COA–R3–CV, 2004 WL 904080, *5 (Tenn.Ct.App. Apr. 27, 2004), *perm. app. denied* (Tenn. Nov. 15, 2004)) ("[I]t is clear that the same rules apply to both *in personam* jurisdiction and venue."); *McKinney v. Widner,* 746 S.W.2d 699, 702 (Tenn.Ct.App.1987) ("Rule 12.02 does not authorize the consideration of the motion as a motion for summary judgment except when grounded upon failure to state a claim for which relief can be granted."). Tennessee law generally holds that a motion to dismiss based upon the application of a forum selection clause implicates the doctrine of venue rather than personal jurisdiction. *See generally ESI Cos., Inc. v. Ray Bell Constr. Co.,* No. W2007–00220–COA–R3–CV, 2008 WL 544563, at *7 (Tenn.Ct.App. Feb. 29, 2008); *Signal Capital Corp. v. Signal One, LLC,* No. E2000–00140–COA–R3–CV, 2000 WL 1281322, at *3 (Tenn.Ct.App. Sept. 7, 2000), *perm. app. denied* (Tenn. Mar. 19, 2001). Regardless, the standard of review of both types of motions is identical. *See* 32A Am.Jur.2d *Federal Courts* § 1202 ("The procedural analysis and standards applied in deciding a motion to dismiss for improper venue are generally

WESTLAW  © 2018 Thomson Reuters. No claim to original U.S. Government Works.     3

the same as in deciding a motion to dismiss for lack of personal jurisdiction.") (footnotes omitted).

**\*4** Both the decisions regarding the exercise of personal jurisdiction over a defendant and improper venue of a lawsuit involve questions of law. *Franklin Am. Mortgage v. Dream House Mortg. Corp. of R.I.*, No. M2009–01956–COA–R9–CV, 2010 WL 3895531, at \*2 (Tenn.Ct.App. Oct. 5, 2010)* (personal jurisdiction); *Jones v. Gwyn,* No. E2011–00084–COA–R3CV, 2011 WL 4477999, at \*2 (Tenn.Ct.App. Sept. 7, 2011)* (venue) (citing *S. Constructors, Inc. v. Loudon Cnty. Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn.2001)). Accordingly, the appellate courts will review a trial court's decision concerning personal jurisdiction and venue *de novo,* with no presumption of correctness, for the purpose of determining whether the plaintiff has made out a *prima facie* case for the exercise of personal jurisdiction over the defendant. *Woodruff v. Anastasia Int'l, Inc.*, No. E2007–00874–COA–R3CV, 2007 WL 4439677, at \*3 (Tenn.Ct.App. Dec. 19, 2007), *perm. app. withdrawn* (Apr. 7, 2008); *In re Clark,* No. W2005–01687–COA–R3–JV, 2007 WL 152537, at \*10 (Tenn.Ct.App.Jan.22, 2007), *no perm. app. filed.* In considering an appeal from a trial court's grant of a motion to dismiss for lack of personal jurisdiction or venue, we take all allegations of fact in the complaint as true and review the trial court's legal conclusions *de novo* with no presumption of correctness. *State v. NV Sumatra Tobacco Trading Co.*, 403 S.W.3d 726, 739 (Tenn.2013) ("When weighing the evidence on a Tenn. R. Civ. P. 12.02(2) motion, the trial court must take all factual allegations in the plaintiff's complaint and supporting papers as true."); *see also* 32A Am.Jur.2d Federal Courts § 1202 ("Thus, on a motion to dismiss for improper venue, the court accepts facts alleged in the complaint as true.").

### *Forum Selection Clauses Generally*

Generally, a forum selection clause is enforceable and binding on the parties entering the contract. *Lamb v. MegaFlight, Inc.*, 26 S.W.3d 627, 631 (Tenn.Ct.App.2000). A forum selection clause will be upheld if it is fair and reasonable in light of all the circumstances surrounding its origin and application. *Id.* (citing *Dyersburg Mach. Works, Inc. v. Rentenbach Eng'g Co.*, 650 S.W.2d 378 (Tenn.1983)). A party seeking to invalidate a forum selection clause must prove that the

clause resulted from misrepresentation, duress, abuse of economic power, or other unconscionable means. *Id.*

Tennessee law is clear that the party challenging the enforcement of the forum selection clause "should bear a heavy burden of proof." *Chaffin v. Norwegian Cruise Line Ltd.*, No. 02A01–9803–CH–00080, 1999 WL 188295, \*4 (Tenn.Ct.App. Apr. 7, 1999); *see also Dyersburg,* 650 S.W.2d at 380 (holding that courts "should enforce such a clause unless the party opposing enforcement demonstrates that it would be unfair and inequitable to do so").[5] With the foregoing in mind, we address Appellants' contentions that the parties' contracts and the forum selection clause are unenforceable.

[5]     We note that Appellants' brief provides the following argument:

> The *burden* is **on** *defendant Yps'* [Appellees] "to show that the parties *actually bargained* over the ... provision or that it was a reasonable term considering the circumstances." *Brown v. Karemor Intl., Inc.,* 1999 Tenn.App. LEXIS 249, 1999 WL 221799 (Tenn.Ct.App.1999) Emphasis added. The defendant Yps have **not** carried this burden.

(Emphasis in original.) Appellants inserted an ellipsis in the above excerpt because they omitted that this case was analyzing an agreement to arbitrate. Of the nine cases cited by Appellants, only one case concerns forum selection clauses. However, in their discussion of the other eight cases, Appellants' citation to authority often omits, via ellipsis, any indication that the case cited concerns an arbitration agreement. While we understand that certain points of law are analogous and may apply in various situations, such is not the case in the way Appellants present their argument. The Court finds this practice misleading.

### *Adhesion Contracts*

Appellants' foremost argument is that the forum selection clause is void because the contracts are adhesion contracts. According to the Tennessee Supreme Court:

**\*5** An adhesion contract has been defined as "a standardized contract form offered to consumers of goods and services on essentially a 'take it or leave it' basis, without affording the consumer a realistic opportunity to bargain and under such conditions

that the consumer cannot obtain the desired product or service except by acquiescing to the form of the contract." *Black's Law Dictionary* 40 (6th ed.1990); *Broemmer* [*v. Abortion Servs. of Phoenix, Ltd.*], 840 P.2d [1013, 1015 (Ariz.1992)] ].

*Buraczynski v. Eyring*, 919 S.W.2d 314, 320 (Tenn.1996).

This Court previously discussed the relationship between adhesion contracts and forum selection clauses in *Woodruff v. Anastasia International, Inc.*, No. E2007–00874–COA–R3–CV, 2007 WL 4439677 (Tenn.Ct.App.2007). In *Woodruff*, the plaintiff, a Tennessee resident, filed suit in the circuit court of Sevier County, Tennessee, against Anastasia International, Inc. ("Anastasia"). *Id.* at *1. Anastasia was a Kentucky corporation with its principal place of business in Maine. Anastasia provided a service to help men find brides from countries in the former Soviet Union. Anastasia maintained a database of women who were interested in marrying American men. For certain fees, Anastasia provided services to facilitate a marriage between its American male clients and foreign women, such as translation services and "Romance Tours" where the clients would have the opportunity to meet local women at social events. The plaintiff entered into two contracts with Anastasia, including one written contract for a "Romance Tour" and an online "click-through" agreement through Anastasia's website for other services. The plaintiff ultimately used Anastasia's services, including corresponding with various women and participating in a "Romance Tour" to Ukraine. However, he became dissatisfied with various aspects of these transactions, and he sued Anastasia in the circuit court for Sevier County.

Anastasia moved to dismiss the plaintiff's complaint citing, *inter alia*, that the contracts signed by the plaintiff included a forum selection clause providing that all litigation would take place in the states of Kentucky or Maine. *Id.* at *2, *4. Ultimately, the trial court found that it did not have personal jurisdiction over Anastasia, but not because of the existence of the forum selection clause. *Id.* at *4. On appeal, this Court concluded that Anastasia had waived the issue of personal jurisdiction, but that the forum selection clause remained viable. The plaintiff argued that the contracts signed with Anastasia were adhesion contracts, and thus, were unenforceable. *Id.* at *5. The court stated that it "agree[d] with Plaintiff that his [c]ontracts with Anastasia may well be contracts

of adhesion." However, the finding that the contracts were adhesion contracts did not end the inquiry, as adhesion contracts "are not *per se* unenforceable."

The *Woodruff* Court, relying on the Tennessee Supreme Court's decision in *Buraczynski v. Eyring*, 919 S.W.2d 314 (Tenn.1996), opined that the determination that a contract is one of adhesion is not determinative of the contract's enforceability. Instead, "[e]nforceability generally depends upon whether the terms of the contract are beyond the reasonable expectations of an ordinary person, or oppressive or unconscionable." *Id.* (citation omitted). The Court concluded that nothing in the plaintiff's contracts with Anastasia was beyond the reasonable expectations of an ordinary person. The plaintiff's preference to litigate in his home state of Tennessee was insufficient to invalidate the clauses. Finding no evidence that the forum selection clause was either unconscionable or oppressive, the court upheld the forum selection clause and the dismissal of the plaintiff's complaint. *Id.* at *6.

**\*6** We agree that Appellants have sufficiently alleged a *prima facie* claim that the contracts were adhesion contracts "in that [they were] standardized contracts that were offered on essentially a 'take it or leave it' basis without affording [Appellants] a real opportunity to bargain." *See Taylor v. Butler*, 142 S.W.3d 277, 286 (Tenn.2004). However, this conclusion does not end our inquiry.

Tennessee law is clear that the finding of an adhesion contract alone is an insufficient basis to conclude that a forum selection clause is unenforceable. At some points in Appellants' brief, it appears that they concede that in order to void the contracts, there must be a finding of adhesion *and* some other reason to invalidate the clause, such as unconscionability or fraud.[6] Accordingly, even if the contracts are contracts of adhesion, there must also be some showing that the contracts are unconscionable or were fraudulently induced. *See Buraczynski,* 919 S.W.2d at 320 ("We must examine the agreements in question to determine whether they are contracts of adhesion, and if so, whether they contain such unconscionable or oppressive terms as to render them unenforceable."); *see also Lamb,* 26 S.W.3d at 631 ("[I]f Plaintiffs were fraudulently induced into entering the contract with [Defendant], Plaintiffs are not bound by the forum selection clause within the contract."). Here, even

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

5

assuming that the contracts and the forum selection clause constitute contracts of adhesion, this conclusion does not render the contracts unenforceable. Therefore, we next examine the record to determine whether Appellants sufficiently alleged that the contracts were unconscionable or procured through fraud on behalf of Appellees.

6    In Appellants' brief, they state: "If the contract is one of adhesion, the next question is whether it contains such unconscionable or oppressive terms as to render it unenforceable." We interpret this argument as an acknowledgement that just a finding of adhesion is alone insufficient to render a contract unenforceable. However, to the contrary, Appellants' argument also equates a finding of an adhesion contract to unenforceability of that contract. Indeed, several times in their brief, Appellants state that a finding that a contract is an adhesion contract renders the contract void. For example, Appellants state: "Since the Contract between the parties was a contract of adhesion, its terms are void, and the venue clause is therefore void. The Court cannot base a dispositive ruling on a void clause in a contract." While Appellants may be correct that the contracts in this case are ones of adhesion, they provide no citation or explanation for their argument that an adhesion contract is *per se* unenforceable. Our research has not uncovered any authority to support Appellants' contention in this regard.

We first address whether Appellants have sufficiently alleged that the contracts were unconscionable. The Tennessee Supreme Court has explained that an adhesion contract is unconscionably unenforceable when it is "oppressive to the weaker party" or when it "serve[s] to limit the obligations and liability of the stronger party." *Buraczynski,* 919 S.W.2d at 320 (citing *Broemmer v. Abortion Servs. of Phoenix Ltd.,* 840 P.2d 1013 (Ariz.1992)). Tennessee courts have defined unconscionability in general as resulting

> *7 when the inequality of the bargain is so manifest as to shock the judgment of a person of common sense, and where the terms are so oppressive that no reasonable person would make them on one hand, and no honest and fair person would accept them on the other.

*Trinity Indus., Inc. v. McKinnon Bridge Co.,* 77 S.W.3d 159, 171 (Tenn.Ct.App.2001) (citing *Haun v. King,* 690 S.W.2d

869, 872 (Tenn.Ct.App.1984)). Where the parties possess equal bargaining power or sophistication, courts are less likely to find an unconscionable bargain. *Id.* (citing *Royal Indem. Co. v. Westinghouse Elec. Corp.,* 385 F.Supp. 520 (S.D.N.Y.1974)). Terms that are common in the industry also often lead a court to find that a contract is not unconscionable. *Id.* (citing *Posttape Assocs. v. Eastman Kodak Co.,* 450 F.Supp. 407 (E.D.Pa.1978)).

In the instant case, Appellants contend that the contracts were unconscionable because they were presented on a "take-it-or-leave-it basis." We have previously concluded that Appellants have made out a *prima facie* case that the contracts were adhesion contracts; however, as discussed above, this does not end our inquiry, as an adhesion contract is not per se unconscionable or otherwise unenforceable. Accordingly, we consider Appellants' other allegations that the contracts were unconscionable. To that end, Appellants assert that the contracts were unreasonably lengthy and that the forum selection clause was buried well into them. Appellants also assert in their brief they had to sign the contracts quickly. Last, Appellants assert that they would have to pay an oppressive amount of money to litigate the case in Georgia. Mr. Cohn's affidavit attached to the response to the motion to dismiss is replete with allegations demonstrating that Georgia is an inconvenient forum and that, had Appellants known of the forum selection clause, they would have never willingly agreed to litigate their claims there. Based on the foregoing, Appellants request that this Court conclude the contracts are unconscionable and the forum selection clause thereby void.

Upon review, we find nothing in the parties' contract (i.e., the one contract that was included in the record) or in the record demonstrating that the parties' other contracts or the underlying transaction was unconscionable or otherwise beyond the reasonable expectations of an ordinary person. Here, we reject as a matter of law Appellants' contention that a mere three-page contract is unreasonably long or that the forum selection clause was buried in the contract. Moreover, we cannot agree that either Appellants' complaint or Mr. Cohn's affidavit support their allegation that they were pressured into hastily signing the contracts, as neither of those documents allege that fact. Indeed, it appears that Appellants continued to enter into contracts with Appellees for advertising services for more than twenty years and only seek to invalidate contracts from recent

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.    6

years; accordingly, by the time the 2013–2014 and 2014–2015 contracts were executed, Appellants had ample time to consider the contracts' terms. As such, these allegations are insufficient to establish that the provisions in the contracts were otherwise oppressive or unconscionable.

Finally, like the defendant corporation in *Woodruff*, it is reasonable to expect that corporations such as Appellees, who have many customers, would prefer to limit where they are subject to suit. *See Woodruff*, 2007 WL 4439677, at *5 (holding that the inconvenience of the forum state is insufficient to invalidate a forum selection clause) (citing *Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 593 (1991); *Thomas v. Costa Cruise Lines N.V.*, 892 S.W.2d 837, 841 (Tenn.Ct.App.1994)). We note that the forum state selected by Appellees is a bordering state of Appellants' home state of Tennessee. Additionally, we find no evidence in the record from which we can conclude that there was such uneven bargaining power between the two parties that resulted in such an "inequality of the bargain is so manifest as to shock the judgment of a person of common sense." *Trinity Indus.*, 77 S.W.3d at 171 (citation omitted). Although Appellees are large corporate entities, Mr. Cohn, a seasoned attorney, was also a sophisticated and intelligent party. *See Trinity Indus.*, 77 S.W.3d at 171; *Shepherd v. Weather Shield Mfg., Inc.*, No. W1999–00508–COA–R3–CV, 2000 WL 34411064 (Tenn.Ct.App. Aug. 21, 2000). Therefore, we conclude that even assuming arguendo that the contracts at issue are adhesion contracts, Appellants failed to meet their heavy burden to show that the contracts are unconscionable.

**\*8** In addition to their unconscionability argument, Appellants appear to also assert that they were fraudulently induced into entering the advertising contracts with Appellees and that such fraud renders the contracts unenforceable. In their brief, Appellants appear to argue that their allegations of fraud contribute to their position that the contracts were unconscionable.[7] From what we can discern from Appellants' brief, their fraud allegations appear as part-and-parcel of their argument regarding adhesion contracts and unconscionability. Thus, we address Appellants' fraud allegation only in the context of that issue.[8]

---

[7]  Specifically, Appellants argue: A contract of adhesion by definition is a *coercive* event which is *unconscionable* .... The *complaint* further *alleges* that an *abuse of economic power* was involved and

also that *misrepresentation* of the facts and the effectiveness of the defendants' analysis techniques were the *fraudulent* bases on which the defendants convinced the plaintiffs to agree to the contracts. (Emphasis in original.) (Citations omitted.)

[8]  We note, however, that other caselaw has indicated that fraud in the inducement of a contract, standing alone, may invalidate a forum selection clause because it invalidates the entire contract. *See generally Lamb v. MegaFlight, Inc.*, 26 S.W.3d 627 (Tenn.Ct.App.2000). While Appellants' complaint seeks the remedy of rescission of the contract, nothing in Appellants' statement of the issues presented for review can be fairly read to raise fraudulent inducement as an independent basis for denying the motion to dismiss. *See Tenn. R.App. P. 13(b)* ("Review generally will extend only to those issues presented for review."). Accordingly, we decline to address it.

Appellants allege that Appellees fraudulently misrepresented the amount of business Appellants were receiving from Appellees' advertising services and this misrepresentation induced Appellants to enter into additional contracts with the Appellees. Appellants' complaint contains the following allegations:

> 5) The plaintiffs derived 70% of his [sic] consumer clientele from the defendants until 2008, at which time the percentage began to dwindle to 15 to 20%. The defendants knew of this and did not just disclose this, but denied this fact and offered false information and false advice by failing to advise the claimant to maximize his internet presence and minimize his book presence in order to maximize their fees in contravention of the fiduciary responsibilities that they had constructed.

> * * *

> 10) ... The plaintiffs **annually** continued to advise of the continuing deterioration of the print results, but the defendants' representatives continued to invoke the trust of the plaintiffs with false representations that the number of calls was somehow a valid indication of how the ads were doing, and the defendants [ ] continued to recommend more and more **print** advertising.

> 11 The plaintiffs then analyzed all of his client data sheets in 2012 and again advised the defendant [ ] through their employees that the percentage of appointments from print advertising had dwindled to

15% to 20%. The said defendant against responded the same as before. .[sic]

(Emphasis in original.) With Appellants' allegations in mind, we turn to whether Appellants have sufficiently alleged fraud in the underlying transactions so as to invalidate the forum selection clause.

First, we address the deficiencies in the record that hinder our review. Despite basing their lawsuit on the contracts at issue, [9] Appellants' complaint does not include any of the parties' actual contracts. Rule 10.03 of the Tennessee Rules of Civil Procedure provides:

> **\*9** Whenever a claim or defense is founded upon a written instrument other than a policy of insurance, a copy of such instrument or the pertinent parts thereof shall be attached to the pleading as an exhibit unless the instrument is (1) a matter of public record in the county in which the action is commenced and its location in the record is set forth in the pleading; (2) in the possession of the adverse party and this fact is stated in the pleading; (3) inaccessible to the pleader or is of such nature that attaching the instrument would be unnecessary or impracticable and this fact is stated in the pleading, together with the reason therefor. Every exhibit so attached or referred to under (1) and (2) shall be a part of the pleading for all purposes.

In this case, Appellants clearly sought relief based on the written contracts and, therefore, were required to attach the contracts to the complaint. Omitting the contracts from the complaint obviously presents a hindrance to appellate review, and the complaint sets forth no allegations that would suggest Appellants were unable to attach the contracts. [10] Appellees, on the other hand, did provide a copy of one of the parties' contracts as an attachment to their initial motion to dismiss. [11]

[9]      From what we can discern, Appellants' complaint suggests the following causes of actions: fraudulent

misrepresentation, breach of contract, breach of the duty of good faith and fair dealing, and breach of fiduciary duty. Appellants seek a declaratory judgment, rescission, reformation of the contract or contracts at issue, injunctive relief, and monetary damages. "The Court of Appeals has held that in Tennessee there is no cause of action in tort for breach of the duty of good faith in the performance of a contract." *Wallace v. Nat'l Bank of Commerce,* 938 S.W.2d 684, 685 (Tenn.1996) (citing *Solomon v. First Amer. Nat'l Bank,* 774 S.W.2d 935, 945 (Tenn.Ct.App.1989); 17 Am.Jur.2d *Contracts* § 732 (1991)). Thus, Appellants' complaint is premised on the parties' contracts.

[10]      In Appellants' brief, however, they cite to the first page of the original complaint, the first amended complaint, and the second amended complaint, and state that the "document sought to be utilized was a *contested* document which was directly *addressed* in the pleadings." Simply addressing a document in a pleading or asserting that the document is contested does not excuse a plaintiff from complying with Rule 10.03.

[11]      The attached contract appears to represent the parties' agreement at a date in 2013. The contract provides that it had been revised on May 20, 2013 and also includes the notation "V.07/22/2013." The record does not reflect whether the same agreement had been used in previous agreements between the parties. Additionally, at one point, Appellants assert that the agreement was an online click-through contract. However, no such contract appears in the record.

In addition to Appellants' failure to attach the contracts to the complaint, we note that Appellants' allegations in their complaint are meager in light of Rule 9.02 of the Tennessee Rules of Civil Procedure. [12] Rule 9.02 provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Tenn. R. Civ. P. 9.02. Thus, the rule requires "particularity." *Id.* "Particularity" connotes a "concern[ ] with details, [or] minut[ia]." *Diggs v. Lasalle Nat'l Bank Ass'n,* 387 S.W.3d 559, 565 (Tenn.Ct.App. May 30, 2012) (citing *The New Lexicon Webster's Dictionary of the English Language* 954 (1993)). Particularity in pleadings "requires singularity —of or pertaining to a single or specific person, thing, group, class, occasion, etc., rather than to others or all." *Id.* From our review of the complaint, particular facts giving rise to the Appellants' alleged fraud are simply not averred. Here, while it is apparent that

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Appellants' complaint contains some allegations that they were fraudulently induced into entering the contracts, the complaint does not specifically assert any of the circumstances surrounding the alleged fraud, such as which of the two defendants made the fraudulent misrepresentations, where the misrepresentations were made, on what date they were made, or which year's contract the misrepresentations concerned. Appellants simply pleaded conclusory statements, as those stated above, indicating that Appellees made "fraudulent representations." Despite this procedural shortcoming, we will address whether the allegations that are actually contained in Appellants' complaint and Mr. Cohn's affidavit are sufficient to show fraud in order to rescind the forum selection clause. We conclude, however, that even taking all of Appellants' allegations as true, *see generally Trau–Med of Amer., Inc. v. Allstate Ins. Co.,* 71 S.W.3d 691 (Tenn.2002), these allegations fail as a matter of law to make out a *prima facie* case of fraud sufficient to invalidate the parties' forum selection clause.

**\*10** We note again that Tennessee law is clear that the party challenging the enforcement of the forum selection clause bears the burden of demonstrating why the clause is unenforceable. *Chaffin,* 1999 WL 188295 at \*4; *see also Dyersburg,* 650 S.W.2d at 380. Furthermore, to establish a claim for fraudulent misrepresentation, a plaintiff must show the following elements:

> (1) the defendant made a representation of an existing or past fact; (2) the representation was false when made; (3) the representation was in regard to a material fact; (4) the false representation was made either knowingly or without belief in its truth or recklessly; (5) plaintiff reasonably relied on the misrepresented fact; and (6) plaintiff suffered damage as a result of the misrepresentation.

*PNC Multifamily Capital Institutional Fund XXVI Ltd. P'ship v. Bluff City Cmty. Dev. Corp.,* 387 S.W.3d 525, 548 (Tenn.Ct.App.2012); *see also Kincaid v. SouthTrust Bank,* 221 S.W.3d 32, 40 (Tenn.Ct.App.2006). In this case, as the allegations in Appellants' complaint relate to Appellants being fraudulently induced to entering into the contracts with Appellees, we cannot conclude that they have sufficiently carried this heavy burden. Specifically, we

are unable to conclude that Appellants have sufficiently alleged that they justifiably relied on Appellees' alleged misrepresentations. Appellants' claim that the alleged fraudulent inducement to sign the contracts establishes unconscionability must, therefore, fail.

12    Although Rule 9.02 was not relied upon by the trial court in dismissing Appellants' complaint, we note that this Court may affirm a trial court's decision based upon different grounds. *Continental Cas. Co. v. Smith,* 720 S.W.2d 48, 50 (Tenn.1986).

For our conclusion, we find guidance in the case of *Lambdin v. Garland,* 723 S.W.2d 953 (Tenn.Ct.App.1986). In *Lambdin,* this Court held that the plaintiff buyer of a funeral home failed to sufficiently allege fraud in his complaint. *See id.* at 956. The plaintiff buyer in *Lambdin* contracted with the seller of a funeral home to buy the business. *Id.* at 954. The plaintiff buyer sued the seller's wife, alleging that she had misrepresented the number of funerals conducted annually and the number of members in the "burial association." *Id.* at 956. Still, the seller's wife had given plaintiff buyer "the opportunity to determine all of the financial elements of this business prior to its purchase, or at least he was afforded the opportunity to make this determination and no one denied him access to any details." After a bench trial, the trial court dismissed the complaint. *Id.* at 954. On appeal, this Court affirmed and held that the plaintiff buyer did not satisfy the reliance element of his fraud claim because he had examined the funeral home's records himself.

In the case-at-bar, despite Appellants' allegations of fraud, Appellants admit that they obtained knowledge that the advertising results of Appellees were decreasing. For example, Appellants' complaint alleges that, as early as summer 2008, they were aware that the success of the Appellees' advertisements had dwindled and had advised the Appellees of this fact. Appellants further alleged that in 2012 they "analyzed all of [the] client data sheets [ ] and again advised that the percentage of appointments from print advertising had dwindled to 15% to 20%" from 70% previously. However, Appellants seek rescission or reformation of contracts covering only the 2013–2014 and 2014–2015 advertising years. Thus, it appears that, as early as 2008, Appellants knew that the results from Appellees' advertisements were questionable because they had informed Appellees of this knowledge, and Appellants, as stated in the complaint, kept their own "client data sheets." Despite this knowledge, Appellants

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

entered into additional contracts with the Appellees. Like the plaintiff buyer in *Lambdin*, because Appellants had independent knowledge of the inaccuracy of the facts that allegedly induced them to sign the contract, Appellants simply have not shown that their reliance on any alleged misrepresentations by Appellees was justifiable. *Id.* Without justifiable reliance, there can be no fraud. *PNC,* 387 S.W.3d at 548. Accordingly, the allegations in both Appellants' complaint and Mr. Cohn's affidavit are insufficient, as a matter of law, to show that the contracts are unconscionable on the basis of fraud.[13]

[13]   Our holding herein does not prevent Appellants from presenting additional evidence that the contracts should be rescinded or reformed due to fraud and unconscionability in the appropriate forum. Instead, our analysis simply concerns whether the documents in the record provide sufficient evidence, at this juncture, to show that the forum selection clause should not be enforced.

**\*11** This holding, however, does not end our inquiry, as Tennessee courts apply certain principles, discussed *infra,* when looking specifically at forum selection clauses. We next turn to those principles and examine the forum selection clause at issue.

*The Dyersburg Factors*[14]

[14]   Although Appellants do not rely on these factors in their brief, we note that the Tennessee Supreme Court's case of *Dyersburg Machine Works, Inc. v. Rentenbach Engineering Co.,* 650 S.W.2d 378 (Tenn.1983) offers the appropriate framework under which Tennessee courts should analyze forum selection clauses. *Dyersburg,* 650 S.W.2d at 380 ("We conclude that the courts of this state should give consideration to the above mentioned factors."). Indeed, this is the framework utilized by the trial court in upholding the forum selection clause.

In addition to the above analysis concerning allegations of adhesion contracts, unconscionability, or fraud, Tennessee courts utilize a list of factors when looking directly at a forum selection clause. According to the Tennessee Supreme Court, a court must give effect to a forum selection clause and refuse to entertain the action unless:

> (1) the plaintiff cannot secure effective relief in the other state, for reasons other than delay in bringing the action; (2) or the other state would be a substantially less convenient place for the trial of the action than this state; (3) or the agreement as to the place of the action was obtained by misrepresentation, duress, abuse of economic power, or other unconscionable means; (4) or it would for some other reason be unfair or unreasonable to enforce the agreement.

*Dyersburg,* 650 S.W.2d at 380 (quoting *The Model Choice Forum Act of 1968*). The Dyersburg Court further stated that Tennessee courts should give consideration to the above factors and should enforce a forum selection clause unless the party challenging the clause demonstrates that enforcement would be unfair or inequitable. *Id.* Our research demonstrates that the factors promulgated by the *Dyersburg* Court have been followed in numerous subsequent cases. *E.g., Sevier Cnty. Bank v. Paymentech Merch. Servs.*, No. E2005–02420–COA–R3–CV, 2006 WL 2423547 (Tenn. Ct.App. Aug. 23 2006); *Spell v. Labelle,* No. W2003–00821–COA–R3–CV, 2004 WL 892534 (Tenn.Ct.App. Apr. 22, 2004); *Signal Capital,* No. E2000–00140–COA–R3–CV, 2000 WL 1281322 (Tenn.Ct.App. Sept. 7, 2000); *Tennsonita ( Memphis), Inc. v. Cucos, Inc.,* No. 36, 1991 WL 66993 (Tenn.Ct.App. May 2, 1991).

We now apply the factors to the case-at-bar. First, the record does not demonstrate, and Appellants do not allege, that they would be unable to obtain effective relief in the selected forum of Georgia. Although Mr. Cohn's affidavit provides that Georgia would be an inconvenient forum, the affidavit includes no allegations that Appellants would be denied an appropriate remedy if required to litigate in Georgia.

In the same vein, the second factor is not met because, while Appellants allege in Mr. Cohn's affidavit that they have no contact with the forum state, mere inconvenience is insufficient to render the forum selection clause unenforceable. *See Woodruff,* 2007 WL 4439677 at \*5 (holding that the "fact that a resident of Tennessee

WESTLAW   © 2015 Thomson Reuters. No claim to original U.S. Government Works.    10

or any other state other than [the forum state] would prefer to sue in his home state rather than in [the forum state] does not, by itself, make[ ] the forum selection clause" unenforceable). Furthermore, Appellees are not Tennessee corporations, and there is nothing in the record to suggest that all witnesses who may be called would be Tennessee residents. *See Dyersburg, 650 S.W.2d at 381* (holding that the second factor was met because the chosen forum of Kentucky was "a substantially less convenient place for trial [ ] wherein all witnesses are Tennessee residents, the plaintiffs and the defendants, ... are Tennessee corporations"). "[T]he party resisting a forum selection clause must show more than inconvenience or annoyance such as increased litigation expenses, and the party cannot rely on facts and circumstances that were present or reasonably foreseen when they signed the contract." *ESI, 2008 WL 544563, at *7 (Tenn.Ct.App. Feb. 29, 2008)* (citing *Sevier Cnty. Bank, 2006 WL 2423547 at *6*). In addition, "convenience is evaluated from the perspective of all the parties, not just the Plaintiffs." *ESI, 2008 WL 544563, at *7* (citing *Signal Capital, 2000 WL 1281322, at *3*). As such, Appellants' assertion that they would be required to expend more to litigate in Georgia is simply insufficient to defeat application of the forum selection clause.

**\*12** As to the third factor, although Appellants have indicated that the contracts as a whole were procured through "fraudulent representations," we find nothing

in the record to suggest that the "agreement as to the place of the action" was specifically procured unfairly. Indeed, Appellants do not specifically reference the forum selection clause anywhere in their complaint. While Mr. Cohn's affidavit does mention the clause, the affidavit is devoid of any allegations demonstrating that the clause itself was procured through fraud on behalf of Appellees. Last, Appellants do not argue nor does the record suggest that the forum selection clause was otherwise unfair, especially in light of our prior holding that Appellants failed to establish that the contracts as a whole are unconscionable. Accordingly, we find nothing in the record to suggest that any of the factors in *Dyersburg* exist to invalidate the forum selection clause in this case.

### Conclusion

The decision of the Chancery Court of Shelby County granting Appellees' motion to dismiss is hereby affirmed. We remand this case to the trial court for further proceedings as are necessary and are consistent with this Opinion. Costs of this appeal are taxed to Appellants The Cohn Law Firm and William A. Cohn and their surety.

**All Citations**

Slip Copy, 2015 WL 3883242

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

11

2015 WL 1734926
Only the Westlaw citation is currently available.
United States District Court,
M.D. Tennessee,
Nashville Division.

Richard COLE, Bradford Cole, Cary Justice,
Michael Massey, and Don Wegener, et al., Plaintiffs,
v.
AMERICAN SPECIALTY HEALTH NETWORK,
INC., American Specialty Health, Inc.,
Cigna Corporation, Inc., John Does A, B,
& C, and Jane Does A, B, & C, Defendants.

No. 3:14–cv–02022.
|
Filed April 16, 2015.

**Attorneys and Law Firms**

Amber Griffin Shaw, J. Houston Gordon, Lyle Reid,
Law Office of J. Houston Gordon, Covington, TN,
Charles Robert Bone, Bone, McAllester & Norton, PLLC,
Nashville, TN, for Plaintiffs.

Andrew Z. Edelstein, Elizabeth D. Mann, Mayer Brown
LLP, Los Angeles, CA, Britt K. Latham, Meredith
Mallard Thompson, Bass, Berry & Sims, T. Harold
Pinkley, Valerie Leigh Diden Moore, Amanda Haynes
Young, Butler Snow LLP, Nashville, TN, Joshua B.
Simon, Ryan McEnroe, Warren Haskell, Kirkland &
Ellis, New York, NY, for Defendants.

**MEMORANDUM OPINION**

TODD J. CAMPBELL, District Judge.

**\*1** Pending before the Court are motions to dismiss
filed by Cigna Corporation, Inc. ("Cigna") (Docket No.
28) and by American Specialty Health Network, Inc.
("ASH") (Docket No. 31). For the reasons stated herein,
the Court will grant the motion in part and deny it in
part. Specifically, the Court will deny the motions as to
Plaintiffs' contract of adhesion claim and grant them as to
the remainder of Plaintiffs' claims.

**I. FACTUAL BACKGROUND AND PROCEDURAL
HISTORY** [1]

[1]    The facts set forth herein are taken from Plaintiffs'
Complaint, Docket No. 1.

Cigna is a healthcare company that administers healthcare
benefits plans for its clients, many of which are
employers who provide health benefits to their employees
through self-funded plans. As part of its role in
administering plans, Cigna contracts with individual
healthcare providers to treat plan members such that those
providers become "in-network" providers who agree to
charge members based on a pre-determined fee schedule.
In contrast, "out-of-network" providers do not have a
contractual relationship with Cigna and thus do not have
agreed-upon rates with Cigna. However, those providers
can still be compensated for treating patients covered by
Cigna-administered plans.

Cigna also contracts with entities that provide healthcare
services, including entities that provide access to their
own networks of contracted healthcare professionals,
administer payments to healthcare professionals for
claims submitted to Cigna, and evaluate claims for
medical necessity and/or appropriateness. In 2010, Cigna
contracted with ASH to serve these functions with respect
to Cigna's chiropractic claims in Tennessee. Some of
the plaintiffs were existing in-network providers with
Cigna at the time that Cigna contracted with ASH,
though at least one plaintiff was not yet in-network.
On November 11, 2010, ASH sent a letter to Cigna's
in-network chiropractors informing them that effective
March 1, 2011, "[t]o continue participation in the CIGNA
network for these customers, you will need to contract
directly with us at ASH Networks by submitting a
credentialing application, Provider Services Agreement,
and CIGNA Election to Participate documents to ASH
by February 11, 2011." Docket No. 32–1 to 32–5
("Recruitment Letter"). The Recruitment Letter also
stated, "If ASH Networks does not receive the completed
credentialing documents on or before the February 11,
2011 deadline termination proceedings will begin in
accordance with your CIGNA agreement and applicable
state law." [2] Plaintiffs allege that they were advised that
their existing Cigna agreement would remain in effect
but be "suspended" as it pertained to Cigna's managed-
care medical-benefit plans for chiropractic services for the
duration of Cigna's contract with ASH.

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

2   The Recruitment Letter is referenced in Plaintiffs'
    Complaint and attached to Defendants' brief. The
    Court may consider these materials in ruling on
    Defendants' motion to dismiss pursuant to Rule 12(b)
    (6) because they are "referred to in the complaint and
    [are] central to the plaintiffs' claim." *Greenberg v. Life
    Ins. Co. of Va.,* 177 F.3d 507, 514 (6th Cir.1999); *see
    also Thomas v. Publishers Clearing House, Incl,* 29 F.
    App's 319, 322 9th Cir.2002) ("Where the plaintiff
    fails to introduce a pertinent document as part of his
    pleading, defendant may introduce the exhibit as part
    of his motion attacking the pleading.").

The crux of Plaintiffs' Complaint is that they signed the
three-page Election to Participate before receiving the 82–
page contract referred to in the Recruitment Letter as the
"Provider Services Agreement" ("PSA"). Plaintiffs allege
that they were not aware that the Election to Participate
did not represent the entirety of their agreement with
ASH, that they had no ability to negotiate the terms
of the PSA, and that they object to some of the terms
of the PSA. Defendants represent that the November
11, 2010 Recruitment Letter included a CD with all the
documentation needed to enroll with ASH and remain
in-network providers with Cigna, including the Election
to Participate and the PSA. Defendants argue that the
letter demonstrates that Plaintiffs had the PSA before
they executed the Election to Participate. The Recruitment
Letter states the following details about the nature of what
is contained on the compact disc:

> **\*2** The enclosed ASH Networks
> Contracting Kit compact disc
> provides detailed information on
> the completion of the documents
> that need to be returned to
> ASH Networks to begin your
> credentialing process and remain
> participating in the CIGNA
> network. The Contracting Kit CD
> also includes the ASH Networker
> provider Operations Manual and
> the Payor Summaries and Fee
> Schedule of other ASH Network
> clients in your state, payor
> Summaries and Fee Schedules for
> the CIGNA program are included as
> a hard copy in this packet for your
> review.

Plaintiffs dispute that the CD was attached to the
Recruitment Letter and allege that they did not have the
PSA until after executing the Election to Participate. At
least one Plaintiff was not an in-network provider and so
alleges that he did not receive the Recruitment Letter or
the PSA at all before signing the Election to Participate.

In addition to their complaints about the lack of disclosure
of the terms of the PSA before the signing of the Elections
to Participate, Plaintiffs also complain about alleged
problems with the implementation of the PSA, including
that Defendants failed to properly pay claims as required
by the contract, failed to pay claims in a timely fashion,
failed to pay claims pursuant to contractual terms,
improperly assessed fees and penalties, improperly applied
a "Tier System," and failed to pay required interest as
required by statute for late claims. On October 20, 2014,
Plaintiffs filed this action asserting the following claims:
(1) breach of contract/unjust enrichment; (2) contract
of adhesion; (3) fraud/tortious misrepresentation; (4)
wrongful trover and conversion; (5) constructive trust; (6)
negligence; (7) negligence per se; (8) accounting. Federal
jurisdiction is based on the diverse citizenship of the
parties.

## II. Standard of Review

For purposes of a motion to dismiss, the Court must
take all of the factual allegations in the complaint as true.
*Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173
L.Ed.2d 868 (2009). To survive a motion to dismiss, a
complaint must contain sufficient factual matter, accepted
as true, to state a claim to relief that is plausible on
its face. *Id.* A claim has facial plausibility when the
plaintiff pleads factual content that allows the court to
draw the reasonable inference that the defendant is liable
for the misconduct alleged. *Id.* Threadbare recitals of
the elements of a cause of action, supported by mere
conclusory statements, do not suffice. *Id.* When there are
well-pleaded factual allegations, a court should assume
their veracity and then determine whether they plausibly
give rise to an entitlement to relief. *Id.* at 1950. A legal
conclusion couched as a factual allegation need not be
accepted as true on a motion to dismiss, nor are recitations
of the elements of a cause of action sufficient. *Fritz v.
Charter Township of Comstock,* 592 F.3d 718, 722 (6th
Cir.2010).

## III. Legal Analysis

### A. ERISA Preemption

**\*3** Defendants' first argument is that Plaintiffs' claims for breach of contract/unjust enrichment, wrongful trover/conversion, constructive trust, negligence, negligence per se, and accounting are preempted by the Employment Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1111 *et seq.* because these claims allege that Cigna improperly calculated and/or denied benefits pursuant to the applicable benefit plans. Defendants assert that, to the extent that these plans are governed by ERISA, the Court should find that Plaintiffs' state-law claims "relate to" an employee benefit and thus are preempted under ERISA § 514(a).

"ERISA preempts state law and state law claims that 'relate to' any employee benefit plan as that term is defined therein." *Cromwell v. Equicor–Equitable HCA Corp.,* 944 F.2d 1272, 1275 (6th Cir.1991) (citing 29 U.S.C. § 11144(a), *Pilot Life Insurance Co. v. Dedeaux,* 481 U.S. 41, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987)). "The phrase 'relate to' is given broad meaning such that a state law cause of action is preempted if 'it has connection with or reference to that plan.' " *Id.* (quoting *Metropolitan Life Ins. Co. v. Mass.,* 471 U.S. 724, 730, 732–33, 105 S.Ct. 2380, 85 L.Ed.2d 728 (1985)). The Sixth Circuit has interpreted ERISA's preemption to include "virtually all state law claims relating to an employee benefit plan." *Id.* at 1276 (citing cases).

The allegation that Defendants failed to properly compensate Plaintiffs for the services rendered to participants in Cigna's insurance plans is at the root of Plaintiffs' claims for breach of contract/unjust enrichment, trover and conversion, negligence, and negligence per se claims. For example, the breach of contract claim alleges that Cigna failed to "properly" and "timely" pay claims in administering its plans, failed "to pay claims pursuant to contractual terms," and improperly applied a "tier system." To assess the validity of these claims, the Court would need to interpret Cigna's plans. Similarly, the trover/conversion cause of action alleges that Defendants "converted to their own use monies for claims rightfully belonging to Plaintiffs," and wrongfully converted Plaintiffs' "properties and assets." This claim, too, would require the Court to interpret Cigna's plans.

Because Plaintiffs' Complaint does not identify any specific benefits claims that were improperly handled or what plans those claims belonged to, it is not possible for the Court to ascertain which, if any, of Plaintiffs' benefits claims are governed by ERISA. Cigna represents that the majority of the plans it administers are governed by ERISA. To the extent that Plaintiffs' claims for breach of contract/unjust enrichment, trover and conversion, negligence, and negligence per se are related to benefit plans governed by ERISA, the Court agrees with Defendant that they have a "connection with" an employee benefit plan. Through these claims, Plaintiffs seek reimbursement for allegedly unpaid or underpaid benefits, which would require the Court to interpret the terms of Cigna's plans to determine whether additional payments were warranted. *See, e.g., Ward v. Alternative Health Delivery Sys.,* Inc., 55 F.Supp.2d 694, 699 (W.D.Ky.1999) *aff'd in part, rev'd in part,* 261 F.3d 624 (6th Cir.2001) (holding state-law causes of action brought by health care provider alleging health maintenance organization did not pay the amount due for treatment of plan participants was preempted by ERISA); *Productive MD, LLC v. Aetna Health, Inc.,* 969 F.Supp.2d 901, 934 (M.D.Tenn.2013) ("[Plaintiff] concedes, as it must, that ERISA preempts its state law claims to the extent that those claims seek to recover benefits under the applicable insurance policies."). As the Sixth Circuit has held, "[i]t is not the label placed on a state law claim that determines whether it is preempted, but whether in essence such a claim is for the recovery of an ERISA plan benefit." *Cromwell,* 944 F.2d at 1276 (finding health care provider's state law claims against administrator of employee benefit plan for failure to pay for services rendered to a plan participant were "at the very heart of issues within the scope of ERISA's exclusive regulation" and thus clearly preempted). The Court finds Plaintiff's claims for breach of contract/unjust enrichment, trover and conversion, negligence, and negligence per se related to any benefit plans governed by ERISA are preempted by ERISA and will, accordingly, dismiss those claims.

**\*4** Plaintiffs' claims for constructive trust and accounting are dismissed because they are remedies, not causes of action. To the extent, if any, those claims can be construed as causes of action and are related to benefit plans governed by ERISA, they too are dismissed based on ERISA preemption.

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Even if Plaintiffs' breach of contract claim were not preempted by ERISA, and to the extent that Plaintiffs have a breach of contract claim that is related to benefit plans that are not governed by ERISA, the Court dismisses this claim for the additional reason that Plaintiffs have not identified "the specific contract language whereby the defendant assumed a legally-enforceable obligation to the plaintiff," as is required in a breach of contract case. *Brooks v. Wells Fargo Bank, N.A.,* No. 3:12–0821, 2014 WL 345737, at *2 (M.D.Tenn. Jan.30, 2014) (citation omitted). This claim is also legally deficient in that Plaintiffs failed to allege facts necessary to support the claim, such as any facts that would demonstrate that Defendants have violated one or more terms of the PSA. *Id.* at *3 (citing cases). Without the facts to support their claim, their allegations are simply legal conclusions couched as factual allegations.

Similarly, if Plaintiffs' claims for conversion and trover were not preempted by ERISA, and to the extent Plaintiffs have such claims that are related to benefit plans that are not governed by ERISA, the Court would dismiss these claims for the additional reason that under Tennessee law, unless "money is specific and capable of identification or where there is a determinate sum that the defendant was entrusted to apply to a certain purpose," "the general rule is that money is an intangible and therefore not subject to a claim for conversion.... Trover does not lie to enforce a mere obligation to pay money...." *PNC Multifamily Capital Institutional Fund XXVI Ltd. P'ship v. Bluff City Cmty. Dev. Corp.,* 387 S.W.3d 525, 553 (Tenn.Ct.App.2012) (quoting 90 C.J.S. Trover and Conversion § 16 (2012)). Additionally, under Tennessee law, Tennessee Rule of Civil Procedure 9.02 requires that conversion claims be pled with particularity. *Id.* at 554. In this case, Plaintiffs have not identified a single unpaid claim allegedly converted by either Defendant, much less any specific dollar amount or accounts. Nor have Plaintiffs alleged that Defendants were entrusted with money to apply to a certain purpose. Plaintiffs' claims are simply to enforce an obligation to pay money, which does not give rise to claims of conversion and trover. To the extent, if any, that these claims are not preempted by ERISA, the Court would dismiss these claims based on these legal deficiencies.

Finally, if Plaintiffs' negligence and negligence per se claims were not preempted by ERISA, the Court would dismiss them because in Tennessee, contractual duties

do not give rise to a negligence claim. *Permobil, Inc. v. Am. Exp. Travel Related Servs. Co.,* 571 F.Supp.2d 825, 842 (M.D.Tenn.2008) (*citing Thomas & Assoc., Inc. v. Metro. Gov't of Nashville,* No. M2001–00757–COA–R3–CV, 2003 WL 21302974, at *6 (Tenn.Ct.App. June 6, 2003)).

**B. Contract of Adhesion** [3]

[3] Defendants do not argue that this claim is preempted by ERISA. Plaintiffs' allegations in this claim include Defendants' failure to timely and properly pay claims and improper application of a "tier system. Docket No. 1 at 47–49.

**\*5** Plaintiffs allege the following in their claim for contract of adhesion: (1) Plaintiffs were forced into the contracts with ASH by Cigna's unilateral "suspension" of their contracts and also by Cigna's requirement that Plaintiffs contract with ASH in order to remain in-network providers with Cigna; (2) Plaintiffs were required to sign a 3–page Election to Participate with ASH before they received an 82–page Provider Services Agreement; and (3) Plaintiffs were not provided with an opportunity to negotiate the terms of the ASH contract. Plaintiffs seek as a remedy specific performance of the original contract they had with Cigna.

Defendant have several arguments. First, they argue that Plaintiffs admit in sections of the Complaint that they were aware of the PSA when they signed the Election to Participate. The Court does not read the paragraphs from the Complaint cited by Defendants as a concession that Plaintiffs were aware of the existence of the PSA when signing the Election to Participate.

Second, Defendants argue that the Recruitment Letters indicate that to continue participation in the Cigna network, Plaintiffs will have to complete and submit a "credentialing application, Provider Services Agreement, and CIGNA Election to Participate documents" by February 11, 2011. The Recruitment Letters indicate that they are accompanied by a compact disc with the "Contracting Kit" which "provides detailed information on the completion of the documents that need to be returned to the Ash Networks to begin your credentialing process and remain participating in the CIGNA network." Although the fact that there is a Provider Services Agreement to be completed and submitted before Cigna will consider a provider to

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

be in-network is clear from the plain language of the Recruitment Letter, Plaintiffs allege that they only received the CD after they had executed the Election to Participate and the enrollment paperwork for ASH. It also is not clear from the Recruitment Letter that the PSA is included on the CD, although the letter does imply that is the case. Nonetheless, it *is* clear from the letter that there is a PSA to be completed as part of the process of contracting with ASH to remain in-network with Cigna. If the Plaintiffs who were already in-network with Cigna (such that they received the Recruitment Letter) did not receive the disk with the letter, or the disk did not contain the PSA, they nonetheless were clearly on notice that there was a document entitled "Provider Services Agreement." Defendants further argue that the PSA states that Plaintiffs can terminate the PSA "at any time with or without cause" subject to a 60–day notice requirement." Docket No. 30–7 at 30–31 (PSA Art. 5.01). In contrast, the PSA provides that ASH "shall not terminate this Agreement without cause." *Id.* However, Plaintiffs represent that some Plaintiffs did not receive the Recruitment Letter and/or the CD before executing the Election to Participate. For example, Plaintiffs argue that at least one Plaintiff, Dr. Justice, signed the Election to Participate on November 10, 2010 after receiving a fax from ASH so requesting and had not received the November 11, 2010 letter. Docket No. 38 at 15 (Pl's Brief). Plaintiffs further allege that he did not receive the CD with the PSA until January 3, 2011. *Id.* These factual disputes cannot be resolved at this stage of the litigation.

**\*6** Next, Defendants argue that Plaintiffs' claim does not satisfy the elements of an adhesion contract. The Tennessee Supreme Court has defined an adhesion contract as follows:

> An adhesion contract has been defined as "a standardized contract form offered to consumers of goods and services on essentially a 'take it or leave it' basis, without affording the consumer a realistic opportunity to bargain and under such conditions that the consumer cannot obtain the desired product or service except by acquiescing to the form of the contract." Professor Henderson has observed that "the essence of an adhesion contract is that bargaining positions and leverage enable one party 'to select and control risks assumed under the contract.' " Courts generally agree that "[t]he distinctive feature of a contract of adhesion is that the weaker party has no realistic choice as to its terms." *Wallace v. Nat'l*

*Bank of Commerce,* 938 S.W.2d 684, 687 (Tenn.1996) (quoting *Buraczynski v. Eyring,* 919 S.W.2d 314, 320 (Tenn.1996). Defendants argue that Plaintiffs had adequate alternatives to entering into contract with ASH, including becoming an out-of-network provider, contracting with other managed care companies, or treating patients covered under Medicare or Medicaid. Defendants also argue that even if the contract is adhesive, it is still enforceable so long as it is not unduly oppressive or unconscionable, a bar which, according to Defendants, Plaintiffs have not met. Defendants also argue that an adhesive contract is enforceable so long as it is not unduly oppressive or unconscionable and that Plaintiffs have not met this bar. Docket No. 29 at 13 (Defendants' brief) (citing *Buraczynski,* 919 S.W.2d at 320).

The parties have not adequately addressed the question of whether Cigna was legally entitled to suspend their existing contracts with Plaintiffs, which the Court considers to be essential to its evaluation of this claim. The Court concludes that Plaintiffs' allegations, assuming they are correct, give rise to a claim for relief sufficiently colorable to survive a Rule 12(b)(6) motion. The Court will deny Defendants' motion to dismiss this claim.

### C. Fraud

In order to state a claim for fraud under Tennessee law, a plaintiff must plead the following elements: (1) a representation of an existing or past fact; (2) the representation was false when made; (3) the representation was in regard to a material fact; (4) the false representation was made knowingly, without belief in its truth, or recklessly; (5) the plaintiff reasonably relied on the misrepresentation; and (6) the plaintiff suffered damages as a result of the misrepresentation. *Walker v. Sunrise Pontiac–GMC Truck, Inc.,* 249 S.W.3d 301, 311 (Tenn.2008). Plaintiffs' fraud claim alleges the following misrepresentations: (1) the contract with Cigna would continue; (2) the three-page Election to participate and the ASH enrollment package constituted the entire agreement; (3) the fee schedules for Cigna were to remain in place.

**\*7** Under Rule 9(b) of the Federal Rules of Civil Procedure "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." *Advocacy Org. for Patients & Providers*

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

*v. Auto Club Ins. Ass'n,* 176 F.3d 315, 322 (6th Cir.1999). The Sixth Circuit has held that

> a complaint is sufficient under Rule 9(b) if it alleges the time, place, and content of the alleged misrepresentation on which [the deceived party] relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud, and enables defendants to prepare an informed pleading responsive to the specific allegations of fraud.

*United States ex rel. Poteet v. Medtronic, Inc.,* 552 F.3d 503, 518 (6th Cir.2009) (internal bracket and quotations omitted).

The Court agrees with Defendants that Plaintiffs' fraud claim is not pled with sufficient particularity to withstand a motion to dismiss. Even more fundamentally, Plaintiffs' allegations are directly contradicted by the Recruitment Letter to which the Complaint references. It is clear from the Recruitment Letter that the contract with Cigna would not continue without the Plaintiffs' entering an agreement with ASH, that there was a PSA, and that there were fee schedules that the letter purports to have been on a CD attached to the letter. If it is true that the CD was not attached to the letter, Plaintiffs certainly were on notice that there were fee schedules that they could request and review. In any event, Plaintiffs do not allege a time, place, or content of communications that indicated the contract with Cigna would continue, that there were no contractual provisions other than the Election to Participate, or that the fee schedules would remain the same. The Court will dismiss Plaintiffs' fraud claim.

## IV. CONCLUSION

For the foregoing reasons, the Court will grant Defendants' motion to dismiss Plaintiffs' claims for breach of contract/unjust enrichment, trover and conversion, negligence, negligence per se, and fraud. The Court will deny Defendants' motion to dismiss Plaintiffs' claim for contract of adhesion.

An appropriate order is filed herewith.

## All Citations

Not Reported in F.Supp.3d, 2015 WL 1734926

---

**End of Document**

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Blue Flag – Appeal Notification
Appeal Filed by SHERON DOSS v. NORDSTROM, INC., N.A., ET AL., 6th Cir., February 17, 2017

2016 WL 5793238
Only the Westlaw citation is currently available.
United States District Court,
M.D. Tennessee, Nashville Division.

Sheron B. Doss, Plaintiff,

v.

Nordstrom, Inc., N.A.; Blake Nordstrom,
Individually and in His Capacity as C.E.O.; Trevor
Cobb, Individually and in His Capacity as Store
Manager; Nichole M. Dingman, Individually and
in Her Capacity as Human Resources Manager;
and Lauren Luettke, Individually and in Her
Capacity as Department Manager, Defendants.

Case No. 3:15–cv–904
|
Signed 09/22/2016

## MEMORANDUM

ALETA A. TRAUGER, United States District Judge

**\*1** On August 15, 2015, the Magistrate Judge issued a Report and Recommendation (Docket No. 58 (the "R&R")) recommending that 1) the defendants' Motion to Dismiss, Or In The Alternative, To Stay The Proceedings and Compel Arbitration (Docket No. 18) be granted; 2) the parties be ordered to arbitrate their dispute; 3) the Complaint be dismissed; and 4) all other pending motions be terminated as moot. On August 30, 2016, the plaintiff filed an Objection to the R&R (Docket No. 61), to which the defendants filed a Response in opposition (Docket No. 62). For the reasons discussed herein, the R&R will be accepted and this action will be dismissed.

## BACKGROUND & PROCEDURAL HISTORY

This action arises from the plaintiff's employment by defendant Nordstrom, Inc. ("Nordstrom"),[1] as a full-time sales associate in the Nordstrom store in Nashville, Tennessee. The plaintiff, proceeding *pro se*, filed this action on August 18, 2015, bringing claims against Nordstrom, as well as several of its managerial employees, for breach of contract and violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 *et seq.* ("Title VII") and the Age Discrimination in Employment Act, 29 U.S.C. §§ 621–634 ("ADEA"),[2] based on allegations of age-and race-based discrimination and retaliation. (Docket No. 1.) According to the allegations in the Complaint, the plaintiff, at the time a sixty-two year old African–American woman, entered into an employment contract with Nordstrom in March of 2015. The Complaint alleges that, thereafter, the plaintiff repeatedly complained about harassment and discrimination based on her age and race, including being treated differently from other employees; repeatedly requested and was denied transfer to a different department; and was ultimately forced to resign due to a hostile work environment. The Complaint also alleges that Nordstrom violated its employment contract with the plaintiff by reducing her work hours without notice.

[1]   In its briefing, Nordstrom notes that the plaintiff incorrectly identified it as Nordstrom Inc., *N.A.* in the Complaint, as reflected in the caption. (Docket No. 18, p. 1, n. 1.)

[2]   While the plaintiff does not actually name the ADEA in the Complaint, claims for employment discrimination based on age are covered under the ADEA and not Title VII and, accordingly, the plaintiff's claims are understood as claims for violation of both statutes.

On September 28, 2015, the defendants filed a Motion to Dismiss, or in the Alternative, to Stay the Proceedings and Compel Arbitration, along with a Memorandum in support. (Docket Nos. 18, 19.) The defendants argue that, pursuant to the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.* (the "FAA"), the plaintiff is bound by the arbitration clause in the Nordstrom Dispute Resolution Agreement (the "NDRA"), to which she agreed at the time she submitted her online employment application to Nordstrom. The defendants also argue that individual defendants Blake Nordstrom, Trevor Cobb, Nichole M. Dingman, and Lauren Luettke, as supervisory employees of Nordstrom, cannot be held liable for violating Title VII or the ADEA under applicable federal law and, therefore, claims against these defendants should be dismissed.[3]

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

3     The Complaint in this action does not expressly address which claims are being brought against which defendants (*see* Docket No. 1 ¶¶ 44–47) and, in seeking to dismiss the claims against the *individual* defendants, the defendants do not expressly address whether the breach of contract claim is also brought against them. The court finds, however, that it would not be reasonable to read the Complaint as asserting breach of contract claims against the individual defendants, since there are no allegations to suggest that they were parties to the employment agreement between the plaintiff and defendant Nordstrom. Moreover, nowhere in the record does the plaintiff argue that she is bringing breach of contract claims against these defendants. Accordingly, the unchallenged finding of the Magistrate Judge that the Title VII and ADEA claims are not properly brought against the individual defendants, discussed below, is a sufficient basis for dismissing them from this action entirely.

**\*2** The defendants filed with their motion the Declaration of Mary Porter, Nordstrom's Director of Talent Acquisition, along with attached exhibits. (Docket No. 20.) In her Declaration, Ms. Porter avers that, at the time the plaintiff submitted her application for employment to Nordstrom, the plaintiff affixed her electronic signature to a document called "Important Information for You," signifying her agreement to the following language regarding the NDRA:

> I understand that Nordstrom resolves disputes or claims that arise from an application for employment, the employment relationship and/or the termination of employment through final and binding arbitration as explained in full in the [NDRA]. I understand that neither Nordstrom nor I may pursue courtroom litigation as a means to resolve disputes or claims between myself and Nordstrom that are covered by the [NDRA]. My signature below confirms that I have obtained a copy of [the NDRA] by clicking <u>here</u> or by visiting the <u>Nordstrom Careers</u> site or from a Nordstrom Human Resources office. My signature below also confirms that I reviewed the

> [NDRA] and that I understand and agree to its terms and conditions.

(*Id.* ¶¶ 9–10.) Ms. Porter further states that, on March 8, 2015, after accepting Nordstrom's employment offer, the plaintiff was asked to again provide her signature agreeing to the terms of the NDRA, which she did electronically. (*Id.* ¶¶ 11–12.) Ms. Porter states that a true and correct copy of the NDRA to which the plaintiff agreed is attached as Exhibit D to her Declaration. (*Id.* ¶ 12.) The attached NDRA includes a mandatory arbitration clause, which is worded as follows:

> This Dispute Resolution Agreement ("Agreement") is governed by the [FAA] and evidences a transaction involving commerce. This agreement applies to any disputes arising out of or related to your application for employment with Nordstrom or one of its affiliates, subsidiaries or parent companies ("Nordstrom"), your employment with Nordstrom or the termination of your employment .... This Agreement is intended to apply to the resolution of past, present, and future disputes that otherwise would be resolved in a court of law and requires that all such disputes be resolved only by an arbitrator through final and binding arbitration and not by way of court or jury trial except as otherwise stated in this Agreement. The Agreement applies without limitation to disputes regarding the employment relationship, trade secrets, unfair competition, compensation, breaks and rest periods, termination, discrimination, retaliation ... or harassment and claims arising under the Uniform Trade Secrets Act, Civil Rights Act of 1964, Americans With Disabilities Act, Age Discrimination in Employment Act ... and other state and local statutes, addressing the same or similar subject matters,

and all other state statutory and common law claims.

(Docket No. 20–4 (Ex. D.), p. 2.) Finally, Ms. Porter states that the plaintiff signed an Employee Acknowledgement and Agreement Form, attached to Ms. Porter's Declaration as Exhibit G. (Docket No. 20 ¶ 12.) This attached form, containing the plaintiff's signature dated March 8, 2015, states, in pertinent part, that the employee has received and reviewed, and will agree to abide by, the NDRA. (Docket No. 20–7 (Ex. G).)

On October 5, 2015, the plaintiff filed a Response in opposition to the defendants' Motion to Dismiss, along with a Memorandum in support, arguing that 1) because the employment contract was breached (including through the defendant's failure to comply with the terms of the NDRA itself), the NDRA has been revoked and is no longer enforceable; 2) that the NDRA is unenforceable because it is an unconscionable contract of adhesion; and 3) that the individual defendants are proper defendants to the Title VII and ADEA claims in this action. (Docket Nos. 22, 23.) With respect to her assertion that the defendants breached the NDRA, the plaintiff alleges, for the first time in this briefing, that the defendants did not properly comply with the steps outlined in the NDRA for attempting to resolve disputes outside of the arbitration process. (Docket No. 22, pp. 1–2.) The plaintiff specifically alleges that the defendants did not fully investigate her complaints internally and that they informed the plaintiff that that they were not open to reaching a resolution. (*Id.*) The plaintiff also recounts the allegations in her Complaint that the defendants did not adequately address her reports of discrimination and requests for transfer to a different department, allegations that underlie the breach of contract cause of action in the Complaint. (*Id.* at pp. 3–4.) The plaintiff does not, however, allege that she ever attempted to commence the arbitration process as outlined under the NDRA or that the defendants in any way indicated a refusal to engage in arbitration.

**\*3** With respect to the plaintiff's argument that the arbitration agreement is an unenforceable adhesion contract, she references the fact that the contract was drafted by Nordstrom and presented as a mandatory condition of employment, with no provision for the plaintiff to waive or opt-out of its requirements, and without any procedure for Nordstrom to confirm that the plaintiff had actually read and *understood* what she

was signing. (*Id.* at p. 3.) The plaintiff does not deny, however, that she did, in fact, sign the forms agreeing to be bound by the NDRA and indicating that she had read and understood its terms. (*Id.*) Nor does she deny any of the facts put forth in the Porter Declaration regarding her having been given the opportunity to access the NDRA both at the time she applied for her position at Nordstrom and at the time she began her employment, and to print a copy to retain for her records. Finally, the plaintiff does not dispute that the signed documents placed in the record by Ms. Porter are accurate copies of documents bearing the plaintiff's signature as quoted above.

On October 20, 2015, the defendants filed a Reply. (Docket No. 29.)

On August 15, 2016, the Magistrate Judge issued the R&R with respect to this motion. (Docket No. 58.) The Magistrate Judge began by noting that the Sixth Circuit applies the FAA to arbitration agreements formed in employment settings and, therefore, the FAA governs the question of arbitrability in this action, citing *Walker v. Ryan's Family Steak Houses, Inc.*, 400 F.3d 370, 376 (6th Cir. 2005). (*Id.* at p. 5.) The Magistrate Judge also noted that federal courts are required to exercise a strong presumption in favor of arbitration, citing *Stout v. J.D. Byrider*, 228 F.3d 709, 714 (6th Cir. 2000). (*Id.* at p.6.) The Magistrate Judge then followed a four-part test, laid out in *Glazer v. Lehman Bros., Inc.*, 394 F.3d 444, 451 (6th Cir. 2001), for determining a motion to dismiss and compel arbitration: 1) the court must determine whether the parties agreed to arbitrate, 2) the court must determine the scope of the arbitration agreement, 3) if there is a federal claim asserted, the court must determine whether Congress intended those claims to be non-arbtitrable, and 4) if some but not all of the claims are arbitrable, then the court must decide whether to stay the action pending arbitration. (*Id.* at p. 7.)

The Magistrate Judge found that the plaintiff's argument with respect to Nordstrom's alleged breach of the employment agreement (including a breach of the NDRA) is not a proper grounds for invalidating the agreement to arbitrate because the validity or revocation of the contract as a whole is a question for the arbitrator, citing *Buckeye Check Cashing, Inc. v. Cardenza*, 546 U.S. 440, 445–46 (2006). (*Id.* at 8–9.) The Magistrate Judge, however, did not expressly address the question of whether the arbitration agreement itself is an unconscionable contract

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works. 3

of adhesion but, rather, found that this question should also be determined by the arbitrator. (*Id.*) The Magistrate Judge then went on to find: 1) the parties entered an enforceable arbitration agreement; 2) the claims in this action are all within the scope of that agreement; 3) the claims brought under Title VII and the ADEA are not excluded from arbitration under federal law, citing *Willis v. Dean Witter Reynolds, Inc.*, 948 F.2d 305, 309–10 (6th Cir. 2004) (Title VII) and *Gilmer v. Interstate Johnson Lane Corp.*, 500 U.S. 20 (1991) (ADEA); 4) there is no basis for staying the action rather than dismissing it, because all claims are subject to arbitration; and 5) the individual defendants cannot be held liable under Title VII or the ADEA and, therefore, claims against those defendants should be dismissed, citing *Wathen v. Gen. Elec. Co.*, 115 F.3d 400, 404–05 (6th Cir. 1997). (Docket No. 58. at pp. 8–12.)

On August 30, 2016, the plaintiff filed her Objection to the R&R, arguing that the Magistrate Judge erred in finding that the questions of whether Nordstrom breached the NDRA and whether the arbitration agreement is an unconscionable adhesion contract are matters for the arbitrator to decide rather than grounds for voiding the arbitration agreement and keeping this action in federal court. (Docket No. 61.) The plaintiff expressly concedes, however, that she does not object to the Magistrate Judge's findings with respect to the dismissal of the individual defendants. (*Id.* at p. 1.) Moreover, the plaintiff does not object to the Magistrate Judge's findings that 1) an arbitration agreement was entered between the parties, 2) the plaintiff's claims all fall within the scope of that arbitration agreement, 3) claims under Title VII and the ADEA are arbitrable under federal law, and 4) dismissal is warranted rather than staying the proceedings, assuming that the parties are ordered to arbitrate all claims. In her Objection, the plaintiff also argues for the first time that Nordstrom committed fraud in its handling of her requests—under the NDRA—for resolution of her claims outside of the arbitration process. (*Id.* at pp. 5–6.) Specifically, the plaintiff alleges that Nordstrom misrepresented that her claims were being investigated and would potentially be internally resolved. [4] (*Id.*)

---

[4]     Finally, in her Objection, the plaintiff uses the term "duress" to refer to her state of mind at the time she signed the NDRA, apparently referring to the facts put forth in her briefing that her husband had passed away and she was in "dire

need of employment." (Docket No. 61, p. 6.) Nowhere in the record, however, has the plaintiff argued that the arbitration agreement was signed under duress as defined for purposes of invalidating an agreement under Tennessee law, meaning as a product of improper coercive influence placed on her by Nordstrom. *See Barnes v. Barnes*, 193 S.W.3d 495, 500 (Tenn. 2006) (Under Tennessee law, "[d]uress is defined as a condition of mind produced by improper external pressure or influence that practically destroys the free agency of a party, and causes him to do and act or make a contract not of his own volition, but under such wrongful external pressure."). As recounted below, the plaintiff does allege that Nordstrom conditioned her employment on her acceptance of the arbitration agreement within the NDRA, but this is not grounds for a finding of even procedural unconscionability, let alone grounds for a finding of duress that invalidates a contract.

**\*4** On September 14, 2016, the defendants filed a Response to the plaintiff's Objection. (Docket No. 62.)

## ANALYSIS

When a magistrate judge issues a report and recommendation regarding a dispositive pretrial matter, the district court must review *de novo* any portion of the report and recommendation to which a specific objection is made. Fed. R. Civ. P. 72(b); 28 U.S.C. § 636(b)(1)(C); *United States v. Curtis*, 237 F.3d 598, 603 (6th Cir. 2001); *Massey v. City of Ferndale*, 7 F.3d 506, 510 (6th Cir. 1993). The only objection to the R&R advanced by the plaintiff is with respect to the Magistrate Judge's finding that the arbitration agreement entered by the parties is *enforceable*. As noted above, the plaintiff contends that the Magistrate Judge erred in failing to find the NDRA either revoked by the defendant's breach of contract or unenforceable as an unconscionable adhesion contract. For the reasons discussed below, there is no merit to either of these objections.

The plaintiff is correct that arbitration agreements may be rendered unenforceable on the same grounds as other contracts, in common law and in equity. *See Gilmer*, 500 U.S. at 24–25 (citing 9 U.S.C. § 2). The plaintiff's arguments that the arbitration agreement she entered with Nordstrom is unenforceable, however, fail as a matter of law. First, the Magistrate Judge correctly found that an alleged breach of a contract containing an arbitration

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

clause is a matter for the *arbitrator* to decide and is not grounds to invalidate the arbitration clause, which is severable for this purpose from the remainder of the challenged contract. *See Fazio v. Lehman Bros., Inc.*, 340 F.3d 386, 394 (6th Cir. 2003) (finding that allegations of breach of a contract containing an arbitration clause are not grounds for rendering the arbitration agreement invalid and that the only way to invalidate an arbitration clause is to show that the arbitration clause *itself* was the product of improper contract formation). Here, as the Magistrate Judge found, the plaintiff's assertions that Nordstrom breached its employment contract with the plaintiff by reducing her hours without notice, as well as her assertions that Nordstrom specifically breached the NDRA by failing to investigate her claims and reach a resolution outside of the arbitration process, are all matters to be decided by the arbitrator. There are no allegations anywhere in the record that the plaintiff attempted to initiate arbitration proceedings and Nordstrom refused to arbitrate, or that Nordstrom otherwise indicated an intent to renege on its agreement to arbitrate this dispute, such as would warrant legal review.

The plaintiff's allegations of fraud in the communication process around her internal complaint are raised for the first time in her Objection and so are not properly before the court in its review of the R&R. Nevertheless, the court notes that any fraud committed by Nordstrom in the course of responding to the plaintiff's request for extra-arbitral review of her complaints are, again, matters for the arbitrator to consider. The plaintiff appears to confuse fraud in this context with fraud in the context of initially entering an arbitration agreement, which, as discussed below, may be grounds for rendering an arbitration clause invalid. In this action, however, there are no allegations that Nordstrom committed fraud in the process of entering into the arbitration agreement with the plaintiff.

 **\*5** Contrary to the Magistrate Judge's findings, however, a federal court should, in fact, review the question of whether an arbitration agreement is unconscionable before compelling arbitration and dismissing the legal action. *See Buckeye*, 546 U.S. at 446 (differentiating between challenges to the validity of a contract as a whole and challenges to the formation of the arbitration clause itself). "[*U*]*nless the challenge is to the arbitration clause itself*, the issue of the contract's validity is considered by the arbitrator in the first instance." *Id.* (emphasis added);

*see also Johnson v. Long John Silver's Rests., Inc.*, 320 F. Supp. 2d 656, 663–64 (M.D. Tenn. 2004) (differentiating grounds upon which the arbitration clause itself should be voided from matters to be considered by the arbitrator). Here, the plaintiff challenges the arbitration clause in the NDRA *itself* by arguing that it is an unconscionable contract of adhesion. This is a matter that should be addressed by the court before determining that the parties entered an enforceable arbitration agreement. Upon *de novo* review, however, the court finds that the arbitration provision of the NDRA is not an unconscionable contract of adhesion and, therefore, this argument does not, in the end, provide a basis for overturning the Magistrate Judge's finding that the parties entered an enforceable arbitration agreement.

Under Tennessee law, in order to find that a contract is an unenforceable adhesion contract, it must be found both adhesive *and* unconscionable. *See Seawright v. Am. Gen. Fin. Servs.*, 507 F.3d 967, 976–77 (6th Cir. 2007); see also *Cooper v. MRM Inv. Co.*, 367 F.3d 493, 503 (6th Cir. 2004). An adhesion contract is one that is offered on a standard form, on a take it or leave it basis, without giving the weaker party to the negotiation an opportunity to bargain, and under conditions where the weaker party has a lack of meaningful choice. *Id.* at 975–76; *see also Cooper*, 367 F.3d at 499 (citing *Buraczynski v. Eyring*, 919 S.W.2d 314, 320 (Tenn. 1996)). Unconscionability is found where "the inequality of the bargain is so manifest as to shock the judgment of a person of common sense, and where the terms are so oppressive that no reasonable person would make them on the one hand, and no honest and fair person would accept them on the other." *Seawright*, 507 F.3d at 977 (quoting *Huan v. King*, 690 S.W. 2d 869, 872 (Tenn. Ct. App. 2001)).

First, the arbitration agreement between the plaintiff and Nordstrom is not an adhesion contract, because the plaintiff has put forth no evidence that she lacked meaningful choice in whether to enter the agreement or seek employment elsewhere. In *Seawright*, the Sixth Circuit explained that an arbitration agreement in an employment contract is not a contract of adhesion simply because the potential employee has no choice but to agree in order to be hired or to *continue* her employment in that *particular* job. *Id.* at 976 (citing *Cooper*, 367 F.3d at 502). Rather, a lack of meaningful choice would require a showing that the employee had no other comparable employment options. *Id.* As the Sixth Circuit

WESTLAW © 2016 Thomson Reuters. No claim to original U.S. Government Works.

recounted in *Cooper*, Tennessee courts have found a lack of meaningful choice in the adhesion context in a contract given by a doctor to a patient in the middle of her treatment, such that the patient would not be able to maintain her doctor-patient relationship or have her medical treatment continue uninterrupted without agreeing to the contract's terms. 367 F.3d at 499 (citing *Buraczynski*, 919 S.W.2d 314). Tennessee courts have not found a contract to be adhesive, however, where a consumer is simply deprived of the choice of purchasing a product or service from a particular merchant without agreeing to a particular contract term, absent evidence that the consumer would be unable to purchase that item elsewhere. *Id.* at 500 (citing *Pyburn v. Bill Heard Chevrolet*, 63 S.W. 3d 351 (Tenn. Ct. App. 2001); *Wallace v. Nat'l Bank of Commerce*, 938 S.W.2d 684 (Tenn. 1997)). In light of these holdings, the plaintiff cannot establish that Nordstrom presented her with a contract of adhesion merely by conditioning her employment with Nordstrom on the arbitration agreement. The record is devoid of any evidence to suggest that the plaintiff lacked other comparable employment options elsewhere.

**\*6** Further, even if the arbitration agreement between the plaintiff and Nordstrom were an adhesion contract, it is neither substantively nor procedurally unconscionable. Under Tennessee law, a mere inequality between two parties to an agreement is not sufficient to find unconscionability. *See Cooper*, 367 F.3d at 504 (finding no unconscionability, even where the agreement was between a sophisticated employer and a low-level fast-food worker). Unconscionability requires a showing that either the weaker party to the agreement—by virtue of age, intelligence, education, or experience—was so clearly unable to understand the terms of the agreement as to shock the conscience (procedural unconscionability), or that the terms of the agreement are so unfair as to be unreasonable (substantive unconscionability). *Id.* at 504–505. The Sixth Circuit has held that an arbitration agreement in the employment context is not so unreasonable where the terms are mutual and the agreement is not aimed solely at limiting the liability of the employer. *Id.* at 505; *Seawright*, 507 F.3d at 977.

Here, the plaintiff has not established any grounds for the court to find that there was procedural or substantive unconscionability. While there may be an imbalance of power between the plaintiff and Nordstrom, in that Nordstrom is a large company that drafted the agreement

and the plaintiff is an individual seeking a non-managerial sales position, this is not sufficient under the law to establish procedural unconscionability. The plaintiff has presented no evidence to suggest that her age, education, or experience rendered her unable to understand the terms of the contract. [5] Nor has the plaintiff cited any legal proposition to support her argument that Nordstrom was required to affirmatively ensure that she truly understood the terms of the arbitration agreement, beyond providing her with a copy, giving her the opportunity to keep a copy, and asking for her signature to confirm that she read and understood all terms of the NDRA. With respect to the substantive terms of the arbitration agreement, as quoted above, the agreement is clearly mutual, and Nordstrom has waived its rights to pursue litigation just as the plaintiff has. [6] There is no evidence whatsoever to indicate that this agreement was aimed at limiting the liability of Nordstrom.

[5] In fact, to the contrary, the plaintiff has placed in the record a letter from the Nashville Branch of the NAACP, in support of her position in this action, stating that the plaintiff has obtained Juris Doctorate and Master's in Social Work degrees and has extensive employment experience in a variety of professional settings. (Docket No. 54.)

[6] Notably, the plaintiff has not argued that the arbitration agreement in this action is one-sided or otherwise unfair to her in terms of costs, selection of arbitrators, discovery opportunities, or scope of remedies—the type of arguments often used to challenge arbitration agreements on grounds of substantive unconscionability. Moreover, the court's review of the arbitration agreement in the record reveals that such assertions here would be without merit.

In sum, the court finds that the arbitration agreement has not been rendered unenforceable due to allegations of Nordstrom's breach of contract, which is a matter for the arbitrator to determine. Nor is the arbitration agreement an unconscionable contract of adhesion. Accordingly, there is no basis to reject the Magistrate Judge's findings that the parties entered an enforceable agreement to arbitrate and, therefore, the dispute should be subject to arbitration and this action, dismissed.

WESTLAW © 2016 Thomson Reuters. No claim to original U.S. Government Works.

## <u>CONCLUSION</u>

For the foregoing reasons, the R&R will be accepted, as supplemented herein, the Motion to Dismiss, or In Alternative, To Stay the Proceedings and Compel Arbitration will be granted, and this action will be dismissed.

An appropriate order will enter.

**All Citations**

Slip Copy, 2016 WL 5793238

---

**End of Document**

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

---

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Declined to Follow by Skaggs v. HSBC Bank USA, N.A., D.Hawai'i,
December 22, 2010

2009 WL 3244729
Only the Westlaw citation is currently available.
United States District Court,
C.D. California.

Marco A. GAITAN

v.

MORTGAGE ELECTRONIC REGISTRATION
SYSTEMS; Quality Loan Services Corp .;
OneWest FSB; and Does 2 through 10, Inclusive.

No. EDCV 09-1009 VAP (MANx).
|
Oct. 5, 2009.

**Attorneys and Law Firms**

Gregory H.D. Alumit, for Plaintiff.

Jennifer Caroline Bercovici, for Defendants.

PROCEEDINGS: MINUTE ORDER DENYING
PLAINTIFF'S MOTION FOR LEAVE TO
FILE A SECOND AMENDED COMPLAINT

Honorable VIRGINIA A. PHILLIPS, District Judge.

**\*1** Jim Holmes, Relief, Courtroom Deputy

Phyllis Preston, Court Reporter

The Motion for Leave to File a Second Amended
Complaint filed by Plaintiff Marco A. Gaitan came
before the Court for a hearing on October 5, 2009. After
reviewing and considering all papers filed in support
of, and in opposition to, the Motions, as well as the
arguments advanced by counsel at the hearing, the Court
DENIES the Motion for Leave to File a Second Amended
Complaint in the manner set forth below.

## I. BACKGROUND

On April 8, 2009, Plaintiff Marco A. Gaitan ("Plaintiff")
filed this foreclosure-related action in the California

Superior Court for the County of Riverside, against the
Federal Deposit Insurance Corporation ("the FDIC")
in its capacities as receiver of Indymac Bank, F.S.B.
("Indymac") and conservator of Indymac Federal
Bank, FSB, successor in interest to Indymac Bank,
F.S.B.:[1] Mortgage Electronic Registration System, Inc.
("MERS"); Quality Loan Services Corp. ("Quality");[2]
and ten unnamed Does. Doe 1 has since been identified as
OneWest Bank, FSB ("OneWest").

[1] On September 11, 2009, while this motion was
pending, Plaintiff voluntarily dismissed his claims
against the FDIC.

[2] Quality Loan Services Corp. has yet to appear in this
action. It is unclear if it has been served properly.

On May 27, 2009, the FDIC removed the action to this
Court, invoking the Court's federal question jurisdiction
under 28 U.S.C. § 1441(b), based both on the FDIC's
presence as a party and the presence of a claim brought
under the Truth in Lending Act, 15 U.S.C. §§ 1601, et seq.
("TILA").

On June 3, 2009, OneWest and MERS filed a motion to
dismiss the action. Before the Court could hold a hearing
on that motion, Plaintiff attempted to file an amended
complaint on July 27, 2009. On July 31, 2009, the Court
held that Plaintiff was not entitled to file an amended
complaint as a matter of right, and directed him to file a
motion for leave to do so.

On August 10, 2009, Plaintiff filed the instant motion,
seeking leave to file a Second Amended Complaint.
OneWest and MERS ("the Opposing Defendants") filed
an opposition on September 21, 2009, and Plaintiff filed a
reply on September 28, 2009.

## II. THE OPERATIVE COMPLAINT

The operative complaint is the initial one filed in
the Superior Court in April 2009, as modified by a
nonsubstantive amendment filed in that court in May
2009.

The complaint seeks to avoid a trustee's sale of Plaintiff's
residence in Corona ("the property"), set for April 14,
2009. (Compl.¶¶ 2-3.) The property was the subject of two
mortgage loans issued by Indymac Bank in July 20, 2007.

(Compl.¶ 12.) Plaintiff alleges that when these loans were negotiated, he was not provided with "certain disclosures pursuant to the TILA, including two (2) properly prepared Notices of Right to Cancel." (Compl.¶¶ 20-21.)

Plaintiff also alleges several flaws in the documents he did receive, and that the existence of these flaws prove the mortgage loans were obtained by fraud. Specifically, he alleges that neither the "Adjustable Rate Mortgage ('ARM') loan documents" or the Truth in Lending Disclosure Statement ("TILD") "clearly and conspicuously disclose[d]": (i) the actual interest rate on which the scheduled payments were based; "(ii) that making the payments according to the payment schedule listed in the TILD will result in negative amortization and that the principal balance will increase; and (iii) that the payment amounts listed on the TILD are insufficient to pay both principal and interest." (Compl.¶¶ 29, 44, 45.) Plaintiff alleges that not only were the disclosure statements "unclear and inconspicuous," but they were "deceptive" and "based in order to mislead and deceive Plaintiff into believing that he would be getting a loan with a low fixed payment rate that would be sufficient to pay both interest and principal." (Compl.¶¶ 46, 49.)

**\*2** Plaintiff also alleges that, although he has defaulted on the mortgage loans, he "can afford to make a monthly mortgage payment if the loan is modified ...." (Compl.¶ 22.) He claims there exists a potential modification that is "affordable to Plaintiff" and "would be more profitable to the Defendants than a foreclosure." (Compl.¶ 25.) Nevertheless, after discussions with the FDIC, the FDIC would only agree to a loan modification agreement that Plaintiff deemed "inequitable." (Compl.¶ 26.) In a somewhat contradictory fashion, Plaintiff also alleges that the FDIC failed to contact him and "explore options for the borrower to avoid foreclosure," and that they failed to include a declaration attesting to such contact, prior to filing a notice of sale. (Compl.¶ 59.)

Finally, Plaintiff alleges the Defendants were not the proper holders of the note on the loans and thus had no right to foreclose under the security instrument, and they have a practice of foreclosing on properties which they have no right to. (Compl.¶¶ 89-91.)

Based on these factual allegations, the initial complaint contains eleven claims: (1) violation of TILA in failing to provide a notice of the right to cancel (Compl.¶¶ 15-54,

*passim* ); (2) violation of TILA in failing to make clear and conspicuous material disclosures (Compl.¶¶ 15-54, *passim* ); (3) violation of Cal. Civ.Code § 2923.5 (Compl.¶¶ 55-60); (4) violation of Cal. Civ.Code § 2923.6 (Compl.¶¶ 61-64); (5) violation of Cal. Bus. & Prof.Code § 17200 (Compl.¶¶ 65-73); (6) breach of the implied covenant of good faith and fair dealing (Compl.¶¶ 74-85); (7) wrongful foreclosure (Compl.¶¶ 86-99); (8) violation of the Rosenthal Fair Debt Collection Practices Act, "including but not limited to Civ.Code § 1788(e) and (f)" (Compl.¶¶ 100-102); (9) cancellation of the instruments (Compl.¶¶ 103-107); (10) quiet title (Compl.¶¶ 108-110); and (11) equitable rescission under Cal. Civ.Code § 1689 (Compl.¶¶ 111-117).

As remedies for these violations, the original complaint seeks "actual," "compensatory," "consequential," statutory, and punitive damages; rescission of the loans at issue; equitable relief; restitutionary disgorgement; interest; declaratory relief; attorneys' fees and costs; and an order quieting Plaintiff's title to the property. (Compl. p. 20).

### III. THE PROPOSED SECOND AMENDED COMPLAINT

The proposed Second Amended Complaint ("SAC") is twice as long as the original complaint filed in state court, and contains seventeen, rather than eleven claims. [3] In amending the complaint, Plaintiff also seeks to correct the name of Defendant MERS. The factual allegations of the SAC are largely the same as those in the original complaint, with the following modifications.

[3] The SAC omits the original complaint's TILA claim based on a failure to provide notice of the right to cancel. It adds claims alleging violation of Cal. Civ.Code § 2923.52; negligent servicing; violation of the National Housing Act, 12 U.S.C. § 1701x(c)(5); breach of fiduciary duty; and "unjust enrichment/ double dipping." It also includes an action for an accounting, and a claim of "unconscionability."

Plaintiff now alleges that, on or around March 19, 2009, OneWest acquired all deposits, assets, and liabilities of Indymac. (SAC ¶¶ 18-19.)

**\*3** As to the initial loan agreements, Plaintiff continues to allege he was not provided with certain disclosures

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

required by TILA, (SAC ¶ 21), and the failure to make those disclosures clearly and conspicuously shows that the mortgage loans were obtained by fraud. (SAC ¶¶ 29.)

The SAC also continues to allege improprieties in the foreclosure process. On December 17, 2008, Defendants filed a Notice of Default, and on March 18, 2009, they filed a Notice of Trustee's Sale, set for August 28, 2009. (SAC ¶¶ 26-27.) Plaintiff alleges that, although he is in default or it is reasonably foreseeable that he will be in default on the loans, he can make reduced monthly payments on the loans that would be more profitable to Defendants than a foreclosure. (SAC ¶¶ 22, 24-25.)

There are a series of contradictory allegations as to the interactions between Plaintiff and Defendants about a loan modification. For example, Plaintiff alleges he contacted Defendants and proposed a modification to Defendants, but they refused to respond to his proposals, (SAC ¶ 23), yet goes on to allege OneWest is reviewing his proposed modification, but will not postpone the sale while it completes such a review. (SAC ¶ 28.) In yet a third set of allegations, he says he "and/or his attorney called the lender and/or servicer" of the loans to advise them of his financial difficulties and request a modification, but that "the lender and/or servicer failed, refused and/or neglected to work with" him in "any reasonable way," and instead "demanded that the loans be immediately brought current" or else he would face foreclosure. (SAC ¶¶ 42-44.)

The SAC also adds allegations that, in seeking to foreclose, Defendants failed to make "any reasonable efforts to determine Plaintiff's eligibility for the [United States Treasury's] Making Home Affordable Program" (SAC ¶¶ 27, 46(a)), comply with loan servicing obligations for Fannie Mae/Freddie Mac underwritten home loans (SAC ¶ 46(d)), or comply with "Applicable Pooling and Servicing Agreement Loan Serving Requirements" (SAC ¶ 46(e)).

The SAC contains seventeen claims: (1) violation of TILA, 15 U.S.C. §§ 1601, *et seq.,* and its implementing regulations by failing to comply with disclosure requirements (SAC ¶¶ 59-79); (2) violation of Cal. Civ.Code § 2923.5 (SAC ¶¶ 80-85); (3) violation of Cal. Civ.Code § 2923.52 (SAC ¶¶ 86-91); (4) violation of Cal. Civ.Code § 2923.6 (SAC ¶¶ 92-95); (5) negligent servicing (SAC ¶¶ 96-101); (6) violation of the National Housing Act, 12 U.S.C. § 1701x(c)(5) (SAC ¶¶ 102-106); (7) wrongful foreclosure

(SAC ¶¶ 107-122); (8) various "unfair debt collection practices," in violation of the Rosenthal Fair Debtor Collection Practices Act ("including but not limited to" Cal. Civ.Code § 1788), the Federal Fair Debt Collections Act, 15 U.S.C. §§ 1692, *et seq.,* and the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. §§ 2601-26170 (SAC ¶¶ 123-126); (9) for violation of Cal. Bus. & Prof.Code §§ 17200, *et seq.;* (10) breach of the implied covenant of good faith and fair dealing (SAC ¶¶ 137-148); (11) an action to cancel the loan instrument (SAC ¶¶ 149-153); (12) an action to quiet title (SAC ¶¶ 154-157); (13) breach of fiduciary duty (SAC ¶¶ 158-163); (14) an action for an accounting (SAC ¶¶ 164-166); (15) "unconscionability" (SAC ¶¶ 167-171); (16) an action for rescission in equity (SAC ¶¶ 172-178); (17) and "unjust enrichment/double dipping" (SAC ¶¶ 179-185).

**\*4** The claims for violation of Cal. Civ.Code §§ 2923.5 and 2923.52; wrongful foreclosure; unfair debt collection practices; violation of Cal. Bus. & Prof.Code § 17200; and unjust enrichment/double dipping, as well as those to cancel the instrument, to quiet title, and for an accounting are brought against all Defendants. The breach of the implied covenant of good faith and fair dealing and "unconscionability" claims, and the claim for rescission in equity, are brought against all Defendants except Quality. The claims for violation of TILA and Cal. Civ.Code § 2923.6, for negligent servicing, and for violation of the National Housing Act, are brought only against the FDIC, OneWest, and Does 2 through 10. The breach of fiduciary duty claim is brought only against Quality and Does 2 through 10.

As remedies for these violations, the SAC seeks the same remedies as in the initial complaint, in addition to an accounting. (SAC p. 40).

### IV. LEGAL STANDARD

Federal Rule of Civil Procedure 15(a)(2) provides that leave to amend "shall be freely given when justice so requires." Fed.R.Civ.P. 15(a)(2). Although liberally granted, leave to amend is not automatic. The Ninth Circuit strongly favors allowing amendment, and a district court should only deny a motion for leave to amend upon a showing of bad faith, undue delay, prejudice to the opposing party, or futility of the amendment. *Royal Ins.*

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

*Co. of America v. Southwest Marine,* 194 F.3d 1009, 1016 (9th Cir.1999).

## V. DISCUSSION

The Opposing Defendants argue that Plaintiff should not be granted leave to amend because amendment would be futile, since each of the claims contained in the proposed SAC fails to state a claim.

Amendment is futile if a claim, as amended, would fail to state a claim under the standard applied on a motion to dismiss pursuant to Fed. R. Civ. Pro. 12(b)(6), *Miller v. Rykoff-Sexton, Inc.,* 845 F.2d 209, 214 (9th Cir.1988), and any defect in the pleading cannot "possibly be cured by the allegation of other facts." *Lopez v. Smith,* 203 F.3d 1122, 1127 (9th Cir.2000) (en banc), *quoting Doe v. United States,* 58 F.3d 494, 497 (9th Cir.1995). Thus, Plaintiff will only be granted leave to amend his complaint if he can show that the claims, as amended, establish a plausible entitlement to relief. *See Ashcroft v. Iqbal,* 556 U.S. ----, 129 S.Ct. 1937, 1949 (2009).

Plaintiff makes the legally flawed argument that "courts do not ordinarily consider the validity of a proposed amended pleading in deciding whether to grant leave to amend." Reply at 3, *citing SAES Getters S.p.A. v. Aeronex, Inc.,* 219 F.Supp.2d 1081, 1086 (S .D. Cal.2002). As noted above, the validity of the proposed amended pleading is at the heart of futility analysis. The case Plaintiff cites does not support his assertion at all, as the court there explicitly stated that "courts will determine the legal sufficiency of a proposed amendment using the same standard as applied on a Rule 12(b)(6) motion." *SAES Getters S.p.A.,* 219 F.Supp.2d at 1086, *citing Miller,* 845 F.2d at 214.

**\*5** Plaintiff also argues, without any citation to supporting authority, that claims cannot be deemed "futile" until after discovery is complete. (Reply at 3.) The 12(b)(6) standard is always applied prior to the completion of discovery, however. To state a claim, a complaint must allege "enough facts to raise a reasonable expectation that discovery will reveal evidence" demonstrating an entitlement to relief. *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007). That discovery has yet to occur does not preclude a court from examining whether a complaint meets the 12(b)(6) plausibility standard.

The court examines each of the claims in the proposed amended complaint in turn. Plaintiff fails to argue regarding the viability of any of the claims, but the Court nonetheless gives due consideration to each claim.

### A. First Claim: TILA

The first claim in the proposed SAC alleges a violation of TILA based on a failure to comply with the statute's disclosure requirements.

TILA contains a one-year statute of limitations. 15 U.S.C. § 1640(e). Plaintiff's TILA claim is premised on failures to make disclosures at the time the loans were executed in July 2007.

(SAC ¶¶ 18-19.) This action was not filed until April 2009, well beyond the end of the limitations period.

At the hearing on this motion, for the first time, Plaintiff argued that his TILA claim has been equitably tolled, citing *Ralston v. Mortgage Investors Group, Inc.,* No. C 08-536 JF (RS), 2009 WL 688858 (N.D.Cal. Mar. 16, 2009). The Ninth Circuit has held that "the doctrine of equitable tolling may, in the appropriate circumstances, suspend the limitations period until the borrower discovers or had reasonable opportunity to discover the fraud or nondisclosures that form the basis of the TILA action." *King v. California,* 784 F.2d 910, 915 (9th Cir.1986), *cert. denied,* 484 U.S. 802 (1987). *See also Cervantes v. City of San Diego,* 5 F.3d 1273, 1277 (9th Cir.1993); *Ayala v. World Savings Bank, FSB,* 616 F.Supp.2d 1007, 1019 (C.D.Cal.2009).

But as one district court recently noted, to assert equitable tolling, a complaint must include actual factual allegations as to how plaintiffs were precluded from discovering the TILA violation, particularly "in such a case as the one before the Court since the vast majority of Plaintiffs' alleged violations under TILA are violations that are self-apparent at the consummation of the transaction-e.g., not being provided a notice of one's right to rescind the transaction at the time of closing, not being properly provided with the annual percentage rate, finance charges, total amount financed, payment schedule, etc." *Cervantes v. Countrywide Home Loans, Inc.,* No. CV 09-517-PHX-JAT, 2009 WL 3157160, at \*4 (D.Ariz. Sept. 24, 2009).

WEST

4

As plead, the SAC contains no facts suggesting discovery was precluded, and thus there is no basis for invoking equitable tolling. In *Ralston,* notably, the court relied upon the plaintiff's specific allegations that "the loan documents were so confusing as to obfuscate the true terms of the loan, and that because he did not understand the true terms of the loan at the time of the transaction, he did not realize [the TILA violation] until later." 2009 WL 688858 at *3. The SAC here contains no similar allegations. Accordingly, the SAC fails to state a viable TILA claim, as it is time-barred, and amendment is futile. Nevertheless, it cannot be said Plaintiff could never state such facts, and thus state a TILA claim. *See Tanuvasa v. F.D.I.C.,* No. CV 09-02795 DDP (AGRx), 2009 WL 3108568, at *2 (C.D.Cal. Sept. 23, 2009) (dismissing TILA claim but granting leave to amend "to include facts relevant to the applicability of equitable tolling"); *Rabb v. BNC Mortg., Inc.,* No. CV 09-4740 AHM (RZx) 2009 WL 3045812, at *2 (C.D.Cal. Sept. 21, 2009) (same); *Ayala,* 616 F.Supp.2d at 1020 (same). Accordingly, the Court will entertain a further motion for leave to amend should Plaintiff seek to revise his TILA claim.

**B. Second Claim: Cal. Civ.Code § 2923.5**

**\*6** Plaintiff's second claim in the proposed SAC alleges a violation of Cal. Civ.Code § 2923.5. Passed as part of the Perata Mortgage Relief Act, Civ.Code § 2923.5 imposes several requirements on lenders before they may file a notice of default and nonjudicially foreclose upon a property. First, the statute imposes a requirement of "due diligence." Cal. Civ.Code § 2923.5(g). Such due diligence requires that the lender take several steps before foreclosure, including providing a borrower with contact information for a United States Department of Housing and Urban Development ("HUD")-approved counseling agency. (*Id.*) The lender must also contact the borrower "to assess the borrower's financial situation and explore options for the borrower to avoid foreclosure." Cal. Civ.Code § 2923.5(a)(2). Only when 30 days have elapsed after contact is made in such an effort may a lender file a notice of default. Cal. Civ.Code § 2923.5(a)(1).

**(1) Against MERS**

MERS argues that it cannot be a party to a Cal. Civ.Code § 2923.5 claim, since it transferred its sole interests under the applicable Deed of Trust to Indymac Federal Bank FSB on November 26, 2008. (Defs.' Request for Judicial Not. ("RJN"), Ex. B.)[4] The Notice of Default was

not filed in this case until December 17, 2008. (SAC ¶ 27.) As such, MERS was no longer a "mortgagee, trustee, beneficiary, or authorized agent" subject to the requirements of § 2923.5 at the time of foreclosure. Moreover, neither the allegations of the FAC nor the Notice of Default and Notice of Trustee Sale, included by Plaintiff with the SAC, show any involvement by MERS in the foreclosure proceedings. *See* SAC Ex. A (Notice of Default), SAC Ex. B (Notice of Trustee Sale). The SAC thus fails to state a claim against MERS under Civ.Code § 2923.5, and any amendment is futile.

[4]    The Court may "take judicial notice of matters of public record outside the pleadings," *Mir v. Little Co. of Mary Hosp.,* 844 F.2d 646, 649 (9th Cir.1988), and does so here.

**(2) Against OneWest**

OneWest makes multiple arguments as to why any amendment to the Civ.Code § 2923.5 claim against it is likewise futile.

OneWest argues that the Notice of Default, as well as Plaintiff's own allegations, establish its compliance with the requirements of section 2923.5. Since, as noted above, the SAC contains contradictory and confusing allegations regarding the contacts between OneWest and Plaintiff, the Court cannot determine whether, accepting these allegations as true, OneWest complied with the minimal statutory requirement that it "assess the borrower's financial situation and explore options for the borrower to avoid foreclosure." Cal. Civ.Code § 2923.5(a)(2). While this does not mean the claim is futile, it does suggest that the claim, as alleged in the SAC, violates Fed. R. Civ. Pro. 8, as it is "so verbose, confused and redundant that its true substance, if any, is well disguised." *Hearns v. San Bernardino Police Dep't,* 530 F.3d 1124, 1131 (9th Cir.2008), *quoting Gillibeau v. City of Richmond,* 417 F.2d 426, 431 (9th Cir.1969). While the Court could allow Plaintiff to propose yet another amended complaint to remedy this defect, such amendment would be futile if, as OneWest suggests, the statute does not create a private right of action.

**\*7** Under California law, a statute will only be deemed to contain a private right of action if the Legislature has manifested an intent to create such a right. *Moradi-Shalal v. Fireman's Fund Ins. Companies,* 46 Cal.3d 287, 305 (1988).

The Perata Mortgage Relief Act was enacted relatively recently, and thus California courts have had little chance to examine its provisions. Nevertheless, section 2923.6, passed along with section 2923.5, clearly does not create a private right of action. That section solely "creat[es] a duty between a loan servicer and a loan pool member. The statute in no way confers standing on a borrower to contest a breach of that duty." *Farner v. Countrywide Home Loans,* No. 08cv2193 BTM (AJB), 2009 WL 189025, at *2 (S.D.Cal. Jan. 26, 2009). Other courts to consider this question have agreed unanimously with the Farner court. *See Tapia v. Aurora Loan Servs ., LLC,* No. 1:09-cv-01143 AWI (GSA), 2009 WL 2705853, at *1 (E.D.Cal. Aug. 25, 2009); *Anaya v. Advisors Lending Group,* No. CV F 09-1191 LJO DLB, 2009 WL 2424037, at *8 (E.D.Cal. Aug. 5, 2009); *Pantoja v. Countrywide Home Loans, Inc.,* ---F.Supp.2d ----, No. C 09-01615 JW, 2009 WL 2423703, at *7 (N.D.Cal. July 9, 2009); *Connors v. Home Loan Corp.,* No. 08cv1134-L (LSP), 2009 WL 1615989, at *7 (S.D. Cal. June 9, 2009).

Whether or not section 2923.5 creates a private right of action, however, has not been the subject of unanimity among the courts. Only two courts have considered this question, and they have reached inconsistent results. *See Yulaeva v. Greenpoint Mortgage Funding, Inc.,* No. CIV. S-09-1504 LKK/KJM, 2009 WL 2880393, at *11 (E.D.Cal. Sept. 03, 2009) (assuming without deciding that section 2923.5 does not provide a private right of action); *Ortiz v. Accredited Home Lenders, Inc.,* --- F.Supp.2d ----, No. 09 CV 0461 JM (CAB), 2009 WL 2058784, at *5 (S.D.Cal. Jul. 13, 2009) (finding section 2923.5 does contain a private right of action, as "the California legislature would not have enacted this 'urgency' legislation, intended to curb high foreclosure rates in the state, without any accompanying enforcement mechanism.").

Under California law, "courts are not at liberty to impute a particular intention to the Legislature when nothing in the language of the statute implies such an intention." *Dunn-Edwards Corp. v. Bay Area Air Quality Management Dist.,* 9 Cal.App. 4th 644, 658 (1992). Thus, "if the Legislature intends to create a private cause of action, we generally assume it will do so directly, in clear, understandable, unmistakable terms." *Vicko Ins. Servs., Inc. v. Ohio Indemnity Co.,* 70 Cal.App. 4th 55,

62-63 (1999), *quoting Moradi-Shalal,* 46 Cal.3d at 294-295 (internal marks omitted).

Section 2923.5 contains no language that indicates any intent whatsoever to create a private right of action. As such, the Court concludes that section 2923.5 does not contain such a right, and that amendment of the claim would be futile. [5]

[5]     OneWest also argues the claim is futile because Plaintiff has failed to tender the full amount due and owing under the loans, and that plaintiff has not stated "any violation of HAMP." Given the Court's conclusions above, it is unnecessary to reach either of these arguments.

### C. Third Claim: Cal. Civ.Code § 2923.52

**\*8** The third claim in the proposed SAC alleges a violation of Cal. Civ.Code § 2923.52(a). Section 2923.52(a) requires a mortgagee to wait "at least 90 days after the lapse of three months" from the filing of a notice of default before filing a notice of sale. However, the statute was not enacted until May 21, 2009, and explicitly only became operative "14 days after the issuance of regulations, which shall include the form of the application for mortgage loan servicers, by the commissioner." Cal. Civ.Code § 2923.52(d). The Notice of Sale that forms the basis of Plaintiff's section 2923.52 claim was effected on March 18, 2009. (SAC ¶ 89.) Since the statute did not apply to the transaction, Plaintiff fails to state a claim, and amendment is futile.

### D. Fourth Claim: Cal. Civ.Code § 2923.6

The fourth claim in Plaintiff's proposed SAC alleges violation of Cal. Civ.Code § 2923.6. As noted above, there is no private right of action under section 2923.6. Moreover, section 2923.6 imposes no duty on any party, as it is merely a statement of "Legislative findings and declarations." *See Ruiz v. Saxon Mortg. Servs.,* No. CV09-02766 AHM (SSx), 2009 WL 1872465, at *2 n. 2 (C.D. Cal. June 29, 2009). As such, Plaintiff fails to state a claim and amendment is futile.

### E. Fifth Claim: Negligent Servicing

The fifth claim in the proposed SAC alleges "negligent servicing ." The Opposing Defendants argue that the proposed amendment to add this claim is futile, since there is "no such cause of action." Opp'n at 14. However,

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

liberally construed, this claim can be read as one sounding in general negligence.

Under California law, "[t]he elements of an action for negligence are the existence of duty (the obligation to other persons to conform to a standard of care to avoid unreasonable risk of harm to them); breach of duty (conduct below the standard of care); causation (between the defendant's act or omission and the plaintiff's injuries); and damages." *Merrill v. Navegar, Inc.,* 26 Cal.4th 465, 500 (2001). Nevertheless, parties to a contractual relationship, such as a mortgagor and mortgagee, cannot bring a tort claim unless a legal duty independent of the contract itself has been violated. *Freeman & Mills, Inc. v. Belcher Oil Co.,* 11 Cal.4th 85, 102-03 (1995).

No such duty is implicated here. The SAC alleges OneWest breached its duties of "honesty, fair dealing and good faith," "to follow the applicable standards of residential single family mortgage lending and servicing," "to diligently exercise skill and care in the performance of their servicing duties with respect to Plaintiff's mortgage," and "to investigate and disclose all facts known to them materially affecting the subject mortgage and any loss mitigation or foreclosure prevention available to Plaintiff." (SAC ¶¶ 98-99.)

Since the duties of honesty, fair dealing and good faith are contained in every contract under California, law, *see Habitat Trust for Wildlife, Inc. v. City of Rancho Cucamonga,* 175 Cal. App .4th 1306, 1332 (2009), these duties are not "independent" of the loan contracts. Moreover, any claims based on the breach of these duties duplicate Plaintiff's breach of the implied covenant of good faith and fair dealing claim, which rests on the same facts. *See Frank Music Corp. v. Metro-GoldwynMayer Inc.,* 886 F.2d 1545, 1556 (9th Cir.1989) (affirming dismissal of duplicative claims).

 **\*9** As to the other alleged duties, under California law, "as a general rule, a financial institution owes no duty of care to a borrower when the institution's involvement in the loan transaction does not exceed the scope of its conventional role as a mere lender of money." *Nymark v. Heart Fed. Sav. & Loan Ass'n,* 231 Cal.App.3d 1089, 1096 (1991). "Liability to a borrower for negligence arises only when the lender 'actively participates' in the financed enterprise 'beyond the domain of the usual money lender.' " *Id., quoting Wagner v. Benson,* 101 Cal.App.3d 27, 35

(1980). *See also Wilkerson v. World Sav. & Loan Ass'n,* No. CIV S-08-2168 LKK DAD PS, 2009 WL 2777770, at \*4 (E.D.Cal. Aug. 27, 2009); *Marks v. Ocwen Loan Servicing,* No. C 07-02133 SI, 2008 WL 344210, at \*6 (N.D.Cal. Feb. 6, 2008). Moreover, in the context of nonjudicial foreclosures, California courts have held repeatedly that the common law imposes no duties of notice other than those required by statute or contract. *I.E. Associates v. Safeco Title Ins. Co.* 39 Cal.3d 281, 287-288 (1985); *Diediker v. Peelle Financial Corp.,* 60 Cal.App. 4th 288, 295-296 (1997).

The proposed SAC contains no allegations suggesting that OneWest acted outside its "conventional role as a mere lender of money." As such, the proposed amendment of the complaint is futile. Amendment may not be futile, however, if Plaintiff can amend the claim to include such allegations. Accordingly, the Court will entertain a further motion for leave to amend should Plaintiff seek to revise his negligent servicing claim.

### F. Sixth Claim: Violation of The National Housing Act
The sixth claim in the proposed SAC seeks to enforce "the foreclosure prevention loan servicing requirement imposed on Defendants pursuant to the National Housing Act, 12 U.S.C. § 1701x(c)(5) [,] which requires all private lenders servicing non-federally insured home loans ... to advise borrowers" of any home ownership counseling they or the United States Department of Housing and Urban Development ("HUD") may offer. (SAC ¶ 103.) The Opposing Defendants argue there is no private right of action to enforce this statutory provision.

"The question whether a statute creates a cause of action, either expressly or by implication, is basically a matter of statutory construction." *Opera Plaza Residential Parcel Homeowners Ass'n v. Hoang,* 376 F.3d 831 (9th Cir.2004). By its structure, the National Housing Act "govern[s] relations between the mortgagee and the government, and give[s] the mortgagor no claim for duty owed or for the mortgagee's failure to follow" the statute or its implementing regulations. *Mitchell v. Chase Home Finance LLC,* No. 3:06-CV-2099-K, 2008 WL 623395, at \*3 (N.D.Tex. Mar. 4, 2008). As such, courts have held that the National Housing Act generally does not contain a private right of action. *See City of Rohnert Park v. Harris,* 601 F.2d 1040, 1046-47 (9th Cir.1979); *Saratoga Sav. & Loan Ass'n v. Fed. Home Loan Bank of San Francisco,* 724 F.Supp. 683, 690 (N.D.Cal.1989); *Mitchell,* at \*3; *Fantroy*

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

*v. Countrywide Home Loans, Inc.,* 2007 WL 2254941, No. 3:06-CV-1889-K, at *2 (N.D.Tex. July 24, 2007); *Goss v. Fairfield Housing Authority,* No. 3:03CV0935(WIG), 2006 WL 1272623, at *3 (D.Conn. Mar. 14, 2006). The provision asserted by Plaintiff is no exception. *See Fouche' v. Shapiro & Massey L.L.P.,* 575 F.Supp.2d 776, 780 n. 7 (S.D.Miss.2008).

**\*10** The Court agrees that there is no indication of an intent to create a private right of action in 12 U.S.C. § 1701x(c)(5). As such, Plaintiff cannot state a claim, and the proposed amendment is futile.

### G. Seventh Claim: Wrongful Foreclosure

The seventh claim in the proposed SAC is one for "wrongful foreclosure," and asserts that the FDIC, OneWest, MERS, and Quality are and were not "the holder of the note, payment of which was secured by the security instrument," nor were they "in possession of the note properly endorsed to" them or "otherwise entitled by law" to initiate foreclosure. (SAC ¶ 110.) Hence, Plaintiff alleges that the Defendants had no right to initiate foreclosure proceedings. (SAC ¶ 111.) Plaintiff also claims the substitution of trustee form, transferring interests from Indymac to OneWest was defective, since it was improperly notarized eight days after it was signed. (SAC ¶ 112.)

Plaintiff's argument about the "holder of the note" is premised on his interpretation of Cal. Com.Code §§ 3301, 3309. (SAC ¶ 119 .) Those statutory provisions reflect California's adoption of the Uniform Commercial Code, and generally define a "Person entitled to enforce" a "lost, destroyed or stolen instrument." Non-judicial foreclosure in California is not governed by this statute, but rather by Cal. Civ.Code §§ 2924, *et seq.* "The comprehensive statutory framework established to govern nonjudicial foreclosure sales is intended to be exhaustive." *Moeller v. Lien,* 25 Cal.App. 4th 822, 834 (1994). Accordingly, Plaintiff cannot assert a claim based on a failure to comply with the inapplicable Commercial Code.

Plaintiff's other basis for this claim also fails as a matter of law. Cal. Civ.Code § 2934a requires a document substituting a trustee under a trust deed to be acknowledged. The document is a valid transfer of title even if it is not acknowledged or recorded until later, however. *See Wilson v. Pac. Coast Title Ins. Co.,* 106 Cal.App.2d 599, 602 (1951) (declaring substitution

of trustee valid even though not acknowledged until two years after execution of document).

Since neither of the legal bases for Plaintiff's wrongful foreclosure claim are valid, he fails to state a claim and amendment is futile.

### H. Eighth Claim: Unfair Debt Collection Practices

The eighth claim in the proposed SAC alleges various "Unfair Debt Collection Practices." The claim actually contains claims under three different statutes: the Rosenthal Fair Debt Collection Practices Act ("RFDCPA"), "including but not limited to" Cal. Civ.Code § 1788; the Federal Fair Debt Collections Act ("FDCPA"), 15 U.S.C. §§ 1692, *et seq.,* and the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. §§ 2601-26170.

Cal. Civ.Code § 1788 merely states the short title of the Rosenthal Fair Debt Collection Practices Act, so it is unclear what provision of that statute Plaintiff accuses Defendants of violating. Whatever provision of the RFDCPA Plaintiff relies upon, though, he cannot state a claim against any of the Defendants. The statute only applies to "debt collectors," defined as "any person[s] who, in the ordinary course of business, regularly, on behalf of himself or herself or others, engages in debt collection." Cal. Civ.Code § 1788.2(c). The only attempt to act on a debt alleged in the complaint is the attempted nonjudicial foreclosure, and "foreclosure does not constitute debt collection under the RFDCPA." *Izenberg v. ETS Services, LLC,* 589 F.Supp.2d 1193, 1199 (C.D.Cal.2008), *quoting Ines v. Countrywide Home Loans, Inc.,* No. 08cv1267 WQH (NLS), 2008 WL 4791863, at *3 (S.D.Cal. Nov. 3, 2008). Therefore, Plaintiff cannot state a RFDCPA claim based on the allegations in the SAC.

**\*11** The FDCPA likewise only applies to debt collectors as defined by statute. 15 U.S.C. § 1692a(6). As under the RFDCPA, "foreclosing on [a] property pursuant to a deed of trust is not the collection of a debt within the meaning of the FDCPA." *Izenberg,* 589 F.Supp.2d at 1199, *quoting* Ines, at *2 (alteration in original). Thus, Plaintiff cannot state a FDCPA claim based on the allegations in the SAC.

In the proposed SAC, Plaintiff does not specify what specific provisions of RESPA he alleges Defendants have violated. The opposing defendants have not made any specific objections to the RESPA claim. But "neither

[Defendants] nor the Court are under any obligation to guess as to the manner in which [Defendants]' conduct allegedly violated RESPA." *Izenberg, 589 F.Supp.2d at 1200, citing Assoc. Gen. Contractors of Cal., Inc. v. California State Council of Carpenters,* 459 U.S. 519, 526 (1983). *See also* Fed. R. Civ. Pro. 8(a)(2) (pleading must include "a short and plain statement of the claim showing that the pleader is entitled to relief"). The SAC thus does not state a claim under RESPA. Nevertheless, it cannot be said Plaintiff could never state such a claim. Accordingly, the Court will entertain a further motion for leave to amend should Plaintiff seek to revise his RESPA claim.

**I. Ninth Claim: Cal. Bus. & Prof.Code §§ 17200, et seq.**
Plaintiff's ninth claim alleges violation of the Unfair Competition Law, Cal. Bus. & Prof.Code §§ 17200, et seq. (the "UCL"). It is predicated on Defendants' alleged violations of TILA, Cal. Civ.Code §§ 2923.5, 2923.52, and 2923.6, and the RFDCPA, as well as Defendants' negligent servicing, wrongful foreclosure, and failure "to determine Plaintiff's eligibility for the Making Home Affordable Program." (SAC ¶¶ 130-131.)

As noted above, the complaint fails to state a claim for negligent servicing, wrongful foreclosure, or violation of the RFDCPA or Cal. Civ.Code §§ 2923.52 or 2923.6 on the merits. It also fails to state a Cal. Civ.Code § 2923.5 claim against MERS on the merits. Hence, Plaintiff cannot state a UCL claim based on those predicate violations, since he has not alleged any "unlawful" activity. Since, as plead in the proposed in the SAC, any TILA claim is time-barred, Plaintiff cannot state a UCL claim based on that theory. *See Chabner v. United of Omaha Life Ins. Co ., 225 F.3d 1042, 1048 (9th Cir.2000)* ("A court may not allow plaintiff to 'plead around an absolute bar to relief simply by recasting the cause of action as one for unfair competition.' "); *Rubio v. Capital One Bank ( USA), N.A., 572 F.Supp.2d 1157, 1168 (C.D.Cal.2008).* Should the Plaintiff choose to amend his TILA claim to allege facts entitling him to equitable tolling, he may reassert this claim.

As to the section 2923.5 claim against OneWest as a predicate to the UCL claim Nevertheless, "a private plaintiff may bring a UCL action even when 'the conduct alleged to constitute unfair competition violates a statute for the direct enforcement of which there is no private right of action.' " *Kasky v. Nike, Inc., 27 Cal.4th 939, 950 (2002), quoting Stop Youth Addiction, Inc. v. Lucky Stores,*

*Inc.,* 17 Cal.4th 553, 565 (2002). Thus, plaintiff may be able to state a UCL claims based on OneWest's alleged violation of Cal. Civ.Code § 2923.5. As discussed above, the factual allegations of the proposed SAC regarding are too contradictory and confusing for the Court to discern whether Plaintiff has alleged a violation of that statute. Thus, the proposed amended UCL claim is futile. However, the Court will entertain a further motion for leave to amend should Plaintiff seek to revise his UCL claim against OneWest as premised on a violation of section 2923.5.

**J. Tenth Claim: Breach of Implied Covenant of Good Faith and Fair Dealing**
**\*12** The tenth claim in the proposed SAC alleges breach of the implied covenant of good faith and fair dealing. The actual acts that form the basis for Plaintiff's claim for breach of the implied covenant of good faith and fair dealing are unclear from the face of the SAC. None of the facts in the SAC can support a claim for breach of the implied covenant of good faith and fair dealing, however.

Inasmuch as plaintiff alleges the failure to negotiate or delay foreclosure was a breach of the implied covenant, that claim must fail, since "the implied covenant of good faith and fair dealing does not impose an affirmative duty on a party to forbear from enforcing rights expressly given under the contract." *Storek & Storek, Inc. v. Citicorp Real Estate, Inc., 100 Cal.App. 4th 44, 56 n. 10 (2002).* Inasmuch as Plaintiff alleges wrongdoing in the origination of the loan, those claims cannot be asserted against the remaining Defendants, who, indisputedly, were not involved in the initial negotiation of the loan. *See Bunag v. Aegis Whoelsale Corp.,* No. C 09-00558 MEJ, 2009 WL 2245688, at \*3 (N.D.Cal. July 27, 2009). The proposed SAC thus fails to state a claim for breach of the implied covenant of good faith and fair dealing, and amendment is futile.

**K. Eleventh Claim: Cancellation of Instrument**
The eleventh claim in the proposed SAC seeks cancellation of various legal documents, since the "Notice of Default, Notice of Trustee Sale and potentially any Trustee's Deed or other such instrument purporting to transfer title are invalid as an instrument of transfer." (SAC ¶ 151.) Since this claim fails to provide any legal basis as required by Fed. R. Civ. Pro. 8(a)(2), the claim fails, and amendment is futile.

### L. Twelfth Cause of Action: Quiet Title

In the twelfth claim in the proposed SAC, Plaintiff requests the Court cancel the deed of trust and quiet his title to the property against the claims of all Defendants. (SAC ¶¶ 156-157.)

A basic requirement of an action to quiet title is an allegation that plaintiffs "are the rightful owners of the property, *i.e.,* that they have satisfied their obligations under the Deed of Trust." *Kelley v. Mortgage Elec. Reg. Sys., Inc.,* No. C 09-01538 SI, --- F.Supp.2d ----, 2009 WL 2475703, at *7 (N.D.Cal. Aug. 12, 2009). "[A] mortgagor cannot quiet his title against the mortgagee without paying the debt secured." *Watson v. MTC Financial, Inc.,* No. 2:09-CV-01012 JAM-KJM, 2009 WL 2151782 (E.D.Cal. Jul. 17, 2009), *quoting Shimpones v. Stickney,* 219 Cal. 637, 649 (1934).

Since Plaintiff concedes he has not paid the debt secured by the mortgage, he cannot sustain an action to quiet title, and amendment of this claim is futile.

### M. Thirteenth Claim: Breach of Fiduciary Duty

The thirteenth claim in the proposed SAC alleges breach of fiduciary duty, and is brought against Quality only, who has yet to appear in this action; the Opposing Defendants do not address the claim. Nonetheless, the Court examines the claim as set forth in the proposed SAC and determines it fails as a matter of law. As a foreclosure trustee, Quality has no fiduciary duty to Plaintiff, since "a trustee in a nonjudicial foreclosure is 'not a true trustee with fiduciary duties, but rather a common agent for the trustor and beneficiary.' " *Hendrickson v. Popular Mortg. Servicing, Inc.,* No. C 09-00472 CW, 2009 WL 1455491, at * 7 (N.D.Cal. May 21, 2009), *quoting Pro Value Properties, Inc. v. Quality Loan Service Corp.,* 170 Cal.App. 4th 579, 583 (2009). Plaintiff thus fails to state a claim and amendment would be futile.

### N. Fourteenth Claim: Accounting

**\*13** Plaintiff's fourteenth claim seeks an accounting pursuant to 15 U . S.C. § 1635(b) and 12 U.S.C. § 2605. Section 1635(b), a provision of TILA, provides for return of money or property following rescission. Plaintiff has not alleged facts to show that he is entitled to rescission under TILA, and in the SAC, has removed

any allegations as to Defendants' failure to provide notice of the right to cancel under TILA. Thus, he is not entitled to an accounting on this basis. Likewise, 12 U.S.C. § 2605, a provision of RESPA, also is inapplicable. Section 2605 requires certain disclosures to be made relating to assignment, sale, or transfer of the right to service a loan. Its remedy provisions include damages and costs, but section 2605 does not provide for accounting. *See* 12 U.S.C. § 2605(f). Accordingly, the proposed SAC fails to state an independent claim for accounting, and amendment is futile. Insofar as Plaintiff seeks accounting as an equitable remedy, Plaintiff may seek this relief in connection with an appropriate claim in any further amended pleading filed.

### O. Fifteenth Claim: Unconscionability

The fifteenth claim in the proposed SAC is one for "unconscionability." No such affirmative claim exists. Unconscionability may be raised as a defense in a contract claim, or as a legal argument in support of some other claim, but it does not constitute a claim on its own. *See Dean Witter Reynolds, Inc. v. Superior Court,* 211 Cal.App.3d 758, 766 (1989) (Cal. Civ.Code § 1670.5 allows court to refuse to enforce or limit an unconscionable contract, but does not create an affirmative cause of action); *Carey v. Lincoln Loan,* 203 Or.App. 399, 423-24 (2005) ("[U]nconscionability is not a basis for a separate claim for relief."). As such, the claim is without merit, and amendment is futile.

### P. Sixteenth Claim: Rescission in Equity

The sixteenth claim in the proposed SAC seeks the equitable rescission of the loan agreements under Cal. Civ.Code § 1689(b)(5). The right of rescission is unavailable to Plaintiff, since he is in default on the contracts, however. "The right to rescind a contract rests only with the party who is without default." *Nelson v. Spence,* 182 Cal.App.2d 493, 499 (1960). Hence, the claim is without merit, and amendment would be futile.

### Q. Seventeenth Claim: "Unjust Enrichment/ Double Dipping"

The seventeenth and final claim in the proposed SAC asserts that Defendants' auction of her house would "amount[ ] to unjust enrichment and is what is known as 'double dipping.' " (SAC ¶ 184.) Plaintiff claims he is entitled to relief since "OneWest has committed to the

Home Affordable Modification Program ... [and] refused to determine Plaintiff's eligibility for a loan modification ." Plaintiff fails to show how participation in this program gives rise to a private cause of action. Insofar as Plaintiff's unjust enrichment claim is based on other statutory violations, (SAC ¶ 181), the Court finds the claim fails for the reasons each of those claims independently fail as a matter of law, as described in discussing each independent claim above.

**VI. CONCLUSION**

**\*14** Since amendment would be futile, as none of the seventeen claims contained in Plaintiff's proposed Second Amendment Complaint state a claim on, Plaintiff's motion for leave to amend is DENIED without prejudice to a subsequent motion for leave to file an amended complaint containing only TILA, UCL, negligent servicing and RESPA claims, in accordance with the limitations indicated above.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 3244729

---

**End of Document**

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 2901823
Only the Westlaw citation is currently available.
United States District Court, E.D. Tennessee.

Catherine GEBHARDT, Plaintiff,
v.
GMAC MORTGAGE, LLC, and
MGC Mortgage, Inc., Defendants.

No. 3:09–CV–425.
|
July 21, 2010.

**Attorneys and Law Firms**

Andrew E. Farmer, The Law Office of Andrew E. Farmer, Sevierville, TN, for Plaintiff.

Christopher E. Thorsen, Tera T. Hambrick, Bradley Arant Boult Cummings LLP, Nashville, TN, for GMAC Mortgage, LLC.

Frank R. Olson, Laura Ann Grifka, McCurdy & Candler, LLC, Decatur, GA, for MGC Mortgage, Inc.

*MEMORANDUM AND ORDER*

THOMAS W. PHILLIPS, District Judge.

**\*1** This matter is before the Court on the Motions to Dismiss filed by GMAC Mortgage, LLC ("GMAC") [Doc. 3], and MGC Mortgage, Inc. ("MGC") [Doc. 5]. Pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure, defendants GMAC and MGC move to dismiss this lawsuit.

The following issues are before the Court. First, has Plaintiff alleged sufficient facts to support her adhesion contract and unconscionability claims? Second, has Plaintiff satisfied Rule 9(b)'s pleading requirement with regard to her deceptive practices claim?

For the following reasons, defendants' Motions to Dismiss [Docs. 3, 5] are **GRANTED,** whereby Plaintiff's complaint is **DISMISSED WITH PREJUDICE.**

**I. BACKGROUND**

As a preliminary matter, the Court recognizes that it has jurisdiction pursuant to 28 U.S.C. § 1332. The following facts are taken mostly from Plaintiff's complaint [Plaintiff's "Amended Verified Petition to Require Respondent to Cure Mortgage Default and Set Aside the Pending Foreclosure," Doc. 1–2 at 24–6].

On or about November 7, 2002, Catherine Gebhardt ("Plaintiff") entered into a loan agreement with Sebring Capital. [*Id.*]. Plaintiff used the loan to purchase real property located at 3753 Thomas Cross Road, Sevierville, Tennessee, 37876. [*Id.*]. After down payment and closing costs, Plaintiff was left with a principle balance of \$243,100.00. [*Id.*]. The loan was transferred to GMAC for servicing, and then subsequently transferred to MGC. [*Id.*].

On August 7, 2009, Plaintiff filed a "Verified Petition to Require Respondent to Cure Mortgage Default and Set Aside the Pending Foreclosure" ("Verified Petition") in the Circuit Court for Sevier County, Tennessee. [GMAC's Memorandum in Support of Its Motion to Dismiss, Doc. 4 at 1–2]. On August 26, 2009, Plaintiff filed her "Amended Verified Petition to Require Respondent to Cure Mortgage Default and Set Aside the Pending Foreclosure" ("Amended Verified Petition"). [*Id.* at 2]. On September 25, 2009, this action was removed to federal court. [Doc. 1].

Plaintiff has filed two claims against defendants. First, Plaintiff argues that the loan agreement was an adhesion contract. Second, Plaintiff argues that the loan agreement was unconscionable. Plaintiff also requests punitive damages in the amount of \$300,000 for deceptive practices. In support, Plaintiff alleges the following:

> Petitioner [Plaintiff] avers that contract to purchase home has proven to be grossly unfair and offensive to the public conscience. Petitioner avers that contract has proven to be one-sided clearly favoring the drafter of the document. Whereas Petitioner wanted to provide a real home for her family, she really did not understand that the contract she entered into was what appears to be an interest only loan in which she has

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works. 1

paid an average of 11.23% interest for the existence of this loan.

[Plaintiff's Amended Verified Petition, Doc. 1–2 at 25]. Plaintiff has not provided any additional facts. In particular, Plaintiff has not explained the circumstances surrounding the signing of the loan agreement.

**\*2** On October 2, 2009, defendant GMAC filed a Motion to Dismiss [Doc. 3]. Pursuant to Rule 12(b) (6) of the Federal Rules of Civil Procedure, defendant GMAC argues that Plaintiff's claims should be dismissed because Plaintiff has not alleged sufficient facts. [GMAC's Memorandum in Support of Its Motion to Dismiss, Doc. 4 at 8–9]. Defendant GMAC also argues that Plaintiff's request for punitive damages should be dismissed because Plaintiff did not plead fraud with particularity, as required by Rule 9(b) of the Federal Rules of Civil Procedure. [*Id.* at 10–11]. On October 8, 2009, defendant MGC filed a Motion to Dismiss [Doc. 5] in which it adopted defendant GMAC's Motion to Dismiss [Doc. 3]. Thus, the Motions to Dismiss [Docs. 3, 5] are identical in content.

On June 22, 2010, Plaintiff responded to the Motions to Dismiss [Doc. 12]. Plaintiff states that she was previously unaware of the Motions to Dismiss. [*Id.*]. Plaintiff states that she "was never informed that filings would be available only through the Court's electronic filing system." [*Id.* at 1]. In addition, Plaintiff states that she did not receive notices about the electronic filings because she provided an incorrect email address to the Court Clerk. [*Id.*]. In her Response [Doc. 12], Plaintiff does not address the arguments raised in defendants' Motions to Dismiss [Docs. 3, 5]. [*Id.*]. Instead, Plaintiff states that "dismissing this case would be unjust to the Petitioner as her claim against the Respondent's is still a valid one and dismissing this action would not be in the interest in justice." [*Id.*].

## II. STANDARD OF REVIEW

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *DIRECTV, Inc. v. Treesh,* 487 F.3d 471, 476 (6th Cir.2007). To survive a motion to dismiss, the "[f]actual allegations contained in [the] complaint must 'raise a right to relief above the speculative level.' " *Bassett v. Nat'l Collegiate Athletic Ass'n,* 528 F.3d 426, 430 (6th Cir.2008) (quoting *Bell Atlantic Corp. v. Twombly,*

550 U.S. 544, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007)). This does not "require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Twombly,* 127 S.Ct. at 1974. The court, however, "need not accept as true legal conclusions or unwarranted factual inferences." *Fritz v. Charter Twp. of Comstock,* 592 F.3d 718, 722 (6th Cir.2010) (quoting *Gregory v. Shelby County,* 220 F.3d 433, 446 (6th Cir.2000)).

## III. ANALYSIS

### A. Plaintiff Has Not Alleged Sufficient Facts to Support Her Adhesion Contract Claim

The Supreme Court of Tennessee has defined an adhesion contract as being "a standardized form offered on what amounts to a 'take it or leave it' basis, without affording the weaker party a realistic opportunity to bargain, and under conditions whereby the weaker party can only obtain the desired product or service by submitting to the form of the contract." *Buraczynski v. Eyring,* 919 S.W.2d 314, 320 (Tenn.1996). Plaintiff argues that the "contract for home was an unconscionable and an adhesive contract which put the Petitioner at a severe disadvantage when seeking and securing financing for her home." [Plaintiff's Amended Verified Petition, Doc. 1–2 at 25–6]. In addition, Plaintiff argues that "GMAC Mortgage Company and MGC Mortgage, have taken full advantage of Petitioner's desire to own a home." [*Id.* at 25].

**\*3** In support of her adhesion contract claim, Plaintiff states that she did not understand the loan agreement. [*See Id.,* stating that Plaintiff "really did not understand that the contract she entered into was what appears to be an interest only loan."]. However, Tennessee courts recognize that a party is presumed to understand the contents of a contract. *Philpot v. Tennessee Health Mgmt., Inc.,* 279 S.W.3d 573, 579 (Tenn.Ct.App.2007) (citations omitted). "The law imparts on parties to a contract to learn the contents and stipulations of a contract before signing it, and signing it without learning such information is at the party's own peril." *Id.* Plaintiff has not alleged any exceptional circumstances explaining why she did not understand the contract. For example, Plaintiff has not alleged that her "educational background or abilities" prohibited her from understanding the loan agreement. *Id.* Moreover, Plaintiff's claim fails because she did not explain the circumstances surrounding the signing of the loan agreement. For example, Plaintiff does not explain

whether she signed the loan agreement on a "take it or leave it" basis.

In sum, the Court finds that Plaintiff has not alleged sufficient facts to support her adhesion contract claim. Accordingly, defendants' Motions to Dismiss [Docs. 3, 5] are **GRANTED,** whereby Plaintiff's adhesion contract claim is **DISMISSED WITH PREJUDICE.**

### B. Plaintiff Has Not Alleged Sufficient Facts to Support Her Unconscionability Claims

Even if the Court had found that the loan agreement was an adhesive contract, Plaintiff would still have to show that the terms of the contract were unreasonablethat is, unconscionable. See *Buraczynski,* 919 S.W.2d at 320 (holding that adhesion contracts are unenforceable only when the terms are "beyond the reasonable expectations of an ordinary person, or oppressive or *unconscionable."* ) (emphasis added). Tennessee recognizes two types of unconscionability:

party Unconscionability may arise from a lack of meaningful choice on the part of one (procedural unconscionability) or from contract terms that are unreasonably harsh (substantive unconscionability). In Tennessee we have tended to lump the two together and speak of unconscionability resulting when the inequality of the bargain is so manifest as to shock the judgment of a person of common sense, and where the terms are so oppressive that no reasonable person would make them on one hand, and no honest and fair person would accept them on the other.

*Trinity Indus., Inc. v. McKinnon Bridge Co.,* 77 S.W.3d 159, 170–71 (Tenn.Ct.App.2001) (citations omitted). A contract is substantively unconscionable when its terms "are beyond the reasonable expectations of an ordinary person, or oppressive...." *Buraczynski,* 919 S.W.2d at 320. A contract is procedurally unconscionable if there is "some impropriety during the process of forming the contract that deprives a party of a meaningful choice." *Baptist Mem'l Hosp. v. Argo Constr. Corp.,* 308 S.W.3d 337, 346 (Tenn.Ct.App.2009) (citations omitted).

 **\*4** Plaintiff's claim fails because she has not explained why the loan agreement was unconscionable. Plaintiff has not identified what provision was "grossly unfair" or "offensive to the public conscience." In fact, Plaintiff has not identified any of the contract's terms.

In addition, Plaintiff has not alleged that the loan agreement was unclear, or that the "grossly unfair" provisions (which again, Plaintiff has failed to identify) were hidden in the document. Because Plaintiff has not identified any of the contract's terms, her "substantive unconscionability" claim must fail.

Finally, Plaintiff has failed to explain the circumstances surrounding the signing of the loan agreement. As Tennessee courts have recognized, "[w]hether a contract is [procedurally] unconscionable is determined based on the circumstances as they existed at the time the

parties executed the contract." *Vintage Health Res., Inc. v. Guiangan,* 309 S.W.3d 448, 461 (Tenn.Ct.App.2009) (citations omitted). Because Plaintiff has not alleged any facts surrounding the signing of the loan agreement, her "procedural unconscionability" claim must fail.

Accordingly, defendants' Motions to Dismiss [Docs. 3, 5] are **GRANTED,** whereby Plaintiff's unconscionability claims are **DISMISSED WITH PREJUDICE.**

### C. Punitive Damages Will Not Be Awarded For Deceptive Practices

Plaintiff requests punitive damages in the amount of $300,000 for deceptive practices. As courts within the Sixth Circuit have recognized, these claims are subject to Rule 9(b) of the Federal Rules of Civil Procedure. See *McKee Foods Corp. v. Pitney Bowes, Inc.,* No. 1:06–CV–80, 2007 WL 896153, at \*5–6 (E.D.Tenn. Mar.22, 2007); *Scraggs v. La Petite Academy, Inc.,* No. 3:05–CV539, 2006 WL 2711689, at \*4 (E.D.Tenn. Sept.21, 2006) (dismissing claim because the plaintiff failed to allege how the defendant's alleged misrepresentation was deceptive). Thus, the Court must determine whether Plaintiff's deceptive practices claim satisfies Rule 9(b)'s pleading requirement.

Rule 9(b) states that "[i]n allegations of fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed.R.Civ.P. 9(b). To

WESTLAW © 2019 Thomson Reuters. No claim to original U.S. Government Works.

satisfy this requirement, "a plaintiff must, at a minimum, allege the time, place and content of the alleged misrepresentation upon which he or she relied; the fraudulent intent of the defendants and the injury resulting from the fraud." *Calipari v. Powertel,* 231 F.Supp.2d 734, 735–36 (W.D.Tenn.2002) (citations omitted).

In this case, Plaintiff has not identified the content of the deceptive practice, when the practice occurred, where it occurred, or who committed it. In short, Plaintiff has failed to identify the deceptive practice with the particularity required under Rule 9(b). Accordingly, defendants' Motions to Dismiss [Docs. 3, 5] are **GRANTED,** whereby Plaintiff's request for relief based upon deceptive practices is **DISMISSED WITH PREJUDICE.**

**IV. CONCLUSION**

**\*5** In sum, the Court finds that Plaintiff has not alleged sufficient facts to support her claims. In particular, Plaintiff did not explain the circumstances surrounding the signing of the loan agreement, or the content of that agreement.

In addition, Plaintiff has not responded to the arguments raised in defendants' Motions to Dismiss [Docs. 3, 5]. Accordingly, defendants' Motions to Dismiss [Docs. 3, 5] are **GRANTED,** whereby Plaintiff's complaint is **DISMISSED WITH PREJUDICE.**

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 2901823

---

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 12826638
Only the Westlaw citation is currently available.
United States District Court,
W.D. Tennessee, Western Division.

Terry Mark Ivey, Plaintiff,
v.
Wells Fargo Home Mortgage, a division
of Wells Fargo Bank, N.A., Defendant.

No. 15-2259-STA-cgc
|
Signed 09/28/2015

ORDER GRANTING DEFENDANT'S MOTION
FOR JUDGMENT ON THE PLEADINGS

S. THOMAS ANDERSON, UNITED STATES
DISTRICT JUDGE

**\*1** Before the Court is Defendant Wells Fargo Home
Mortgage's Motion for Judgment on the Pleadings (ECF
No. 23) filed on July 6, 2015. Pursuant to Local Rule
12.1(b), Plaintiff Terry Mark Ivey's response to the
Motion was due within 28 days, that is, on or before
August 3, 2015. When Plaintiff did not respond by that
date, the Court ordered Plaintiff to show cause as to
why Defendant's Motion for Judgment on the Pleadings
should not be granted. The Court set August 14, 2015,
as Plaintiff's deadline for a response. Plaintiff failed to
respond. [1] For the reasons set forth below, Defendant's
Motion is **GRANTED**.

[1]     The Court notes that Defendant previously filed a
        motion to dismiss and that Plaintiff had responded
        in opposition to that motion. The Court denied the
        motion as moot when Plaintiff filed the Amended
        Complaint now before the Court.

**BACKGROUND**

The Court accepts the following well-pleaded factual
allegations of the Amended Complaint as true for
purposes of this Motion. Defendant Wells Fargo made
a loan (no. 1641513) to Carol Compare in November
2013 and held a mortgage on real property which was
recorded with the Shelby County Register of Deed as

Instrument Number 13136025. (Am. Compl. ¶ 3.) Ms.
Compare was the long-time companion and/or common-
law wife of Plaintiff Terry Mark Ivey. (*Id.*) Plaintiff has
lived in the mortgaged real estate, which is the subject of
this suit, for almost 20 years. (*Id.*) Ms. Compare passed
away on June 10, 2014. (*Id.*)

Subsequent to her passing, Plaintiff communicated with
Defendant about Ms. Compare's death only to have
Defendant refuse to deal with Plaintiff or accept mortgage
payments from him on Ms. Compare's behalf. (*Id.*) [2]
Plaintiff undertook other steps to assert rights in
the property. Plaintiff filed at Defendant's direction
an affidavit of heirship as to Ms. Compare's heirs,
which was recorded as instrument number 14115239.
(*Id.*) Ms. Compare's only child and legal heir granted
Plaintiff a quitclaim deed as to the property, and the
quitclaim deed was recorded with the Shelby County
Register as instrument number 14115240. (*Id.*) Despite
Plaintiff's attempts to work with Defendant to keep the
account current, Defendant foreclosed on the property on
December 4, 2014. (*Id.*).

[2]     Plaintiff has included a detailed chronology of his
        attempts to communicate with Defendant about Ms.
        Compare's passing and the statute of the loan. *See*
        Am. Compl. ¶ 12.

The Amended Complaint alleges that Defendant has
wrongfully foreclosed on the property. Plaintiff denies
that the loan was in default at the time of Ms.
Compare's death. (*Id.* ¶ 11.) According to Plaintiff,
Defendant's mortgage servicer has mismanaged the
account, overcharged fees and expenses to the account in
violation of the deed of trust, and comingled the fees and
expenses on the home mortgage with an escrow account
and/or escrow advances that are not supposed to exist. (*Id.*
¶ 4.) Defendant has also refused to provide Plaintiff with
information about possible mortgage life insurance on the
subject property. (*Id.* ¶ 4.) Furthermore, Plaintiff alleges
that the deed of trust was a contract of adhesion and that
its nonjudicial foreclosure procedures violate due process.
(*Id.* ¶ 5.) The Amended Complaint goes on to allege that
Defendant has committed fraud based on the following
acts: (1) the failure of Defendant's collection employees to
give their names; (2) the refusal of Defendant's collection
employees to put anything in writing; and (3) Defendant's
rejection out of hand of a home loan modification shortly
before the scheduled sale of the home. (*Id.* ¶ 6.) Plaintiff
alleges that he did not receive the notice of the foreclosure

WESTLAW © 2018 Thomson Reuters. No claim to original U.S. Government Works.

sale required by Tennessee statute. (*Id.* ¶ 7.) Finally, the Amended Complaint alleges that Defendant has violated Regulation Z at 12 C.F.R. § 1026 by failing to adopt policies and procedures to deal with successors-in-interest to a mortgage customer. (*Id.* ¶ 12.)

**\*2** In its Motion for Judgment on the Pleadings, Defendant argues that it is entitled to judgment as a matter of law. Plaintiff is not a borrower or party to the loan agreement between Defendant and Ms. Compare and therefore lacks standing to assert any claims related to the mortgage. Plaintiff was not Ms. Compare's husband and has no intestate rights to the real property. Plaintiff has not and could not bring suit on behalf of Ms. Compare's estate. To the extent then that Plaintiff claims he was entitled to certain disclosures and information from Defendant, Plaintiff's claims are untenable and would have required Defendant to violate the Tennessee Financial Records Privacy Act. Plaintiff has further failed to allege any right to a loan modification or the assumption of Ms. Compare's loan. Plaintiff has offered only conclusory assertions about the predatory character of Ms. Compare's loan, the excessiveness of the fees charged to the account, or the purportedly fraudulent conduct of Defendant. For all of these reasons, Defendant argues that the Court should dismiss the Amended Complaint.

### STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(c) states, "After the pleadings are closed—but early enough not to delay trial —a party may move for judgment on the pleadings." [3] Motions for judgment on the pleadings may be granted where the moving party "is entitled to judgment as a matter of law." [4] Just as with Rule 12(b)(6) motions, the Court must consider a Rule 12(c) motion by taking all the "well-pleaded material allegations of the pleadings of the opposing party" as true. [5] A pleading's factual allegations must be sufficient to give notice to the defendant as to what claims are alleged, and the plaintiff must plead "sufficient factual matter" to render the legal claim plausible, i.e., more than merely possible. [6] However, "a legal conclusion couched as a factual allegation" need not be accepted as true on a motion to dismiss, nor are recitations of the elements of a cause of action sufficient. [7] Thus, although the factual allegations in a pleading

need not be detailed, they "must do more than create speculation or suspicion of a legally cognizable cause of action; they must show entitlement to relief." [8]

[3]  Fed. R. Civ. P. 12(c).

[4]  *Cincinnati Ins. Co. v. Beazer Homes Invs., LLC,* 594 F.3d 441, 444 (6th Cir. 2010).

[5]  *Henry v. Chesapeake Appalachia, L.L.C.,* 739 F.3d 909, 912 (6th Cir. 2014).

[6]  *Fritz v. Charter Tp. of Comstock,* 592 F.3d 718, 722 (6th Cir. 2010) (citing *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009)).

[7]  *Marais v. Chase Home Finance LLC,* 736 F.3d 711, 713 (6th Cir. 2013) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007)).

[8]  *League of United Latin Am. Citizens v. Bredesen,* 500 F.3d 523, 527 (6th Cir. 2007) (emphasis in original) (citing *Twombly,* 550 U.S. at 555).

### ANALYSIS

The Court holds that Plaintiff's claims are subject to dismissal. Viewing the allegations of the pleadings in a light most favorable to Plaintiff, the Court construes the Amended Complaint to allege claims for breach of contract under the Deed of Trust, a contract of adhesion, violations of Plaintiff's due process rights, fraud, improper notice of the foreclosure in violation of Tennessee statute, and violations of federal regulations. Having analyzed the pleadings under each theory, the Court holds that Defendant is entitled to judgment as a matter of law. Therefore, Defendant's Motion must be **GRANTED**.

### I. Breach of the Deed of Trust

The Amended Complaint alleges that Defendant has breached the Deed of Trust by improperly mismanaging the mortgage account, overcharging fees and expenses to the account, and incorrectly applying payments for the mortgage and escrowed funds. Under Tennessee law, a plaintiff alleging breach of contract must prove (1) the existence of a contract, (2) breach of the contract, and (3) damages which flow from the breach. [9] Plaintiff alleges that his companion Ms. Compare entered into the Deed of Trust with Wells Fargo in November 2013. However, there is no allegation that Plaintiff was

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

a party to the agreement. Generally, Tennessee law presumes that contracts are "executed for the benefit of the parties thereto and not third persons." [10] Non-parties to a contract have no standing to sue for its enforcement, except under circumstances that are not present in this case. [11] Plaintiff does allege that Ms. Compare was his common-law wife. However, Tennessee does not recognize common-law marriages. [12] The Court concludes that Plaintiff lacks standing to bring any claims for breach of the deed trust between Ms. Compare and Defendant. Therefore, Defendant's Motion is **GRANTED** as to these claims.

9  *Life Care Ctrs. of Am., Inc. v. Charles Town Assocs. Ltd. P'ship*, 79 F.3d 496, 514 (6th Cir. 1996) (applying Tennessee law).

10  *Owner–Operator Indep. Drivers Assoc., Inc. v. Concord EFS, Inc.*, 59 S.W.3d 63, 68 (Tenn. 2001); *Ward v. Glover*, 206 S.W.3d 17, 33 (Tenn. Ct. App. 2006).

11  *Concord EFS, Inc.*, 59 S.W.3d at 68 (holding that non-parties to a contract lacked standing unless they could show that they were intended third-party beneficiaries of the contract).

12  *Guzman v. Alvares*, 205 S.W.3d 375, 379 (Tenn. 2006).

## II. Contract of Adhesion

**\*3** The Court briefly considers the Amended Complaint's single allegation that the "Deed of Trust in this instance is a contract of adhesion; not contemplated, read or negotiated by the parties...." [13] For the reasons already explained, the Court is not convinced that Plaintiff has standing to assert this equitable claim. Even assuming that he did have standing, the Tennessee Supreme Court has defined a contract of adhesion as "a standardized contract form offered to consumers of goods and services on essentially a 'take it or leave it' basis, without affording the consumer a realistic opportunity to bargain and under such conditions that the consumer cannot obtain the desired product or service except by acquiescing to the form of the contract." [14] Even then, "[a] contract is not adhesive merely because it is a standardized form offered on a take-it– or-leave-it basis." [15] An adhesive contract remains enforceable unless a plaintiff can show that the contract is also unconscionable. [16]

13  Compl. ¶ 5.

14  *Buraczynski v. Eyring*, 919 S.W.2d 314, 320 (Tenn. 1996).

15  *Cooper v. MRM Inv. Co.*, 367 F.3d 493, 499–500 (6th Cir. 2004).

16  *Id.* at 503.

The Court finds that Plaintiff's lone statement about the Deed of Trust being a contract of adhesion amounts to a legal conclusion, and not a fact pleading. Therefore, the allegation is not entitled to any presumption of truth. [17] Stripping the pleadings as a whole of this isolated conclusion of law, the Court holds that Plaintiff has failed to allege any facts in support of this theory, let alone all of the elements for establishing such a claim. Therefore, the Court holds that any allegation that the Deed of Trust was a contract of adhesion is subject to dismissal.

17  *Morgan*, 829 F.2d at 12.

## III. Due Process Violation

Next, the Court turns to the Complaint's passing mention that "the process in Tennessee of foreclosure by a Trustee on the courthouse steps denies citizens of rights they would otherwise have to due process under the law." [18] The Court holds that this claim lacks merit. The Tennessee Court of Appeals has held that a non-judicial foreclosure does not implicate due process because the sale does not involve state action. [19] Plaintiff has not alleged any state action here, only a sequential foreclosure process between two private parties governed by the Deed of Trust. Therefore, Defendant's Motion is **GRANTED** as to this claim.

18  Am. Compl. ¶ 5.

19  *CitiMortgage, Inc. v. Drake*, 410 S.W.3d 797, 804 (Tenn. Ct. App. 2013).

## IV. Fraud

Plaintiff also alleges that Defendant's conduct amounts to fraud. The Amended Complaint alleges that the following facts support Plaintiff's claim for fraud: (1) the failure of Defendant's collection employees to give their names; (2) the refusal of Defendant's collection employees to put anything in writing; and (3) Defendant's rejection out of hand of a home loan modification shortly before

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

the scheduled sale of the home. When a federal court exercises diversity jurisdiction over a claim for fraud under state law, the claim "must meet the heightened pleading standard required under the Federal Rules of Civil Procedure." [20] Rule 9(b) requires a pleading alleging fraud to "state with particularity the circumstances constituting fraud or mistake," meaning a plaintiff must (1) "specify the allegedly fraudulent statements," (2) "identify the speaker," (3) state "when and where the statements were made," and (4) "explain what made the statements fraudulent." [21] The Court holds that the Amended Complaint falls far short of this heightened standard. Plaintiff has not alleged any facts to satisfy the additional pleading requirements under Rule 9(b). Therefore, Defendant's Motion is **GRANTED** as to any claim sounding in fraud.

[20]  *Newberry v. Silverman*, 789 F.3d 636, 645 (6th Cir. 2015).

[21]  *Republic Bank & Trust Co. v. Bear Stearns & Co., Inc.*, 683 F.3d 239, 247 (6th Cir. 2012).

### V. Lack Statutory Notice of the Sale

The Amended Complaint next alleges that Defendant failed to give Plaintiff adequate notice of the foreclosure as required under Tennessee law. Tenn. Code Ann. § 35–5–104 requires that the advertisement and notice of the foreclosure sale identify "parties interested" in the land, which includes the record holders of any mortgage, deed of trust, or other lien that will be extinguished or adversely affected by the sale. [22] It is well-settled under Tennessee law, however, that "the mere failure to identify or provide notice to an interested party does not provide sufficient grounds to set aside a foreclosure sale." [23] The Amended Complaint contains no allegations to show that Plaintiff was entitled to notice of the foreclosure pursuant to Tenn. Code Ann. § 35–5–104 or that Defendant failed to give notice, which was required under the statute. Furthermore, Plaintiff has not shown why any purported failure to comply with the statute would entitle him to the relief he seeks in the Amended Complaint. Therefore, Defendant's Motion is **GRANTED** as to this claim.

[22]  *EverBank v. Henson*, No. W2013-02489-COA-R3CV, 2015 WL 129081, at *7 (Tenn. Ct. App. Jan. 9, 2015).

[23]  *Id.* (collective cases).

### VI. Federal Regulation Z and Regulation X

**\*4** Finally, the Amended Complaint alleges that Defendant violated 12 C.F.R. § 1026, Regulation Z, and the guidance set forth in a July 111, 2014 rule from the Consumer Financial Protection Bureau ("CFPB"). Regulation Z is the federal regulation implementing the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 et seq. [24] "TILA requires that creditors make certain disclosures as to the terms of lending arrangements and provides for civil liability for failure to comply with its provisions." [25] Among other disclosures, Regulation Z at 12 C.F.R. § 1026.20(b) requires a creditor to make new disclosures to a consumer who enters into an agreement with the creditor to assume an obligation previously undertaken by another consumer. Regulation Z defines an "assumption" as follows: "An assumption occurs when a creditor expressly agrees in writing with a subsequent consumer to accept that consumer as a primary obligor on an existing residential mortgage transaction." [26]

[24]  *Baker v. Sunny Chevrolet, Inc.*, 349 F.3d 862, 865 (6th Cir. 2003).

[25]  *United States v. Petroff-Kline*, 557 F.3d 285, 294 (6th Cir. 2009).

[26]  12 C.F.R. § 1026.20(b).

In 2010 Congress passed the Dodd–Frank Act, which "transferred rulemaking authority for TILA" from the Federal Reserve Board to the CFPB. [27] On July 11, 2014, the CFPB published a final rule addressing the disclosure requirements associated with an assumption under 12 C.F.R. § 1026.20(b). In particular, the CFPB sought to clarify "that where a successor-in-interest (successor) who has previously acquired title to a dwelling agrees to be added as obligor or substitute for the existing obligor on a consumer credit transaction secured by that dwelling, the creditor's written acknowledgement of the successor as obligor is not subject to" other disclosure requirements under Regulation Z. [28] Plaintiff has cited this final rule in his Amended Complaint to support his claim that Defendant has violated Regulation Z. The Court holds that even construing the allegations of the Amended Complaint liberally, Plaintiff has alleged no facts implicating Defendant's duties to make disclosures in connection with an assumption. There is no allegation that Plaintiff ever assumed the mortgage after Ms. Compare's passing. Therefore, the Court holds that the Amended

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Complaint fails to state any claim related to TILA, Regulation Z, or 12 C.F.R. § 1026.20(b).

27    *Fowler v. U.S. Bank, Nat. Ass'n*, 2 F. Supp. 3d 965, 976-77 (S.D. Tex. 2014).

28    Application of Regulation Z's Ability-To-Repay Rule to Certain Situations Involving Successors-in-Interest, 79 FR 41631-01.

Plaintiff has alleged that Defendant "had no policies or procedures in place to deal with heir[s], or other consumers that were successors in interest, and acted with bad faith with respect to Plaintiff who [i]s a legitimate heir and/or successor in interest." [29] The Amended Complaint includes a chronology of events purporting to show Plaintiff's efforts to communicate with Defendant about Ms. Compare's death, make payments on the mortgage account on her behalf, and update Defendant about Ms. Compare's estate and the quitclaim deed given to Plaintiff by Ms. Compare's son and only legal heir. These allegations plausibly implicate the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C.A. §§ 2601 et seq, and its implementing regulation, Regulation X. Pursuant to Regulation X at 12 C.F.R. § 1024.38, loan servicers are required to "maintain policies and procedures that are reasonably designed to achieve" certain objectives. Among the objectives listed there, section 1024.38(b)(1)(vi) specifies that servicers must "[u]pon notification of the death of a borrower, promptly identify and facilitate communication with the successor in interest of the deceased borrower with respect to the property secured by the deceased borrower's mortgage loan." [30] According to the CFPB, this objective was adopted due to "difficulties that some surviving spouses, children, or other successors in interest experienced in attempting to communicate with servicers." [31] The CFPB found instances of "servicers either outright refusing to speak to a successor in interest or demanding documents to prove the successor in interest's claim to the property...." [32] The Court finds that the fact pleadings of the Amended Complaint fall squarely within the ambit of section 1024.38(b)(1)(vi) and Regulation X's mandate for servicers like Defendant to adopt certain policies and procedures for situations just like the one encountered by Plaintiff in this instance.

29    Am. Compl. ¶ 12. The Amended Complaint actually has two paragraphs separately numbered as

paragraph 12. Plaintiff makes this allegation in the second of the two paragraphs.

30    12 C.F.R. § 1024.38(b)(1)(vi).

31    Mortgage Servicing Rules Under the Real Estate Settlement Procedures Act (Regulation X), 78 FR 10696-01.

32    *Id.*

**\*5**  The key inquiry, however, is whether Regulation X and section 1024.38(b)(1)(vi) create a private right of action for violations of the rule adopted by the CFPB. A private right of action is a creature not of administrative regulation but by act of Congress, either by express provision or implication from a statute. [33] For example, this Court has held that RESPA did not create a private right of action for violations of 12 U.S.C. § 2604(c), which requires a lender to provide a good faith estimate of closing costs." [34] In this case, the Court need not closely analyze the text of RESPA for an express or implied private right of action. In adopting section 1024.38(b)(1)(vi), the CFPB itself specifically stated that violations of section 1024.38 did not give rise to a private right of action: "the Bureau is adopting final general servicing policies, procedures, and requirements that are not enforceable through a private right of action." [35] The CFPB reasoned that "allowing a private right of action for the provisions that set forth general servicing policies, procedures, and requirements would create significant litigation risk." [36] Litigation might result in courts "interpret[ing] the proposed flexible objectives-based standards inconsistently," which in turn would compel the CFPB "to issue more prescriptive standards in the final rule." [37] Instead, the CFPB itself has assumed the responsibility "to protect borrowers through robust supervision and enforcement of the servicing policies, procedures, and requirements set forth in § 1024.38...." [38] Based on this persuasive authority, the Court concludes that no private right of action exists for Defendant's alleged violation of 12 C.F.R. § 1024.38(b)(1)(vi). Therefore, Defendant's Motion is **GRANTED** as to this issue.

33    *Transamerica Mortg. Advisors, Inc. v. Lewis*, 444 U.S. 11, 15, 18 (1979).

34    *Carr v. Home Tech Co.*, 476 F. Supp. 2d 859, 869 (W.D. Tenn. 2007).

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

35  Mortgage Servicing Rules Under the Real Estate Settlement Procedures Act (Regulation X), 78 FR 10696-01.

36  *Id.*

37  *Id.*

38  *Id.*

**CONCLUSION**

The Court holds that Defendant is entitled to judgment as matter of law as to all of Plaintiff's claims for relief. Therefore, Defendant's Motion for Judgment on the Pleadings is **GRANTED**.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2015 WL 12826638

---

**End of Document**

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW  © 2017 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 7217738
Only the Westlaw citation is currently available.
United States District Court,
S.D. Georgia, Waycross Division.

John James, individually, and
Row Equipment, Inc., Plaintiffs,
v.
Terex USA, LLC, d/b/a Terex
Environmental Equipment, and Terex
Financial Services, Inc., Defendants.

CV 516-60
|
Signed 12/12/2016

**Attorneys and Law Firms**

Brent J. Savage, Savage & Turner, PC, Savannah, GA, for Plaintiffs.

Cary E. Hiltgen, Jeff C. Grotta, Hiltgen & Brewer, P.C., Oklahoma City, OK, Jeffrey S. Ward, Drew, Eckl & Farnham, LLP, Brunswick, GA, for Defendants.

## ORDER

LISA GODBEY WOOD, CHIEF JUDGE

**\*1** Pending before the Court is Defendant Terex Financial Services, Inc.'s ("Defendant") First Motion to Dismiss (Dkt. No. 4) and Second Motion to Dismiss (Dkt. No. 19).[1] The motions are now ripe for decision. For the reasons stated below, Defendant's Second Motion to Dismiss (Dkt. No. 19) is **GRANTED** and Defendant's First Motion to Dismiss (Dkt. No. 4) is **DENIED AS MOOT**.

---

[1]  The Court notes that the docket reflects that Terex USA, LLC and Terex Financial Services, Inc. (the movant here) are separate legal entities for the purposes of this suit. Terex USA, LLC has made it clear that it has not attempted to renew a previous motion to dismiss (Dkt. No. 4) seemingly filed jointly with that of Terex Financial Services, Inc. (Dkt. No. 26 (incorporating Terex USA, LLC's previous Answer to Plaintiffs' Amended Complaint but not indicating a renewal of the previously filed motion to

dismiss)). Therefore, the Court considers the earlier Motion to Dismiss (Dkt. No. 4) to be moot.

## Factual Background

Terex USA, LLC ("Terex USA") is a Connecticut-based company which sells industrial wood chippers. Defendant is a Connecticut-based company which provides financing for buyers of Terex USA's products. Plaintiffs are both residents of Georgia. On or around September 6, 2012, Plaintiff Row Equipment ("Row") entered into a financing contract with Defendant to purchase an industrial wood chipper ("Chipper 1") manufactured by Terex USA. Dkt. No. 15 ¶ 8. Plaintiff John James ("James") personally guaranteed the contract. Id. ¶ 9. Plaintiffs allege that Chipper 1 was defective. Row later purchased another industrial wood chipper ("Chipper 2"), that was also financed by Defendant. Id. ¶ 15. James also personally guaranteed this contract. Plaintiffs allege that Chipper 2 was also defective. Plaintiffs allege that Defendant knew that both Chipper 1 and Chipper 2 were defective. Id. ¶ 19. Plaintiffs now bring this action as a result of Terex USA's contracts and Defendant's enforcement of the financing agreements. Id. ¶ 29.

## LEGAL STANDARD

When ruling on a motion to dismiss brought pursuant to Rule 12(b)(6), a district court must accept as true the facts as set forth in the complaint and draw all reasonable inferences in the plaintiff's favor. Randall v. Scott, 610 F.3d 701, 705 (11th Cir. 2010). Although a complaint need not contain detailed factual allegations, it must contain sufficient factual material "to raise a right to relief above the speculative level." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). At a minimum, a complaint should "contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory." Fin. Sec. Assurance, Inc. v. Stephens, Inc., 500 F.3d 1276, 1282-83 (11th Cir. 2007) (per curiam) (quoting Roe v. Aware Woman Ctr. for Choice, Inc., 253 F.3d 678, 683 (11th Cir. 2001)).

## DISCUSSION

Defendant seeks dismissal of Plaintiffs' breach of contract and fraudulent inducement claims. Both parties agree that

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Connecticut contract law applies to this case. Dkt. No. 3. Furthermore, the parties agree that Plaintiffs cannot state a claim for either breach of contract or fraudulent inducement at this time. Id. at 3-4.

**\*2** Instead, Plaintiffs seek to amend their Complaint to allege that they suffered "damages as a result of the unconscionable contract entered into with [Defendant]." While the Court must freely grant leave to amend, it need not allow futile amendments. Bryant v. Dupree, 252 F.3d 1161, 1163 (11th Cir. 2001). The Court finds that the Plaintiffs' proposed amendment would be futile. The doctrine of unconscionability is not a separate claim, but rather, a defense to contract enforcement. Defendant has not filed any counterclaims in this action, and Plaintiffs cannot seek to use a shield as a sword by adding a "claim" for unconscionability to their Complaint. See Shaw v. Gen. Elec. Co., 492 F. Supp. 779, 780 (N.D. Ala. 1980) (finding that "[s]eparate defenses do not make separate and independent claims"); see also Ratliff v. McDonald, 756 S.E.2d 569, 575 (Ga. Ct. App. 2014) (holding defense could not be asserted as a separate claim). Plaintiffs' case citations reflect this same principle. See Bender v. Bender, 975 A.2d 636 (Conn. 2009) (explaining that unconscionability is a defense to contract enforcement); Sablosky v. Edward S. Gordon Co., 535 N.E.2d 643, 646-47 (N.Y.

1989) (discussing unconscionability in the context of invalidating an arbitration agreement); Deutsche Bank Nat'l Tr. v. Belizaire, No. FST-CV-065002704S, 2011 WL 3586487, at \*9 (Conn. Sup. Ct. July 13, 2011) (discussing unconscionability as a defense to counterclaims).

As such, the doctrine of unconscionability only applies as a *defense* to contract *enforcement,* rather than as an alternative theory for a breach of contract claim. Therefore, Plaintiffs cannot amend their Complaint to add a claim for unconscionability because no such claim exists. Thus, the Court will grant Defendant's Motion to Dismiss.

## CONCLUSION

For the reasons set forth above, Defendant Terex Financial Services, Inc.'s second Motion to Dismiss (Dkt. No. 19) is hereby **GRANTED**. As such, Defendant's first Motion to Dismiss (Dkt. No. 4) is **DENIED AS MOOT**.

**SO ORDERED**, this 12th day of December, 2016.

## All Citations

Slip Copy, 2016 WL 7217738

---

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Order Modified by Ng v. HSBC Mortg. Corp., E.D.N.Y., September 22, 2014

2011 WL 3511296

Only the Westlaw citation is currently available.

United States District Court,

E.D. New York.

Raymond NG, Plaintiff,

v.

HSBC MORTGAGE CORP., HSBC USA Inc.,

Qi Zhao, and Datius Wong, Defendants.

No. 07–CV–5434 (RRM)(VVP).

|

Aug. 10, 2011.

**Attorneys and Law Firms**

Chunyu Jean Wang, Wang Law Office, PLLC, Flushing, NY, for Plaintiff.

Michael Richard Mendola, Office of General Counsel, Preston L. Zarlock, Sean C. McPhee, Phillips Lytle LLP, Buffalo, NY, for Defendants.

### *MEMORANDUM AND ORDER*

MAUSKOPF, District Judge.

 **\*1** Plaintiff Raymond Ng ("Ng" or "plaintiff") brings this action against defendants HSBC Mortgage Corp. and HSBC USA (collectively "HSBC"), and individual bank employee defendants Qi Zhao ("Zhao") and Datius Wong ("Wong") (collectively "defendants") in connection with a home mortgage transaction. Plaintiff has asserted various state and federal claims against defendants, including claims for alleged non-disclosures, false statements, discrimination, fraud, usury, and violations of the banking law. Currently before the Court is defendants' motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure as to the remaining claims in this action.[1] For the reasons stated below, defendants' motion for summary judgment is DENIED as to Ng's claim based on 15 U.S.C. § 1638(b), and GRANTED as to all other claims.

[1] As discussed more fully below, the Court previously dismissed the majority of claims pled in this action.

### *BACKGROUND*[2]

[2] Unless otherwise noted, citations to the parties' Rule 56.1 statements concern factual assertions that are admitted or are deemed admitted because they were not contradicted by citations to admissible evidence. *See Giannullo v. City of N.Y.,* 322 F.3d 139, 140 (2d Cir.2003) ("If the opposing party ... fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted."). Plaintiff's 56.1 Statement does not comport with Local Civil Rule 56.1(b). Ordinarily, failure to comply with the Local Rules regarding 56.1 Statements would result in the material facts in the non-complying party's Statement being deemed admitted for the purposes of deciding the pending summary judgment motion. *See* Local Civil Rule 56.1(c). A district court, however, "has broad discretion to determine whether to overlook a party's failure to comply with local court rules." *Holtz v. Rockefeller & Co.,* 258 F.3d 62, 73 (2d Cir.2001) (citations omitted); *see also Rateau v. City of N.Y.,* No. 06–CV–4751 (KAM) (CLP), 2009 U.S. Dist. LEXIS 90112, at \*2 n. 1, 2009 WL 3148765 (E.D.N.Y. Sept. 29, 2009) (exercising discretion in reviewing the admissible record evidence in determining whether proposed undisputed facts were disputed); *Robinson v. Keyspan,* No. 03–CV–4796 (FB)(LB), 2005 U.S. Dist. LEXIS 27057, at \*2 n. 2, 2005 WL 3006687 (E.D.N.Y. Nov. 9, 2005) (same). Accordingly, for the purposes of this motion, plaintiff's statement of undisputed facts is treated as undisputed only where it is not controverted by admissible evidence in the record.

### I. Factual Background

This action concerns Ng's acquisition of a residential property located at 2041 79th Street in Bay Ridge, Brooklyn (the "Property"). (Defs.' 56.1 Stmt. ¶ 4; Compl. ¶ 13.) In or around November 2006, plaintiff applied to HSBC in order to obtain financing for the Property, which cost $555,000. (Defs.' 56.1 Stmt. ¶ 5.) He anticipated paying a $56,000 down payment, and sought a loan in the amount of $499,000. (Defs.' 56.1 Stmt. ¶ 6; Compl. ¶ 15.) To that end, he arranged a meeting with Zhao, an HSBC employee.

Ng alleges that Zhao informed him that he could arrange two loans: one for $417,000 at an interest rate of 6.125% (the "First Mortgage"), and one for $82,500 at a fixed interest rate of 8.5% (the "Second Mortgage"). [3] (Compl.¶¶ 17–18.) HSBC sent plaintiff a letter of commitment for the First Mortgage in the amount discussed. (Defs.' 56.1 Stmt. ¶ 13.) It is undisputed that nothing was immediately memorialized with respect to the figures allegedly discussed for the Second Mortgage, and that plaintiff did not submit an application for a Second Mortgage in the amount allegedly discussed. (Id. ¶ 15.)

[3]   Plaintiff alleges that Zhao, against plaintiff's wishes, added $500 to the total mortgage amount in order to charge him a higher rate of interest, and would not lower the total borrowed amount from $499,500 to the $499,000, stating "$500 is not going to make a difference [to the interest rate], and the extra amount will be good for your Home Equity Line of Credit because it will increase your home equity." (Compl.¶ 19.)

Plaintiff subsequently signed a Home Equity Line Agreement with HSBC in connection with the Second Mortgage, which stated that the Second Mortgage would have a principal loan amount of $82,500, and that it would be an adjustable rate mortgage ("ARM"). (Id. ¶¶ 22–23, 33–34; see also Pl.'s Aff. re: Mot. for Summ. J. Ex. 3 (Request for Admissions or "RFA") [4] ) (Doc. No. 98–3).) Indeed, Ng has conceded that he was aware of those very terms at the closing. (Defs.' 56.1 Stmt. ¶¶ 22–23; Compl. ¶¶ 19, 50.) Plaintiff's attorney, Norman Lau Kee, reviewed the loan documents signed by Ng, and signed the First Mortgage as a witness to his execution, which was then notarized by a notary public. (Defs.' 56.1 Stmt. ¶¶ 18–19; Decl. re: Mot. for Summ. J. ("Liew Decl.") (Doc. 99) Ex. A.) However, in deposition testimony, Ng contends that he is unable to tell whether or not the signatures on the mortgage documents are his own. (Defs.' 56.1 Stmt. ¶ 7.)

[4]   Defendants' Request for Admissions was served on October 15, 2008. (Pl.'s Aff. re: Mot. for Summ. J. ("Zarlock Decl.") Ex. 3 (Doc. No. 98–3).) Plaintiff failed to respond to defendants' RFA on or before November 17, 2008 as directed by the Court. (See Order (Doc. No. 47), at 7.) Thus, they are deemed admitted as a matter of law. Fed.R.Civ.P. 36(a)(3).

**\*2** Subsequent to the execution of the loan documents relating to the First and Second Mortgages and the sale of the Property, Ng noticed that his monthly invoices for

the Second Mortgage were higher than he anticipated, and that his monthly payments were not fixed. (Compl.¶¶ 17, 21–22.) He called HSBC, where a service department employee informed him that he agreed to those terms in writing and would have to speak with a loan officer if he desired a fixed rate mortgage. (Id. ¶ 24.) Ng was subsequently told by HSBC's Special Loans Department that his interest rate was 9.75%, rather than the original 8.5%, because his "Loan-to Value (LTV) Ratio" was 95.8%. [5] (Id. ¶ 25.)

[5]   The Special Loans Department informed Ng that loans with an LTV under 90% are entitled to a 8.99% interest rate, loans with an LTV below 80% are entitled to an interest rate of 7.99%, and loans with an LTV at 90% or higher carry an interest rate of 9.75%. (Compl.¶ 26.)

Ng contacted Wong, an employee in HSBC's Chinese Mortgage Department Head Office, who informed him that since he signed the agreements at the closing it was too late to adjust the rate. (Id. ¶¶ 29–30.) Ng noticed another disparity on a document shown to him by Wong entitled "Funding Detail," which listed the Property's purchase price as $521,250.00 instead of $555,000. (Id. ¶¶ 31–32; Pl.'s 56.1 Cntrstmt. ¶ 10.) Ng subsequently spoke with an HSBC underwriter, who informed him that he signed a Home Equity Line of Credit ("HELOC") Application on December 3, 2006, which listed the loan amount for the second mortgage as $82,500, and incorrectly listed the purchase price as $521,250.00. (Compl.¶¶ 33–38.)

In response to plaintiff's complaints, HSBC modified the interest rate on the Second Mortgage, fixing it at 8.5% and granted him a refund. (Defs.' 56.1 Stmt. ¶ 49.) Plaintiff has not made any payments on the Second Mortgage since 2007. (Id. ¶¶ 18–19.)

## II. Procedural Background
On December 15, 2009, Magistrate Judge Pohorelsky issued a Report and Recommendation ("R & R") (Doc. No. 73), recommending that the Court grant the majority of defendants' motion for judgment on the pleadings. The R & R recommended that plaintiff's fourteen causes of action be dismissed, with two exceptions: plaintiff's claim under New York General Business Law ("GBL") § 349 and plaintiff's claim alleging unconscionability. (R & R at 27, 36.) This Court adopted Judge Pohorelsky's R & R by Memorandum and Order dated March 10, 2010 (Doc.

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

No. 79). However, the Court clarified that, to the extent plaintiff had expressly stated a cause of action based on subsections apart from 15 U.S.C. § 1635 of TILA, such claims also survived defendants' motion for judgment on the pleadings. (Doc. No. 79, at 3–4.) Currently before the Court is the defendants' motion for summary judgment with respect to the unconscionability, GBL, and TILA claims.

### STANDARD OF REVIEW

Summary judgment is appropriate when the pleadings, depositions, interrogatories, admissions, and affidavits demonstrate that there are no genuine issues of material fact in dispute and that one party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

**\*3** In deciding a summary judgment motion, a district court must draw all reasonable inferences in favor of the nonmoving party. *See id.* at 249 (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)); *Castle Rock Entm't, Inc. v. Carol Publ'g Grp., Inc. .,* 150 F.3d 132, 137 (2d Cir.1998). The court must not "weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford,* 361 F.3d 113, 122 (2d Cir.2007) (quoting *Weyant v. Okst,* 101 F.3d 845, 854 (2d Cir.1996)). Any evidence in the record of any material fact from which an inference could be drawn in favor of the non-moving party precludes summary judgment. *See Castle Rock Entm't,* 150 F.3d at 137.

Once the movant has demonstrated that no genuine issue of material fact exists, then "the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial.*'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis in original). However, there must exist more than mere "metaphysical doubt as to the material facts"

to defeat a summary judgment motion. *Id.* at 586. Instead, the non-moving party must present "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson,* 477 U.S. at 256. Only disputes over material facts "that might affect the outcome of the suit under the governing law" will properly preclude the entry of summary judgment. *Id.* at 248; *see also Matsushita,* 475 U.S. at 586.

### DISCUSSION

**I. Requests for Admission**

Before turning to the merits of defendants' motion, the Court must address the status of the summary judgment records, specifically, plaintiff's request to withdraw certain admissions upon which defendants rely in making this motion. It is undisputed that plaintiff failed to submit a timely response to defendants' Request for Admissions ("RFA"). Under Federal Rule of Civil Procedure 36(a), a matter set forth in an RFA is deemed admitted unless, within thirty days of service of the requests, the party requesting admission receives an answer or objection to the request. As a result, Judge Pohorelsky found that: "[t]he matters in the defendants' Request for Admissions are therefore 'conclusively established' for purposes of this action unless and until a motion is granted permitting withdrawal." (Order Granting in Part and Denying in Part Mot. for Discovery (Doc. No. 47) at 7.)

However, Rule 36(b) of the Federal Rules of Civil Procedure provides that a court:

> may permit the withdrawal or amendment [of a Rule 36(a) admission] when the presentation of the merits of the action will be subserved thereby and the party who obtained the admission fails to satisfy the court that withdrawal or amendment will prejudice that party in maintaining the action or defense on the merits.

**\*4** The language of the rule is permissive. Thus, even if a party satisfies the two criteria described by the rule, the decision whether to permit withdrawal remains within the sound discretion of the court. *Donovan v. Carls Drug Co.,* 703 F.2d 650, 652 (2d Cir.1983); *Local Union No. 38 Sheet Metal Workers' Int'l Ass'n v. Tripodi,* 913 F.Supp.

290, 294 (S.D.N.Y.1996). The Second Circuit has noted that, in making this determination, a trial court should be cognizant of the underlying policy of Rule 36, which is "to narrow issues and speed the resolution of claims." *Donovan,* 703 F.2d at 652.

Plaintiff now requests, more than two years after Judge Pohorelsky deemed the RFA admitted, that the Court deem his responses timely filed, thereby permitting withdrawal of his prior admissions. The Court initially notes two defects in the way in which plaintiff has requested withdrawal. First, Ng's request is belatedly set forth in his opposition papers in contravention of Federal Rule of Civil Procedure 36(b), which stipulates that "a matter admitted under this rule is conclusively established unless the court, *on motion,* permits the admission to be withdrawn or amended." *Id.* (emphasis added). Second, Ng provides no explanation for his failure to respond to the RFA in a timely fashion. This Court joins those courts that have held that relief under Rule 36(b) is unavailable to a party that has inexcusably failed to comply with the requirements set forth by Rule 36(a). *See, e.g., Sea–Land Serv., Inc. v. Citihope Int'l, Inc.,* 176 F.R.D. 118, 122 n. 10 (S.D.N.Y.1997); *see also Baker v. Dorfman,* No. 99 Civ. 9385(DLC), 2000 WL 420551, at *6 (S.D.N.Y. Apr.17, 2000); *O'Bryant v. Allstate Ins. Co.,* 107 F.R.D. 45, 48 (D.Conn.1985) (noting that granting relief pursuant to Rule 36(b) absent excusable neglect in failing to respond essentially obviates Rule's 30–day time limit); *SEC v. Thrasher,* No. 92 Civ. 6987(JFK), 1996 WL 460148, at *1 (S.D.N.Y. Aug.13, 1996) (internal citation omitted) (deeming RFA admitted where delinquent party "proffer[ed] no meaningful explanation for his tardiness or for his failure to seek more time from the court to meet his obligations under Rule 36").

Moreover, even overlooking these infirmities and assuming, *arguendo,* that plaintiff has satisfied the first of the two requirements stipulated by Rule 36(b), the Court finds that defendants would be prejudiced if the Court admitted plaintiff's responses at this late stage. Discovery has closed, and permitting the amended answers more than two years after the initial admissions would deprive defendants of the ability to conduct additional discovery concerning those answers. *See SEC v. Batterman,* No. 00 Civ. 4835(LAP) 2002 WL 31190171, at *7 (S.D.N.Y. Sept.30, 2002); *Weinberger v. Provident Life & Cas. Ins. Co.,* No. 97 Civ. 9262(JGK)(HBP), 1999 WL 225537, at *2 (S.D.N.Y. Apr. 19, 1999). This concern is all the more

salient where, as here, defendants have relied on those admissions in their motion for summary judgment, which has been fully briefed.

**\*5** Plaintiff argues that his new responses are consistent with prior testimony, which is patently not the case, and insists that he "has found other evidence that a reasonable jury would find disputes them [sic]," without further explaining this evidence. (Pl.'s Mem. in Opp. to Mot. for Summ. J., at 1.) Notwithstanding his assertions to the contrary, Plaintiff's proposed denials are in direct contradiction with his own prior deposition testimony and sworn affidavits submitted by defendants. *See Baker v. Dorfman,* No. 99 Civ. 9385, 2000 WL 420551, at *6 (S.D.N.Y. Apr.17, 2000) (denying application to submit belated response to request for admissions because movants failed to show that their denials would be truthful); *see also Mut. Serv. Ins. Co. v. Frit Indus., Inc.,* 358 F.3d 1312 (11th Cir.2004) (finding that court properly denied motion to withdraw admissions when doing so was simply an attempt to change position in litigation, thus causing prejudice to the opposing party); *Russell v. Acme–Evans Co.,* 51 F.3d 64, 67–68 (7th Cir.1995) ("Where deposition and affidavit are in conflict, the affidavit is to be disregarded unless it is demonstrable that the statement in the deposition was mistaken ...."). Nor does plaintiff point to any new evidence to suggest that his admissions were somehow incorrect or mistaken.

"Although an admission should ordinarily be binding on the party who made it, there must be room in rare cases for a different result, as when an admission no longer is true because of changed circumstances or through honest error a party has made an improvident admission." 8A Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 2264 (3d ed.2011). This is not that exceptional case. In the present circumstances, Ng has offered no justification whatsoever for his failure to comply with Rule 36. Indeed, his failure to respond to the FRA is merely one of plaintiff's "persistent discovery failings." (*See* Order Granting in Part and Denying in Part Mot. for Discovery (Doc. No. 47) at 7). *Compare Printy v. Crochet & Borel Servs.,* 196 F.R.D. 46, 50 (E.D.Tex.2000) (allowing withdrawal where default in responding to RFA was not attributable to "failure to cooperate in discovery," and where plaintiffs "acted responsibly and timely throughout this matter") *with In re Fisherman's Wharf Fillet, Inc. .,* 83 F.Supp.2d 651, 661 (E.D.Va.1999) (finding no reason to justify granting motion to withdraw

admissions, as points urged in support of motion were not recently discovered or previously unknown). Plaintiff has had clear notice, for more than two years, of defendants' reliance on his admissions, yet nonetheless allowed discovery to lapse without making any motion to withdraw the previous admissions despite Judge Pohorelsky's explicit reminder to do so if he desired. *See also In re S.W. Bach & Co.,* No. 07 Civ. 11569, 2010 WL 681000, at *3 (Bankr.S.D.N.Y. Feb.24, 2010) (noting that the defendant's "persistent delays" in discovery did not merit withdrawing its admissions).

**\*6** In any event, "[t]he court is not required to make an exception to Rule 36 even if both the merits and prejudice issues cut in favor of the party seeking exception to the rule." *Donovan,* 703 F.2d at 652; *see also In re Ladouceur,* No 95 Civ. 271(RSP), 1996 WL 596718, at *3–5 (N.D.N.Y. Oct. 15, 1996) (noting that the court has the discretion to disregard lack of prejudice and deem the statements admitted "even though the result may seem harsh") (internal citation omitted). Accordingly, the Court, in the exercise of its discretion, declines to relieve plaintiff from the admissions resulting from his untimely responses, and those admissions will be considered as such for purposes of this motion.

## II. NYGBL § 349

Ng alleges that defendants violated New York's Deceptive Practices Act, General Business Law § 349, through various misrepresentations amounting to fraud. Section 349 makes it unlawful to engage in "deceptive acts or practices in the conduct of any business, trade, or commerce or in the furnishing of service in [New York]." N.Y. Gen. Bus. Law § 349(a). It provides a cause of action to "any person who has been injured by reason of any violation" of the Act, and provides for the recovery of actual damages. *Id.* § 349(h). A consumer asserting injury under the Act must show: (1) a "consumer-oriented" practice that was (2) materially misleading or deceptive, and (3) that the plaintiff suffered an injury as a result. *Champion Home Builders Co. v. ADT Sec. Servs., Inc.,* 179 F.Supp.2d 16, 27 (N.D.N.Y.2001). "The typical violation contemplated by the statute involves an individual consumer who falls victim to misrepresentations made by a seller of consumer goods usually by way of false and misleading advertising." *Genesco Entm't v. Koch,* 593 F.Supp. 743, 751 (S.D.N.Y.1984). "The statute was meant to empower consumers; to even the playing field in their disputes with better funded and superiorly situated

fraudulent businesses. It was not intended to supplant an action to recover damages for breach of contract between parties to an arm's length contract." *Teller v. Hayes, Ltd.,* 213 A.D.2d 141, 630 N.Y.S.2d 769 (App.Div.1995).

For the conduct at issue to be consumer-oriented, it must have a broad impact on consumers at large. *See, e.g., Exxonmobile Inter–America, Inc. v. Advanced Info. Eng'g Servs., Inc.,* 328 F.Supp.2d 443, 447–49 (S.D.N.Y.2004); *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank,* 85 N.Y.2d 20, 25, 623 N.Y.S.2d 529, 647 N.E.2d 741 (1995). "Private contract disputes, unique to the parties ... would not fall within the ambit of the statute." *Vitolo v. Mentor H/S, Inc.,* 426 F.Supp.2d 28, 24 (E.D.N.Y.2006) (internal quotation marks and citation omitted); *see also Denenberg v. Rosen,* 71 A.D.3d 187, 897 N.Y.S.2d 391, 396 (App.Div.2010) (noting that "this is essentially a private dispute among the parties ... rather than conduct affecting the consuming public at large"); *Sec. Mut. Life Ins. Co. v. DiPasquale,* 283 A.D.2d 182, 724 N.Y.S.2d 594, 594 (App.Div.2001) (finding a claim under § 349 unviable because it "essentially alleges a private contract dispute ... unique to the parties, rather than conduct that affects the consumers at large").

**\*7** The complaint here focuses on the losses to Ng as a result of the higher-than-anticipated payments demanded by the mortgage to which he himself agreed. Since "the gravamen of the complaint must be consumer injury or harm to the public interest," and plaintiff has merely alleged harm to himself, the claim must fail. *Azby Brokerage, Inc. v. Allstate Ins. Co.,* 681 F.Supp. 1084, 1089 n. 6 (S.D.N.Y.1988). Indeed, Ng's only argument in opposition is that HSBC's conduct might possibly have been directed at the consuming public in general, and thus similar harm might conceivably come to other consumers. However, he has utterly failed to provide any evidence beyond his own, and his allegation of broader public harm is based solely on conjecture and speculation.

Moreover, a deceptive act is one that is "likely to mislead a reasonable consumer acting reasonably under the circumstances." *Oswego,* 85 N.Y.2d at 26, 623 N.Y.S.2d 529, 647 N.E.2d 741. "The rule imposes an objective standard by taking into account what a reasonable consumer would do under the plaintiff's particular circumstances. There can be no claim for deceptive acts or practices, however, when the alleged deceptive practice was fully disclosed." *Watts v. Jackson Hewitt Tax Serv.*

*Inc.,* 579 F.Supp.2d 334, 346 (E.D.N.Y.2008); *see also Shovak v. Long Island Commercial Bank,* 50 A.D.3d 1118, 858 N.Y.S.2d 660, 663 (App.Div.2008). Here, the alleged deceptive acts were fully disclosed to Ng in the terms of his loan agreement. (Defs.' 56.1 Stmt. ¶¶ 22, 23, 33–35.) He has acknowledged that he knew the interest rate set forth in the loan documents for the Second Mortgage, and signed them nonetheless because he was eager to purchase the Property in question. (*Id.* ¶ 33, 858 N.Y.S.2d 660). He was represented by counsel, who himself signed the documents as a witness to plaintiff's execution. (*Id.* ¶¶ 18–19.) Plaintiff has been deemed to have admitted signing the loan documents due to his failure to respond to defendants' RFA. (*Id.* ¶ 27 n. 1, 858 N.Y.S.2d 660.)

In addition, because Ng's signatures on the documents in question were notarized, their genuineness is presumed, and plaintiff's equivocal, and wholly-self serving response on the simple question of whether the signature was his simply does not create a question of fact. *Feehan v. Feehan,* No. 09 Civ. 7016(DAB)(THK), 2010 WL 3734082, at *9 (S.D.N.Y. July 26, 2010). While it is true that handwriting identification is generally a factual question, "to survive summary judgment, the party contesting the signature's validity must submit sufficient evidence to allow a reasonable juror to conclude that those arguments have merit." *Id.* at *9 (citing *Pent–R–Books,* 538 F.2d 519, 531 (2d Cir.1976) ("[w]here it is apparent that two handwriting specimens are from the same hand, the mere assertion they differ is not sufficient to raise a question of fact for trial")); *Orix Fin. Servs., Inc. v. Thunder Ridge Energy, Inc.,* No. 01 Civ. 4788(RJH)(HBP), 2006 WL 587483, at *20–21 (S.D.N.Y. Mar. 8, 2006) (finding that witness who submitted only a "conclusory affidavit, stating that she did not sign the guaranty bearing her name," failed to create triable issue of fact). Here, plaintiff simply states that the signatures might or might not be his own, thus failing to create a genuine issue of material fact as to whether he signed the loan documents. Since plaintiff acknowledges that he knew of the terms of the loan and was represented by counse, a reasonable jury could not find that he was deceived by HSBC when he agreed to those same terms at the closing.

**\*8** For all of these reasons, plaintiff's claim under GBL § 349 is DISMISSED

## III. Unconscionability

Plaintiff seeks a declaration by this Court that the Second Mortgage is void and unenforceable on the grounds that the transaction was unconscionable under New York common law. (Compl.¶¶ 178, 193.) Defendants in opposition have asserted that unconscionability is improperly asserted here as a means of obtaining affirmative relief, and that plaintiff cannot adequately show procedural and substantive unconscionability.

### A. *Unconscionability as Affirmative Relief*

Under New York law, unconscionability is an affirmative defense to the enforcement of a contract. *See, e.g., Travelers Ins. Co. v. Broadway W. St. Assocs.,* 164 F.R.D. 154, 158 (S.D.N.Y.1995); *Don King Prods. v. Douglas,* 742 F.Supp. 778, 780 (S.D.N.Y.1990) (recognizing unconscionability as an affirmative defense under New York law); *Towner v. Towner,* 225 A.D.2d 614, 639 N.Y.S.2d 133, 134 (App.Div.1996). A cause of action for unconscionability may not be used to seek affirmative relief. *See Galvin v. First Nat. Monetary Corp.,* 624 F.Supp. 154, 158 (E.D.N.Y.1985) ("The doctrine of unconscionability is in the nature of an affirmative defense, and does not give rise to a cause of action"); *Super Glue Corp. v. Avis Rent A Car Sys., Inc.,* 132 A.D.2d 604, 606, 517 N.Y.S.2d 764 (App.Div.1987) ("The doctrine of unconscionability is to be used as a shield, not a sword, and may not be used as a basis for affirmative recovery."). In *Cowin Equip. Co., Inc. v. General Motors Corp.,* the Eleventh Circuit noted that:

> The equitable theory of unconscionability has never been utilized to allow for the affirmative recovery of money damages. The Court finds that neither the common law of Florida, nor that of any other state, empowers a court addressing allegations of unconscionability to do more than refuse *enforcement* of the unconscionable section or sections of the contract so as to avoid an unconscionable result.

734 F.2d 1581, 1582 (11th Cir.1984) (quoting *Bennett v. Behring Corp.,* 466 F.Supp. 689, 700 (S.D.Fla.1979)). Thus, Ng's attempt here to use the doctrine as a "sword" is improper as a matter of law.

Moreover, Ng's mortgage loan transactions do not meet the requirements for unconscionability under New York law, as explained below.

**B.** *Substantive and Procedural Unconscionability*
Under New York law, a contract may be held invalid if it meets the standard for unconscionability—that is, if it "is so grossly unreasonable or unconscionable in the light of the mores and business practices of the time and place as to be unenforceable according to its literal terms." *Gillman v. Chase Manhattan Bank, N.A.,* 73 N.Y.2d 1, 10, 537 N.Y.S.2d 787, 534 N.E.2d 824 (1988). For a contract to be held unconscionable, the party alleging the defect must generally show both substantive and procedural unconscionability. *See Naval v. HIP Network Servs. IPA, Inc.,* 620 F.Supp.2d 566, 571 (S.D.N.Y.2009) (citing cases); *Sands Bros. Venture Capital, LLC v. Burns, Schoenburg & Walden, LLP,* No. 600411/10, 2010 WL 3619861, at *5 (N.Y. Sup.Ct. Sept. 14, 2010). The contract must unreasonably favor one party over the other and the process of contract formation must have deprived the disadvantaged party of meaningful choice. *See King v. Fox,* 7 N.Y.3d 181, 191, 818 N.Y.S.2d 833, 851 N.E.2d 1184 (2006) (citing *Gillman,* 73 N.Y.2d at 10, 537 N.Y.S.2d 787, 534 N.E.2d 824).

*1. Procedural Unconscionability*
**\*9** As Judge Pohoreksly noted in his R & R:

> Notably the plaintiff has, other than using the conclusory words 'lack of meaningful choice', not alleged that he lacked a meaningful choice, nor has he made allegations with respect to his experience, education, or level of sophistication, other than stating he is 'unsophisticated consumers.' *See* Complaint ¶¶ 179, 188. While he alleges that the defendants intentionally misrepresented material information, he fails to disclose what that information was. *See* Complaint ¶ 180.

(R & R at 34.) This Court agrees. The contract formation process here lacks the hallmarks of procedural unconscionability. Though Ng broadly argues that there

existed "high pressure commercial tactics, inequality of bargaining power, deceptive practices and language in contract, [and] an imbalance in the understanding and acumen of the parties," his papers are essentially bereft of admissible evidence supporting these allegations. Ng sought assistance from a Cantonese-speaking loan officer in the initial stages of his inquiry, and was represented by counsel of his choosing at the closing. (Defs.' 56.1 Stmt. ¶¶ 17, 18, 23; Defs.' Aff. re Mot. for Summ. J. Ex. 1 (Ng.Dep.), at 27.) He has admitted that he consulted with his attorney before signing loan documents at the closing, though he has questioned his attorney's quality. (Defs.' 56.1 Stmt. ¶ 33.) Though he has attempted, at the eleventh hour, to withdraw his admissions showing that he signed the documents in question, he has admitted nonetheless by deposition that he signed these documents in full awareness of their terms. (*Id.*) As he himself explained: "the only time we saw the $82,500 was five days before closing ...." (*Id.* ¶¶ 17, 18, 23, 537 N.Y.S.2d 787, 534 N.E.2d 824; Ng. Dep. at 54.) For these reasons, Ng has failed to show procedural unconscionability.

*2. Substantive Unconscionability*
Plaintiff has failed to put forward any evidence showing that the Second Mortgage is a contract "which no man in his senses and not under delusion would make." *Siemens,* 859 F.Supp. at 695. By their plain terms, and as Judge Pohorelsky correctly noted in his R & R, the terms of the Second Mortgage were both common and well below any applicable interest limitation. (R & R at 32.) Thus, the Second Mortgage is not substantively unconscionable. Therefore, defendants' motion for summary judgment is GRANTED as to plaintiff's cause of action based on unconscionability.

**IV. TILA**
Plaintiff in his complaint alleges that defendants violated two provisions of TILA: 15 U.S.C §§ 1635 and 1638. (*See* Compl. ¶¶ 65–78.) This Court dismissed plaintiff's claims based on 15 U.S.C. § 1635, but held that, to the extent plaintiff has expressly asserted causes of action based on other sections of TILA, such claims survived dismissal. For the reasons below, defendants' motion with respect to those surviving TILA claims are GRANTED IN PART AND DENIED IN PART.

A. *Section 1638*

**\*10** The main purpose of TILA is "to assure meaningful disclosure of credit terms, avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices." *See McAnaney v. Astoria Fin. Corp.,* 357 F.Supp.2d 578, 583 (E.D.N.Y.2005) (internal citations omitted). "Failure to make a required disclosure and satisfy the Act may subject a lender to statutory and actual damages that are traceable to the lender's failure." *Id.*

As plaintiff himself admitted in his Memorandum in Opposition to the Motion for Summary Judgment, the Second Mortgage is a Home Equity Line of Credit ("HELOC"), and is an open-ended line of credit. *See Koons Buick Pontiac GMC, Inc. v. Nigh,* 543 U.S. 50, 64 n. 10, 125 S.Ct. 460, 160 L.Ed.2d 389 (2004); *McAnaney v. Astoria Fin. Corp.,* No. 04–CV–1101 (JFB)(WDW), 2008 WL 222524, at \*4 (E.D.N.Y.2008); (Pl.'s Mem in Opp. to Summ. J. Mot. at 18; Liew Ex. D.) Section 1638 governs disclosure requirements for closed-ended lines of credit, and thus does not pertain to the Second Mortgage. *See §§ 1638(a)* (requiring disclosures for closed-end credit plans), 1638(b) (governing GFEs for closed-end credit plans).

With respect to the First Mortgage, a closed-end line of credit, defendants have submitted evidence showing that they provided the required pre-closing disclosures, apparently signed by plaintiff. (Defs.' 56.1 Stmt. ¶¶ 12, 13, 24–29, 42–43; *see* Liew Decl.) The settlement agent that closed the Mortgages in question has declared that plaintiff received, reviewed, and signed all relevant disclosures. (*See* Liew Decl.) Plaintiff's deposition testimony and admissions likewise buttress defendants' contention that they made all disclosures required by TILA. (Defs.' 56.1 Stmt. ¶¶ 12, 13, 24–29, 42–43; *see* Liew Decl.)

Moreover, TILA recognizes that a presumption of delivery of required disclosures arises from a written acknowledgement of receipt by the recipient, such as that offered here. 15 U.S.C. § 1635(c). It is clear that a plaintiff's written acknowledgement of receipt of disclosure is not by itself conclusive, but creates a presumption of delivery. *See id.* ("Notwithstanding any rule of evidence, written acknowledgement of receipt of any disclosures required under this subchapter by a person to whom information, forms, and a statement is required to be given pursuant to this section *does no more than create a rebuttable presumption* of delivery thereof." (emphasis added)). To

rebut this presumption, plaintiff must proffer evidence that he did not receive the disclosure. *See Williams v. First Gov't Mortg. & Investors Corp.,* 225 F.3d 738, 751 (D.C.Cir.2000).

Plaintiff has offered no credible evidence to rebut this presumption. Instead, plaintiff has put forward denials of receipt that are utterly belied by the evidence.[6] In fact, his deposition testimony shows plaintiff's inability to discern whether he received the documents in question and whether or not the signature on those documents is in fact his own. (Ng. Dep. at 12, 13, 24–39, 42–43.) Plaintiff has offered not a scintilla of evidence to support his claim.[7]

[6]     For example, though plaintiff argues, in his 56.1 Statement, that he did not receive the "Federal Truth–in–Lending Disclosure Statement," he stated in his deposition that "it is probable" that he received it, that he did not recall seeing it, and that he could not tell whether it was his signature on the document or not. (Ng Dep. at 46, 58–59.)

[7]     Indeed, plaintiff's contentions, set forward for the first time in his Opposition Memorandum, are not only meritless, but cite to portions of his 56.1 Statement that mischaracterize deposition testimony or fail to support his arguments.

**\*11** In the alternative, plaintiff contends that the disclosure statements violate § 1638 on the ground that they were not delivered in the proper form, with proper statutory language, and at the proper time. Plaintiff has alleged that defendants failed to: (1) provide plaintiff with a statement notifying him of his right to receive an itemization of the amount financed, *see* § 1638(a)(2) (B); (2) include certain descriptive terms in the documents such as "finance charge," "annual percentage rate," "total of payments," and "total sale price," *see* § 1638(a)(8); (3) send a Good Faith Estimate ("GFE") within the three days of receipt of plaintiff's written application as required by statute, and to include a statement, as required by statute, that plaintiff was not required to complete the agreement "merely because you have received these disclosures or signed a loan application." §§ 1638(b).

In part, plaintiff's argument is wholly unsupported and is belied by the uncontroverted record showing that the necessary disclosures were made. Plaintiff was provided with an itemization of the amount financed for the First Mortage. (Liew Decl. Ex. K.) The uncontroverted

record shows that the terms allegedly missing from the documents are actually accounted for, and are signed by plaintiff. (*See* Liew Decl. Ex. P, Q). However, plaintiff's claim relating to the GFE cannot be resolved on summary judgment. That form appears to have been signed by Ng in January, but lacks the statutory language described. (Liew Decl. Ex. H.) Plaintiff has raised a genuine issue of material fact with respect to the form and timing of the GFE disclosure. Thus, defendants' motion for summary judgment is DENIED as to plaintiff's cause of action based on 15 U.S.C. § 1638(b) with respect to the GFE disclosure.

### B. *Section 1637*

This Court previously held that "to the extent that [plaintiff] has expressly asserted TILA-specific (i.e., non-HOEPA) causes of action other than under § 1635, HSBC's motion [for judgment on the pleadings] is denied." (Doc. No. 79, at 2.) In opposition to defendants' motion, plaintiff for the first time alleges the violation of 15 U.S.C. § 1637(a), nowhere mentioned in the plaintiff's pleadings or in earlier motion practice, either by name or in content. Though plaintiff makes an attempt to show that § 1637 should be read into his Complaint, he does so by disingenuously quoting paragraphs that, in fact, support the argument against allowing the claim. Indeed, plaintiff claims that the phrase "defendants failed to deliver to the plaintiff accurately all material disclosures required by TILA" somehow allows all claims under TILA into the action. On the contrary, that phrase states that "defendants failed to deliver to the plaintiff accurately all material disclosures required by TILA *as described above*" and is found in paragraph 73 of the Complaint, not paragraph 59 as stated. "As described above" clearly relates to the TILA-related allegations already described, which state with particularity violations of §§ 1635 and 1638. Because plaintiff has provided no explanation whatsoever for failing to plead a violation of § 1637, and because a violation of that section is materially distinct from the other violations pleaded, defendants had no proper notice of this claim.

**\*12** Therefore, defendants' motion is GRANTED with respect to any claim brought under § 1637, and it is

DENIED with respect to the question of whether the GFE disclosure for the First Mortgage was made in the proper form and proper time as required by § 1638(b).

### V. Individual Liability Of Defendant Wong

The Court grants defendants' summary judgment claim as to individual defendant Wong. The only possible claim against him concerns the TILA claim under 15 U.S.C. § 1638, which by definition deals with a lender's failure to disclose certain information prior to a transaction.

Here, it is uncontested that plaintiff and Wong had no communication until after entering into the transactions at issue and that Wong played no role in the events leading up to the transaction. Thus, the defendants' motion for summary judgment as to individual defendant Wong is GRANTED. [8]

[8]    Neither party addresses whether the sole remaining claim lies against individual defendant Zhao.

### CONCLUSION

For the reasons stated above, defendants' summary judgment motion is DENIED with respect to whether GFE disclosures were made in the proper form and proper time, as required by 15 U.S.C. § 1638(b), and GRANTED as to the remainder of plaintiff's claims. In addition, all claims against Defendant Wong are dismissed.

This matter is re-committed to the assigned Magistrate Judge for supervision of any settlement discussions, and all remaining pre-trial issues including the preparation of a Joint Pre–Trial Order consistent with this Memorandum and Order.

SO ORDERED.

### All Citations

Not Reported in F.Supp.2d, 2011 WL 3511296

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

731 N.W.2d 184
Supreme Court of South Dakota.

Sherry B. NYGAARD, On Behalf of Herself and All
Others Similarly Situated, Plaintiff and Appellant,
v.
SIOUX VALLEY HOSPITALS & HEALTH
SYSTEM, Defendant and Appellee.
Robert Dosch, On Behalf of Himself and All
Others Similarly Situated, Plaintiff and Appellant,
v.
Avera Health, Defendant and Appellee.
Brett and Debra Burgher, On Behalf of
Themselves and All Others Similarly
Situated, Plaintiffs and Appellants,
v.
Rapid City Regional Hospital,
INC., Defendant and Appellee.

Nos. 23905, 23906, 24058.
|
Argued on May 23, 2006.
|
Considered on Briefs On Nov. 27, 2006.
|
Decided April 4, 2007.

**Synopsis**

**Background:** Uninsured hospital patients brought breach
of contract and Deceptive Trade Practices and Consumer
Protection Act class actions against hospitals after
being charged the full undiscounted prices for hospitals'
services. The Circuit Court of the Second Judicial Circuit,
Minnehaha County, Gene Paul Kean, J., and the Circuit
Court of the Seventh Judicial Circuit, Pennington County,
John J. Delaney, J., dismissed the actions for failure to
state a claim, and patients appealed.

**Holdings:** After consolidating the cases, the Supreme
Court, Zinter, J., held that:

[1] patients' agreements with hospitals did not contain an
implied term that hospitals would charge no more than the
fair and reasonable charges for medical care;

[2] hospitals did not breach covenant of good faith and fair
dealing by charging full undiscounted prices;

[3] patients could not use doctrine of unconscionability to
recover damages;

[4] patients did not rely on hospitals' alleged
misrepresentations that they would provide care
regardless of patients' ability to pay, as required for a civil
claim under the Deceptive Practices Act;

[5] hospitals did not engage in discriminatory pricing in
violation of the Act; and

[6] patients failed to state a claim that hospitals violated
the Act by failing to make good faith efforts to determine
whether patients were able to pay for the services.

Affirmed.

**Attorneys and Law Firms**

**\*187** Eric J. Magnuson, Stanley E. Siegel of Rider,
Bennett, LLP, Minneapolis, Minnesota, Steven S. Siegel
of Lynn, Jackson, Shultz & Lebrun, Sioux Falls, South
Dakota, Jay C. Shultz of Lynn, Jackson, Shultz & Lebrun,
Rapid City, South Dakota, Attorneys for plaintiffs and
appellants Nygaard, Dosch and Burgher.

Roberto A. Lange of Davenport, Evans, Hurwitz
& Smith, Sioux Falls, South Dakota, Attorneys for
defendant and appellee Sioux Valley.

Thomas J. Welk, Christopher W. Madsen of Boyce,
Greenfield, Pashby & Welk, Sioux Falls, South Dakota,
Attorneys for defendant and appellee Avera Health.

Jeffrey G. Hurd, Sara L. Larson of Bangs, McCullen,
Butler, Foye & Simmons, Rapid City, South Dakota,
Stuart M. Altman of Hogan & Hartsen, LLP, **\*188**
Denver, Colorado, Attorneys for defendant and appellee
Rapid City Regional Hospital.

**Opinion**

ZINTER, Justice.

[¶ 1.] Sherry Nygaard, Robert Dosch, and Brett and Debra
Burgher (Patients) commenced these class actions against
Sioux Valley Hospitals and Health System, Avera Health,

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works. 1

and Rapid City Regional Hospital, Inc. (Hospitals). [1] The Patients were uninsured and not covered by Medicare/Medicaid. They sought damages for being charged the full, undiscounted price of the Hospitals' services, which was more than the price paid by patients who were insured or covered by Medicare/Medicaid. Patients also sought damages for alleged misrepresentations concerning the Hospitals' willingness to provide medical care regardless of ability to pay. They brought their claims on four theories. Three were premised on contract. The fourth alleged a violation of SDCL 37–24–6, part of South Dakota's Deceptive Trade Practices and Consumer Protection Act (Trade Practices Act or the Act). The circuit courts granted the Hospitals' motions to dismiss for failure to state a claim under SDCL 15–6–12(b)(5). [2] Although each case has procedural issues not present in the others, the four substantive theories are the same. Because Patients' complaints fail to state a claim under the substantive theories, we have consolidated the cases and affirm.

[1]   Two of the actions were initially filed in federal court, but were voluntarily dismissed and re-filed in circuit court. The third was removed to federal court, but later remanded to circuit court.

[2]   South Dakota Rule 12(b)(5) is similar to Federal Rule of Civil Procedure 12(b)(6). South Dakota's version provides in part:

> Every defense, in law or fact, to a claim for relief in any pleading, whether a claim, counterclaim, cross-claim, or third-party claim, shall be asserted in the responsive pleading thereto if one is required, except that the following defenses may at the option of the pleader be made by motion: ...
> (5) Failure to state a claim upon which relief can be granted....
> SDCL 15–6–12(b)(5).

### The Parties and Issues

#### Nygaard v. Sioux Valley

[¶ 2.] Because the cases were dismissed for failure to state a claim, we restate the facts pleaded in the complaints. Sioux Valley is a non-profit corporation with its principle place of business in Sioux Falls, South Dakota. Sioux Valley described itself "as an integrated network of nearly

300 physicians and more than 150 healthcare facilities." Nygaard alleged that Sioux Valley held itself out: as striving "to provide the highest value of health care services through a combination of high quality and cost effective care"; as being "dedicated to providing quality care for patients of all ages, regardless of race, creed, their circumstances, or their ability to pay for such services"; as providing "care for the elderly and poor through the Medicare and Medicaid programs at agreed upon rates, which are substantially lower than the normally charged rates"; and as providing "charity care to patients who have demonstrated an inability to pay for medical services." Nygaard also alleged that Sioux Valley received state and federal tax exemptions, and as a nonprofit charitable organization, was required to provide services regardless of ability to pay.

[¶ 3.] In May 2003, Nygaard underwent surgery at Sioux Valley's Vermillion Campus Hospital. She also received other related treatment at Sioux Valley's facilities. Upon admission, Nygaard alleged that she was required to sign a standardized contract agreeing to pay, in full, unspecified and undiscounted charges for medical care. She also alleged that the **\*189** charges were pre-set by Sioux Valley in its sole discretion. Nygaard was subsequently charged what she describes as the full, undiscounted price of the services provided. Although Nygaard made payments to Sioux Valley, a substantial balance remained, and Sioux Valley charged interest and fees relating to that balance. The complaint does not reflect the amount Nygaard was charged, the amount she paid, or the amount that remains owing.

#### Dosch v. Avera

[¶ 4.] Avera is also a non-profit corporation with its principal place of business in Sioux Falls. Avera held itself out as a health ministry of the Benedictine and Presentation Sisters "serving the people of eastern South Dakota and surrounding states with hospitals, nursing homes, clinics and other health services at more than 100 locations." Avera's "Health Mission" stated that it "provide[s] a quality, cost effective health ministry, which reflects Gospel values." Dosch alleged that Avera publicly stated that it was "guided by gospel values of ... hospitality and stewardship" and "compassion ... especially for the poor...." Dosch also alleged that Avera received state and federal tax exemptions, and as a nonprofit charitable

organization, was required to provide services regardless of ability to pay.

[¶ 5.] In May 1993, Dosch was treated for a broken hip at Avera St. Luke's in Aberdeen, South Dakota. Upon admission, Dosch alleges that he was required to sign an agreement to pay the unspecified, undiscounted, pre-set charges described by Nygaard. Dosch was billed in excess of $30,000. He set up a payment plan, paying $200 per month, but the payments were offset by interest and fees.

*Burghers v. Rapid City Regional Hospital*

[¶ 6.] Rapid City Regional Hospital (RCRH) is a non-profit charitable organization with its principle place of business in Rapid City, South Dakota. Burghers alleged that RCRH publicly represented itself: as "striving to continually exceed the expectations of every patient and customer in regard to service, effort and professional standards, demonstrating honest, positive and ethical behavior and communication in dealing with our patients, customers and employees"; as "providing quality services at the lowest possible cost"; and as "provid[ing] quality medical health care regardless of race, creed, sex, national origin, handicap, age, or ability to pay[.]" Burghers also alleged that RCRH received state and federal tax exemptions, and as a nonprofit charitable organization, was required to provide services regardless of ability to pay.

[¶ 7.] Brett and Debra Burgher, and their son, Nathan, all received medical care at RCRH. Before receiving treatment, they were also required to sign an agreement to pay the unspecified, undiscounted, pre-set charges described by Nygaard.

[¶ 8.] The following issues have been preserved[3] for review:

[3]  Additional theories were presented in the circuit courts, including: unjust enrichment and constructive trust.

1) Whether the circuit court erred in dismissing Patients' contract theories involving: an implied, commercially reasonable price term; breach of the covenant of good faith and fair dealing; and enforcement of an adhesion contract.

2) Whether the circuit court erred in dismissing Patients' claims under the Trade Practices Act.

**\*190  Standard of Review**

[1] [2] [3] [4] [5] [6] [7] [¶ 9.] "A motion to dismiss under SDCL 15–6–12(b) tests the legal sufficiency of the pleading, not the facts which support it. For purposes of the pleading, the court must treat as true all facts properly pled in the complaint and resolve all doubts in favor of the pleader." *Guthmiller v. Deloitte & Touche, LLP,* 2005 SD 77, ¶ 4, 699 N.W.2d 493, 496. "[T]hese 'motions are viewed with disfavor and seldom prevail.' " *Elkjer v. City of Rapid City,* 2005 SD 45, ¶ 6, 695 N.W.2d 235, 238 (quoting *Fenske Media Corp. v. Banta Corp.,* 2004 SD 23, ¶ 7, 676 N.W.2d 390, 392–393 (citations omitted)). However, "facts 'well pled' and not mere conclusions may be accepted as true." *Janklow v. Viking Press,* 378 N.W.2d 875, 877 (S.D.1985). A 12(b)(5) motion "does not admit conclusions of the pleader either of fact or law." *Akron Savings Bank v. Charlson,* 83 S.D. 251, 253, 158 N.W.2d 523, 524 (1968). Therefore, "[w]hile the court must accept allegations of fact as true when considering a motion to dismiss, the court is free to ignore legal conclusions, unsupported conclusions, unwarranted inferences and sweeping legal conclusions cast in the form of factual allegations." *Wiles v. Capitol Indemnity Corp.,* 280 F.3d 868, 870 (8th Cir.2002). We review the circuit court's ruling de novo, with no deference to its determination. *Elkjer,* 2005 SD 45 at ¶ 6, 695 N.W.2d at 238.

**Decision**

*1) Contract Theories*

[¶ 10.] The circuit court that dismissed Nygaard's and Dosch's breach of contract theories viewed the essence of their claims as contentions that the Hospitals breached the contracts by not charging Patients the reduced rate that insured and Medicare/Medicaid patients received. The circuit court's view was based on the complaints' numerous references to being charged the "full, undiscounted cost" rather than the discounted rates Hospitals charged insured and Medicare/Medicaid patients. Therefore, when dismissing, the circuit court explained that recognizing such a claim would put the court in the role of a policy maker and "usurp the

traditional role of the Legislature" in regulating hospitals. The circuit court in Burghers' case reached essentially the same conclusion.

[¶ 11.] Patients, however, emphatically contend that none of their theories seek entitlement to the discounted rates charged to insured and Medicare/Medicaid patients. They contend that their references to discounted rates were merely pleaded as an illustration that the Hospitals' charges were unreasonable. Thus, on appeal, Patients "clarify" that they are not claiming entitlement to the discounted prices charged to others. Instead, they first contend that the Hospitals breached the contracts by charging more than an implied, commercially reasonable rate. [4]

[4]
It is debatable whether Patients preserved this claim by raising it below. Almost all of the allegations in the complaints either directly or indirectly allege a failure to charge the discounted price others received. Patients did, however, argue at the circuit court hearing in Nygaard and Dosch as follows:

> Well, there is no question that there is different pricing, but the question that we're seeking to litigate, your Honor, is are the contracts with our clients, are they—are they commercially reasonable, are they fair, do they violate the South Dakota Fair Trade Practices Act, do they violate any of the contractual premises of the duty of good faith and fair dealing?

But Patients then continued:

> And if you look—I don't think you can look at any single one of those groups of contracts in the abstract. I think they can only be understood when they are compared one to the other.... [W]e anticipate that when we discover those contracts they are going to say here's a list of prices that we'll pay for this list of services....
> And what we think we're going to see, and what they are conceding essentially, is that when we do see these contracts they are going to say the prices that the federal government pays are X, the prices that the insurance companies pay are two times X, and the prices charged—retail prices charge to the uninsured are three times X....

Based on this latter argument and the pleadings, we understand the circuit court's view of Patients' claim. We also observe that one need go no further than examining the Patients' proposed class to understand the circuit court's view. The proposed

class included all uninsured patients who had paid (and persons or entities that had paid on behalf of such patients) "an amount for medical care in excess of the amount charged to Defendant[s'] Medicare, Medicaid, or other insured patients." We finally observe that Burghers failed to respond to RCRH's argument that Burghers did not present their clarified position to the circuit court in that case.

Nevertheless, in the interests of judicial economy, we choose to address the "clarified" claim.

#### *191 (a) Implied Price Term

[8] [¶ 12.] Because there were no price terms itemized in the agreements, Patients pleaded that "[i]mputed in these contracts is the express and/or implied contractual obligation by [Hospitals] that [they] would charge Plaintiff[s] and the Class no more than the fair and reasonable charge for such medical care." However, we conclude that this theory fails to state a claim because the price terms were controlled by language in the contracts. The complaints all allege that the Hospitals required the Patients to sign contracts agreeing "to pay, in full, unspecified and undiscounted charges for medical care, which charges [were] *pre-set* by [the Hospitals]...." (Emphasis added.) Because, as we explain below, pre-set price charges were pleaded, the price terms were fixed and determinable, and because the contracts spoke to the issue of price, the law does not permit imputation of different, implied price terms for what patients later claimed were the reasonable values of the services provided.

[9] [10] [¶ 13.] "[I]n order to ascertain the terms and conditions of a contract, we examine the contract as a whole and give words their 'plain and ordinary meaning.' " *Canyon Lake Park, L.L.C., v. Loftus Dental, P.C.,* 2005 SD 82, ¶ 17, 700 N.W.2d 729, 734 (quoting *Gloe v. Union Ins. Co.,* 2005 SD 30, ¶ 29, 694 N.W.2d 252, 260). Although the price of each hospital service was not listed in the contract itself, "[w]ords [that] fix an ascertainable fact or event, by which the term of a contract [ ] can be determined, make the contract definite and certain in that particular." *Kuhfeld v. Kuhfeld,* 292 N.W.2d 312, 315 (S.D.1980). *See also Restatement (Second) of Contracts § 33(2) (1981)* (stating: "The terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy.").

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

4

[¶ 14.] Here, the word "pre-set" is the operative language of the contracts regarding price. The prefix "pre-" is defined as "[e]arlier; before; prior to." The American Heritage College Dictionary, 1075 (3d 1997). "Set" is defined as "[t]o fix at a given amount." *Id.* at 1247. Therefore, under the ordinary meaning of the language "pre-set charges," the contract prices were fixed at a given amount prior to the execution of the contracts. And obviously, prices that are previously fixed at a given amount are determinable.

[11] [¶ 15.] Therefore, according to the pleadings, the price terms were fixed and determinable from the language of the contracts. For that reason, the contracts were not silent or open concerning price and we cannot impute commercially reasonable **\*192** or fair and reasonable price terms into the agreements. As most courts have noted in similar hospital pricing litigation, if the charges are ascertainable through reference to outside sources, there is no need to judicially impute a fair and reasonable price term. *See Morrell v. Wellstar Health System, Inc.,* 280 Ga.App. 1, 5, 633 S.E.2d 68, 72 (2006) (noting: "The rules of contract construction enabled [the conclusion] that [the term] 'all charges' unambiguously referred to the written summary of specific charges required by [a statute]."); *Cox v. Athens Regional Medical Center, Inc.,* 279 Ga.App. 586, 587–592, 631 S.E.2d 792, 795–797 (2006) (concluding that agreeing to pay "in accordance with the rates and terms of the hospital" is not an open price term subject to an implication of reasonableness considering statutory requirement that hospitals provide written price summaries upon request); *Shelton v. Duke Univ. Health System, Inc.,* 633 S.E.2d 113, 116–117 (N.C.App.2006) (concluding that "regular rates and terms of the Hospital" is not an open price term when the prices are set forth in a chargemaster list). [5]

[5] The conclusion that hospital price terms are not open when pre-set prices can be ascertained through extrinsic sources is also well supported in trial court decisions. *See Buckner v. Banner Health System,* CV 2005–003052 (MaricopaCntySuperCt.Ariz., November 22, 2005) (concluding that when a contract states "usual and customary charges," there is no ambiguity in relation to statutory price posting requirements, and no implied terms may be asserted); *Pitts v. Phoebe Putney Health System, Inc.,* Civ 04CV1991–3, 2005 WL 5176797 (DoughertyCntySuper.Ct.Ga.,

June 23, 2005) (concluding that when prices are set out in a chargemaster, no implied terms are necessary), *aff'd, Pitts v. Phoebe Putney Memorial Hosp., Inc.,* 279 Ga.App. 637, 631 S.E.2d 830 (2006); *Elliot Hospital v. Boerner,* 04–C–739 (HillsboroughSuper.Ct.N.D.N.H., July 15, 2005) (concluding that when "usual and customary" is stated and a chargemaster sets forth the charges, there are no implied contractual obligations); *DiCarlo v. St. Mary's Hospital,* 2006 WL 2038498, Civil Action No. 05–1665 (Dist.N.J., July 19, 2006) (unpublished) (no contract or good faith and fair dealing claims were permitted because "all charges" is a definite price term when a chargemaster exists).

[¶ 16.] We acknowledge that the pleadings do not reference the disclosure statutes or "chargemaster" lists [6] that were referenced in these decisions. However, the point of these cases is that if the contract price is fixed and determinable from sources outside the written agreement, the price term is not open in the sense that it allows a claim for some imputed, commercially reasonable price term. *See* Restatement (Second) of Contracts § 204 cmt c (stating "where a term can be supplied by logical deduction from agreed terms and the circumstances, interpretation may be enough").

[6] Burghers do, however, point that out under 42 CFR 413.20(d)(2)(vi), hospitals that provide care to Medicare patients must have records of "[p]atient service charge schedules" available for review. Patients' pleadings allege that all three Hospitals provided care to Medicare patients.

[¶ 17.] That is precisely what occurred in this case. Patients pleaded that the price terms were pre-set. Therefore, the prices were fixed and determinable, and the pre-set price terms precluded imputation of different, implied terms. [7] The application **\*193** of this rule is especially compelling in these cases: "in a hospital setting, it is not possible to know at the outset what the cost of the treatment will be, because it is not known what treatment will be medically necessary." *Cox,* 279 Ga.App. at 590–591, 631 S.E.2d at 797. The application of the rule is also compelling because Patients did not plead that they were charged something other than the pre-set charges, or that they requested but were denied access to the pre-set charges. Other courts have concluded that similar omissions support a dismissal for failure to state a claim. *See Shelton,* 633 S.E.2d 113 (affirming dismissal of breach of contract claim when contract's price term was "regular rates" of the hospital,

reasoning that patient had not requested information on the regular rates and did not claim that the rates charged were not "regular"); *Elliot Hospital v. Boerner,* 04–C–739 (HillsboroughSuperCtNDNH July 15, 2005) (dismissing breach of contract claim, reasoning that although the hospital contract required payment of the "usual and customary charges," "there [was] no indication that [the patient] requested an estimate or questioned what the [hospital's] usual and customary charges were prior to signing the agreement). *See also Satterfield v. Southern Regional Health System, Inc.,* 280 Ga.App. 584, 585–586, 634 S.E.2d 530, 531 (2006) (dismissing breach of contract claim in a state where a statute required availability of prices and patients had failed to "allege that the pricing information was unavailable").

7    Patients' own case of *Doe v. HCA Health Services of Tennessee, Inc.,* 46 S.W.3d 191 (Tenn. 2001), demonstrates why Patients' pleadings fail to state a claim under the implied price term theory. In HCA, the contract only required the payment of "charges" for the hospitalization. *Id.* at 194. The Tennessee Supreme Court concluded that the term "charges" was not "sufficiently definite," and therefore, it allowed imputation of a fair and reasonable price term. *Id.* at 197. However, the Tennessee Court specifically noted that the contract in issue contained no " 'reference to some document, transaction or other extrinsic facts ... from which its meaning may be made clear.' " *Id.* (quoting 1 Richard A. Lord, *Williston on Contracts,* § 4:27 at 593 (4th ed 1990)). Therefore, it appears the Tennessee Court would have found no open price term had that contract involved pre-set charges that were fixed and determinable.

*(b) Covenant of Good Faith and Fair Dealing*

[¶ 18.] Patients argue that the Hospitals breached the covenant of good faith and fair dealing by charging prices that did not relate to the cost of the services and were unreasonable and unexpected based on the Hospitals' representations. The circuit courts dismissed this theory reasoning that the breach of the duty of good faith and fair dealing did not give rise to a separate cause of action.

[12]    [¶ 19.] In *Farm Credit Servs. of Am. v. Dougan,* 2005 SD 94, 704 N.W.2d 24, we considered when a cause of action arises for breach of the implied covenant of good faith and fair dealing. We held that "South Dakota does not recognize an independent [tort] for breach of the

implied covenant of good faith and fair dealing." *Id.* at ¶ 6, 704 N.W.2d at 27 (citing *Garrett v. BankWest, Inc.,* 459 N.W.2d 833, 842 (S.D.1990); *McKie v. Huntley,* 2000 SD 160, ¶ 10, 620 N.W.2d 599, 602). Consequently, to the extent Patients' complaints sought recovery for the independent tort of breach of the covenant of good faith and fair dealing, we affirm the circuit courts' dismissals.

[13]    [¶ 20.] However, we must also consider the claim of breach of the implied covenant of good faith and fair dealing to the extent that it was a part of the parties' agreements. This Court has previously recognized that " '[e]very contract contains an implied covenant of good faith and fair dealing [that] prohibits either contracting party from preventing or injuring the other party's right to receive the agreed benefits of the contract.' " *Id.* at ¶ 8, 704 N.W.2d at 28 (quoting *Garrett,* 459 N.W.2d at 841). The concept of good faith and fair dealing is also recognized in the analogous provision of SDCL 57A–1–203 (UCC § 1–203): "Every contract or duty within this **\*194** title imposes an obligation of good faith in its performance or enforcement."

[14]   [15]   [16]   [¶ 21.] This duty of good faith permits an aggrieved party to bring a breach of contract action when the other party:

> [B]y [its] lack of good faith, limited or completely prevented the aggrieved party from receiving the expected benefits of the bargain. A breach of contract claim is allowed even though the conduct failed to violate any of the express terms of the contract agreed to by the parties.

*Garrett,* 459 N.W.2d at 841 (citations omitted). The meaning of the covenant varies with the context of the contract. Ultimately, the duty "emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party." *Id.* (citing Restatement (Second) of Contracts § 205, cmt a (1981)).

[17]    [¶ 22.] However, the duty of good faith and fair dealing "is not a limitless duty or obligation." *Id.* "The implied obligation 'must arise from the language used or it must be indispensable to effectuate the intention of the parties.' " *Id.* (quoting *Sessions, Inc. v. Morton,* 491 F.2d 854, 857 (9th Cir.1974)). We also recognized a limitation when the language of a contract addresses the issue.

The covenant of good faith does not create an amorphous companion contract with latent provisions to stand at odds with or in modification of the express language of the parties' agreement. It is not a repository of limitless duties and obligations.

*Farm Credit Services,* 2005 SD 94 at ¶ 9, 704 N.W.2d at 28 (citations omitted). Therefore, we explained that "[i]f the express language of a contract addresses an issue, then there is no need to construe intent or supply implied terms" under the implied covenant. *Id.* at ¶ 10 (citations omitted).

[¶ 23.] In the instant cases the express language of the contracts addressed the price issue. As previously explained, although the price of every hospital service was not itemized in the contracts, the pleadings allege that the charges were pre-set. And because these pre-set charges were fixed and determinable, these contracts addressed the issue of price and there is no basis to supply different price terms. A different implied price term would impermissibly stand at odds with and modify the pre-set price term. *Id.* at ¶ 9. Because we further observe that there is no allegation that Hospitals limited Patients' access to, or charged something other than, the pre-set charges referred to in the pleadings, Patients' breach of the contractual covenant of good faith and fair dealing theory failed to state a claim.

### *(c) Enforcement of an Adhesion Contract*

[¶ 24.] Patients pleaded that the Hospitals did not provide an opportunity for negotiating the agreements and that there was greatly disparate and wholly unequal bargaining power. They further pleaded that such standardized contracts are contracts of adhesion that are unconscionable and contrary to public policy. *See generally, Mobile Electronic Service, Inc., v. FirsTel, Inc.,* 2002 SD 87, ¶¶ 7–9, 649 N.W.2d 603, 605–606 (finding a contract unconscionable and unenforceable); *Citibank (S.D.), N.A. v. Hauff,* 2003 SD 99, ¶ 20, 668 N.W.2d 528, 534–535 (describing construction of a contract of adhesion).

[18]  [19]  [¶ 25.] In determining whether a contract is an unenforceable contract of adhesion, this Court looks not only at the bargaining power between the parties but also at the specific terms of the agreement. **\*195** *Scotland Vet Supply v. ABA Recovery Service, Inc.,* 1998 SD 103, ¶ 13, 583 N.W.2d 834, 837. Thus, we focus on both "overly harsh or one-sided terms," *i.e.,* substantive unconscionability; and how the contract was made (which includes whether there was a meaningful choice), *i.e.,* procedural unconscionability. *Johnson v. John Deere Company,* 306 N.W.2d 231, 237 (S.D.1981) (citation omitted).

[¶ 26.] Patients' complaints pleaded both procedural and substantive unconscionability. They allege that they were forced to sign the standardized agreements before they could receive medical care and that there was unequal bargaining power. Their complaints also allege that the contracts required them to pay pre-set charges that were determined at the sole discretion of the Hospitals.

[¶ 27.] Patients sought two types of relief. They alleged that the Hospitals' use of an adhesion contract caused them economic injury and damages. They also alleged that the contracts were unenforceable.

[20]  [21]  [¶ 28.] To the extent that Patients claimed entitlement to economic damages simply because they entered into a contract of adhesion, the complaints failed to state a claim upon which relief can be granted. Counsel acknowledged at oral argument that the nature of an adhesion claim does not give rise to an independent cause of action for damages. [8]

[8]

> Q: you're essentially agreeing that the adhesion claim is part of the breach of contract.
> A: It is.
> Q: And, that the adhesion claim is essentially defensive in nature, in that, it only prevents the enforcement of unconscionable terms, it's not a sword by which there's some cause of action for ... damages, necessarily
> A. Right, for bad faith.
> A. What it does is it prevents them from enforcing the term of the contract that says they get to set the price....

[22]  [23]  [¶ 29.] But even aside from this acknowledgement, and assuming that the contract was an unconscionable contract of adhesion, Patients have

no right to recover damages simply because they *entered into* an unconscionable contract. As the Eleventh Circuit Court of Appeals noted:

> [T]he equitable theory of unconscionability has never been utilized to allow for the affirmative recovery of money damages. The Court finds that neither the common law of Florida, nor that of any other state, empowers a court addressing allegations of unconscionability to do more than refuse *enforcement* of the unconscionable section or sections of the contract so as to avoid an unconscionable result.

*Cowin Equip. Co., Inc., v. General Motors Corp.,* 734 F.2d 1581, 1582 (11th Cir.1984) (emphasis in original) (quoting *Bennett v. Behring Corp.,* 466 F.Supp. 689, 700 (S.D.Fla.1979)). Other "cases [that] have addressed the issue have consistently rejected the theory that damages may be collected for an unconscionable contract provision, citing the language of [UCC] § 2–302 and its common law precursor...." *Id.* "The doctrine of unconscionability is to be used as a shield, not a sword, and may not be used as a basis for affirmative recovery." *Super Glue Corp., v. Avis Rent A Car Sys., Inc.,* 132 A.D.2d 604, 606, 517 N.Y.S.2d 764 (N.Y.App.Div.1987). "Under both the UCC and common law, a court is empowered to do no more than refuse enforcement of the unconscionable contract or clause." *Id.* (citations omitted). This Court has also noted that the doctrine is a defensive mechanism that enables parties to escape their obligations under contracts contravening public policy. *Bartron v. Codington County,* 68 S.D. 309, 323, 2 N.W.2d 337, 344 (1942) (quoting *Baltimore and Ohio Southwestern Railway* **\*196** *Co. v. Voigt,* 176 U.S. 498, 505, 20 S.Ct. 385, 387, 44 L.Ed. 560 (1900)). " 'Adhesive clauses, exacted by the overreaching of a contracting party who is in an unfairly superior bargaining position, are always subject to the *defense* of unconscionableness. Public policy invalidates such clauses.' " 8 Samuel Williston and Richard A. Lord, *A Treatise on the Law of Contracts,* § 18:5 at 28 (4th ed 1998) (emphasis added) (quoting *Fluor Western, Inc. v. G & H Offshore Towing Co.,* 447 F.2d 35 (5th Cir.1971)).

[¶ 30.] Patients have not, however, directed us to any case permitting an affirmative claim for damages simply because someone may have entered into a one-sided agreement. Therefore, we affirm the circuit courts' dismissal of Patients' affirmative adhesion contract claims that are being used as a sword to recover damages only because Patients entered into the contracts. We also affirm the dismissal of any defensive claims because in these cases there are no pleadings indicating that Hospitals are suing for enforcement of the contracts. [9]

[9] Burghers' and Dosch's bills were discharged in bankruptcy. Therefore, it appears that the defense is also moot in those cases.

*2) Trade Practices Act*

[¶ 31.] The circuit courts dismissed this theory, noting that the complaints did not identify the specific section of the Act that was violated and the complaints did not sufficiently plead fraud. Both courts also concluded that the claims under the Act were simply premised on differential pricing.

[¶ 32.] Patients' complaints pleaded three types of alleged violations of the Trade Practices Act: (1) that the Hospitals falsely held themselves out to the public as providing cost-effective health care regardless of ability to pay; [10] (2) that Hospitals' discriminatory pricing policies violated the Act; and (3) that Patients believed that Hospitals would make good faith efforts to determine their ability to pay following treatment and Hospitals would not charge those who were unable to pay. [11] We analyze these claims under SDCL 37–24–6, which provides in part:

[10] Dosch's pleadings did not make the identical factual allegations concerning the provision of care regardless of ability to pay that were made in the other complaints. However, the complaints are sufficiently similar to make our analysis applicable to all.

[11] This claim was incorporated by reference from the Patients' pleadings on equitable tolling.

It is a deceptive act or practice for any person to:

(1) Knowingly and intentionally act, use, or employ any deceptive act or practice, fraud, false pretense, false promises, or misrepresentation or to conceal, suppress, or omit any material fact in connection

with the sale or advertisement of any merchandise, regardless of whether any person has in fact been mislead, deceived, or damaged thereby....[12]

[12] SDCL 37–24–1(7) defines "merchandise" as "any object, wares, goods, commodity, intangible, instruction, or service[.]" SDCL 37–24–1(8) defines "person" to include "a natural person or his legal representative, a partnership, a limited liability company (domestic or foreign), a corporation (domestic or foreign), a trust, an incorporated or unincorporated association, and any other legal entity[.]"

[24] [25] [¶ 33.] Patients correctly point out that SDCL 37–24–6(1) makes these violations actionable "regardless of whether any person has in fact been mislead, deceived, or damaged thereby...." However, that statute is the criminal proscription. Patients' civil actions are governed **\*197** by SDCL 37–24–31, which specifically requires a causal connection between the alleged violation and the damages suffered:

> Any person who claims to have been adversely affected by any act or a practice declared to be unlawful by § 37–24–6 shall be permitted to bring a civil action for the recovery of actual damages suffered *as a result* of such act or practice.

(Emphasis added.)[13] Therefore, to state a claim under SDCL 37–24–31, Patients must have pleaded that their economic damages were proximately caused by one or more of the three alleged violations of the Act.

[13] Both intentional and negligent misrepresentation also require reliance. *Ducheneaux v. Miller,* 488 N.W.2d 902, 915 (S.D.1992); *Fisher v. Kahler,* 2002 SD 30, ¶ 10, 641 N.W.2d 122, 126–127.

### *Provision of Care Regardless of Ability to Pay*

[26] [¶ 34.] Patients first alleged that Hospitals misrepresented their willingness to *provide care* regardless of ability to pay. Therefore, under the causation element of their civil remedy, Patients' complaint must have left sufficient room to prove the fact that they were denied health care because of their inability to pay. However, this causal proof is not possible under the pleadings. The complaints affirmatively allege that Patients actually

received medical care despite their inability to pay. Therefore, according to the pleadings, the Hospitals' representations regarding the provision of care were not misrepresentations, and this type of allegation fails to state a claim under the Act.

### *Discriminatory Pricing*

[¶ 35.] Patients' second claim alleges a failure to charge discounted pricing similar to that provided for insured and Medicare/Medicaid patients. Patients pleaded:

> As alleged above, Defendant's conduct in charging Plaintiff[s] and the Class the highest and full, undiscounted and uncompensated cost for medical care and its charging the Plaintiff[s] and the Class a higher amount than its insured patients for the same medical services, despite its charitable, non-profit, tax-exempt status, is in violation of the South Dakota Deceptive Trade Practices and Consumer Protection Act because it is unfair, discriminatory, unconscionable, unethical, immoral, and oppressive. Such conduct is against public policy and has caused substantial economic injury to Plaintiff[s] and the Class.

[27] [¶ 36.] This claim fails to state a claim for two reasons. First, this pleading does not allege prohibited conduct under Act; *i.e.,* deceptive practices, fraud, false pretenses, false promises or misrepresentations to conceal, suppress, or omit[14] material facts. Instead, this pleading simply alleges unfairness, claiming that differential pricing by charitable institutions is "unfair, discriminatory, unconscionable, unethical, immoral, and oppressive." This type of allegation does not fall within the deceptive practices prohibited by the Act.

[14] Patients also *argue* that Hospitals violated the Trade Practices Act by omitting the price terms (a material fact) from the standardized agreements. However, Patients did not fairly plead that the omission of a price term violated this Act. We acknowledge that

the complaints repeatedly refer to "unspecified and undiscounted charges," or "undisclosed" charges. However, when fairly read, each of these references is fatally tied to either the non-actionable and abandoned claim for the discounted pricing or the non-actionable claim for an imputed price term. Therefore, this claim was correctly dismissed.

**[28]** [¶ 37.] Second, even if we were to assume that this pleading could state a deceptive pricing claim under the Act, it is **\*198** an attempt to claim that the Hospitals' charitable tax exempt status, under 26 USC § 501(c)(3) and other state tax exemptions, imposes a duty to charge the discounted rates that insured and Medicare/Medicaid patients receive. However, this is the very claim that Patients now disavow. It is also a claim that has been rejected by virtually every court that has considered the issue. [15] Therefore, the circuit courts properly dismissed this type of allegation.

[15] *See Darr v. Sutter Health,* 2004 WL 2873068 (N.D.Cal.2004) (unpublished); *Ferguson v. Centura Health Corp.,* 358 F.Supp.2d 1014 (D.Colo.2004); *Burton v. William Beaumont Hosp.,* 347 F.Supp.2d 486 (E.D.Mich.2004); *Gardner v. North Mississippi Health Servs., Inc.,* 2005 WL 1312753 (N.D.Miss.2005); *Wright v. St. Dominic Health Servs., Inc.,* 2005 WL 743339 (S.D.Miss.2005) (unpublished); *Quinn v. BJC Health Sys.,* 364 F.Supp.2d 1046 (E.D.Mo.2005); *Shriner v. ProMedica Health Sys., Inc.,* 2005 WL 139128 (N.D.Ohio 2005)(unpublished); *Lorens v. Catholic Health Care Partners,* 356 FSupp2d 827 (N.D.Ohio 2005); *Amato v. UPMC,* 371 F.Supp.2d 752 (W.D.Pa.2005); *Bobo v. Christus Health,* 227 F.R.D. 479 (E.D.Tex.2005).

*Patients' Beliefs Concerning Post–Care Charges*

**[29]** [¶ 38.] Patients finally allege that they "*believed* that Defendant[s] would make good faith efforts to determine a person's ability to pay following evaluation or treatment and would not bill or charge those ... who were unable to pay. Thus [they] *believed* that free care or reduced cost care would be provided ... based upon [their] ability to pay...." (Emphasis added.) However, these conclusory statements of belief are not sufficient to survive a motion to dismiss.

**[30]    [31]    [32]    [33]** [¶ 39.] To survive a motion to dismiss, a plaintiff "must allege causation with sufficient

particularity such that we can determine whether the factual basis for its claim, if proven, could support an inference of proximate cause." *First Nationwide Bank v. Gelt Funding Corp.,* 27 F.3d 763, 770 (2d Cir.1994). " '[C]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss.' " 2 James Moore, *Moore's Federal Practice,* § 12.34(1)(b) (3rd ed 2006) (quoting *Campbell v. San Antonio* 43 F.3d 973, 975 (5th Cir.1995)). "While facts must be accepted as alleged, this does not automatically extend to bald assertions, subjective characterizations, or legal conclusions. The plaintiff need not include evidentiary detail, but must allege a factual predicate concrete enough to warrant further proceedings." *Id.* (quoting *DM Research v. College of American Pathologists,* 170 F.3d 53, 55–56 (1st Cir.1999) (citations omitted)).

[¶ 40.] In this case, Patients have only pleaded subjective characterizations of belief and legal conclusions of proximate cause that are untethered to any factual predicate that could constitute causation. In fact, Patients' subjective beliefs are totally at odds with their pleadings. Patients did not plead that the Hospitals made any representations involving post-care determinations of ability to pay. Furthermore, Patients' alleged damages could not have arisen *as a result* of such beliefs because they did not plead that it was their beliefs that caused them to select these Hospitals in lieu of other healthcare providers. Rather than alleging that they sought care at these facilities because they believed they would receive post-treatment reduction of charges, they specifically alleged that they entered into contracts that required them to pay the full, undiscounted prices that were pre-set by the Hospitals. Therefore, Patients' subjective and conclusory allegations of belief and proximate cause failed to state a claim of causation.

**\*199** [¶ 41.] For all of the foregoing reasons, the circuit courts' dismissals are affirmed. In light of this disposition of the substantive theories that are central to each case, we need not reach the parties' remaining issues and arguments.

[¶ 42.] Affirmed.

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

10

[¶ 43.] GILBERTSON, Chief Justice, and KONENKAMP, and MEIERHENRY, Justices, and MACY, Circuit Court Judge, concur.

[¶ 44.] MACY, Circuit Court Judge, for SABERS, Justice, disqualified.

**All Citations**

731 N.W.2d 184, Med & Med GD (CCH) P 302,066, 2007 S.D. 34

---

**End of Document**

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works. 11

2014 WL 558712
Only the Westlaw citation is currently available.
United States District Court,
D. Nevada.

Stephanie O'CONNOR, Plaintiffs,

v.

NATIONAL DEFAULT SERVICING
CORPORATION, Defendant.

No. 3:13–cv–00274–MMD–WGC.
|
Feb. 10, 2014.

**Attorneys and Law Firms**

Stephanie O'Connor, Reno, NV, pro se.

Kevin S. Soderstrom, Wilde & Associates, Gregory L. Wilde, Tiffany & Bosco P.A., Las Vegas, NV, for Defendant.


ORDER

MIRANDA M. DU, District Judge.

**I. SUMMARY**

**\*1** Before the Court are Plaintiff Stephanie O'Connor's Motion to Remand to State Court (dkt. no. 11) and Defendant National Default Servicing Corporation's ("NDSC") Motion to Dismiss (dkt. no. 4). For the reasons set forth below, Plaintiff's Motion to Remand is denied and Defendant's Motion to Dismiss is granted.


**II. BACKGROUND**

Plaintiff Stephanie O'Connor purchased the property located at 8920 Red Baron Boulevard, Reno, Nevada. (Dkt. no. 1, ex. 1 at 1.) Ms. O'Connor obtained a loan of $204,000 ("the Loan") from BankUnited, FSB, and executed a promissory note ("Note") that was secured by a deed of trust on the property ("Deed of Trust") for $204,000. (Dkt. no. 1, ex. 3.) The Deed of Trust names BankUnited, FSB, as lender but identifies no trustee. (*Id.*) The Deed of Trust was signed on June 7, 2006, and recorded on July 19, 2006,[1] in the official records of Washoe County, Nevada. (*Id.*)

[1]   The Notice of Sale (dkt. no. 9, ex. 2) states that the Deed of Trust was recorded on June 19, 2006, but the Deed of Trust (dkt. no. 1, ex. 3) lists the recorded date as July 19, 2006.

On September 27, 2011, a Notice of Default and Election to Sell Under Deed of Trust ("Notice of Default") was recorded by NDSC. (Dkt. no. 9, ex. 1.)

On January 9, 2012, a Substitution of Trustee ("the Substitution") was executed stating that an original trustee was not set-out in the Deed of Trust and designating NDSC as the trustee. (Dkt. no. 9, ex. 5.) The Substitution was recorded on July 19, 2012. (*Id.*)

NDSC executed a Notice of Trustee's Sale ("Notice of Sale") on August 20, 2012, setting a sale date of September 20, 2012. (Dkt. no. 9, ex. 2.) The Notice of Sale was recorded on August 21, 2012. (*Id.*)

The Trustee's Deed Upon Sale was executed on October 23, 2012, and recorded on October 30, 2012. (Dkt. no. 9, ex. 3.)


**III. MOTION TO REMAND**

**A. Legal Standard**

Federal courts are courts of limited jurisdiction, having subject-matter jurisdiction only over matters authorized by the Constitution and Congress. U.S. Const. art. Ill, § 2, cl. 1; *see e.g.,* Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994). A suit filed in state court may be removed to federal court if the federal court would have had original jurisdiction over the suit. 28 U.S.C. § 1441(a). However, courts strictly construe the removal statute against removal jurisdiction, and "[f]ederal jurisdiction *must* be rejected if there is any doubt as to the right of removal in the first instance." Gaus v. Miles, Inc., 980 F.2d 564, 566 (9th Cir.1992) (emphasis added). The party seeking removal bears the burden of establishing federal jurisdiction. Durham v. Lockheed Martin Corp., 445 F.3d 1247, 1252 (9th Cir.2006).

To establish subject matter jurisdiction pursuant to diversity of citizenship, the party asserting jurisdiction must show: (1) complete diversity of citizenship among opposing parties, and (2) an amount in controversy exceeding $75,000. 28 U.S.C. § 1332(a). Where a defendant removes a plaintiffs state action on the basis of diversity

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

jurisdiction, the defendant must either: (1) demonstrate that it is facially evident from the plaintiff's complaint that the plaintiff seeks in excess of $75,000, or (2) prove, by a preponderance of the evidence, that the amount in controversy meets the jurisdictional limit. *Valdez v. Allstate Ins. Co.,* 372 F.3d 1115 (9th Cir.2004). In considering what evidence may be considered under (2) above, the Ninth Circuit has adopted the "practice of considering facts presented in the removal petition as well as any 'summary-judgment[sic]-type evidence relevant to the amount in controversy at the time of removal.' " *Matheson v. Progressive Specialty Ins. Co.,* 319 F.3d 1089, 1090 (9th Cir.2003) (*quoting Singer v. State Farm Mut. Auto. Ins. Co.,* 116 F.3d 373, 377 (9th Cir.1997)).

**\*2** For jurisdictional purposes, the amount in controversy is determined by the amount at stake in the underlying litigation. *Theis Research, Inc. v. Brown & Bain,* 400 F.3d 659, 662 (9th Cir.2005). In determining the amount in controversy, a district court may consider the amount of compensatory and punitive damages recoverable based on plaintiffs complaint as well as attorney fees, but may not consider interest and cost of suit. *Meisel v. Allstate Indem. Co.,* 357 F.Supp.2d 1222, 1225 (*citing Hunt v. Wash. State Apple. Adver. Comm'n,* 432 U.S. 333, 347–48 (1977)).

### B. Discussion

Defendant has met its burden in establishing diversity jurisdiction pursuant to 28 U.S.C. § 1332(a). Plaintiff herself acknowledges that the parties are diverse as Plaintiff is a resident of Washoe County, Nevada, and Defendant is a foreign corporation with its principle place of business in Phoenix Arizona, (*See* dkt. no. 1, ex. 1 ¶¶ 1, 2.) "In actions seeking declaratory or injunctive relief, it is well established that the amount in controversy is measured by the value of the object of the litigation ." *Hunt v. Wash. State Apple Adver. Comm'n,* 432 U.S. 333, 347 (1977). As the Deed of Trust lists the amount of the debt secured as $204,000 (dkt. no. 1, ex. 3), the amount in controversy requirement is satisfied. Given that the parties are diverse and the amount in controversy requirement is met, the Court will exercise jurisdiction over this dispute.

## IV. MOTION TO DISMISS

### A. Legal Standard

A court may dismiss a plaintiff's complaint for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). A properly pled complaint must provide "a short and plain statement" of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2); *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007). While Rule 8 does not require detailed factual allegations, it demands more than "labels and conclusions" or a "formulaic recitation of the elements of a cause of action," *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (*citing Papasan v. Attain,* 478 U.S. 265, 286 (1986)). "Factual allegations must be enough to rise above the speculative level." *Twombly,* 550 U.S. at 555, Thus, to survive a motion to dismiss, a complaint must contain sufficient factual matter to "state a claim to relief that is plausible on its face." *Iqbal,* 556 U.S. at 678 (internal citation omitted).

In *Iqbal,* the Supreme Court clarified the two-step approach district courts are to apply when considering motions to dismiss. First, a district court must accept as true all well-pled factual allegations in the complaint; however, legal conclusions are not entitled to the assumption of truth. *Id.* at 679. Mere recitals of the elements of a cause of action, supported only by conclusory statements, do not suffice. *Id.* at 678. Second, a district court must consider whether the factual allegations in the complaint allege a plausible claim for relief. *Id.* at 679. A claim is facially plausible when the plaintiffs complaint alleges facts that allow a court to draw a reasonable inference that the defendant is liable for the alleged misconduct. *Id.* at 678. Where the complaint does not permit the court to infer more than the mere possibility of misconduct, the complaint has "alleged—but not shown—that the pleader is entitled to relief." *Id.* at 679 (internal quotation marks omitted). When the claims in a complaint have not crossed the line from conceivable to plausible, the complaint must be dismissed. *Twombly,* 550 U.S. at 570.

**\*3** A complaint must contain either direct or inferential allegations concerning "all the material elements necessary to sustain recovery under *some* viable legal theory." *Twombly,* 550 U.S. at 562 (*quoting Car Carriers, Inc. v. Ford Motor Co.,* 745 F.2d 1101, 1106 (7th Cir.1989) (emphasis in original)).

### B. Discussion

### 1. Claim 1: Issuance of Void Notices Under N.R.S. 107.080 for Lack of Standing

There is no "issuance of void notices under N.R.S. 107.080 for lack of standing" cause of action that has been recognized in Nevada. However, "[a] document filed *pro se* is to be liberally construed," *Erickson v. Pardus,* 551 U.S. 89, 94 (2007) (internal quotation marks and citation omitted). Based on the substance of the allegations within this cause of action, the Court construes it as a defective foreclosure claim under N.R.S. § 107.080.

In the Complaint, Plaintiff alleges that NDSC served a notice of default upon her, and recorded the notice of default with the Washoe County Recorder on September 27, 2011. (*See* dkt. no. 1, ex. 1 ¶ 8.) Plaintiff argues that "NDSC was not a duly appointed trustee or substitute trustee and had no legal authority to issue a notice of default or to exercise the power of sale." (*See id.*) Plaintiff continues that because NDSC did not have standing as a trustee, the sale was not valid and should be nullified. (*See id.* ¶ 9.)

Defendant admits that it was neither the original trustee under the Deed of Trust, nor a substitute trustee at the time it sent the Notice of Default. (*See* dkt. no. 10 at 3.) NDSC was substituted as trustee, however, before it issued the Notice of Sale and Trustee's Deed Upon Sale. (Dkt. no. 9, exs.2, 3.)

However, at the time the Notice of Default was issued, NRS 107.080 did not require that a particular party—trustee, beneficiary, or their assigns—record notices of default or trustee sale. *See Berilo v. HSBC Mortg. Corp., USA,* No, 2:09–CV–2353, 2010 WL 2667218, at *4 (D. Nev. June 29, 2010). Additionally, Nevada did not require that a substitution of trustee be recorded prior to notice of default. *See id.* [2] The law only required that a party filing a notice of default be an agent of the beneficiary. *Nev. ex rel. Bates v. Mortgage Elec. Registration Sys., Inc.,* No. 3:10–CV–00407, 2011 WL 1582945, at *5 (D.Nev. Apr, 25, 2011) ("[A]ny party [the beneficiary] commands to file a notice of default is by that fact alone a proper party as the beneficiary's agent.").

[2] While Plaintiff notes that Nevada Assembly Bill 284 added a number of conditions to a trustee sale under NRS § 107,080, Defendant is correct that these changes did not take effect until October 1,

2011. While originally the changes were to take effect on July 1, 2011, on June 20, 2011, the Governor approved Assembly Bill 273, which amended the effective date of AB 284 to October 1, 2011, and amended § 14.5 of the bill to provide that the amendments would only apply to notices of default filed on or after October 1, 2011. *See* Assemb. B. 273 § 5.9, 76th Leg., Reg. Sess. (Nev.2011).

Plaintiff carries a significant burden if she attempts to demonstrate that NDSC was not an agent acting under the authority of the beneficiary at the time the Notice of Default issued. But even if she were to succeed in demonstrating that "a rogue title company [NDSC] file[d] a notice of default without the knowledge of the beneficiary—the Court has not yet seen such a case—the filing becomes proper if the beneficiary later ratifies the act after discovering what has occurred." *Bates,* 2011 WL 1582945, at *5 (*citing Edwards v. Carson Water Co.,* 34 P.381, 386–89 (Nev.1893). Here, the fact that NDSC was later substituted as a trustee "is practically insurmountable evidence of ratification," the agency doctrine that allows for a principal to retroactively authorize an actor's prior conduct. *Id.; see* Restatement (Third) of Agency § 4.03. Accordingly, Plaintiffs first claim, construed as a defective foreclosure claim under N.R.S. § 107.080, must fail.

### 2. Claim 2: Enforcement of Notice of Lis Pendens

**\*4** There is no cause of action in Nevada for "enforcement of notice of lis pendens." While it appears that Plaintiff is seeking the same relief as is found in a quiet title claim, as Plaintiff states that "[t]itle to the property should revert to Plaintiff O'Connor," Plaintiff has not satisfied the requirements for a quiet title claim. In Nevada, a quiet title action may be brought "by any person against another who claims an estate or interest in real property, adverse to the person bringing the action, for the purpose of determining such adverse claim." NRS § 40.010. "In a quiet title action, the burden of proof rests with the plaintiff to prove good title in himself." *Breliant v. Preferred Equities Corp.,* 918 P.2d 314, 318 (Nev.1996). "Additionally, an action to quiet title requires a plaintiff to allege that she has paid any debt owed on the property." *Lalwani v. Wells Fargo Bank, N.A.,* No. 2–11–cv–84, 2011 WL 4574388, at *3 (D.Nev. Sep. 30, 2011) (*citing Ferguson v. Avelo Mortg., LLC,* No. B223447, 2011 WL 2139143, at *2 (Cal.App.2d June 1, 2011)). In this case, Plaintiff has not claimed that she has paid all debt and in fact acknowledges that she fell behind on her payments, [3]

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Plaintiff's second claim, construed as a quite title claim, must fail.

3    Plaintiff states that she "made timely payments until July 1, 2010, when she discovered that Bank United, FSB, no longer existed." (*See* dkt. no 1, ex. 1 ¶ 7.)

### 3. Claim 3: Unconscionable Adhesion of Contract

Plaintiff's third claim, "unconscionable adhesion of contract," is, like Plaintiffs other claims, not a viable cause of action in Nevada, The Court knows of no recognized cause of action that Plaintiff may be attempting to reference. To the extent that this claim relates to defective foreclosure, the Court has addressed that claim in Section IV.B.1 supra. The Court dismisses Plaintiff's third claim.

### V. CONCLUSION

The Court notes that the parties made several arguments and cited to several cases not discussed above. The Court has reviewed these arguments and cases and determines that they do not warrant discussion as they do not affect the outcome of the Motion.

It is therefore ordered that Plaintiff's Motion to Remand (dkt. no. 11) is denied.

It is further ordered that Defendants' Motion to Dismiss (dkt. no. 4) is granted.

### All Citations

Not Reported in F.Supp.3d, 2014 WL 558712

---

    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

    © 2017 Thomson Reuters. No claim to original U.S. Government Works.    4

2010 WL 711161
Only the Westlaw citation is currently available.
United States District Court,
W.D. Tennessee,
Western Division.

David PATTESON, Plaintiff,

v.

McADAMS TAX ADVISORY GROUP, LLC,
Gregory Gibson, Allianz Life Insurance Company
of North America, Genworth Financial Trust
Company, Investors Capital Corp., and Unknown
and Unnamed Individuals, Defendants.

No. 09–2085 Ma/P.
|
Feb. 14, 2010.

**Attorneys and Law Firms**

Paul Forrest Craig, Law Office of Paul Forrest Craig, Memphis, TN, for Plaintiff.

Charles W. Hill, Glankler Brown, PLLC, Memphis, TN, James A. McGovern, Marshall Dennehey Warner Coleman Goggin PC, Pittsburgh, PA, Lori Hackleman Patterson, Baker Donelson Bearman Caldwell & Berkowitz, Memphis, TN, for Defendants.

### REPORT AND RECOMMENDATION

TU M. PHAM, United States Magistrate Judge.

**\*1** Before the court by order of reference is defendants Investors Capital Corporation ("ICC"), McAdams Tax Advisory Group, LLC ("McAdams"), and Gregory L. Gibson's (collectively "the McAdams Defendants") Motion to Dismiss Complaint and Compel Arbitration or Alternatively, to Stay Proceedings. (D.E.8.) For the reasons below, the court recommends that the motion to compel be granted and that all claims against the McAdams Defendants be dismissed without prejudice.[1]

[1] Some courts have held that motions to compel arbitration are dispositive motions, while other courts have treated them as nondispositive motions. *Compare Costello v. Patterson Dental Supply, Inc.,* No. 5:06–CV–213, 2007 WL 4178942, at \*3

(W.D.Mich. Nov. 20, 2007) (dispositive motion), *JTH Tax, Inc. v. Lee,* No. 2:06cv486, 2007 WL 1795751, at \*1–2 (E.D. Va. June 19, 2007) (same), *and Flannery v. Tri–State Div.,* 402 F.Supp.2d 819, 821 (E.D.Mich.2005) (same), *with Gonzalez v. GE Group Adm'rs, Inc.,* 321 F.Supp.2d 165, 166–67 (D.Mass.2004) (nondispositive), *Third Millennium Techs., Inc. v. Bentley Sys.,* No. 03–1145–JTM, 2003 WL 22003097, at \*1 (D.Kan. Aug. 21, 2003) (same), *and Herko v. Metro. Life Ins. Co.,* 978 F.Supp. 141, 142 n. 1 (W.D.N.Y. Jan. 29, 1997) (same). Out of an abundance of caution, this court submits a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) & (C).

### I. PROPOSED FINDINGS OF FACT

The following facts are based on Patteson's complaint, the Investor Profile and New Account Agreement, the affidavit of Gregory L. Gibson, and Patteson's response in opposition to the motion to compel.[2]

[2] The court may consider matters beyond the pleadings in resolving motions to compel arbitration. *See Capitol Leasing Co. v. Fed. Deposit Ins. Corp.,* 999 F.2d 188, 191 (7th Cir.1993); *Jann v. Interplastic Corp.,* 631 F.Supp.2d 1161, 1162 n. 1 (D.Minn.2009); *Safranek v. Copart, Inc.,* 379 F.Supp.2d 927, 928 (N.D.Ill.2005); *Boulet v. Bangor Sec. Inc.,* 324 F.Supp.2d 120, 123–24 (D.Me.2004).

In March of 2007, David Patteson, a retiree who at the time was in his seventies, received a solicitation from Gregory Gibson, an investment advisor employed by ICC and McAdams, to prepare his taxes at a reduced rate of $50.00. In response to this solicitation, Patteson met with Gibson in June of 2007. Patteson told Gibson that he had $210,780.29 invested in a retirement account with the Lincoln Financial Group, and that the account contained a five-year surrender penalty which would expire approximately thirty days from the date of their meeting. During that meeting, Gibson persuaded Patteson to allow him to reinvest the funds in Patteson's retirement account. Patteson alleges that he insisted that any new investment with the defendants be put in a low-risk investment vehicle that would not penalize him for withdrawing funds.

During his June 2007 meeting with Gibson, Patteson opened an investment account with ICC. Gibson obtained

WESTLAW © 2021 Thomson Reuters. No claim to original U.S. Government Works.

1

information from Patteson and prepared for him a four-page Investor Profile and New Account Agreement ("Agreement"), which Patteson and Gibson signed and dated. [3] (D.E. 8–2, Aff. of Gregory L. Gibson ¶ 2.) The following paragraph, typed in all capital letters, appeared directly above their signatures on page two of the Agreement:

[3] Patteson apparently questions the authenticity of the Agreement by pointing out in his response to the motion to compel that although pages three and four of the Agreement indicate "Page 3 of 4" and "Page 4 of 4," pages one and two indicate "Page 1 of 2" and "Page 2 of 2," instead of "Page 1 of 4" and "Page 2 of 4." However, Gibson's affidavit states "[a]ttached as Exhibit A to this Affidavit is a true and correct copy of the [Agreement] executed by Mr. Patteson on June 11, 2007," and Patteson has not presented any evidence to challenge Gibson's affidavit.

### Signatures

I REPRESENT THAT I HAVE READ THE ATTACHED TERMS AND CONDITIONS GOVERNING THIS ACCOUNT (THE AGREEMENT) AND AGREE TO BE BOUND BY SUCH TERMS AND CONDITIONS AS CURRENTLY IN EFFECT AND AS BE AMENDED FROM TIME TO TIME. **BY SIGNING BELOW I AKNOWLEDGE [sic] THAT THIS AGREEMENT CONTAINS A PREDISPUTE ARBITRATION CLAUSE, WHICH IS LOCATED IN PARAGRAPHS 13 AND 14 IN THIS AGREEMENT AND FURTHER AKNOWLEDGE [sic] THAT I HAVE RECEIVED A COPY OF THE AGREEMENT AND HAVE BEEN PROVIDED OR WILL BE PROVIDED WITHIN 30 DAYS, A COPY OF THIS COMPLETE INVESTOR PROFILE.**

————————————————

Customer Signature Date

————————————————

Representative Signature Date

————————————————

Customer Signature Date

————————————————

Principal Signature Date

(D.E. 8–2 at 14.) The sentence beginning "BY SIGNING BELOW ..." appeared in bold lettering. None of the other provisions on pages one and two were typed in all capital letters.

The third and fourth pages of the Agreement, titled "Customer Account Agreement—Terms and Conditions" ("Terms and Conditions") contained the terms and conditions referenced on page two. Paragraph 13 of the Terms and Conditions, found on page three, stated in all capital letters as follows:

**\*2** 13. ARBITRATION DISCLOSURES

THIS AGREEMENT CONTAINS A PREDISPUTE ARBITRATION CLAUSE. BY SIGNING AN ARBITRATION AGREEMENT THE PARTIES AGREE AS FOLLOWS:

• ALL PARTIES TO THIS AGREEMENT ARE GIVING UP THE RIGHT TO SUE EACH OTHER IN COURT, INCLUDING THE RIGHT TO A TRIAL BY JURY, EXCEPT AS PROVIDED BY THE RULES OF THE ARBITRATION FORUM IN WHICH A CLAIM IS FILED.

• ARBITRATION AWARDS ARE GENERALLY FINAL AND BINDING: A PARTY'S ABILITY TO HAVE A COURT REVERSE OR MODIFY ARBITRATION AWARD IS VERY LIMITED.

• THE ABILITY OF THE PARTIES TO OBTAIN DOCUMENTS, WITNESS STATEMENTS AND OTHER DISCOVERY IS GENERALLY MORE LIMITED IN ARBITRATION THAN IN COURT PROCEEDINGS.

• THE ARBITRATORS DO NOT HAVE TO EXPLAIN THE REASON(S) FOR THEIR AWARD.

• THE PANEL OF ARBITRATORS WILL TYPICALLY INCLUDE A MINORITY OF ARBITRATORS WHO WERE OR ARE AFFILIATED WITH THE SECURITIES INDUSTRY.

• THE RULES OF SOME ARBITRATION FORUMS MAY IMPOSE TIME LIMITS FOR

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

BRINGING A CLAIM IN ARBITRATION. IN SOME CASES, A CLAIM THAT IS INELIGIBLE FOR ARBITRATION MAY BE BROUGHT IN COURT.

• THE RULES OF THE ARBITRATION FORUM IN WHICH THE CLAIM IS FILED, AND ANY AMENDMENTS THERETO, SHALL BE INCORPORATED INTO THIS AGREEMENT.

(*Id.* at 15.) Paragraph 14 of the Terms and Conditions, located on page four, stated in all capital letters as follows:

14. ARBITRATION AGREEMENT

ANY CONTROVERSY BETWEEN YOU AND U.S. SHALL BE SUBMITTED TO ARBITRATION BEFORE THE NEW YORK STOCK EXCHANGE, INC., ANY OTHER NATIONAL SECURITIES EXCHANGE ON WHICH A TRANSACTION GIVING RISE TO THE CLAIM TOOK PLACE (AND ONLY BEFORE SUCH EXCHANGE), OR THE NATIONAL ASSOCIATION OF SECURITIES DEALERS, INC....

(*Id.* at 16.) None of the other provisions on pages three and four were typed in all capital letters.

Patteson alleges that after he signed the Agreement, Gibson failed to follow his instructions and placed Patteson's money in high risk investments with defendants Allianz Life Insurance Company of North America and Genworth Financial Trust Company. [4] In addition, Patteson alleges that, contrary to his instructions, Gibson invested the money in accounts that subjected him to new surrender penalties and withdrawal fees. As a result, Patteson filed a complaint on February 20, 2009, alleging that the defendants violated the Securities Investor Protection Act, 15 U.S.C. § 78a *et seq.,* the Tennessee Consumer Protection Act, Tenn.Code. Ann. §§ 47–18–109 and 47–18–125, and the Tennessee Insurance Code, Tenn.Code. Ann. § 56–8–104. He also alleges causes of action for negligence, detrimental reliance, conversion, and breach of fiduciary duty against the defendants.

[4]    The other defendants have not asserted that the arbitration provision governs the claims brought against them. Allianz Life Insurance has filed a motion to dismiss on other grounds.

In response, the McAdams Defendants filed the instant Motion to Dismiss Complaint and Compel Arbitration or Alternatively, to Stay Proceedings. They ask the court to either dismiss or stay the present litigation and order the parties to proceed to arbitration as required by the Agreement.

**II. PROPOSED CONCLUSIONS OF LAW**

**\*3**  The Federal Arbitration Act ("FAA") provides that written agreements to arbitrate "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The FAA was enacted with the purpose "to reverse the longstanding judicial hostility to arbitration agreements that had existed at English common law and had been adopted by American courts, and to place arbitration agreements on the same footing as other contracts." *Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 24 (1991). When a party files a motion to compel arbitration, the court "must follow the procedure set forth in section 4 of the FAA." [5] *Highlands Wellmont Health Network, Inc. v. John Deere Health Plan, Inc.,* 350 F.3d 568, 573 (6th Cir.2003). Section 4 provides as follows:

[5]    Section 4 of the FAA does not require an evidentiary hearing. Thus, the court submits this report and recommendation based on the parties' submissions. *See Cincinnati Gas & Elec. Co. v. Benjamin F. Shaw Co.,* 706 F.2d 155, 159 (6th Cir.1983) (stating that § 4 does not require an evidentiary hearing); *see also Armstrong v. Assocs. Int'l Holdings Corp.,* No. 06–11177, 2007 WL 2114512, at \*4 (5th Cir. July 24, 2007) (concluding that district court was not required to conduct an evidentiary hearing before compelling the parties to proceed to arbitration); *Marks 3–Zet–Ernst Marks Gmbh & Co. KG v. Presstek, Inc.,* 455 F.3d 7, 14 (1st Cir.2006) (stating that under § 4 "a 'hearing' on the papers may be all that is required" (citing *Cincinnati Gas & Elec. Co.,* 706 F.2d at 159); *Acosta v. Fair Isaac Corp.,* No. 3:09–CV–0378, 2009 WL 3487833, at \*2 (N.D.Tex. Oct. 28, 2009) (stating that there is "no requirement that an evidentiary hearing be convened on motions to compel arbitration").

A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court ... for an order directing that such

© 2017 Thomson Reuters. No claim to original U.S. Government Works.   3

arbitration proceed.... [U]pon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement.

9 U.S.C. § 4; *see also Great Earth Cos. v. Simons,* 288 F.3d 878, 889 (6th Cir.2002). As this court stated in *Terry v. Labor Ready, Inc.,* No. 02–1035, 2002 WL 1477213 (W.D.Tenn. July 2, 2002),

> Under the Federal Arbitration Act, a district court must stay proceedings if satisfied that the parties have agreed in writing to arbitrate the issue(s) presented in the lawsuit. The district court has no discretion to refuse to compel arbitration if the court finds that the parties have so agreed. Any limitation of an arbitration provision must be read narrowly in order to effectuate the strong national policy of favoring enforcement of agreements to arbitrate, and any doubts must be resolved in favor of arbitration. Arbitration should be ordered unless it can be said that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.

*Id.* at *1 (internal citations omitted); *see also Fazio v. Lehman Bros.,* 340 F.3d 386, 392 (6th Cir.2003). Patteson, as the party opposing arbitration, carries the burden of proving that the claims at issue are unsuitable for arbitration. *See Green Tree Fin. Corp. v. Randolph,* 531 U.S. 79, 91 (2000); *Johnson v. Long Silver's Rests., Inc.,* 320 F.Supp.2d 656, 667 (M.D.Tenn.2004); *Terry,* 2002 WL 1477213, at *1, *3 (citing *Gilmer,* 500 U.S. 20).

In determining whether to grant a motion to compel arbitration, the court must consider whether the arbitration provision is valid and enforceable. *Morrison v. Circuit City Stores, Inc.,* 317 F.3d 646, 665–66 (6th Cir.2003). The court must then consider whether the dispute falls within the scope of the provision. *Javitch v. First Union Sec., Inc.,* 315 F.3d 619, 624 (6th Cir.2003).

**\*4** The court finds that the arbitration provision is valid and enforceable, and that Patteson's claims against the McAdams Defendants are covered by the provision. When Patteson entered into the investment relationship, he signed the Agreement which contained the arbitration provision. Specifically, located directly above his signature was a paragraph that clearly stated (in bold and capital letters) that he acknowledged the Agreement contained a predispute arbitration clause located in paragraphs 13 and 14 of the Agreement. Paragraphs 13 and 14 set forth (in all capital letters) the terms of the arbitration provision, which included submitting "ANY CONTROVERSY BETWEEN YOU AND US. ... TO ARBITRATION." (D.E. 8–2 at 16.) This broad language covers all claims relating to the investment relationship. *See Terry,* 2002 WL 1477213, at *1 (stating that "[w]hen a contract contains a broad arbitration clause covering all controversies arising under the agreement, arbitration must be ordered unless the party seeking to avoid it can show that the particular dispute was expressly excluded") (citing *Cincinnati Gas & Elec. Co.,* 706 F.2d at 160). In other cases where investors have entered into similarly worded arbitration agreements with their investment advisors, courts have compelled the parties to arbitrate all of their claims. *See, e.g., Safer v. Nelson Fin. Group, Inc.,* 422 F.3d 289, 292–93, 297–98 (5th Cir.2005); *Wald v. 1 Fin. Marketplace Sec., L.L.C.,* No. 2:09–cv1116, 2009 WL 3209930, at *2, *9 (E.D.Pa. Oct. 5, 2009); *Al–Thani v. Wells Fargo & Co.,* No. C 08–1745, 2009 WL 55442, at *2–3 (N.D.Cal. Jan. 7, 2009); *Shammami v. Broad Street Sec., Inc.,* 544 F.Supp.2d 585, 586 (E.D.Mich.2008). Therefore, Patteson must arbitrate all of the claims that he now seeks to bring against the McAdams Defendants in this lawsuit.[6]

---

[6]   Although defendant McAdams is not a signatory to the Agreement, it is well settled that "[n]on-signatories to an arbitration agreement may be bound by or enforce an arbitration agreement executed by other parties under theories arising out of common law principles of contract and agency law." *Broaddus v. Rivergate Acquisitions, Inc.,* No. 3:08–0805, 2008 WL 4525410, at *2 (M.D.Tenn. Oct. 1, 2008) (citations omitted); *see also E.I. Dupont De Nemours & Co. v. Phone Poulenc Fiber & Resin Intermediates, S.A.A .,* 269 F.3d 187, 198 (3d Cir.2001). "When an agency relationship has been established, the principal may be bound by the acts of the agent performed on the principal's behalf and within the actual or apparent scope of the agency." *Creech*

*v. Addington,* 281 S.W.3d 363, 373 (Tenn.2009). Patteson alleges in his complaint that Gibson is an agent of McAdams, and the allegations establish that there is a clear and close nexus between Gibson and McAdams and that Patteson's claims arise in large part out of Gibson's alleged conduct. *Wald,* 2009 WL 3209930, at *6. Moreover, in his response in opposition to the motion to compel arbitration, Patteson raises no objections to McAdams's ability to enforce the arbitration agreement, even though the issue was raised in the motion to compel arbitration. McAdams is therefore entitled to enforce the arbitration provision.

In his response in opposition to the motion to compel, Patteson attempts to challenge the arbitration provision on three state law grounds. [7] First, he argues that the arbitration agreement should not be enforced because it is an adhesion contract. Tennessee law defines a contract of adhesion as "a standardized contract form offered to consumers of goods and services on essentially a 'take it or leave it' basis, without affording the consumer a realistic opportunity to bargain and under such conditions that the consumer cannot obtain the desired product or service except by acquiescing to the form of the contract." *Buraczynski v. Eyring,* 919 S.W.2d 314, 320 (Tenn.1996) (citations omitted). Although the Agreement in this case is a standardized contract, it is not a contract of adhesion. The Sixth Circuit has determined that "[a] contract is not adhesive merely because it is a standardized form offered on a take-it-or-leave-it basis," and that "[e]ven after *Buraczynski,* Tennessee courts decline to find arbitration provisions adhesive where the consumer fails to prove that refusal to sign would cause some detriment other than not being able to buy from the particular merchant (such as not being able to obtain the goods or services elsewhere)." *Cooper,* 367 F.3d at 500; *see also Davis v. Morningside of Jackson, L.L.C.,* No. 1:05–CV–1284, 2006 WL 889325, at *4 (W.D.Tenn. Mar. 28, 2006) (stating that although "adhesion contracts typically *involve* boilerplate, take-it-or-leave-it terms offered by a 'superior' party, the 'distinctive' indicia of a true adhesion contract is that 'the weaker party has no realistic choice as to [the] terms")" (citations omitted); *Wallace v. Nat'l Bank of Commerce,* 938 S.W.2d 684, 687–88 (Tenn.1997) (finding no contract of adhesion where "there is no showing in the record that the customers had no realistic choice but to acquiesce in the imposition of the bank's charges ... [and] no showing that the fees were the same at all the defendant banks or that banking services could not be obtained from other institutions"); *Pyburn v. Bill Heard*

*Chevrolet,* 63 S.W.3d 351, 359–60 (Tenn.Ct.App.2001) (finding arbitration agreement between car dealer and buyer was not adhesive, as there was no evidence that the buyer's refusal to agree would have caused some detriment other than being unable to come to terms with the particular dealer). Patteson has not alleged, much less presented any evidence to show, that he would have been unable to find other investment services had he refused to sign the Agreement. *Cooper,* 367 F.3d at 502–03. Therefore, Patteson has not shown that the arbitration agreement is a contract of adhesion.

[7]
In analyzing Patteson's state law grounds for challenging the arbitration provision, the court applies Tennessee law. In Tennessee, "a contract is presumed to be made with reference to the law of the place where it was entered into unless it appears it was entered into in good faith with reference to the law of some other state." *Ohio Cas. Ins. Co. v. Travelers Indem. Ins. Co.,* 493 S.W.2d 465, 467 (Tenn.1973) (citations omitted). "Tennessee generally applies the *lex loci contractus,* but sometimes it applies the law of the place of performance." *Cooper v. MRM Inv. Co.,* 367 F.3d 493, 499 (6th Cir.2004). Here, Tennessee is the location where the Agreement was executed, where Gibson performed on the Agreement, and where the alleged mismanagement of Patteson's investments occurred.

**\*5** Second, Patteson argues that the arbitration term of the contract is unconscionable. Tennessee recognizes two types of unconscionability:

Unconscionability may arise from a lack of a meaningful choice on the part of one party (procedural unconscionability) or from contract terms that are unreasonably harsh (substantive unconscionability). In Tennessee we have tended to lump the two together and speak of unconscionability resulting when the inequality of the bargain is so manifest as to shock the judgment of a person of common sense, and where the terms are so oppressive that no reasonable person would make them on one hand, and no honest and fair person would accept them on the other.

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

*Trinity Indus., Inc. v. McKinnon Bridge Co.,* 77 S.W.3d 159, 170–71 (Tenn.Ct.App.2001) (citations omitted).

Patteson does not specifically address procedural unconscionability in his response, but he implies that because he had little bargaining power, it follows that he had little meaningful choice. While inequality of bargaining power is relevant to the procedural unconscionability analysis, the party opposing enforcement of the contract must present evidence on "factors bearing on the relative bargaining position of the contracting parties, including their age, education, intelligence, business acumen and experience, relative bargaining power ... [and] whether the terms were explained to the weaker party." *Cooper,* 367 F.3d at 504 (quoting *Morrison,* 317 F.3d at 666). As to his age, Patteson alleges that he is retired and, in 2007, was in his seventies. (D.E. 1 at 3.) As to his business or investment experience, it appears that Patteson has some investment experience, as he had an investment account with Lincoln Financial Group at the time he initiated an investment relationship with the defendants. (*Id.* at 5.) However, he has not presented the court with any evidence, by affidavit or otherwise, relating to the other relevant factors.

As for substantive unconscionability, "[a] contract is substantively unconscionable ... when its terms 'are beyond the reasonable expectations of an ordinary person, or oppressive.' " *Cooper,* 367 F.3d at 504 (quoting *Buraczynski,* 919 S.W.2d at 320). Patteson has simply not shown that the arbitration provision is oppressive, unreasonably harsh, or unfair. *See Howell v. Rivergate Toyota, Inc.,* 144 F. App'x 475, 479 (6th Cir.2005) (finding the "terms of the arbitration agreement ... are not so one-sided ... that an ordinary person would regard them as unreasonable, oppressive, or unconscionable"). The court concludes that Patteson has not demonstrated that the arbitration provision is unconscionable.

Finally, Patteson argues that the contract lacks mutual assent, contending that his signature "only appears on the form which refers to a 'Predispute Arbitration Clause,' " and that his signature "is not on the actual agreement which outlines the terms of this 'Predispute Arbitration Clause.' " (D.E. 19 at 4.) "In determining mutuality of assent, courts use an objective standard based on the manifestations of the parties." *T.R. Mills Contractors, Inc. v. WRH Enters., L.L.C.,* 93 S.W.3d 861, 866 (Tenn .Ct.App.2002). Under Tennessee law, "a party is obligated to be bound by the terms of an agreement he or she signs." *Plyler v. BDO Seidman, L.L.P.,* No. 04–2146, 2004 WL 5039850, at *7 (W.D.Tenn. Dec. 15, 2004). "If a person 'fails to read the contract or otherwise learn of its contents, he signs the same at his peril and is estopped to deny his obligations, will be conclusively presumed to know the contents of the contract, and must suffer the consequences of his own negligence.' " *Id.* (quoting *Giles v. Allstate Ins. Co.,* 871 S.W.2d 154, 156 (Tenn.Ct.App.1993)). "It is not up to the Court to notify Plaintiffs of a specific incorporated provision within a contract...." *Id.*

**\*6** As discussed earlier, Patteson's signature on the Agreement appears immediately below the paragraph that clearly stated that the Agreement contains a predispute arbitration clause in paragraphs 13 and 14. Although Patteson did not sign pages three or four, those pages do not contain any signature lines, and in any event, a separate signature on those pages was not required to trigger the arbitration provision. Patteson has not shown that he was denied a fair opportunity to read over the Agreement or that Gibson deceived him in any way regarding the arbitration provision.

### III. RECOMMENDATION

For the reasons above, it is recommended that the motion to compel arbitration be granted and that the claims against the McAdams Defendants be dismissed without prejudice.[8]

---

[8] As all claims against the arbitration, the court may defendants without prejudice. F.3d 967, 973 (6th Cir.2000) McAdams Defendants are subject to dismiss the claims against these *See Green v. Ameritech Corp.,* 200.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 711161

2004 WL 5039850
Only the Westlaw citation is currently available.
United States District Court,
W.D. Tennessee, Western Division.

William O. PLYLER, et al., Plaintiffs,

v.

BDO SEIDMAN, L.L.P, et al., Defendants.

No. 04 2146 B/AN.
|
Dec. 15, 2004.

**Attorneys and Law Firms**

David R. Deary, Stewart Clancy, W. Ralph Canada, Jr., Shore Deary, LLP, Jeven R. Sloan, Deary Montgomery Defeo & Canada, LLP, Dallas, TX, Ernest Cory, Cory Watson Crowder & Degaris, Joe R. Whatley, Jr., Othni J. Latham, Whatley Drake, LLC, Birmingham, AL, Glen G. Reid, Jr., Wyatt Tarrant & Combs, Memphis, TN, for Plaintiffs.

Edward M. Bearman, Kristine L. Roberts, Leo Maurice Bearman, Jr., Baker Donelson Bearman Caldwell & Berkowitz, Albert C. Harvey, Thomason Hendrix Harvey Johnson & Mitchell, Timothy R. Johnson, Bass Berry & Sims PLC, Memphis, TN, Benjamin Sokoly, Christine Chi, Richard A. Nessler, Law Office of Dewey Ballantine LLP, Susan E. Brune, Theresa Trzaskoma, Brune & Richard LLP, New York, NY, for Defendants.

REPORT AND RECOMMENDATION

ANDERSON, Magistrate J.

**\*1** Before the Court is Defendant BDO Seidman, LLP and Defendant Mark Puckett's (collectively "BDO") Motion to Compel Arbitration and Dismiss the Complaint filed on May 10, 2004. United States District Judge J. Daniel Breen referred this matter to the Magistrate Judge for Report and Recommendation. For the reasons set forth below, the Court recommends that Defendants' Motion to Compel Arbitration be GRANTED and Defendants' Motion to Dismiss Complaint be DENIED.

*BACKGROUND*

Plaintiffs William O. Plyler ("Plyler"), Suzanne O. Plyler, Charles L. Rodgers ("Rodgers"), and their affiliated entities created as part of the tax-related transactions in dispute filed this lawsuit against multiple parties, including BDO, for damages arising out of allegedly defective tax planning advice offered by Defendants.[1] Plaintiffs claim that Defendants defrauded Plaintiffs through the marketing and sale of tax advice that they knew or should have known the Internal Revenue Service ("IRS") would claim to be flawed. Plaintiffs' claims against BDO include violating the Racketeer Influenced and Corrupt Organizations Act ("RICO"), breach of fiduciary duty, fraud, negligent misrepresentation, professional malpractice, breach of conduct, unjust enrichment, and civil conspiracy. Plaintiffs also allege Defendants charged excessive and unconscionable fees for their advice and improperly agreed to split their fees between lawyers and non-lawyers.

[1]     Other Defendants in this lawsuit include the law firm of Johnson, Grusin & Surprise P.C. f/k/a Johnson, Grusin, Kee & Surprise, the investment bank of Deutsche Bank AG and its subsidiary Deutsche Bank Securities, Inc., and three individuals associated with these entities.

Plaintiffs hired BDO to provide consulting services related to federal and state taxation issues, and Plyler and Rogers entered into a Consulting Agreement on September 29, 1999 ("Agreement") with the law firm of Johnson, Grusin & Surprise P.C. f/k/a Johnson, Grusin, Kee & Surprise ("JGS"). One specific section of the Agreement requires the use of arbitration if a dispute arises in connection with the performance or breach of the Agreement. In particular, the paragraph states:

> If any dispute, controversy or claim arises in connection with the performance or breach of this agreement and cannot be resolved by facilitated negotiations (or the parties agree to waive that process) then such dispute, controversy or claim shall be settled by arbitration in accordance with the laws of the State of Tennessee, and the then current Arbitration Rules of the

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

American Arbitration Association ("AAA"), except that no pre-hearing discovery shall be permitted unless specifically authorized by the arbitration panel, and shall take place in Memphis, unless the parties agree to a different locale.

(Mem. of Law of BDO in Supp. of Mot. to Compel Arbitration and Dismiss the Compl., at 3). In addition, the Agreement provided that if JGS hired BDO to aid in the services to be provided for in the Agreement, "the same obligations and limitations set forth in [the arbitration provision] shall likewise apply" to BDO. (Dagley Aff., at Ex. 2, ¶ 10). On September 29, 1999, JGS retained the services of BDO to assist with the services to be preformed under the Agreement. (Dagley Aff., at Ex. 3).

## ANALYSIS

**\*2** While there has been some dispute as to whether this matter should be characterized as a tort issue or a contract issue, the Court concludes this is a contract issue concerning the formation of the Agreement. More specifically, this matter concerns whether or not the Agreement requires Plaintiffs to enter into dispute resolution with Defendant BDO. In ruling on a motion to compel arbitration, the Court must first determine whether a valid agreement to arbitrate exists. *Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 403–04, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967). Once the Court determines a valid agreement exists, the Court must then determine if the dispute falls within the scope of the agreement. *Javitch v. First Union Sec., Inc.,* 315 F.3d 619, 624 (6th Cir.2003).

### I. The Agreement is a valid agreement to arbitrate.

Pursuant to the Federal Arbitration Act ("FAA"), federal law applies to a written provision in a contract "evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract." 9 U.S.C. § 2 (2004). Thus, the FAA governs any agreement to arbitrate contained in a contract relating to interstate commerce. The term interstate commerce means "commerce among the several states or with foreign nations." 9 U.S.C. § 1 (2004). Because the tax planning advice in this matter implicated interstate commerce, the FAA governs the Agreement.

Plaintiffs have refused to arbitrate, as required by the Agreement; therefore, Defendants are entitled to "petition any United States district court ... for an order directing that such arbitration proceed." 9 U.S.C. § 4 (2004). Overall, courts should "rigorously enforce agreements to arbitrate." *Dean Witter Reynolds, Inc. v. Byrd,* 470 U.S. 213, 221, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985); *see also Javitch v. First Union Sec., Inc.,* 315 F.3d 619, 624 (6th Cir.2003). The FAA preempts state law on the issue of arbitrability in dealing with those contracts falling under the FAA. *See Southland Corp. v. Keating,* 465 U.S. 1, 10, 104 S.Ct. 852, 79 L.Ed.2d 1 (1984). In determining whether the parties agreed to arbitrate, however, ordinary state law principles governing contract formation apply. *See First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 944, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995). The FAA "preserves general principles of state contract law as rules of decision on whether the parties have entered into an agreement to arbitrate." *Cook Chocolate Co. v. Saloman, Inc.,* 684 F.Supp. 1177, 1182 (S.D.N.Y.1988). Thus, the Court must apply Tennessee law to determine if a valid, enforceable contract exists.

In Tennessee there is a presumption "in favor of the validity and regularity of a written instrument, and the person asserting its invalidity has the burden of proving his allegations by clear and satisfactory evidence." *In re Acuff v. O'Linger,* 56 S.W.3d 527, 531 (Tenn.Ct.App.2001) (quoting *Kyle v. Kyle,* 18 Tenn.App. 200, 74 S.W.2d 1065, 1067 (Tenn.Ct.App.1934)). However, an enforceable agreement in Tennessee must exhibit mutual assent and valid consideration. *Price v. Mercury Supply Co.,* 682 S.W.2d 924, 933 (Tenn.Ct.App.1984). A contract that is unconscionable will not be enforced. *Trinity Indus., Inc. v. McKinnon Bridge Co.,* 77 S.W.3d 159, 180–71 (Tenn.Ct.App.2001). In this matter, Plaintiffs assert the arbitration provision is invalid because no contract existed between Plaintiffs and BDO, since there was no mutual assent between the parties. Plaintiffs alternatively argue that the arbitration provision is invalid because the provision is unconscionable.

### A. Mutual Assent Between Plaintiffs and BDO

WESTLAW © 2021 Thomson Reuters. No claim to original U.S. Government Works.

**\*3** Plaintiffs argue that there is no mutual assent between Plaintiffs and BDO because "[n]one of the BDO Defendants are a party to the Johnson Grusin Agreement." (Pls.'s Resp. in Opp. to Mot. to Compel Arbitration, at 5). Plaintiffs rely on the Tennessee Court of Appeals case of *C.O. Christian & Sons Co., Inc. v. Nashville P.S. Hotel, Ltd.,* 765 S.W.2d 754 (Tenn.Ct.App.1988). In this case, the court held that "[a]n arbitration clause does not bind one not a party to the contract" and "[a]n arbitration agreement does not bind either party unless both parties are bound." *Id.* at 757 (citing *Jackson v. Chambers,* 510 S.W.2d 74 (Tenn.1974); *Nunnelly v. Southern Iron Co.,* 94 Tenn. 397, 29 S.W. 361 (Tenn.1895)).

BDO, however, noted in the hearing before the Court that this case was decided before the 1990 Sixth Circuit Court of Appeals' decision in *Arnold v. Arnold Corp.,* 920 F.2d 1269 (6th Cir.1990). In *Arnold,* the owner of a corporation entered into a stock purchase agreement with a larger corporation for the sale of his personal shares of company stock in exchange for a large sum of money. After Mr. Arnold sold his stock to the company, the Board of Directors entered into several deals that earned each director a large sum of money. Because he had sold all of his shares, Mr. Arnold did not profit from the directors' actions, so he sued the company and the directors alleging violations of the Securities Exchange Act and the Ohio Securities Act. *See id.* at 1271–72.

The stock purchase agreement contained an arbitration provision, and while there was little doubt that Mr. Arnold would be required to arbitrate with the company, there was some confusion as to whether the directors, as non-signators to the agreement, would also be required to arbitrate with Mr. Arnold. Ultimately, the court held that because "the nonsignatory defendants are alleged to have committed acts related to their running of the corporation," the directors would also be required to arbitrate. *Id.* at 1282. The court found it critical that "[a]ll of these alleged wrongful acts relate to the nonsignatory defendants' behavior as officers and directors or in their capacities as agents of the Arnold Corporation." *Id.*

In this matter, BDO is not a signatory to the Agreement; however, BDO's actions significantly relate to the actions of JGS, which was a signatory to the Agreement. The text of the Agreement itself notes that "[i]t is contemplated as part of the Services to be rendered pursuant of this Agreement, that [JGS] will engage the services of BDO Seidman for their assistance and aid in the Services and for the preparation of certain tax returns." (Dagley Aff., at Ex. 2, ¶ 10). Plaintiffs retained JGS to assist them with tax advice, and JGS, in turn, retained BDO to further assist with the tax-planning advice. The Court concludes that all of BDO's actions and assistance with the Services under the Agreement relate to the actions of JGS.

**\*4** Furthermore, Plaintiffs received a number of benefits from BDO's assistance with the Agreement. BDO is an accounting firm, which can most likely provide more detailed accounting and tax advice than a law firm, such as JGS. Plaintiffs also received the benefits of economy and efficiency in receiving their tax advice. By having multiple professional firms working on their problems and needs, Plaintiffs were able to spend less money and receive tax advice quicker than had they independently retained two separate firms. As such, because Plaintiffs received benefits from BDO's participation and because BDO's actions were related to JGS's duties under the Agreement, Plaintiffs should be required to arbitrate with BDO, even though BDO was not a signatory to the Agreement.

## B. Unconscionability

The Court must also consider whether the arbitration provision is unconscionable. Under Tennessee contract law, a contract can be found to be unconscionable for one of two reasons:

> Unconscionability may arise from a lack of a meaningful choice on the part of one party (procedural unconscionability) or from contract terms that are unreasonably harsh (substantive unconscionability). In Tennessee we have tended to lump the two together and speak of unconscionability resulting when the inequality of the bargain is so manifest as to shock the judgment of a person of common sense, and where the terms are so oppressive that no reasonable person would make them on one hand, and no honest and fair person would accept them on the other.

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

*Trinity Indus., Inc. v. McKinnon Bridge Co.,* 77 S.W.3d 159, 170–71 (Tenn.Ct.App.2001) (citations omitted). A contract is thus unconscionable when its terms "are beyond the reasonable expectations of an ordinary person or oppressive...." *Buraczynski v. Eyring,* 919 S.W.2d 314, 320 (Tenn.1996). In this matter, the Court has reviewed the Agreement and has determined that the Agreement is not unconscionable.

Plaintiffs refer the Court to their Response to JGS's Motion to Compel Arbitration and Dismiss the Complaint for argument as to why the provision is unconscionable. In their Response to Defendants' Motion to Compel Arbitration, Plaintiffs rely on the cases of *Howell v. NHC Healthcare–Fort Sanders, Inc.* and *Buraczynski v. Eyring.* In both *Howell* and *Buraczynski,* Tennessee courts analyzed whether arbitration agreements were unconscionable; however, these cases can be distinguished from the current matter. In *Howell,* an Executor of a deceased nursing home resident sued the nursing home for abuse and neglect. *See Howell v. NHC Healthcare–Fort Sanders, Inc.,* 109 S.W.3d 731, 733 (Tenn.Ct.App.2003). The defendants insisted that the admitting agreement, signed by the deceased's husband, was enforceable and required that the plaintiff's claims were handled by mediation and arbitration. Mr. Howell was unable to read or write, and the nursing home representative chose to explain the agreement to him, rather than have Mr. Howell read the agreement and attempt to understand it for himself. While the nursing home representative said she explained mediation and arbitration, she did not explain to Mr. Howell that he was giving up his right to a jury trial. Mr. Howell was also required to sign the agreement if his wife was to be allowed to enter the nursing home.

**\*5** The *Buraczynski* case involved a medical malpractice action between a patient and her doctor. *Buraczynski v. Eyring,* 919 S.W.2d 314, 320 (Tenn.1996). Beverly Buraczynski received a total right knee replacement in September 1990, and some two months after the surgery, her doctor asked her to sign a "Physician–Patient Arbitration Agreement" that was "effective as of the date of first medical services." *Buraczynski,* 919 S.W.2d at 316. The doctor would refuse to continue to treat Ms. Buraczynski if she did not sign the agreement. Shortly after signing the agreement, Ms. Buraczynski began to experience problems with her knee. She sued to recover damages.

This matter can be distinguished from *Howell* and *Buraczynski* in multiple respects. First, unlike the *Howell* agreement, the current Agreement was only five pages long. In *Howell,* the agreement was eleven pages long and the arbitration agreement was buried at the bottom of the tenth page. In this Agreement, the arbitration provision constitutes an entire page of the five page agreement. The *Howell* court was worried about the arbitration provision being "buried" within the agreement, but the Court is unable to see a similar problem with the current Agreement, since the current Agreement contains clearly-marked headings for each paragraph. Using underline formatting for each topic heading, the Agreement lists "Dispute Resolution" on page three of the Agreement. By clearing setting apart each topic from the next, the concerns expressed by the *Howell* court are not present here.

Second, unlike Mr. Howell and Ms. Buraczynski, Plaintiffs are sophisticated business persons. Mr. Howell was elderly and unable to read or write, and Ms. Buraczynski was a patient suffering from a knee replacement. In this matter, Plaintiffs are not illiterate. Moreover, while Plaintiffs may not be attorneys who are experienced in tax law, they should understand the dispute resolution provision of the Agreement. Unlike detailed state and federal tax consulting advice, sophisticated business persons should be familiar with dispute resolution.

Third, the Agreement in this case was not a contract of adhesion. An adhesion contract can be defined as "[a] standard-form contract prepared by one party, to be signed by the party in a weaker position, usually a consumer, who has little choice about the terms." *Black's Law Dictionary* 318–19 (7th ed.1999). In both *Howell* and *Buraczynski,* the courts found that the plaintiffs, weaker parties with little to no bargaining power, signed contracts of adhesion. In *Buraczynski,* for example, the patient was offered a "take it or leave it" agreement. If the patient refused to sign the agreement, the doctor would not continue to care for the patient. The *Howell* court similarly reasoned that because Mr. Howell was required to sign the agreement for his wife to be admitted to the nursing home, the agreement was a "take it or leave it" adhesion contract.

**\*6** The Supreme Court of Tennessee noted that "the distinctive feature of a contract of adhesion is that the weaker party *has no realistic choice* as to its terms." *Buraczynski,* 919 S.W.2d at 320 (quoting *Broemmer v. Abortion Services of Phoenix Ltd.,* 173 Ariz. 148, 840 P.2d 1013, 1016 (Ariz.1992)) (emphasis added). In this case, the Court cannot conclude Plaintiffs had no realistic choice to the terms of the Agreement. To the contrary, Paul Dorman, who was initially a party to the Agreement, had time to strike his name from the Agreement and decide he was not interested in participating. As such, the Court concludes that Plaintiffs were not in an unfair bargaining position. As successful business persons, Plaintiffs could have followed Mr. Dorman and not signed the Agreement, or Plaintiffs could have demanded that JGS strike or amend the Dispute Resolution provision in the Agreement. "Where the parties possess equal bargaining power the courts are unlikely to find that their negotiations resulted in an unconscionable bargain...." *Trinity Indus.,* 77 S.W.3d 171 (holding that because "[b]oth parties were large, successful, and sophisticated businesses possessing equal bargaining power," the agreement was not unconscionable).

This Agreement was also not a "take it or leave it" contract. Plaintiffs met and discussed the transaction for months before entering into this Agreement in September 1999. Additionally, the tax returns were not due until April 2000. Therefore, Plaintiffs had over six months to consider the Agreement until Defendants fully performed under the Agreement. Mr. Howell, on the other hand, was given an on-the-spot choice of signing an agreement and caring for his wife or not signing an agreement and finding another suitable place for his wife to receive the care she needed. Mr. Howell's wife was in critical need of care, and Mr. Howell did not have time to search for alternative care facilities to treat his wife. The Plaintiffs, in this case, had months to consider their situation and determine if they could find a better opportunity for consulting help. The Court is thus unable to conclude that Plaintiffs' situation is analogous to Mr. Howell's situation.

Interestingly enough, the *Buraczynski* court held that although the contract was adhesive-like, the contract was not unconscionable. Unconscionability does not depend on adhesion; instead, unconscionability depends on whether the terms of the contract are beyond the reasonable expectations of an ordinary person. *Buraczynski,* 919 S.W.3d at 321. The *Buraczynski*

agreement contained no buried terms, and the retroactive provision was clearly labeled. Moreover, the *Buraczynski* agreement went one step further than the current Agreement and conspicuously noted "by signing this contract you are giving up your right to a jury or court trial." *Id.* In this matter, the Agreement contains no buried terms, and the "Dispute Resolution" section was clearly marked with an underlined heading. While the current Agreement does not specifically state Plaintiffs are giving up their right to a jury or court trial, a sophisticated business person should be able to conclude that the "Dispute Resolution" provision requires out-of-court resolution. The Sixth Circuit "has flatly rejected the claim that an arbitration agreement must contain a provision expressly waiving the ... right to a jury trial." *Cooper,* 367 F.3d at 506. Thus, the Court should not be concerned that Plaintiffs were left to infer through their own reading of the Agreement that participation would waive the right to trial by jury.

**\*7** Plaintiffs also claim the provision is unconscionable because a law firm advised its client to waive its right to a jury trial if a dispute arose with a third-party accounting firm. In the referenced Response to JGS's Motion to Compel Arbitration, Plaintiffs cite Tennessee Model Rule 1.8, which notes that "[a] lawyer shall not enter into an agreement with a prospective, current or former client to prospectively limit the lawyer's liability to the client for malpractice." Tenn. Sup.Ct. R. 8, RPC 1.8. The Court is unable to locate any Tennessee authority addressing whether an attorney-client agreement containing an arbitration provision, involving either the law firm or a third-party, is invalid. One case from the district of Colorado ruled that a similar provision did not violate the rules of professional conduct. "The arbitration provisions here do not prospectively limit lawyer liability to the client. Rather, they merely shift determination of the malpractice claim to a different forum." *McGuire, Cornwell & Blakely v. Grider,* 765 F.Supp. 1048, 1051 (D.Colo.1991); *see also Monahan v. Paine Webber Group, Inc.,* 724 F.Supp. 224 (S.D.N.Y.1989). This Court agrees with *Grider,* and as such, the Agreement is not unconscionable.

Plaintiffs finally claim that the alleged "Agreement to Arbitrate" between Plaintiffs and BDO did not meet Tennessee's conspicuous requirement. Tennessee courts will not enforce a provision to arbitrate if the provision is somehow "buried" within the larger document. *See Howell,* 109 S.W.3d at 734. The Court, however, is not

convinced that the arbitration provision is "buried" within the document. Plaintiffs state that the provision involving Plaintiffs' duty to arbitrate with BDO is contained within paragraph 10 of the Agreement. This paragraph states, in relevant part, that "the same obligations and limitations set forth" in certain paragraphs of the Agreement will likewise apply to BDO. (Dagley Aff., at Ex. 2, ¶ 10). While this one particular sentence is set out in the same font and size as the rest of the Agreement, sophisticated business persons should be able to follow this sentence's reference to six separate paragraphs of the Agreement. These six paragraphs encompass two full pages of the five page Agreement; therefore, the Court cannot conclude that Plaintiffs were not on notice that certain provisions, including the provision to arbitrate, applied to BDO.

In its Reply to Plaintiffs' Response, BDO notes that under Tennessee law, a party is obligated to be bound by the terms of an agreement he or she signs. If a person "fails to read the contract or otherwise learn its contents, he signs the same at his peril and is estopped to deny his obligations, will be conclusively presumed to know the contents of the contract, and must suffer the consequences of his own negligence." *Giles v. Allstate Ins. Co.,* 871 S.W.2d 154, 156 (Tenn.Ct.App.1993) (citing *Beasley v. Metropolitan Life Ins. Co.,* 190 Tenn. 227, 229 S.W.2d 146, 148 (Tenn.1950)). It is not up to the Court to notify Plaintiffs of a specific incorporated provision within a contract, including paragraph 10 that specifically incorporates almost fifty percent of the Agreement to cover BDO. As such, the Court concludes Plaintiffs should have been able to reasonably connect paragraph 10 with the duty to arbitrate with BDO.

**\*8** In sum, the arbitration provision was not "buried" in the Agreement, Plaintiffs are sophisticated business people who had equal bargaining power with Defendants when creating the Agreement, the Agreement was not a contract of adhesion, and Plaintiffs were not tricked or otherwise forced into signing the Agreement. Therefore, for the foregoing reasons, the Court concludes the Agreement is not unconscionable.

As such, because the Agreement is not unconscionable and because the Court concludes that BDO's actions performed under the Agreement significantly relate to JGS' duties, the arbitration provision is valid.

II. The dispute in this case falls
within the scope of the Agreement.

Because the arbitration provision is valid, the Court must determine if the dispute falls within the scope of the Agreement. As noted above, the Agreement states that "any dispute, controversy or claim [that] arises in connection with the performance or breach of this agreement" should be settled in arbitration. Plaintiffs allege Defendants violated RICO, breached their fiduciary duty, and committed fraud, negligent misrepresentation, professional malpractice, breach of conduct, unjust enrichment, and civil conspiracy. Plaintiffs also allege Defendants charged excessive and unconscionable fees for their advice and improperly agreed to split their fees between lawyers and non-lawyers. After review, the Court concludes all of the alleged wrongdoings by Defendants are related to the "performance or breach" of the Agreement; therefore, Plaintiffs' claims should be settled in accordance with the terms of the Agreement.

*CONCLUSION*

Because the arbitration provision in the Agreement is valid and because Plaintiffs' alleged claims against Defendants relate to the performance or breach of the Agreement, the Court recommends that Plaintiffs' claims should be settled by arbitration in accordance with the laws of the State of Tennessee and the then current Arbitration Rules of the AAA. The Court therefore recommends that Defendant's Motion to Compel Arbitration be GRANTED.

The Court, however, does not recommend that this matter be dismissed at this time. Therefore, the Court recommends that Defendants' Motion to Dismiss Complaint be DENIED.

ANY OBJECTIONS OR EXCEPTIONS TO THIS REPORT MUST BE FILED WITHIN TEN (10) DAYS FROM THE DATE OF SERVICE OF THE REPORT. FAILURE TO FILE THEM WITHIN TEN (10) DAYS OF SERVICE MAY CONSTITUTE A WAIVER OF OBJECTIONS, EXCEPTIONS, AND FURTHER APPEAL.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2004 WL 5039850

**End of Document**                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

2007 WL 4322016
Only the Westlaw citation is currently available.

SEE COURT OF APPEALS RULES 11 AND 12

Court of Appeals of Tennessee.

ROSS PRODUCTS DIVISION
ABBOTT LABORATORIES
v.
STATE of Tennessee.

No. M2006-01113-COA-R3-CV.
|
May 8, 2007 Session.
|
Dec. 5, 2007.
|
Application for Permission to Appeal
Denied by Supreme Court
April 28, 2008.

Appeal from the Tennessee Claims Commission No. 20050189.

**Attorneys and Law Firms**

Peter H. Curry, Nashville, Tennessee, for the appellant, Ross Products Division Abbott Laboratories.

Robert E. Cooper, Jr., Attorney General and Reporter; Janie C. Porter, Senior Counsel, for the appellee, State of Tennessee.

PATRICIA J. COTTRELL, J., delivered the opinion of the court, in which WILLIAM C. KOCH, JR., P.J., M.S., joined. WILLIAM B. CAIN, J. not participating.

**OPINION**

PATRICIA J. COTTRELL, J.

*1 A manufacturer of infant formula entered into a contract with the State of Tennessee to furnish large quantities of its products to retailers for the federally-funded WIC program. The contract included a cash rebate which the manufacturer agreed to pay the State for each can furnished, to offset the cost of administering the program. After operating under the contract for

four years, the manufacturer unilaterally decided to reduce the size of the cans it was providing, and it asked the state to reduce the rebate proportionally. The State refused, citing a provision in the contract that precluded rebate reductions. The manufacturer then filed an administrative claim, asking for a $1.2 million refund of its alleged overpayment of rebates. The Claims Commissioner granted Summary Judgment to the State. We affirm the Commissioner's judgment.

**I. BACKGROUND**

The contract whose interpretation is at the center of this dispute was awarded through a competitive bidding process. On May 6, 1999, the State of Tennessee published a detailed Invitation to Bid (ITB) for a contract to furnish retailers with cans of infant formula that would then be purchased by vouchers issued to individuals enrolled in the Special Supplemental Nutrition Program for Women, Infants and Children (WIC).[1] Retailers participating in the program could then submit these vouchers to the State and be reimbursed for the full retail price of the product.

[1]  "The WIC program is designed to provide supplemental foods (including infant formula) and nutrition education to women, infants and children (up to their fifth birthday) who have income levels so low as to put them at nutritional risk. 42 U.S.C. §§ 1786-1788 (1988). WIC is funded by the federal government, but the implementation of the program is left to the states." *F.T.C. v. Abbott Laboratories,* 853 F.Supp. 526, 527 (D.D.C.,1994). *See also Valesky's Market v. Department of Health,* 779 A.2d 1251, 1253 (Pa.Commonwealth 2001).

The ITB requested that bidders communicate their "best full truckload national wholesale price" as well as an offer of a rebate for each can purchased through the program. The cash rebate was to be paid to the State on a monthly basis to offset the program's administrative cost. The ITB declared that "an award shall be made to the lowest responsive and responsible bidder based on the lowest net monthly wholesale cost to the state for milk based formula." The parties agree that the "lowest net monthly wholesale cost" was arrived at by considering both the wholesale price and the per can rebate.[2]

[2]  The State declared in the ITB that it could not determine with precision the exact number of units

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works. 1

that would be purchased under the program, but it estimated on the basis of the program's past history that the demand for various kinds of infant formula under the contract (concentrate, powdered and ready-to-feed) would amount to 962,500 cans per month.

Once a bid was accepted by the State, the original ITB together with the winning bidder's response became the contract between the State and the winning bidder. Ross Products Division of Abbott Laboratories ("Ross" or "the manufacturer") was the low bidder, and was awarded the contract. The contract ran for one year, but was renewable. Ross's performance was apparently satisfactory, at least initially, for the contract was extended annually over the next four years.

On June 16, 2003, Ross notified the State that it would be replacing its Similac 14.1 ounce can and its Isomil powder 14 ounce can with infant formula packaged in 12.9 ounce cans, [3] starting in October. The manufacturer indicated that "consistency across all items" was the purpose of the move. Ross notified the State that the rebate would need to be reduced to reflect the change and suggested a methodology to compute the reduced rebate during the transition period while the discontinued infant formula cans were being replaced with cans of the smaller size.

[3]     We note that under the WIC program, mothers are entitled to receive vouchers for no more than 128 ounces of formula per month, which means they would receive no more than nine cans per month under the program whether those cans contained 14.1, 14.0 or 12.9 ounces each. If the cans contained 14.1 ounces, a mother who used the vouchers for the full number of cans for which her infant was eligible would receive 126.9 ounces of formula. If the cans contained 14 ounces, such a mother would receive 126 ounces for her infant. But if the can contained 12.9 ounces, she would receive only 116.1 ounces of formula under the program.

**\*2** An exchange of e-mails about Ross's proposal followed, with the company's manager for government operations asking the State for its assent to the proposed transition plan and several State officials responding that they were not certain that any reduction in the rebate was contemplated under the contract. Finally, on December 31, 2003, purchasing administrator Sondra Howe of the Tennessee Department of General Services sent a letter to Ross informing it that the State was rejecting the request

that it reduce the rebate because such a reduction was not consistent with the terms of the contract.

## II. ADMINISTRATIVE PROCEEDINGS

On November 3, 2004, Ross Laboratories filed a claim with the Division of Claims Administration. The company contended that the State had breached its contract by refusing to reduce the rebate the company was obligated to pay, and it asked to be reimbursed for what it deemed to be its overpayments, in the amount of $1.2 million dollars. The claim was subsequently transferred to the Claims Commission pursuant to Tenn.Code Ann. § 9-8-402(c).

The State filed an Answer to the manufacturer's claim, followed by a motion for summary judgment. The motion was argued before the Claims Commissioner on January 18, 2006. The Commissioner's order, filed on April 24, 2006, included a recitation of the undisputed facts and a detailed analysis of the contract at issue. The Commissioner noted that Clause 11 of the ITB stated that in the event of an increase in the manufacturer's price, there would be an automatic increase in the rebate by the same amount, but that if the manufacturer reduced its price, the rebate would remain unchanged. After discussion of that clause and of the basic principles of contract construction, the Commissioner granted summary judgment to the State on the ground that its refusal to adjust the amount of its rebate was not a breach of the contract. Ross Laboratories then filed a direct appeal to this court pursuant to Tenn. R.App. P. 12.

## III. ANALYSIS

### A. The Standard of Review

Summary judgment is an appropriate vehicle for resolving disputes if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04; *Blair v. West Town Mall,* 130 S.W.3d 761, 764 (Tenn.2004); *Pero's Steak & Spaghetti House v. Lee,* 90 S.W.3d 614, 620 (Tenn.2002); *Byrd v. Hall,* 847 S.W.2d 208, 210 (Tenn.1993).

Case 3:17-cv-00013 Document 25-17 Filed 03/24/17 Page 124 of 171 PageID #: 381

In the present case, the facts are undisputed, and thus the only issue before this court involves the proper construction of the contract between the State and Ross. Questions of contract interpretation are generally considered to be questions of law, and thus are especially well-suited for resolution by summary judgment. *See Doe v. HCA Health Services of Tennessee,* 46 S.W.3d 191, 196 (Tenn.2001); *Guiliano v. Cleo,* 995 S.W.2d 88, 95 (Tenn.1999); *Hamblen County v. City of Morristown,* 656 S.W.2d 331, 335-36 (Tenn.1983).

**\*3** The cardinal rule for interpretation of contractions is to ascertain the intention of the parties from the contract as a whole, and to give effect to that intention consistent with legal principles. *Planters Gin Co. v. Fed. Compress & Warehouse Co.,* Inc., 78 S.W.3d 885, 890 (Tenn.2002); *Bob Pearsall Motors Inc., v. Regal Chrysler-Plymouth,* Inc., 521 S.W.2d 578, 580 (Tenn.1975); *Rainey v. Stansell,* 836 S.W.2d 117, 118 (Tenn.Ct.App.1992). The intent of the parties is presumed to be embodied and expressed in the contract as written. *Planters Gin Co.,* 78 S.W.3d at 890; *Rainey v. Stansell,* 836 S.W.2d at 118. Accordingly, the court's role in resolving disputes regarding the interpretation of a contract is to ascertain the intention of the parties based upon the usual, natural, and ordinary meaning of the language used. *Memphis Housing Authority v. Thompson,* 38 S.W.3d 505, 511 (Tenn.2001); *Guiliano v. Cleo,* 995 S.W.2d at 95; *Bob Pearsall Motors v. Regal Chrysler-Plymouth* 521 S.W.2d at 580.

A trial court's interpretation of a contractual document is not entitled to a presumption of correctness on appeal. [4] *Barnes v. Barnes,* 193 S.W.3d 495, 498 (Tenn.2006); *Angus v. Western Heritage Ins. Co.,* 48 S.W.3d 728, 730 (Tenn.Ct.App.2000). This court must review the document *de novo,* and we must make our own determination regarding its meaning and legal import. *Hillsboro Plaza Enterprises v. Moon,* 860 S.W.2d 45, 47 (Tenn.Ct.App.1993).

[4]  Proceedings on the Claims Commission's regular docket are conducted pursuant to the Tennessee Rules of Civil Procedure. *See* Tenn.Code Ann. § 9-8-403(a)(1). Accordingly, the "trial court" in this opinion is the Claims Commission. *See Turner v. State of Tennessee,* 184 S.W.3d 701, 704 (Tenn.Ct.App.2006); *Learue v. State of Tennessee,* 757 S.W.2d 3, 6 (Tenn.Ct.App.1987).

### B. The Terms of the Contract

Ross argues that the State breached its contract by refusing to reduce the rebate that the manufacturer was obligated to pay. There is nothing in the contract that specifically allows for a reduction in the rebate. To the contrary, Clause 11 of the ITB, which sets out the effect on the rebate of two different kinds of price changes, appears to preclude such a reduction. That clause, which is captioned "Price List Adjustment" reads in relevant part as follows:

> Manufacturer's industry-wide price increases in the best full truckload national wholesale price per can of milk-based, iron fortified formulas will result in an automatic rebate increase on a cent for cent basis for such formulas, taking effect on or after the first day of the month of any such increase in the manufacturer's best full truckload national wholesale price per can.

> The per can rebate for milk-based, iron-fortified formulas will increase the same number of cents as any increase over the best truckload national wholesale price per can. **A decrease in the best full truckload national wholesale price shall not result in a decrease in the per can rebate for milk-based, iron-fortified formulas.**

Clause 11 does not prohibit the manufacturer from raising its wholesale prices. Nonetheless, by increasing the rebate on a cent for cent basis for any such increase, it prevents the manufacturer from making any additional profit from such an action. Conversely, a reduction in the wholesale price leaves the rebate unchanged. However, Ross argues that since Clause 11 refers to the effects on the rebate of the manufacturer's industry-wide price changes, it should not apply where a change in price occurs solely because of a change in the size (or more accurately, the capacity) of the can containing its product. [5] However, no provision in the contract specifically authorized Ross to unilaterally reduce the size of the cans it furnished. Regardless of the cause of the price reduction, which is the reason for Ross's request to reduce the rebate, we find Clause 11 applies and prevents the requested reduction.

[5]  The parties agree that the reduction in can size has resulted in a corresponding reduction in the wholesale per can price which retailers must now pay for the product.

**\*4** Ross suggested at oral argument that we should not place much weight on Clause 11 because, as the party that drafted the ITB, the State gave bidders no opportunity to negotiate over its terms. The manufacturer implied that we should treat the contract as a contract of adhesion, which is construed against the drafting party because of the disparity in bargaining power between the parties. *Vargo v. Lincoln Brass Works,* 115 S.W.3d 487, 492 (Tenn.Ct.App.2003).

We find that argument to be without merit. An adhesion contract is a "[s]tandardized contract form offered to consumers of goods and services on essentially 'take it or leave it' basis without affording consumer realistic opportunity to bargain and under such conditions that consumer cannot obtain desired product or services except by acquiescing in form contract." Black's Law Dictionary 40 (6th Ed.1990).

Contracts of adhesion often arise from transactions between relatively uneducated or powerless members of the public on one side, and knowledgeable professionals or powerful companies on the other. *See, for example, Taylor v. Butler,* 142 S.W.3d 277 (Tenn.2004) (arbitration clause in sale by used car dealer); *Alcazar v. Hayes,* 982 S.W.2d 845 (Tenn.1998) (uninsured motorist clause in insurance contract); *Russell v. Bray,* 116 S.W.3d 1 (Tenn.Ct.App.2003) (exculpatory clause in home inspection contract); *Howell v. NHC Healthcare-Fort Sanders,* 109 S.W.3d 731 (Tenn.Ct.App.2003) (arbitration clause in contract between nursing home and illiterate and gravely ill patient). There was no such disparity in bargaining power here.

Putting aside the question of whether Ross or the sophisticated business persons who prepared the infant formula bid for the manufacturer should be considered "consumers of goods and services" under the above definition, we note that a contract of adhesion is not necessarily unenforceable. It is only unenforceable if "the terms of the contract are beyond the reasonable expectations of an ordinary person, or oppressive or unconscionable." *Taylor v. Butler,* 142 S.W.3d at 286; *Howell v. NHC Healthcare-Fort Sanders,* 109 S.W.3d at 734 (citing *Buraczynski v. Eyring,* 919 S.W.2d 313, 320 (Tenn.1996)).

We can see nothing in the bidding process or in the contract terms to indicate oppressiveness or

unconsciousability. Ross chose to bid on the contract with full knowledge of its rebate provisions. We presume it would not have done so if it did not believe that the advantage to be gained from being the sole supplier of infant formula to the WIC program in Tennessee outweighed any reduction in its profit margin resulting from the rebates it had to pay for the privilege.

Further, since Ross unilaterally chose to change the size of the product it was furnishing, it should not be heard to complain that the State's refusal to reduce the manufacturer's rebate obligation was beyond its reasonable expectations. To the contrary, it appears to us that by demanding that the State reduce the rebate, Ross was attempting to change its bid after the fact, a move which if successful would have been unfair both to the other bidders and to the State, which depends upon the rebate to fund the WIC program. Thus, the contract is enforceable as written.

### C. The Question of Ambiguity
**\*5** Ross's argument that it is entitled to a rebate reduction rests entirely on a section of the contract which sets out the duties of the winning bidder in the event of a change in the formula supplied:

> In the event the contractor introduces a formula designed to replace or be an alternative to formula(s) referenced in the contract, the contractor shall provide such formulas at the same net per can wholesale cost as the original formula, with adjustments made for packaging size difference. Any Replacement formula offered by the contractor for a formula that is discontinued would have to be formulated to serve the same population that would have been served by the formula referenced in the contract.

Ross argues that since the State calculated the net per can wholesale cost during the bidding process by subtracting the rebate amount from the price, the above passage impliedly endorses reductions in the rebates applicable to new formulas. Even if we accepted the manufacturer's contention, Ross did not introduce a new formula, and it

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

therefore concedes that the above passage is not directly applicable to the situation before us. Nonetheless, Ross argues that the above provision, read in conjunction with Clause 11, shows that the contract is ambiguous, and thus that it should be allowed to offer evidence as to what should occur if the manufacturer reduces its packaging size. We do not agree.

As we noted above, the court's role in resolving disputes regarding the interpretation of a contract is to ascertain the intention of the parties based upon the usual, natural, and ordinary meaning of the language used. Where the language of the contract is clear and unambiguous, its literal meaning controls the outcome of contract disputes. *Planters Gin Co.,* 78 S.W.3d at 890. When the language is ambiguous, however, the courts must resort to other evidence to determine the intention of the parties.

Nonetheless, an ambiguity does not arise in a contract merely because the parties may differ as to the interpretation of certain of its provisions. *Trinity Industries v. McKinnon Bridge,* 147 S.W.3d 225, 234 (Tenn.Ct.App.2003) (citing *Oman Construction Co. v. Tennessee Valley Authority,* 486 F.Supp. 375, 382 (M.D.Tenn.1979)). Neither the parties nor the courts may create an ambiguity where none appears in the contract. *Edwards v. Travelers Indemnity Insurance,* 201 Tenn. 435, 300 S.W.2d 615 (Tenn.1957). A strained construction may not be placed on the language used to find an ambiguity where none exists. *McGee v. Best,* 106 S.W.3d 48, 63 (Tenn.Ct.App.2002) *(citing Empress Health & Beauty Spa, Inc. v. Turner,* 503 S.W.2d 188, 190-91 (Tenn.1973)).

We must consider the agreement as a whole in determining whether the meaning of the contract is clear or ambiguous. *Warren v. Metropolitan Gov't of Nashville and Davidson County,* 965 S.W.2d 618, 623 (Tenn.Ct.App.1997); *Gredig*

*v. Tennessee Farmers Mutual Ins. Co.,* 899 S.W.2d 909, 912 (Tenn.Ct.App.1994). Further, "[u]nder Tennessee law, it is presumed that a written contract contains the entire agreement between the parties." *Simonton v. Huff,* 60 S.W.3d 820, 826 (Tenn.Ct.App.2000). Thus, the contract at issue can not be considered ambiguous just because it doesn't include a term or a contingency that Ross wishes it contained.

**\*6** The ITB defines a rebate as an "amount payable to Tennessee Department of Health for each can of infant formula purchased with a negotiable food instrument." Almost every other mention of the rebate in the contract documents refers to it as a "rebate per can." Ross does not allege that its own bid included a sliding or variable amount of rebate depending on the size of the can provided, or that the ITB allowed for such a bid. The only section of the ITB which directly addresses the possibility of change in the rebate allows for the possibility of an increase, but precludes a decrease. Thus, even though the contract does not explicitly discuss the effect on the rebate of the manufacturer's unilateral decision, that does not makes the contract ambiguous. We accordingly affirm the decision of the Claims Commissioner.

## IV.

The judgment of the Claims Commissioner is affirmed. We remand this case to the Claims Commission for any further proceedings necessary. Tax the costs on appeal to the appellant, Ross Products Division of Abbott Laboratories.

**All Citations**

Not Reported in S.W.3d, 2007 WL 4322016

---

**End of Document** © 2017 Thomson Reuters. No claim to original U.S. Government Works.

551 So.2d 1045
Supreme Court of Alabama.

Linda SANDERS, et al.

v.

COLONIAL BANK OF
ALABAMA, a corporation, et al.

88–409.
|
Sept. 29, 1989.

Bank depositor filed claim for injunctive relief and damages based on bank's alleged unconscionability and bad faith in assessing service charge for each check honored when funds in account were insufficient. The Circuit Court, Jefferson County, No. CV-86-502-385, Marvin Cherner, J., entered summary judgment for bank. Depositor appealed. The Supreme Court held that: (1) doctrine of unconscionability was not available to obtain affirmative relief but only as defense, and (2) bank did not breach covenant of good faith and fair dealing with its depositors.

Affirmed.

Houston, J., concurred in result.

**Attorneys and Law Firms**

**\*1045** James H. Faulkner, Birmingham, for appellants.

Bradley R. Byrne of Miller, Hamilton, Snider & Odom, Mobile, and James L. North, Birmingham, for appellees.

**Opinion**

PER CURIAM.

This is an appeal from a summary judgment in favor of Colonial Bank ("the Bank") on a claim by Linda Sanders for injunctive relief and damages based on alleged unconscionability and bad faith in the Bank's assessing a $15 service charge for each check honored by the Bank when funds in Sanders's account were insufficient to cover the issued check. We affirm.

Two issues are presented: [1] "1) If relief is granted by the trial court for an unconscionable contract, whether

that relief can be limited to prospective relief only; and 2) whether the trial court erred in dismissing Sanders's complaint that Colonial Bank breached the covenant of good faith and fair dealing with its depositors."

[1] We take these two issues directly from the appellant's brief and we note that a third issue (whether the trial court erred in denying certification of the suit as a class action) is mooted in light of our affirmance of the judgment.

[1] As to issue number one, we find no error. See *Cowin Equipment Co. v. General Motors Corp.,* 734 F.2d 1581 (11th Cir.1984) (holding that the doctrine of unconscionability is not available to obtain affirmative relief, but only as a defense); *Lloyd v. Service Corp. of Alabama,* 453 So.2d 735 (Ala.1984); and *Ex parte Redshaw, Inc.,* 524 So.2d 367 (Ala.Civ.App.1987). For cases to like effect in other jurisdictions, see *Galvin v. First National Monetary Corp.,* 624 F.Supp. 154 (E.D.N.Y.1985); *Bennett v. Behring Corp.,* 466 F.Supp. 689 (S.D.Fla.1979); *Jamestown Farmers Elevator Inc. v. General Mills,* 413 F.Supp. 764 (D.N.D.1976), *rev'd on other grounds,* 552 F.2d 1285 (8th Cir.1977); **\*1046** *Whitman v. Connecticut Bank & Trust Co.,* 400 F.Supp. 1341 (D.Conn.1975); *Best v. United States Bank of Oregon,* 78 Or.App. 1, 714 P.2d 1049 (1986), *aff'd,* 303 Or. 557, 739 P.2d 554 (1987); *Witmer v. Exxon Corp.,* 260 Pa.Super. 537, 394 A.2d 1276 (1978); and *Vom Lehn v. Astor Art Galleries, Ltd.,* 86 Misc.2d 1, 380 N.Y.S.2d 532 (Sup.Ct.1976). See, also, the following treatises: J. White & R. Summers, *Uniform Commercial Code* § 4–8 (2d ed. 1980); W. Jaeger, 15 *Williston On Contracts* § 1763A at 215 (3d ed. 1972); and 1 Corbin, *Corbin On Contracts* § 128 (1963).

[2] As to issue number two, we find no error. See *Peninsular Life Insurance Co. v. Blackmon,* 476 So.2d 87 (Ala.1985) (holding that the tort of bad faith is limited to the breach of a contract of insurance). For other cases that have refused to extend the tort of bad faith, see *Brown–Marx Associates, Ltd. v. Emigrant Savings Bank,* 527 F.Supp. 277 (N.D.Ala.1981) (applying Alabama law); *Gaylord v. Lawler Mobile Homes, Inc.,* 477 So.2d 382 (Ala.1985) (sales contract); *Williams v. Killough,* 474 So.2d 680 (Ala.1985) (wrongful termination of employment contract); *Keeton v. Bank of Red Bay,* 466 So.2d 937 (Ala.1985) (foreclosure redemption contracts); *Hall v. Hall,* 455 So.2d 813 (Ala.1984) (illegal contract to

terminate marriage); and *Kennedy Electric Co. v. Moore–Handley,* 437 So.2d 76 (Ala.1983) (settlement agreements).

AFFIRMED.

HORNSBY, C.J., and MADDOX, JONES, SHORES, ADAMS and KENNEDY, JJ., concur.

HOUSTON, J., concurs in the result.

**All Citations**

551 So.2d 1045

---

**End of Document**

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

352 N.J.Super. 555
Superior Court of New Jersey, Chancery Division

SITOGUM HOLDINGS, INC., a
Delaware corporation, Plaintiff,

v.

Phyllis E. ROPES, a/k/a Phyllis Eline
Ropes, a/k/a Phyllis Ropes, Defendant,

v.

Marlene Van Noord; Timothy P. Sullivan,
individually; Neil Coles, individually; and
John Doe and Jane Doe (the yet unnamed
officers and directors of the Plaintiff
corporation), Third-party defendants.

March 21, 2002.

Optionee sued vendor for specific performance to transfer property pursuant to the option. Vendor moved for summary judgment on grounds that the option contract was unconscionable. The Superior Court, Chancery Division, Monmouth County, Fisher, P.J.Ch., held that: (1) contract was procedurally unconscionable, and (2) contract was substantively unconscionable.

Motion for summary judgment granted.

**Attorneys and Law Firms**

**916  *556 Joseph A. Deckhut, Freehold, for plaintiff.

*557 Gerald P. Tyne, for defendant/third party plaintiff, Tyne & Tyne, Bergenfield, Attorneys.

**Opinion**

FISHER, P.J.Ch.

The common law doctrine of unconscionability has proved difficult to define and has been rarely invoked undoubtedly because, other than in exceptional cases, it has been largely viewed as grossly interfering with the freedom to contract. Notwithstanding this philosophical discomfort, the surrounding circumstances regarding defendant's desire to sell her property provided fertile ground for, and did in fact result in, a one-sided agreement which this court finds unconscionable. [1]

[1] The matter is before the court by way of defendant's motion for summary judgment. There do not appear to be any disputed questions of fact and the parties agree there are no other facts available concerning this issue. Accordingly, the application of the doctrine of unconscionability in this case turns on its sufficiency as a matter of law. In reciting the facts relating to this contention, the court will also give plaintiff, as the opponent of the motion, all reasonable inferences to be drawn from the facts provided.

**I**

Defendant Phyllis E. Ropes ("Mrs.Ropes") and her husband, John M. Ropes, Jr., were the owners of waterfront property in Brielle, New Jersey. This was their principal residence although they also owned a winter home in the Cayman Islands. It was in the Cayman Islands that John M. Ropes, Jr. died suddenly on January 3, 2000.

Grief-stricken, Mrs. Ropes, then 81 years old, took a number of rapid and inconsistent steps regarding the Brielle property. Apparently, not long before his death, it had been her and Mr. Rope's desire to sell the property. With his death, Mrs. Ropes almost immediately executed two separate powers of attorney on the same day—January 13, 2000; one in favor of third-party defendant Marlene Van Noord and the other in favor of Linda Dowhan. On January 26, 2000 another power of attorney, prepared by plaintiff Sitogum Holdings, Inc. ("Sitogum"), was also *558 executed by Mrs. Ropes in favor of Ms. Van Noord. The next day, Ms. Van Noord executed an option to purchase the Brielle property in favor of Sitogum. [2] This option contract, which Mrs. Ropes now claims is unconscionable, provided Sitogum—an entity which would not even be incorporated for another six days—with the right to purchase the Brielle property, within eight months, for $800,000. Sitogum **917 agreed to pay $1000 per month for this option.

[2] According to Sitogum, on January 19, 2000—only 3 days after the execution of the power of attorney and 16 days after Mr. Ropes died—Ms. Van Noord received a telephone call from a Florida attorney expressing an interest in the Brielle property. No explanation has been provided by Sitogum as to how this Florida attorney came to learn of the property or Mrs. Ropes' desire to sell it.

A February, 2000 appraisal suggested the Brielle property was worth between $1,500,000 and $1,750,000. Apparently recognizing the windfall about to come its way, Sitogum claims to have prepaid six of its monthly $1000 payments on or about February 28, 2000. [3]

[3]    Whether this payment was actually made is a genuinely disputed fact. Sitogum contends that it was mailed to Ms. Van Noord's Cayman Islands address; Ms. Van Noord claims not to have received it. For present purposes, in light of this factual dispute, the court assumes the payment was made.

Apparently, at the same time, efforts were being made to market the property through Mrs. Ropes' other attorney-in-fact. Sitogum may have become aware of this since it recorded a "Memorandum of Option to Purchase Real Property" on or about April 11, 2000. On April 13, 2000, Mrs. Ropes executed a contract for the sale of the Brielle property to another party for $1,500,000. Upon learning of this, Sitogum, on April 28, 2000, exercised its option to purchase. Notwithstanding, Mrs. Ropes advised that she would not transfer the property to Sitogum. As a result, on May 19, 2000, Sitogum filed this suit to compel specific performance of the January 27, 2000 option agreement. [4] Mrs. Ropes now moves for summary judgment.

[4]    On March 14, 2001, an order was entered which (1) permitted the sale of the property to this other contracting party for $1,500,000, (2) discharged the notice of lis pendens filed by Sitogum, and (3) required that the net proceeds be placed in escrow pending final judgment or such other order of the court.

**\*559 II**

Mrs. Ropes recognizes that the claim of her alleged capacity to contract or the voluntariness of the power of attorney elude resolution by way of summary judgment. [5] Other contentions also cannot be resolved on this motion. [6] The only issue which is ripe for summary judgment is Mrs. Ropes' claim that the option contract is unconscionable.

[5]    That is, the motion invites the court to assume, for present purposes only, that Mrs. Ropes was of sound mind in January 2000, that she freely and voluntarily provided a power of attorney to Marlene Van Noord,

that the power of attorney was given the day before the option contract was executed and that the power of attorney authorized Ms. Van Noord to sign the option contract. *Db* at 6–7.

[6]    Besides the claim of unconscionability, the motion was based on two points. The first relies on the fact—apparently, undisputed—that Sitogum was not incorporated at the time the option contract came into existence; as a result, Mrs. Ropes contends there could be no valid contract. However, a court of equity could conclude that the lack of certain ministerial steps to the creation of a corporation need not preclude the enforceability of a contract made by such a nascent entity. Second, Mrs. Ropes contends there was a default in the timely submission of the monthly $1000 payments required by the option contract and, thus, there was either no consideration for the attorney-in-fact's promise to sell or Sitogum otherwise breached the option contract. The parties dispute whether those payments were made. And, while the $6000 prepayment may have been mailed or received a few days late does not necessarily relieve Mrs. Ropes of her obligations under the option contract. There is nothing in the present record to suggest that time was of the essence for those $1000 payments. The option contract states only that "[t]ime is of essence *of this option.*" The emphasized portion might suggest that time was of the essence of the exercise of the option, not the $1000 payments.

**A**

The power of a court to relieve parties from unconscionable contracts has ancient roots. [7] In *Earl of Chesterfield v. Janssen*, **\*\*918 \*560** plaintiff borrowed 5000 pounds in exchange for his agreement to pay 20,000 pounds upon the death of his then 70–year old grandmother. In referring to the agreement as "unconscientious," the Chancellor described the power to set it aside, which still has traces in the doctrine currently applied by modern courts:

[7]    Roman law recognized the doctrine of "laesio ultra dimidum vel enormis" which permitted rescission upon a disproportionate exchange of promises. The doctrine is defined in *Black's Law Dictionary* (7th ed., 1999) as "the injury sustained by one party to an onerous contract when the overreaching party receives twice the value of the party's money or property, such as a purchaser who pays less than half

of the value of the property sold, or a seller who receives more than double the property's value."

It may be apparent from the intrinsic nature and subject of the bargain itself; such as no man in his sense and not under a delusion would make on the one hand, and as no honest man would accept on the other; which are unequitable and unconscientious bargains, and of such even the common law take notice.

[2 *Ves. Sr.* 125, 155, 28 *Eng. Rep.* 82, 100 (1750).]

The Supreme Court of the United States recognized this common law authority in the nineteenth century [8] and courts of equity have traditionally refused their assistance to parties who obtain such one-sided bargains. [9]

[8] *See, Eyre v. Potter,* 56 *U.S.* 42, 45, 15 *How.* 42, 14 *L.Ed.* 592 (1853) ("A disposition of property so revolting to common sense and natural affection ought to be looked upon with suspicion"); *Hume v. United States,* 132 *U.S.* 406, 411, 10 *S.Ct.* 134, 33 *L.Ed.* 393 (1889) (quoting *Earl of Chesterfield, supra* with approval).

[9] In *Campbell Soup Co. v. Wentz,* 172 *F.*2d 80, 83–84 (3d Cir.1948), Judge Goodrich emphasized this point: "We think it is too hard a bargain and too one-sided an agreement to entitle the plaintiff to relief in a court of conscience.... We do think, however, that a party who has offered and succeeded in getting an agreement as tough as this one is, should not come to a chancellor and ask ... help in the enforcement of its terms. That equity does not enforce unconscionable bargains is too well established to require elaborate citation." *See also,* 4 Pomeroy, *Equity Jurisprudence* (5th ed., 1941), § 1405a; 5 Williston, *Contracts,* § 1425 (Rev.ed., 1937).

Notwithstanding its venerable history, the application of the doctrine has always been viewed as controversial and it would appear, judging from the paucity of reported decisions, that its use has been infrequent. The reason for this is undoubtedly over a heightened concern that its uncertain parameters "increase[ ] the potential for unreasoned or arbitrary decisions based on personal value judgments." Hillman, "Debunking Some Myths about Unconscionability: A New Framework for U.C.C. Section 2–302," 67 *561 Cornell L.Rev.* 1, 15 (1981). Courts normally examine challenges to the validity of contracts by first recognizing the parties' freedom to contract and by applying the principle that the execution

of a contract manifests an intent to be bound by all its terms. *See, e.g., Restatement of Contracts,* § 70 (1932). As a result, the principle that courts "should not rewrite contracts," is often intoned in such disputes. *See, e.g., Kampf v. Franklin Life Ins. Co.,* 33 *N.J.* 36, 43, 161 *A.*2d 717 (1960); *Carroll v. United Airlines, Inc.,* 325 *N.J.Super.* 353, 358–59, 739 *A.*2d 442 (App.Div.1999); *Chemical Bank v. Bailey,* 296 *N.J.Super.* 515, 527, 687 *A.*2d 316 (App.Div.), *certif. denied,* 150 *N.J.* 28, 695 *A.*2d 671 (1997). Regardless, however, of the unease which its potential use produces, the doctrine of unconscionability has a place in our jurisprudence so that grossly unfair or one-sided contracts may be properly "policed." White & Summers, *Uniform Commercial Code* (4th ed., 1995) 206; *Wille v. Southwestern Bell Tel. Co.,* 219 *Kan.* 755, 549 *P.*2d 903 (1976).

Considering the rapid evolution of the implied covenant of good faith and fair **919 dealing in New Jersey [10]— allowing for the watchful examination of the *bona fides* of the *performance* of valid contracts—it is plain to see that the application of the doctrine of unconscionability to the *bona fides* of the *creation* of contracts should not be viewed as a relic, as labelled by one commentator. Brown, "The Uncertainty of U.C.C. Section 2–302: Why Unconscionability Has Become A Relic," 105 *Com. L.J.* 287 (2000). In appropriate cases, the doctrine of unconscionability provides a *562 more than proper and valid basis for interdicting an inequitable result which would otherwise flow from the cold enforcement of the terms of a contract.

[10] *See, Wilson v. Amerada Hess Corporation,* 168 *N.J.* 236, 773 *A.*2d 1121 (2001); *R.J.Gaydos Ins. Agency, Inc. v. National Consumer Ins. Co.,* 168 *N.J.* 255, 773 *A.*2d 1132 (2001); *Sons of Thunder v. Borden, Inc.,* 148 *N.J.* 396, 690 *A.*2d 575 (1997); *Onderdonk v. Presybterian Homes,* 85 *N.J.* 171, 425 *A.*2d 1057 (1981); *Bak–A–Lum Corp. v. Alcoa Bldg. Prods., Inc.,* 69 *N.J.* 123, 351 *A.*2d 349 (1976); *Palisades Properties, Inc. v. Brunetti,* 44 *N.J.* 117, 207 *A.*2d 522 (1965); *Seidenberg v. Summit Bank,* 348 *N.J.Super.* 243, 791 *A.*2d 1068 (App.Div.2002); *M.J. Paquet, Inc. v. N.J. Dept. of Transp.,* 335 *N.J.Super.* 130, 761 *A.*2d 122 (App.Div.2000), *certif. granted,* 167 *N.J.* 635, 772 *A.*2d 937 (2001); *Emerson Radio Corp. v. Orion Sales, Inc.,* 253 *F.*3d 159 (3d Cir.2001).

### B

Besides existing at common law, the doctrine of unconscionability was included within the Uniform Commercial Code, becoming, as Professor Hawkland said, "undoubtedly the most controversial section in the entire Code." Hawkland, *A Transactional Guide to the U.C.C.,* Vol. I, § 1.16 at p. 44 (1964). The Uniform Commercial Code ("the Code") handles the issue in two interesting ways. First, the Code "assigns the issue of unconscionability exclusively to the judge." White & Summers, *Uniform Commercial Code* (2d ed.,1980) 151. *Accord, County Asphalt, Inc. v. Lewis Welding & Eng. Corp.,* 444 F.2d 372 (2d Cir.1971); *Fleming Companies, Inc. v. Thriftway Medford Lakes, Inc.,* 913 F.Supp. 837 (D.N.J.1995); *Bishop v. Washington,* 331 Pa.Super. 387, 480 A.2d 1088 (1984); *Smith v. Price's Creameries,* 98 N.M. 541, 650 P.2d 825 (1982). Second, the Code provision contains no helpful definition or parameters, stating only:

> If the court as a matter of law finds the contract of any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result. [*N.J.S.A.* 12A:2–302(1).]

The Code's official comments, intended to explain the meaning of this provision, also do not lend any great insight into what constitutes an unconscionable contract. Rather, the comment states that the "basic test" requires an examination into the general commercial background and seeks the "prevention of oppression and unfair surprise and not of disturbance of allocation of risks because of superior bargaining power."

The leading commentators refer to section 2–302 and the official comments as "unintelligible and abstract." Leff, "Unconscionability and the Code—The Emperor's New Clause, 115 U. Pa. L.Rev. 485, 488–89 (1967). Professors White and Summers observed that

**\*563** Experimentation with even a single case shows this litmus to be useless; in no sense is the comment an objective definition of the word. It is simply a string of hopelessly subjective synonyms ladened with a heavy "value" burden: **\*\*920** "oppression," "unfair," or "one-sided." [White & Summers, *supra,* at 151.]

*See also,* Spanogle, "Analyzing Unconscionability Problems," 117 U. Pa. L.Rev. 931, 942 (1969) ("The terms 'unfair surprise' and 'oppression' are no more concretely definable than the term 'unconscionable' so the Comment seems to offer slogan words rather than an explanation of the purposes behind the statute"). [11]

[11] The *Restatement (Second) of Contracts, § 208 (1981)* uses language similar to the Code. The case at hand is not governed by the Code because it concerns a contract involving a transfer of real estate and not a sale of goods. *See, N.J.S.A.* 12A–2–102. Nevertheless, because there is no reason to believe that the definition of unconscionability would have a different scope outside the parameters of the Code, it is helpful to consider the cases emanating from all areas. Indeed, section 2–302 has been fairly described by one commentator as being nothing more than a "restatement of common law." Davenport, "Unconscionability and the Uniform Commercial Code," 22 U. Miami L.Rev. 121, 123 (1967).

While this criticism may be accurate, in this court's view it erroneously suggests that the imprecise defining of unconscionability is a weakness. In short, the critics' "reproof is something too round." Shakespeare, *Henry V:* 4.1.202 (1598–99). Unquestionably the common law rule, the Code's controversial section 2–302 and the *Restatement* 's descriptions are general and abstract, but they also possess wisdom—the wisdom of understanding that the bright-line rule sought by the leading commentators is not only utterly elusive but also quite undesirable. [12] Instead, the erecting of parameters has been left to the courts to consider in light of their general experience with contract disputes and upon an understanding of the particular facts of each case. In short, the lawmakers undoubtedly anticipated that the skeletal unconscionability framework would be filled out through case-by-case determinations. While the risk of defining the doctrine through **\*564** such a case-by-case approach is the possible loss of restraint and consistency, the advantage is a device inherently governed by the particular circumstances of each case measured against

the experiences of past and present judges, the lifeblood of the common law.

12  While critical of the phrasing of 2–302 and the Code's comments, Professors White and Summers also recognize that such criticism is unrealistic: "It is not possible to *define* unconscionability. It is not a *concept,* but a determination to be made in light of a variety of factors not unifiable into a formula." White & Summers, *supra,* at 151.

## C

Raising other questions about unconscionability is the fact that this case-by-case process, which began in earnest in the mid–1960's, slowed soon thereafter. Most of the decisions of note concerning the Code's unconscionability provision took place in the District of Columbia, New York and New Jersey. Unlike the present case, those decisions generally involved contracts where, due to unsophistication or lack of education, the consumer entered into a grossly unfair agreement. White & Summers, *supra,* at 149–50. The most important of these was *Williams v. Walker–Thomas Furniture Co., 121 U.S.App.D.C.* 315, 350 *F.*2d 445 (D.C.Cir.1965), where the consumer purchased on installment a number of household items at different times. A provision in the contract cross-collateralized all past and present purchases so that no item was ever fully paid off until the last payment was made on the last item. When a default occurred the seller sought to repossess everything. The court found this unconscionable because of an "absence of meaningful choice" at the inception of the contract coupled **\*921** with contractual terms "unreasonably favorable to the other party." *Id.* at 449.

[1] [2] For the most part, the unconscionability cases follow *Williams v. Walker–Thomas* and look for two factors: (1) unfairness in the formation of the contract, and (2) excessively disproportionate terms. Professor Leff labelled these two elements as "procedural" and "substantive" unconscionability. Leff, *supra, 115 U. Pa. L.Rev.* at 487. The first factor—procedural unconscionability—can include a variety of inadequacies, such as age, literacy, lack of sophistication, hidden or unduly complex contract terms, bargaining tactics, and the particular setting existing during the contract formation process. *See, e.g.,* **\*565** *Gillman v. Chase Manhattan Bank, 73 N.Y.*2d 1, 537 *N.Y.S.*2d 787,

534 *N.E.*2d 824 1988); *Complete Interiors, Inc. v. Behan, 558 So.*2d 48 (Fla.App.), *review denied, 570 So.*2d 1303 (Fla.1990). The second factor—substantive unconscionability—simply suggests the exchange of obligations so one-sided as to shock the court's conscience. *See, e.g., State ex rel. Lefkowitz v. ITM, Inc., 52 Misc.*2d 39, 275 *N.Y.S.*2d 303 (Sup.Ct.1966) (purchase price/market value ratio approximately 2 ½ times); *American Home Improvement, Inc. v. MacIver, 105 N.H.* 435, 201 *A.*2d 886 (1964) (2 ½ times); *Toker v. Perl,* 103 *N.J.Super.* 500, 247 *A.*2d 701 (Law Div.1968), *aff'd on other grounds,* 108 *N.J.Super.* 129, 260 *A.*2d 244 (App.Div.1970) (2 ½ times).

Most courts have looked for a sufficient showing of both factors in finding a contract unconscionable. *See, e.g., Williams v. Walker–Thomas, supra; Patterson v. Walker–Thomas Furniture,* 277 *A.*2d 111 (D.C.1971); *Mobile Am. Corp. v. Howard,* 307 *So.*2d 507, 508 (Fla.Dist.Ct.App.1975); *K.D. v. Education Testing Service,* 87 *Misc.*2d 657, 386 *N.Y.S.*2d 747 (Sup.Ct.1976); *Truta v. Avis Rent A Car System, Inc.,* 193 *Cal.App.*3d 802, 238 *Cal.Rptr.* 806 (1987); *Adams v. American Cyanamid Co.,* 1 *Neb.App.* 337, 498 *N.W.*2d 577 (1992). Other courts have been satisfied merely by proof of substantive unconscionability, *i.e.,* an excessively disproportionate exchange of material promises. *See, e.g., Ahern v. Knecht,* 202 *Ill.App.*3d 709, 150 *Ill.Dec.* 660, 563 *N.E.*2d 787, 792 (1990) ("[g]ross excessiveness of price alone can make an agreement unconscionable"); *MacIver, supra,* 105 *N.H.* 435, 201 *A.*2d 886; *Frostifresh Corp. v. Reynoso,* 52 *Misc.*2d 26, 274 *N.Y.S.*2d 757 (Dist.Ct.1966), *rev'd as to damages only,* 54 *Misc.*2d 119, 281 *N.Y.S.*2d 964 (App.Div.1967); *Toker v. Perl, supra,* 103 *N.J.Super.* 500, 247 *A.*2d 701; *Toker v. Westerman,* 113 *N.J.Super.* 452, 274 *A.*2d 78 (Dist.Ct.1970).[13] Still other courts have determined that the two elements need not have equal effect but work together, **\*566** creating a "sliding scale" of unconscionability. *Funding Systems Leas. Corp. v. King Louie Intern.,* 597 *S.W.*2d 624, 634 (Mo.Ct.App.1979) ("if there exists gross procedural unconscionability then not much be needed by way of substantive unconscionability, and that the same 'sliding scale' be applied if there be great substantive unconscionability but little procedural unconscionability"); *Tacoma Boatbuilding, Inc. v. Delta Fishing Co.,* 28 UCC Rep.Serv. 26, 1980 *WL* 98403 n. 20 (W.D.Wash.1980) ("The substantive/procedural analysis is more of a sliding scale than a true dichotomy"); Spangole, *supra,* 117 *U. Pa. L.Rev.* at 950 (if a **\*922**

"court considered the terms especially harsh, only a slight procedural abuse would be necessary"); *cf., Campbell Soup Co. Wentz, supra,* 172 F.2d 80.[14]

[13] There do not appear to be any decisions where procedural unconscionability was present but not substantive unconscionability. This should not come as any surprise. No matter how the contract came about, it would be unlikely that a party would complain—or a court would listen—if the contract was otherwise fair or reasonable. It would be much like arguing about negligent conduct which failed to result in any damage.

[14] It should also be recognized that the doctrine acts as a shield against enforcement of an unreasonable contract and not as a sword on a claim for affirmative relief. *See, Lewis v. Hertz Corp.,* 181 A.D.2d 493, 581 N.Y.S.2d 305 (1st Dept.), *app. dis.,* 80 N.Y.2d 893, 587 N.Y.S.2d 909, 600 N.E.2d 636 (1992).

**D**

In *Kugler v. Romain,* 58 N.J. 522, 279 A.2d 640 (1971), the Court considered the validity of contracts for the door-to-door sale of education books and materials for two and a half times a reasonable price. Speaking for the Court, Justice Francis observed, as discussed earlier, that unconscionability is not defined by the Code, and described unconscionability as

an amorphous concept obviously designed to establish a broad business ethic. The framers of the Code naturally expected the courts to interpret it liberally so as to effectuate the public purpose, and to pour content into it on a case-by-case basis. In that way a substantial measure of predictability will be achieved and professional sellers of consumer goods as well as draftsmen of contracts for their sale to ordinary consumers will become aware of the abuses the court have declared unacceptable and will avoid them. The intent of the clause is not to erase the doctrine of freedom of contract, but to make realistic the assumption of the law that the agreement has resulted from real bargaining between parties who had freedom of choice and understanding and ability to negotiate in a meaningful fashion. Viewed in that sense, freedom to contract survives, but marketers of **\*567** consumer goods are brought to an awareness that the restraint of unconscionability is always hovering over their

operations and that courts will employ it to balance the interests of the consumer public and those of the sellers.

[*Id.* at 543–44, 279 A.2d 640.]

While the Court did not refer to procedural and substantive unconscionability in those terms, there is little question but that the Court acknowledged the importance of both: "We have no doubt that an exorbitant price ostensibly agreed to by a purchaser of the type involved in this case—but in reality unilaterally fixed by the seller and not open to negotiation—constitutes an unconscionable bargain from which such a purchaser should be relieved." *Id.* at 544–45, 279 A.2d 640. Within that statement, the Court included not only the need for proof of an "exorbitant price" but also the presence of a "purchaser of the type involved in this case" (*i.e.,* a financially distressed person), and a contract "unilaterally fixed" and "not open to negotiation." In short, the Court clearly included both the procedural and substantive unconscionability concepts.

Since *Kugler v. Romain,* nothing has emanated from our courts, by way of published decisions, which would suggest any change or modification in that approach. Rather, the courts have repeatedly emphasized that a case-by-case approach would "pour content" into the meaning of "unconscionability." *Meshinsky v. Nichols Yacht Sales, Inc.,* 110 N.J. 464, 472, 541 A.2d 1063 (1988); *Associates Home Eq. Servs. v. Troup,* 343 N.J.Super. 254, 278, 778 A.2d 529 (App.Div.2001).

The one aspect which went unmentioned in *Kugler v. Romain* was whether the two factors of procedural and substantive unconscionability operate on the sliding scale **\*\*923** suggested by a few courts (and mentioned above). There is a good deal of sense to the adoption of such an approach. The clear import of the doctrine of unconscionability has been its flexibility or, as Justice Francis said in *Kugler v. Romain,* its "amorphous" nature. 58 N.J. at 543, 279 A.2d 640. That being so, this court fails to see why such a claim should be barred if some unknown barrier for both factors is not surpassed instead of allowing such a claim to succeed when one factor is greatly exceeded, while the other only marginally so.

**\*568 III**

WESTLAW © 2018 Thomson Reuters. No claim to original U.S. Government Works.

Against this flexible standard, the court must canvass the factual record to determine whether the option contract was the product of both procedural and substantive unconscionability. Since the factual contentions of the parties are not in dispute—except for the ultimate fact as to whether this contract was unconscionable—and since both parties acknowledged during oral argument they had no other facts or information to provide on this issue, the matter is ripe for summary judgment. [15]

[15]    As noted earlier, the Code leaves the question of unconscionability to the court's determination. It is not clear whether this is also true when the contract, as here, is not governed by the Code. This is undoubtedly so because the issue normally arises in matters where rescission or some other equitable remedy is sought and, thus, in actions brought in chancery courts where the judge is both the trier of the law and the trier of the facts. Indeed, because this action is also a non-jury chancery matter, this court need not decide whether a finding of unconscionability is for the judge or a jury to decide.

### A

[3]    The concept of procedural unconscionability arises in this case in an unusual way. That is, Mrs. Ropes' situation does not fit the pattern seen in most of the cases cited above. She was not financially vulnerable nor does it appear she was either illiterate or of limited education. But, the events in question came immediately upon her husband's unexpected death and, thus, it is fair to say that Mrs. Ropes was vulnerable to an unfair transaction, albeit in a different sense from the consumer in *Williams v. Walker–Thomas* and most other such cases. Certainly, the law, [16] and particularly courts of equity, [17] have shown special solicitude to persons of Mrs. Ropes' age and situation.

[16]    *See, e.g., N.J.S.A.* 52:27G–1.

[17]    *See, e.g., Bergen Eastern Corp. v. Koss,* 178 *N.J.Super.* 42, 427 *A.*2d 1132 (App.Div.), *app. dis.,* 88 *N.J.* 499, 443 *A.*2d 713 (1981).

**\*569** Also, while it may have been her own voluntary way of approaching the sale of her Brielle property, Mrs. Ropes was not directly involved in the transaction because she had given a power of attorney to Ms. Van Noord. While it is recognized that the question of Mrs.

Ropes' competency or vulnerability to influence cannot be resolved on this motion, the fact that more than one power of attorney was executed at the same time [18] adds further procedural irregularities to the transaction. In addition, while Sitogum had the assistance of counsel (indeed, Sitogum appears to be made up of a consortium of attorneys), neither Mrs. Ropes nor Ms. Van Noord appeared to have received any sound advice from counsel. While counsel on the Cayman Islands assisted in the preparation and execution of certain documents, **\*\*924** there admittedly was no advice rendered as to the appropriate steps to be taken in securing the highest and best price. And the rationale behind simultaneously appointing two different attorneys-in-fact, as occurred here, both with the power to sell the same property on Mrs. Ropes' behalf—with the potential for different contracts concerning the same property—has not been explained or justified.

[18]    According to Ms. Van Noord, "on or about January 13, 2000, a Power of Attorney, separate documents, one to me and one to Linda Dowhan were prepared by Mr. Broadbent and signed by Phyllis Ropes. These Powers of Attorney were signed before the Will was signed and again were given to both myself and Linda Dowhan."

After communications with a Florida attorney regarding the sale of the Brielle property, Ms. Van Noord received yet another form of a power of attorney and a proposed option contract. Ms. Van Noord claims to have brought these papers to Mrs. Ropes, who "appeared to be nervous but certainly seemed to know what she was doing and what she wanted to do." A few days later, according to Ms. Van Noord, she received a telephone call from Mrs. Ropes indicating that she wanted to sell the property. They both went to the office of a second Cayman Islands attorney. No explanation has been offered to explain why they did not return to **\*570** the Cayman Islands attorney they saw a few days earlier. Mrs. Ropes signed yet another power of attorney, apparently in the form proposed by Sitogum's Florida attorney. For reasons, also not explained, Ms. Van Noord did not then sign the option contract but did so the next day. [19] Ms. Van Noord then sent both the January 25 power of attorney and the January 26 option contract to the Florida attorney. In the same time frame, Mrs. Ropes' other attorney-in-fact reached an agreement with a different buyer.

19  The name of the witness to Ms. Van Noord's signature on the option contract is not indicated and the signature indecipherable.

So many questions arise from these events. Most notable is the curious fact that Mrs. Ropes did not sign the option contract, but only signed a power of attorney which authorized Ms. Van Noord to sign the option contract. Why would she first sign a power of attorney in favor of Ms. Van Noord on one day, in the presence of an attorney, allowing Ms. Van Noord to sign an option contract the next day, apparently outside the presence of an attorney, when, according to Ms. Van Noord, the option contract had already been seen and reviewed by Mrs. Ropes? Clearly, if Ms. Van Noord's version is accurate, the events in question must be found to be quite irregular. And, most incredibly, nearly all these events appeared to occur in the presence of attorneys apparently engaged to assist in Mrs. Ropes' efforts to sell the Brielle property. Accepting as true all the facts asserted by Sitogum in opposition to this motion, the court must conclude that the transactions in question, leading up to the creation of the option contract, were most unusual and made in the absence of the meaningful representation of counsel. Neither Mrs. Ropes nor those acting on her behalf obtained the type of zealous and careful advocacy required by aged persons or, for that matter, any other person in Mrs. Ropes' situation.[20] While the present record does **\*571** not yet suggest sufficient irregularity about the procedural events as to rise to the level of fraud, at best Mrs. Ropes' attorney-in-fact exhibited only some desultory interest in obtaining fair value for the property. The court is satisfied that a sufficient degree of procedural **\*\*925** unconscionability is present to permit examination into the substantive fairness of the contract.

20  The court does not find that Mrs. Ropes' apparent carelessness regarding the marketing of the property in this fashion (assuming, *arguendo,* it came about through carelessness or foolishness and not some lack of capacity) an obstacle to the application of the doctrine of unconscionability. *Accord, Fotomat Corp. of Florida v. Chanda,* 464 So.2d 626 (Fla.App.1985).

**B**

[4]  Most startling about this transaction is the size of the purchase price locked in by the option contract. As indicated, Ms. Van Noord entered into the option contract without having engaged professional assistance for determining the value of the Brielle property. As a result, the price set by the option contract was $800,000, a figure apparently discussed and considered by Mrs. Ropes' husband prior to his untimely death. However, as later revealed, the Brielle property's true value was approximately twice that amount. An appraisal rendered by Diane Turton Realtors, at the request of Mrs. Ropes' current counsel, opined that the value of the property ranged between $1,500,000 and $1,750,000 and, in fact, the property was ultimately sold for $1,500,000. The great disparity between the $800,000 at which Sitogum had gained the right to purchase the property for and the later appraisal and the ultimate sale of the property to others for nearly twice that much demonstrates the substantive unconscionability of the option contract.

In seeking to defeat the claim of substantive unconscionability, Sitogum observes that Ms. Van Noord believed Mrs. Ropes was more concerned about disposing of the property than the price. In her answers to interrogatories, Ms. Van Noord swore to the following facts:

**\*572**  [Mrs. Ropes] was adamant that she wanted the "Brielle property off my back." [Ms. Van Noord] counseled [Mrs. Ropes] in the presence of everyone to not do anything rash, to be patient. [Mrs. Ropes] kept stating that she wanted the property off her back, regardless of the content of house—regardless of the price—just sell it. [Ms. Van Noord] accompanied [Mrs. Ropes] to at least three or four meetings with Mr. Broadbent [the first of the two Cayman Island attorneys mentioned earlier]. During each of those conversations, I remember that there was a desire by [Mrs. Ropes] to get rid of, to just sell the Brielle property in New Jersey.

If those facts are true—as the court presently assumes—it becomes apparent that Ms. Van Noord did not act consistently with that goal. Not only did she obligate Mrs. Ropes to sell for approximately half the property's value, but she failed to "get the property off" Mrs. Ropes' back. Instead, Ms. Van Noord entered into an option contract which had the potential of tying up the property for eight months, without any guarantee of it actually being sold. Within that eight month period, Sitogum could unilaterally determine whether it would purchase the property; if Sitogum chose to walk away, Mrs. Ropes would be left where she started. And, if Sitogum decided to purchase within the initial eight month period, the

transaction need not actually occur for yet another 90 days. [21] So, the result of the option contract was to require Mrs. Ropes to potentially **\*\*926** wait for as long as 11 months to be "rid" of the property at an unreasonably low price. The contention that this option contract is not unconscionable because Mrs. Ropes allegedly did not care about the price (so long as it was at least $800,000) if the property could be gotten rid of quickly is proved fallacious in light of the terms of the option contract. And the option contract appears all the more unconscionable when **\*573** it is observed that Mrs. Ropes received no consideration for tying up the property for potentially eight months (and possibly eleven months) if Sitogum ultimately decided to purchase because the option payments—which were either never sent, sent but not received, or received by Ms. Van Noord but lost, purloined, or at least never given to Mrs. Ropes [22]—were to be deducted from the purchase price. On the other hand, if Sitogum determined not to exercise the option, then Mrs. Ropes would only have benefitted to the meagre tune of $1000 per month, [23] and still would not have been rid of the property.

[21]    The option contract, prepared by Sitogum's representatives, does not indicate precisely when Sitogum would be obligated to tender the purchase price. It does say that the option must be exercised within eight months, but it also states that the option is exercised by Sitogum "giving optionor written notice thereof, signed by optionee, before the time herein set for expiration." The contract then indicates that Mrs. Ropes would be obligated to deliver a warranty deed "[w]ithin 90 days after receipt of such notice." Without clarity as to the time for the tender of the purchase price, Mrs. Ropes was further faced with the potential that the purchase price might not be tendered for approximately 11 months from the formation of the option contract.

[22]    Ms. Van Noord indicates in her answers to interrogatories that she "was recently advised that

a check for $6,000.00 was sent to my home in the Cayman Islands. This check was never received by me. At the time this check was allegedly sent, the condominium association where I lived was going under new management and the post office address for the old association changed. This is the only reason I can think of that I did not receive this check."

[23]    Paragraph 4 of the option contract states: "If optionee purchases the property described in this option, and under the terms and conditions hereof, the consideration paid for this option shall be applied to the purchase price."

While the existing case law does not precisely define what exchange of promises might be classified as "substantively unconscionable," certainly a price $700,000 less than what the property ultimately sold for meets this court's definition of unconscionability.

## IV

For the foregoing reasons, Mrs. Ropes' motion for summary judgment will be granted, declaring the option contract void *ab initio*. While questions about the unconscionability of contracts normally would suggest the presence of factual disputes, it seems clear, in accepting the truth of Sitogum's allegations and in light of the parties' acknowledgement that there are no other sources of factual information known to them, that summary judgment is available at this stage of the litigation. This seems particularly **\*574** true considering the fact that determinations of unconscionability are matters left exclusively to the court for resolution.

An appropriate order has been entered.

## All Citations

352 N.J.Super. 555, 800 A.2d 915

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

1993 WL 44600
Only the Westlaw citation is currently available.

SEE COURT OF APPEALS RULES 11 AND 12

Court of Appeals of Tennessee,
Western Section at Jackson.

April WALLACE, Vickie Gwin,
et al, Plaintiffs-Appellants,
v.

NATIONAL COMMERCE BANCORPORATION,
Union Planters National Bank, First Tennessee
Bank National Association, United American
Bank of Memphis, Boatmen's Bank of Tennessee,
First American National Bank, Bank of Bartlett,
Leader Federal Bank for Savings, and Sovran
Bank/Tennessee, Defendants-Appellees.

Feb. 23, 1993.

Appeal from the Circuit Court of Shelby County, C.A.
No. 02A01-9205-CV-00143; James M. Tharpe, Judge.

**Attorneys and Law Firms**

Thomas & Thomas, P.C., Memphis by Al H. Thomas
and Ira M. Thomas, Neely, Green, Fargarson & Brooke,
Memphis by Robert L. Green, for appellants.

David Wade, J. Richard Buchignani, Memphis, H.
Frederick Humbracht, Jr., Nashville, Frank J. Glankler,
Jr., John C. Speer, Robert E. Craddock, Jr., Memphis,
J.O. Bass, Jr., Nashville, Bill R. Hester, Memphis, for
appellees.

**Opinion**

CRAWFORD, Judge.

*1 Plaintiffs appeal from the order of the trial court
dismissing their complaint [1] for failure to state a
claim upon which relief can be granted pursuant to
Tenn.R.Civ.P. 12.02. Thirty-six named plaintiffs filed
suit against nine defendant banks for relief from alleged
excessive fees charged by the defendants for insufficient
funds checks, and for processing third party checks
deposited by the plaintiffs to their accounts which were
subsequently returned unpaid by the maker's bank.

[1] This is the third amended complaint, and although
this complaint and superseded complaints were filed
as class actions pursuant to Tenn.R.Civ.P. 23, there
has been no compliance with the Tenn.R.Civ.P. 23.03
to authorize the maintenance of the action as a class
action.

Appellants' issue for review is whether the trial court
erred in dismissing the complaint. Since there has been
no compliance with Tenn.R.Civ.P. 23.03, and class action
status has not been granted, we are required to determine
if the complaint states a claim for relief by any of the
plaintiffs against any of the named defendants. *Bohlinger
v. American Credit Co.,* 594 S.W.2d 710 (Tenn.App.1979).

In reviewing an appeal from an order dismissing a suit for
failure to state a claim upon which relief can be granted,
we are obviously limited to the allegations in the complaint
and we must construe the complaint liberally in favor of
the plaintiffs, taking all of the allegations of fact therein
as true. *HMF Trust v. Bankers Trust Co.,* 827 S.W.2d 296
(Tenn.App.1991).

The complaint alleges that each of the plaintiffs
maintains a checking account in one or more of the
defendants' banks and have been charged "processing
charges" (hereinafter NSF charges) for checks they have
written on the accounts which were both honored and
not honored when the account had insufficient funds to
cover the checks. They also allege that they have been
charged a processing or NSF charge by their own bank for
deposits of third party checks in their account which were
not honored by the maker's bank because of insufficient
funds.

Count I of the complaint avers that defendants conspired,
arranged, combined or agreed to fix the NSF fees
charged to the plaintiffs for the insufficient fund checks
heretofore described. They aver "[t]hat such acts of price
manipulation amounts [sic] to unfair and deceptive trade
practices and in violation of state laws governing such
practices, and more specifically, T.C.A. §47-18-101 et seq.,
including, but not limited to, § 47-18-104(15) and (26)."

Count II avers that although the signature card signed
by the plaintiffs at the various defendant banks states
that the signer agrees to the terms of the bank deposit
agreement and acknowledges receipt of a copy of the
agreement, plaintiffs were "rarely" furnished a copy of the
deposit agreement. This count further avers that neither

the deposit agreement, nor the signature card, sets out the specific amount to be charged for NSF checks. It is averred that the bank, through its employees, misled and deceived plaintiffs into believing that the signature card is for identification of signature purposes only. They further aver that because of the bank's superior bargaining position they are compelled by the bank to sign the signature card and have no alternative means of obtaining such services. They allege that NSF charges are automatically deducted without any advance notice, sometimes done in error by the bank, and sometimes causing the customer to have an insufficient balance in the account to honor future checks. Plaintiffs allege that the NSF charge bears no reasonable relationship to the defendant bank's costs in processing the transaction although banks lead the plaintiffs to believe that these charges are assessed to cover extraordinary services, when in fact the charge is itself a penal charge. Plaintiffs allege that these practices on the part of the defendant banks are deceptive and unfair and in violation of state laws, "specifically, T.C.A. § 47-18-101 et seq., including, but not limited to, § 47-18-104(15) and (26)."

**\*2** Count III alleges that the NSF charge to the plaintiffs is a penalty and is arbitrary and capricious and bears no relationship to the actual cost incurred by the defendant handling the transaction. They aver that the signature card is a type of contract of adhesion which is unconscionable and oppressive and should not be enforced because the banks have an obligation to deal fairly, reasonably and in good faith with their customers, the plaintiffs herein. Plaintiffs further allege that the defendant banks do not fairly contract with their customers, that the customer has a "take it or leave it" choice in opening an account and the plaintiffs-customers are left with the impression that the bank will deal fairly and reasonably with them in charging the fee for services. They allege that the charges actually imposed are excessive and unconscionable and a breach of the bank's common law contractual obligation to deal with their customers fairly and in good faith.

Count IV of the complaint incorporates the language of Count III and further claims that the fees charged are arbitrary and capricious and amount to a breach of the statutory obligation to deal with the customers fairly and in good faith as required in the Uniform Commercial Code, T.C.A. § 47-1-101 et seq.

Count V alleges that defendant banks waive the NSF charges for preferred customers, thereby shifting the costs from those preferred customers to others, such as the plaintiffs. They allege that this is a deceptive and unfair practice, in violation of T.C.A. § 47-18-101 et seq., including but not limited to § 47-18-104(15) and (26)."

Count VI alleges that the NSF charge is an unfair penalty and is disguised interest which is usurious in violation of T.C.A. § 47-14-101 et seq.

Plaintiffs seek both compensatory and punitive damages, reasonable attorney fees and expenses, and treble damages as provided by T.C.A. § 47-18-109(3).

The complaint is premised on a business relationship established between plaintiffs on the one hand, and the applicable defendant banks on the other, pursuant to a depositor's agreement which is activated by the plaintiff-depositor's executing a signature card. Count II of the complaint alleges that the bank misleads and deceives the customer into believing that the signature card is for "identification of signature" purposes only. Allegations of deception or misleading are in essence allegations of fraudulent conduct and the circumstances constituting fraud must be stated with particularity in the complaint. Tenn.R.Civ.P. 9.02. Count II does not comply with the rule. This count also infers that the defendant banks procured the plaintiffs' signatures on the card without explaining the ramifications of the contract between the parties. It is averred that the bank's activities constitute a violation of the Tennessee Consumer Protection Act, T.C.A. § 47-18-104(15) and (26). The trial court, in holding that this count of the complaint did not state a claim upon which relief can be granted, noted that T.C.A. § 47-18-104(15) relates to servicing of goods as defined in the act and has no bearing on the case at bar. We agree with the trial court. Moreover, in the unreported decision of *Commerce Federal Savings Bank v. Parten,* Nos. C.A. 1235, 1236, 1237 (Tenn.App. at Knoxville, filed March 17, 1989), the Court had before it the issue of whether the bank violated the Tennessee Consumer Protection Act by not explaining the terms of a guaranty agreement before it was executed. The Court, in affirming the dismissal of the case by the trial court, said:

> **\*3** We find nothing in the act which proscribes the inaction of the lender, on one hand, or requires it to explain the legal ramifications of

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

commercial documents, on the other
hand.

*Id.* It has long been the law in this state that a person
signing a written document has the duty to inform himself
of the contents thereof and will not be allowed to avoid it
by showing that he was ignorant of its contents or failed
to read it. *Evans v. Tillett Bros. Const. Co.,* 545 S.W.2d 8
(Tenn.App.1977). In considering the allegations of Count
II of the complaint in their most favorable light, we agree
with the trial court that the allegations fail to state a claim
upon which relief can be granted.

The trial court found that Counts III and IV fail to state a
cause of action, because although these are defenses upon
which a court may refuse to enforce a particular contract,
they do not form the basis for affirmative relief. We agree
with the trial court in one respect, but disagree in another.
As to the unconscionability claim, we agree with the trial
court that this is a defense to enforcement of a contract.
Although we have been unable to find any Tennessee cases
directly on point, we agree with the decisions in *Sanders
v. Colonial Bank of Alabama,* 551 So.2d 1045 (Ala.1989)
and *Cowen Equipment Co. v. General Motors Corp.,* 734
F.2d 1581 (11th Cir.1984), which hold that the doctrine
of unconscionability is not available to obtain affirmative
relief, but is available only as a defense.

As to the action based on good faith, it has been held that
there is no cause of action in tort for the breach of duty
of good faith. *Solomon v. First American Nat'l Bank,* 774
S.W.2d 935 (Tenn.App.1989); *Chandler v. Prudential Ins.
Co.,* 715 S.W.2d 615 (Tenn.App.1986).

Insofar as plaintiffs' action for breach of the duty of good
faith is based on tort, the trial court correctly found a
failure to state a claim. Although plaintiffs, in their brief,
have explicitly denied a contract existed between them and
the banks, they also have asserted breach of contractual
obligations, which in the complaint could be considered a
permissible alternative pleading. Giving the complaint the
liberal construction which, at this stage, we are required
to do, we discern a claim for a breach of the banks'
contractual duty of good faith in their performance of
the contracts. "Every contract imposes upon each party
a duty of good faith and fair dealing in its performance
and enforcement." *Covington v. Robinson,* 723 S.W.2d
643, 645 (Tenn.App.1986) (citing Restatement (Second) of
Contracts § 205 and 17 Am.Jur.2d Contracts § 256).

In the absence of precise Tennessee authority, we have
been cited for our guidance to two cases from other
jurisdictions. In *Best v. United States Nat'l Bank,* 739
P.2d 554 (Or.1987), the Court after noting that under
Oregon law "there is an obligation of good faith in the
performance and enforcement of every contract," held,
"This obligation limited the Bank's apparently unlimited
authority to set NSF fees, and the depositors can recover
for the breach of this obligation just as they could for the
breach of any other contractual obligation." 739 P.2d at
557. To the same effect, see *Perdue v. Crocker Nat'l Bank,*
702 P.2d 503 (Cal.1985).

**\*4** In view of the clear duty of good faith and fair
dealing in the performance of every contract which is a
part of our jurisprudence, we can find no reason that
an action for affirmative relief such as the one before
us cannot be maintained. We note that the foundation
of such an action is an agreement between the parties,
which apparently in this instance is the signature card
incorporating the depositor's agreement. Plaintiffs have
failed to comply with Tenn.R.Civ.P. 10.03 regarding a
claim founded upon a written contract. However, the
averments of the complaint concerning the substance
of the depositor's agreement meet the bare minimum
requirements to premise the allegation of breach of the
duty of good faith in the performance of the contract.

We construe the allegations of the complaint and
specifically Count III therein to allege that defendant
banks breached the common law contractual obligation
to deal in good faith in the performance of the contract.
Accordingly, we hold that a claim upon which relief can
be granted is stated.

In Count IV, plaintiffs rely upon the Uniform Commercial
Code provision, T.C.A. § 47-1-203, which imposes an
obligation of good faith. This reliance is misplaced
because this statute is specifically applicable only to the
contracts or duties within chapters 1 through 9 in the
Uniform Commercial Code, none of which are relevant
to the claim in this complaint. The trial court correctly
dismissed the case as to Count IV.

The trial court held that Count VI of the complaint failed
to state a claim because the usury statute applies only to
loans. Plaintiffs do not contest this ruling, but contend
that the trial court did not consider their allegation that
the bank's charges amount to a penalty for a breach

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

of a contract. Contrary to the previous allegations that the bank has breached a contract, this allegation is that plaintiffs have breached the contract. As we previously noted, plaintiffs have failed to comply with Tenn.R.Civ.P. 10.03, and thus we do not have the benefit of the terms of the contract. The complaint itself fails to provide sufficient information concerning the contract as to plaintiffs' duties in the performance thereof. As heretofore noted, the complaint alleges that the NSF charges made by the banks was a breach of the duty of good faith in the performance of the contract and we interpret the allegation in this Court that the charge was a penalty duplicitous of the allegation of breach of duty of good faith. The allegation of Count VI as framed is based on the usury statute and the trial court correctly found a failure to state a claim.

The plaintiffs have presented no argument concerning the trial court's dismissal of Counts I and V of the complaint and have waived the issues insofar as these counts are concerned. We note, however, upon examination of Counts I and V together with the complaint as a whole, we concur in the trial court's ruling.

The final issue for review is presented by appellee-whether the trial court erred in finding that the plaintiffs' action is not barred under the doctrine of federal preemption.

**\*5** In *Watson v. Cleveland Chair Co.,* 789 S.W.2d 538 (Tenn.1989), our Supreme Court said:

> The supremacy clause of Art. VI of the Constitution provides Congress with the power to preempt state law. Preemption occurs when Congress, in enacting a federal statute, expresses a clear intent to preempt state law, *Jones v. Rath Packing Co.,* 430 U.S. 519, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977), when there is outright or actual conflict between federal and state law, e.g., *Free v. Bland,* 369 U.S. 663, 82 S.Ct. 1089, 8 L.Ed.2d 180 (1962), where compliance with both federal and state law is in effect physically impossible, *Florida Lime and Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963), where there is implicit in federal law a barrier

to state regulation, *Shaw v. Delta Airlines, Inc.,* 463 U.S. 85, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983), where Congress has legislated comprehensively, thus occupying an entire field of regulation and leaving no room for the States to supplement federal law, *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947), or where the state law stands as an obstacle to the accomplishment and execution of the full objectives of Congress. *Hines v. Davidowitz,* 312 U.S. 52, 61 S.Ct. 399, 85 L.Ed. 581 (1941). Preemption may result not only from action taken by Congress itself; a federal agency acting within the scope of its congressionally delegated authority may preempt state regulation. *Capital Cities Cable, Inc. v. Crisp,* 467 U.S. 691, 104 S.Ct. 2694, 81 L.Ed.2d 580 (1984). See *Louisiana Public Service Commission v. FCC,* 476 U.S. 355, 106 S.Ct. 1890, 1899, 90 L.Ed.2d 369 (1986).

789 S.W.2d at 542.

The National Bank Act created the office of comptroller of the currency who is authorized to administer the act and to prescribe rules and regulations. 12 U.S.C. §§ 1, 93 a and 21 et seq. (1989). Defendant banks rely upon an interpretative ruling of the Comptroller codified at 12 C.F.R. § 7,8000 (1992) which states in pertinent part:

(a) All charges to customers should be arrived at by each bank on a competitive basis and not on the basis of any agreement, arrangement, undertaking, understanding or discussion with other banks or their officers.

(b) Establishment of deposit account service charges, and the amounts thereof, is a business decision to be made by each bank according to sound banking judgment and federal standards of safety and soundness. In establishing deposit account service charges, the bank may consider, but is not limited to considering:

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

(1) Costs incurred by the bank, plus a profit margin, in providing the service.

(2) The deterrence of misuse by customers of banking services;

(3) The enhancement of the competitive position of the bank in accord with the bank's marketing strategy;

(4) Maintenance of the safety and soundness of the institution.

(c) A national bank may establish any deposit account service charge pursuant to paragraphs (a) and (b) of this section notwithstanding any state laws which prohibit the charge assessed or limit or restrict the amount of that charge. Such state laws are preempted by the comprehensive federal statutory scheme governing the deposit-taking function of national banks.

**\*6** The bank defendants argue that this regulation clearly evidences the intent to preempt any state law or proceeding which would affect the deposit account charges made by the banks. This same argument was made in the previously cited case of *Best v. United States Nat'l Bank,* 739 P.2d 554 (Or.1987), which was a class action by depositors challenging the validity of the bank's service charge for processing insufficient fund checks. The Oregon Supreme Court, in responding to the bank's argument, said:

Congress did not intend, however, that national banks would be regulated exclusively by the federal government. "[N]ational banks are subject to state laws, unless those laws infringe the national banking laws or impose an undue burden on the performance of the banks' functions." *Anderson National Bank v. Luckett,* 321 U.S. 233, 248, 64 S.Ct. 599, 88 L.Ed. 691 (1944) (state abandoned property law not preempted with respect to deposits in national banks); *see also Franklin National Bank,* 347 U.S. at 378 n. 7, 74 S.Ct. at 554 n. 7. In particular, the contracts of national banks have always been governed and construed by state laws, at least insofar as those laws have been of general application and have not been in conflict with federal law. *See Davis,* 161 U.S. at 290, 16 S.Ct. at 506; *National Bank v. Commonwealth,* 76 U.S. (9 Wall) 353, 362, 19 L.Ed. 701 (1870). We do not perceive, then, that Congress intended national banks, as a general

matter, to be free of state-imposed obligations of good faith in the performance of contracts. The question remains, however, whether the obligation of good faith is preempted with respect to the specification of NSF fees.

In response to inquiries by Congress and national bank officials in the early 1960s, the Comptroller of the Currency took the position that bank account service fees were to be determined by individual banks on the basis of their costs and competitive position. The Comptroller has continued to adhere to this position. *See* 48 FedReg 54319 (December 2, 1983); 12 CFR § 7.8000 (1972); 12 CFR § 7.2 (1963)....

As an interpretive rule promulgated without notice and comment under 5 U.S.C. § 553, 12 CFR § 7.8000 does not have the force and effect of law. *See Chrysler Corp. v. Brown,* 441 U.S. 281, 312-16, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979). Nonetheless, an interpretive ruling "is entitled to deference unless it can be said not to be a reasoned and supportable interpretation of the act" upon which it is based. *Whirlpool Corp. v. Marshall,* 445 U.S. 1, 11, 100 S.Ct. 883, 63 L.Ed.2d 154 (1980); *cf. Bureau of Alcohol, Tobacco & Firearms v. FLRA,* 464 U.S. 89, 97-98 & n. 8, 104 S.Ct. 439, 78 L.Ed.2d 195 (1983) (courts should uphold reasonable and defensible constructions of an agency's enabling act but should not permit the unauthorized assumption of an agency of major policy decisions properly made by Congress).

We do not believe that the depositors' good faith claim is inconsistent with the Comptroller's interpretation of the National Bank Act. The Comptroller's interpretation would preempt only those "state laws which prohibit the charge assessed or limit or restrict the *amount* of that charge." 12 CFR § 7.8000(c) (1987) (emphasis added). The depositors' good faith claim, as it now stands, does none of these things. The Bank's obligation to set its NSF fees in good faith obviously does not prohibit it from charging NSF fees. In addition, the obligation does not of itself impose any particular limit on the amount that the Bank may charge. The obligation requires only that the Bank charge an amount that is within the reasonable expectations of the depositors. So long as the Bank take steps to ensure that the amount is within those expectations, it could set the fee at any amount it wished. The obligation of good faith, then,

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

does not limit the *amount* of the Bank's NSF fee, but only the contractual procedure by which it is set.

**\*7** Given the historical application of state contract law to national banks, the Comptroller's interpretation would make little sense if it freed national banks from contractual limits on their ability to charge NSF fees. Contractual limits are essentially limits that national banks impose upon themselves. The state acts only to enforce the agreement of the parties....

We conclude that neither Congress nor the Comptroller has precluded the depositors' good faith claim as it now stands. What the National Bank Act forbids is state regulation of account service fees. It does not free national banks from state contract law that enforces only the reasonable contractual expectations of the bank and its depositors. This is not to say that the Comptroller could not preempt the application of state contract law to bank service charges if the Comptroller wished to do so. That issue, however, is not before us.

739 P.2d at 560-563. *See also Perdue v. Crocker Nat'l Bank,* 702 P.2d 503 (1985) (Holding that California law requiring that processing charges not be unreasonable or unconscionable is not preempted by federal law).

The Oregon Supreme Court in *Best* has with clarity and perception analyzed the preemption doctrine as applicable to the instant case. We find the analysis to be quite persuasive, not contrary to the law in this state, and should be adopted as dispositive of the issue before us. The trial court did not err in holding that there was no federal preemption.

In summary, the order of the trial court dismissing the complaint as to defendant United American Bank of Memphis is affirmed, because no claim of any kind is stated against this defendant. The order of the trial court dismissing the complaint as to Count III is vacated, and the order in all other respects is affirmed. The case is remanded for such further proceedings as may be necessary. Costs of the appeal are assessed against the appellees.

TOMLIN, P.J. (W.S.), and HIGHERS, J., concur.

**All Citations**

Not Reported in S.W.2d, 1993 WL 44600

---

**End of Document**

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Declined to Follow by Villate v. Southport Bank, Ill.App. 1 Dist., July
31, 2014

2006 WL 6676801
Only the Westlaw citation is currently available.
United States District Court,
W.D. Tennessee,
Western Division.

Barbara WILLINGHAM, Plaintiff,

v.

NOVASTAR MORTGAGE, INC., et al., Defendants.

No. 04–CV–2391.
|
Feb. 7, 2006.

**Attorneys and Law Firms**

Sapna V. Raj, Susan L. Ratner, Webb A. Brewer,
Memphis Area Legal Services, Inc., Memphis, TN, for
Plaintiff.

Worldwide Mortgage Corporation, Memphis, TN, pro se.

Home Tech Services Co., Inc., Memphis, TN, pro se.

Memphis Financial Services, Inc., Memphis, TN, pro se.

Christopher S. Campbell, John L. Ryder, Harris Shelton
Dunlap Cobb & Ryder, John S. Golwen, Kristen C.
Wright, Mary Hovious Stout, Bass Berry & Sims PLC,
Virginia Patterson Bozeman, W. Timothy Hayes, Jr., The
Hardison Law Firm, Memphis, TN, for Defendants.

Earnest Wells, Memphis, TN, pro se.

Chandra Wells, Memphis, TN, pro se.

Nina Townes, Memphis, TN, pro se.

**ORDER GRANTING IN PART AND DENYING
IN PART THE MOTION OF NOVASTAR
MORTGAGE, INC TO DISMISS; AND GRANTING
PLAINTIFF LEAVE TO AMEND THE COMPLAINT**

BERNICE BOUIE DONALD, District Judge.

**\*1** Before the Court is the motion (dkt.# 35) of NovaStar
Mortgage, Inc. ("NovaStar" or "Defendant") to dismiss

the complaint of Barbara Willingham ("Willingham"
or "Plaintiff") pursuant to Fed.R.Civ.P. 12(b)(1) and
12(b)(6). Plaintiff alleges that Defendant violated 1)
the Racketeer Influenced and Corrupt Organizations
Act ("RICO"), 18 U.S.C. § 1961, et seq.; 2) the Fair
Housing Act ("FHA"), 42 U.S.C. § 3601, et seq.; 3)
the Truth–in–Lending Act ("TILA"), 15 U.S.C. § 1601,
et seq.; 4) the Real Estate Settlement Procedures Act
("RESPA"), 12 U.S.C. § 2601, et seq.; 5) the Equal Credit
Opportunity Act ("ECOA"), 15 U.S.C. § 1691, et seq.; and
6) the Tennessee Consumer Protection Act ("TCPA"),
Tenn.Code Ann. § 47–18–101, et seq. Plaintiff additionally
asserts state law claims for fraud, conversion, negligent
misrepresentation, breach of fiduciary duty, breach of
contract, conspiracy, and unconscionability. In this
motion, Defendant contends that the complaint should
be dismissed because Plaintiff's Chapter 13 bankruptcy
confirmation precludes her predatory lending claims in
this Court. Defendant also contends that Plaintiff has
failed to state a claim upon which relief may be granted.
This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331
and 1367. For the following reasons, the Court grants in
part and denies in part Defendants' motion to dismiss.

**I. FACTUAL ALLEGATIONS** [1]

[1] The factual allegations are taken from the complaint
and are presumed to be true for purposes of the
instant motion only.

Willingham, an African–American woman, asserts that
NovaStar, in conjunction with the remaining defendants
in this case, engaged in conduct which constituted
predatory lending practices and a predatory lending
scheme. Plaintiff contends that all Defendants acted in
concert to lure unsuspecting and unsophisticated African–
American homeowners into exploitative mortgage loans
to purportedly consolidate debt and/or finance home
repairs or home improvement work. [2]

[2] As previously noted, Plaintiff's complaint includes
claims for violations of RICO and for conspiracy.
Accordingly, the factual allegations made in the
complaint concerning all the defendants must be
examined in order to analyze NovaStar's arguments
in support of its motion to dismiss.

In support of her claims, Willingham asserts, *inter
alia,* that in May of 2001, she decided to make home
improvements and sought the assistance of Defendant

Roy Perkins ("Perkins") of Perkins Remodeling & Construction ("Perkins Remodeling"). After giving Plaintiff a $50,000 estimate for the home improvements, Perkins instructed Plaintiff to contact Defendant Memphis Financial Services to finance the repairs. Am. Compl. ¶ 27. Willingham followed Perkins' suggestion, and eventually signed a loan application with Memphis Financial Services which she alleges was blank at the time. *Id.* ¶ 28. Willingham also signed a blank contract with Perkins Remodeling while meeting with the Memphis Financial Services representative. *Id.* ¶ 30.

Before closing, Memphis Financial Services representative Sandra Wells convinced Willingham to sign up with an "Equity Savings Program" offered by Defendant Economic Advantages. Ms. Wells represented that this program would shorten the length of the loan and save the Plaintiff money. However, Wells did not disclose that Economic Advantages would charge a $500.00 fee up-front and a servicing fee each time a biweekly payment was made. Additionally, the $500.00 fee did not appear on the HUD–1 Settlement Statement ("HUD–1") that Willingham received or in the Better Business Bureau documentation.

*2 On her Notice of Right to Cancel, Plaintiff was only effectively given the date of closing to cancel. Her notice stated that the closing date was May 25, 2001 and Plaintiff was allowed until May 29, 2001 to cancel. The loan closing, however, actually took place on May 29, 2001. At closing, Willingham was told not to date any of the documents she signed and the Defendants recorded the closing date on the HUD–1 and other closing documents as May 25, 2001. At the time Willingham contacted Defendants she only owed $554.31 on her home mortgage. When the application process was finalized, her loan package consolidated unsecured debt and the home improvement loan into a mortgage loan of $40,500, though her initial request was only $30,000 to fund home repairs and remodeling. *Id.* ¶ 40.

Soon thereafter, Defendant Memphis Financial Services sold Willingham's loan to Defendant NovaStar. Loan proceeds of $40,621.77 were disbursed from NovaStar to Defendant Equity Title on May 31, 2001. Equity Title distributed the funds for Willingham's home improvement and closing services amongst the other Defendants. Plaintiff ultimately received a check for $394.54, although the HUD–1 reported that she received

$1,112.18. The statement forwarded to the Better Business Bureau by Equity Title shows that Willingham received $894.54. During August of 2001, Willingham discovered that multiple mortgage payments were being deducted from her checking account. *Id.* ¶ 83. NovaStar was directly deducting funds from Willingham's account, but Defendant Economic Advantage was also deducting funds from Plaintiff's account for the same mortgage and purportedly forwarding the payments to NovaStar. *Id.* Although Willingham requested that Economic Advantages cease withdrawals in August, 2001, the company continued its deductions until October, 2001.

In November 2003, NovaStar informed Willingham that she was $609.03 behind on payments. Willingham alleges that either NovaStar failed to properly credit her account for the amount they received, or Economic Advantages failed to forward the money it deducted to NovaStar. *Id.* ¶ 86.

On December 19, 2003, a little over two years after receiving the loan, Willingham filed a Chapter 13 bankruptcy petition in the United States Bankruptcy Court for the Western District of Tennessee. Her Chapter 13 Bankruptcy plan was confirmed on February 23, 2004. She later filed the instant action on May 24, 2004, asserting that Defendants' actions constituted predatory lending practices which resulted in violations of federal and state law. Plaintiff now seeks monetary and equitable relief from the Defendants, including NovaStar. On July 24, 2004 NovaStar filed the instant motion to dismiss.

## LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) enables a defendant to file a motion to dismiss for a plaintiff's failure to state a claim upon which relief can be granted. Motions to dismiss under Fed.R.Civ.P. 12(b)(6) are designed to test "whether a cognizable claim has been pleaded in the complaint." *Scheid v. Fanny Farmer Candy Shops, Inc.,* 859 F.2d 434, 436 (6th Cir.1988). Dismissal under Fed.R.Civ.P. 12(b)(6) is appropriate when no set of facts exists which would entitle the plaintiff to recover. *Hammond v. Baldwin,* 866 F.2d 172, 175 (6th Cir.1989). Essentially, it allows the court to dismiss meritless cases which would otherwise waste judicial resources and result in unnecessary discovery. *See, e.g., Nietzke v. Williams,* 490 U.S. 319, 326–27 (1989).

**\*3** In reviewing a defendant's Rule 12(b)(6) motion to dismiss, a district court should construe the complaint in the light most favorable to the plaintiff and determine whether the plaintiff undoubtedly can prove no set of facts in support of his claims that would entitle him to relief. *Meador v. Cabinet for Human Res.,* 902 F.2d 474, 475 (6th Cir.1990), *cert. denied,* 498 U.S. 867 (1990). If an allegation is capable of more than one inference, it must be construed in the plaintiff's favor. *Sinay v. Lamson & Sessions Co.,* 948 F.2d 1037, 1039–40 (6th Cir.1991).

A district court may not grant a defendant's Fed.R.Civ.P. 12(b)(6) motion to dismiss based on its disbelief of the plaintiff's factual allegations. *In re Sofamor Danek Group, Inc.,* 123 F.3d 394 (6th Cir.1997), *cert. denied, Murphy v. Sofamor Danek Group, Inc.,* 523 U.S. 1106 (1998). It is not the court's function to weigh evidence or evaluate the credibility of witnesses. *Miller v.. Currie,* 50 F.3d 373, 377 (6th Cir.1995). A court will not consider any disputed questions of fact at this stage. *Barnes v. Winchell,* 105 F.3d 1111, 1114 (6th Cir.1997). Rather, the court should accept all well-pleaded facts as true and not consider matters outside the pleadings. *Hammond,* 866 F.2d at 175. The United States Supreme Court has held that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46 (1957); *see also Nietzke,* 490 U.S. at 326–27; *Lewis,* 135 F.3d at 405 (6th Cir.1997). Thus, the standard to be applied when evaluating a motion to dismiss for failure to state a claim is very liberal in favor of the party opposing the motion. *Westlake v. Lucas,* 537 F.2d 857, 858 (6th Cir.1976). Even if the plaintiff's chances of success are remote or unlikely, a motion to dismiss should be denied. *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974).

## II. THEORETICAL OVERVIEW OF PREDATORY LENDING

Plaintiff asserts that NovaStar, in conjunction with its alleged co-conspirators, engaged in a predatory lending scheme that violates several state and federal laws. The particular scheme Plaintiff alleges she was lured into is usually termed "equity swapping" or "equity theft." In an equity theft scheme, borrowers are induced to receive a loan that consolidates debt, refinances debt, or finances home improvements which is designed to fail. David Medine, *Prepared Statement of the Federal Trade Commission before the House Committee on Banking and Financial Services,* May 24, 2000, *available at* http://www. ftc.gov/os/2000/05/predatorytestimony.htm. The lender and broker do not consider the borrowers ability to repay the loan or knowingly lend more than the borrower can afford to repay. U.S. HUD and U.S. Treasury Joint Report on Predatory Lending, at 2, *available at* Http:// www.hud.gov/offices/hsg/sfh/buying/ loanfraud.cfm. [hereinafter Joint Report]. The final loan is usually packed with excessive fees and charges and may include charges for nonexistent or unnecessary services. *Id.* The interest rate is usually exorbitant and accompanied by stiff prepayment penalties. U.S. HUD, Don't Be a Victim of Loan Fraud, available at http:// www.hud.gov/ offices/hsg/sfh/buying/loanfraud.cfm. Many times, when the borrower receives a loan for home improvements, the contractor is paid for services that are substandard or never completed. HUD, Joint Report, at 39. When the borrower can no longer repay the loan, the lender forecloses on the borrower's home. At the foreclosure auction, the creditor purchases the borrower's the home itself at a price below market value. *See* Duncan Kennedy, *Cost Benefit Analysis of Debtor Protection Rules in Subprime Market Default Situations,* Joint Center for Housing Studies, available at http:/ / www.jchs.harvard.edu/publications/finance/ babc/babc_04–22.pdf (explaining lender appropriation of borrower equity during foreclosure). When title clears, the home is sold at market value. These schemes are disproportionately aimed at the elderly, the disabled, and minority homeowners who have built significant equity in their home, but do not have the ability or resources to protect themselves from lending scams. HUD, Joint Report, at 71–72.

## IV. ANALYSIS

**\*4** NovaStar avers that it was not involved in a predatory lending scheme and Plaintiff has not alleged sufficient claims of federal and state law. The Court will address each of NovaStar's arguments.

### A. *Effect of Chapter 13 Proceedings*

NovaStar first asserts that confirmation of Willingham's Chapter 13 Bankruptcy plan abrogates her right to pursue her predatory lending claims under the standing, judicial estoppel, and res judicata doctrines. The Court will address each of the bankruptcy issues in this section individually.

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

### 1. Standing

NovaStar first contends that this Court should dismiss Willingham's case under Fed.R.Civ.P. 12(b)(1) because this claim is a part of the Plaintiff's bankruptcy estate and therefore the bankruptcy trustee, not Plaintiff, has standing to bring the claim. 11 U.S.C. § 541(a) states:

(a) The commencement of a case under section 301, 302, or 303 of this title creates an estate. Such an estate is comprised of all of the following property, wherever located and by whomever held:

(1) Except as provided in subsections (b) and (c)(2) of this section, *all legal or equitable interests of the debtor* in the property as of the commencement of the case.

11 U.S.C. § 541(a) (emphasis added). Section 541 therefore vests legal claims in the bankruptcy estate. The right to pursue the estate's legal claims is therefore the exclusive province of the bankruptcy trustee, and the debtor no longer has standing to pursue the claims of the estate. *Bauer v. Commerce Union Bank,* 859 F.2d 438 (6th Cir.1988).

Willingham filed her Chapter 13 petition in December, 2003. The mortgage transactions which give rise to this claim arose in 2001. Under section 541, because the legal claims existed pre petition, they become part of the debtor's bankruptcy estate, and the bankruptcy trustee has exclusive standing to pursue the estate's legal claims. *Bauer,* 859 F.2d at 441. Willingham therefore lacks standing to pursue the claims in her personal capacity.

Although Plaintiff avers that she has sought authorization from the Bankruptcy Court to pursue this action such authorization will not cure Plaintiff's standing defect. 11 U.S.C. § 327.2. Section 327.2 allows the Bankruptcy Court to appoint professionals to help carry out the trustee's duties. This section does not authorize or release the professionals to pursue the assets of the bankruptcy estate on behalf of the debtor absent orders of the court. Also, counsel for Willingham sought leave from the Bankruptcy Court to represent the Plaintiff in her personal capacity and not the bankruptcy estate. Def's Ex. 1, Application to Employ Att'y. Because the claims belong to the estate and not to Willingham, leave to represent the Plaintiff in her personal capacity would not cure the defect.

However, Plaintiff's standing defects are not incurable. The Bankruptcy Code provides for abandonment of certain property. 11 U.S.C. § 554 states:

**\*5** (a) After notice and a hearing, the trustee may abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate.

(b) On request of a party in interest and after notice and a hearing, the court may order the trustee to abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate.

11 U.S.C. § 554. Under this section, Willingham could seek to have the bankruptcy trustee abandon the predatory lending claims so that she could personally litigate them. Willingham may also seek to amend the complaint and name the bankruptcy trustee as Plaintiff.

Rule 15 of the Federal Rules of Civil Procedure provides that after a responsive pleading is served "a party may amend the party's pleading only by leave of court ... and leave shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). In the interest of justice, the Court finds that because Plaintiff's standing defects are readily curable, and because Plaintiff has already attempted, in good faith, though unsuccessfully, to cure the defect, Plaintiff has until January 29, 2006 to amend the complaint or receive authorization from the bankruptcy trustee to pursue the claim for Willingham's personal benefit.

### 2. Judicial Estoppel

Defendant next argues that Willingham's bankruptcy proceedings bar this action under the doctrine of judicial estoppel. Judicial estoppel is an equitable remedy that precludes a party from asserting a position contrary to one that the party asserted under oath in a prior proceeding, where the court adopted the contrary position. *Teledyne Indus., Inc. v. NRLB,* 911 F.2d 1214, 1217 (6th Cir.1990) (citing *Reynolds v. Comm'r of Internal Revenue,* 861 F.2d 469 (6th Cir.1988). When Willingham filed for bankruptcy protection in November of 2003, she did not list the instant predatory lending action among her disclosures. NovaStar relies on Eleventh Circuit case *De Leon v. Comcar Indus.* for the proposition that all failures to disclose legal claims require courts to dismiss a plaintiff's

claims under the judicial estoppel doctrine, regardless of inadvertence. 321 F.3d 1289 (11th Cir.2003).

However, in *Eubanks v. CBSK Fin. Group, Inc.* the Sixth Circuit counseled that judicial estoppel is not compulsory, but should be "applied with caution to avoid impinging on the truth-seeking function of the court, because the doctrine precludes a contradictory position without examining the truth of either statement." 385 F.3d 894, 899 (6th Cir.2004) (internal citations omitted). The *Eubanks* Court noted that judicial estoppel is improperly applied when omissions are the result of mistake or inadvertent conduct. *Id.* (concluding that bad faith or an attempt to mislead are necessary under the judicial estoppel doctrine).

In this case, Willingham asserts that she only became aware that her mortgage transactions were a basis for legal claims subsequent to the filing for her petition in bankruptcy. Plaintiff states that she did not consult with counsel in this case until after confirmation of her Chapter 13 plan. This Court acknowledges Plaintiff's assertion that the "arcane statutory claims" in the instant case based upon, among other things, the Racketeer Influenced and Corrupt Organizations Act and the Real Estate Settlement Procedures Act may not be readily recognizable to lay persons unlike a personal injury action where a layperson may readily recognize they that a legal claim exists, even without the assistance of counsel. Because Willingham did not seek the assistance of counsel until after her Chapter 13 confirmation, and a layperson probably would not recognize the legal claims involved in a predatory lending action as an asset for disclosure, it would be unjust to apply the equitable remedy of judicial estoppel to bar Willingham's claim without any evidence of bad faith or intent to mislead the bankruptcy court. *See Browning v. Levy,* 283 F.3d 761, 776 (6th Cir.2002) (holding that the necessity of a court finding of bad faith or attempt to mislead is consistent with the policy reasons of the judicial estoppel doctrine).

### 3. Res Judicata

**\*6** Defendant also contends that Plaintiff's claims are barred by *res judicata. Res judicata* bars parties from relitigating issues that were raised or could have been raised in previous proceedings. *Browning v. Levy,* 283 F.3d 761, 772 (6th Cir.2002). NovaStar relies on the Eleventh Circuit case of *In re Bateman* for the argument that Willingham's Chapter 13 confirmation should bar

litigation of her predatory lending claims in this Court. 331 F .3d 821 (11th Cir.2003).

The Sixth Circuit has recognized that *res judicata* can preclude claims which could have been litigated in Chapter 11 proceedings; however, this circuit has not extended the doctrine to Chapter 13 proceedings. Although NovaStar contends that this distinction is unimportant, there are critical differences between Chapter 11 and Chapter 13 bankruptcy proceedings including the role of creditors like NovaStar. In Chapter 11 proceedings, creditors are permitted to file plans. Creditors whose legal rights could be impaired are allowed to vote on the plan, and must approve it by a majority. In a Chapter 13 proceeding, creditor participation is not similarly extensive. In Chapter 13 proceedings, only the debtor is permitted to file a plan, and creditors are not entitled to vote. Under *res judicata,* courts pay particular attention to whether the same parties and the same issues are being litigated. Because Chapter 13 proceedings do not involve the same degree of significant participation, on the instant case, this Court declines to extend the *res judicata* doctrine to Willingham's Chapter 13 case.

### B. 12(b)(6) Claim Adequacy

### 1. RICO Claims

Defendant maintains that the Court should dismiss Willingham's RICO claims raised pursuant to 18 U.S.C. § 1962(c) and (d), because the complaint does not establish a violation of these statutory provisions. 18 U.S.C.1962(c) and (d) provide in pertinent part:

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

(d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

18 U.S.C. § 1962(c) and (d). To state a claim under 18 U.S.C. § 1962(c), a plaintiff must establish that 1) the defendants committed two or more of the thirty-five enumerated predicate offenses; 2) an "enterprise" existed; 3) a connection existed between the pattern of racketeering

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

5

activity and the enterprise; and 4) the plaintiff suffered an injury to business or property as a result. *VanDenBroeck v. CommonPoint Mortg. Co.,* 210 F.3d 696, 699 (6th Cir.2000); *Advocacy Org. for Patients and Providers v. Auto Club Ins. Assoc.,* 176 F.3d 315, 322 (6th Cir.1999). NovaStar asserts that Plaintiff failed to sufficiently plead an offense under 18 U.S.C. § 1962(c).

### a. Predicate Offenses

**\*7** In the complaint, Plaintiff alleges that Defendants committed the predicate offenses defined in 18 U.S.C. §§ 1341 and 1343. Section 1341 defines the criminal offense of mail fraud, providing that:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both. If the violation

affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

18 U.S.C. § 1341. Section 1343 defines the criminal offense of wire fraud as follows:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both. If the violation affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

18 U.S.C. § 1343.

NovaStar argues that Plaintiff has failed to plead the predicate acts with sufficient specificity. The sufficiency of Plaintiff's claims for mail and wire fraud must be analyzed pursuant to the requirements set forth in Fed.R.Civ.P. 9(b). *Advocacy Org.,* 176 F.3d at 322. Rule 9(b) requires a plaintiff to plead fraud with particularity. Fed.R.Civ.P. 9(b). The particularity requirement has been interpreted to mean that a plaintiff must allege at a minimum, "the time, place, and content of the alleged misrepresentation ...; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud." *Coffey v. Foamex L.P.,* 2 F.3d 157, 162 (6th Cir.1993). Moreover, "allegations of fraudulent misrepresentation must be made with sufficient particularity and with a sufficient factual basis to support an inference that they were knowingly made." *Advocacy Org.,* 176 F.3d at 322 (quoting *Coffey,* 2 F.3d at 162).

**\*8** In ruling on a motion to dismiss based on Rule 9(b), however, a court must consider the policy of simplicity in pleading found in Fed.R.Civ.P. 8. *Michaels Bldg. Co. v. Ameritrust Co., N.A.,* 848 F.2d 674, 679 (6th Cir.1988). Rule 8 requires the plaintiff to provide a "short and plain statement of the claim" and "simple, concise, and direct" allegations. Fed.R.Civ.P. 8. The principal purpose for the Rule 9(b) particularity requirement, when considered in context with Rule 8, is to ensure that the defendant receives fair notice of the alleged misconduct or fraudulent acts of which the plaintiff complains in order to prepare a responsive pleading. *Michaels Bldg. Co.,* 848 F.2d at 679. Moreover, an exception to the particularity requirement of Rule 9(b) exists when the relevant facts "lie exclusively within the knowledge and control of the opposing party." *United States ex rel. Wilkins v. State of Ohio,* 885 F.Supp. 1055, 1061 (S.D.Ohio 1995). In such a case, pleading upon information and belief is permissible, although the plaintiff must still plead a statement of facts upon which the belief is based. *Craighead v. E.F. Hutton & Co.,* 899 F.2d 485, 489 (6th Cir.1990). A court should hesitate to dismiss an action when the facts underlying the claim are within the defendant's control, especially when no discovery has been conducted. *Michaels Bldg. Co.,* 848 F.2d at 680.

The Court must thus determine whether the allegations pled by Plaintiff in support of the predicate offenses of mail fraud and/or wire fraud are sufficient to satisfy the particularity requirements of Rule 9(b). "The elements of mail and wire fraud are: 1) a scheme to defraud, and 2) use of the mails, or of an interstate electronic communication, respectively, in furtherance of the scheme ." *Advocacy Org.,* 176 F.3d at 322. A scheme to defraud

> consists of [i]ntentional fraud, consisting in deception intentionally practiced to induce another to part with property or to surrender some legal right, and which accomplishes the designed end. To allege intentional fraud, there must be proof of misrepresentations or omissions which were reasonably calculated to deceive persons of ordinary prudence and comprehension. Thus, the plaintiffs must allege with particularity a false statement of fact made by the defendant which

the plaintiff relied on. The plaintiff must also allege the facts showing the plaintiff's reliance on the defendant's false statement of fact. Alternatively, the plaintiff may allege an omission on which he or she relied.

*Kenty v. Bank One, Columbus, N.A.,* 92 F.3d 384, 389–90 (6th Cir.1996) (internal quotations and citations omitted).

Plaintiff asserts, *inter alia,* that the Defendants engaged in the following activities as part of their scheme to defraud her. In 2001, Plaintiff contacted Memphis Financial Services at the direction of Roy Perkins. At the instruction of Sandra Wells, a Memphis Financial Services representative, Willingham signed a blank contract with Perkins Remodeling and a blank loan application. Ms. Wells also convinced Willingham to register for the Economic Advantages program, for which she was charged a $500 fee that does not appear on her HUD–1 Statement. NovaStar purchased Willingham's loan within a day after closing based upon documentation that NovaStar allegedly knew was falsified. Am. Compl. ¶ 87. NovaStar wired the funds to Equity Title which distributed the money among the other Defendants and finally to Willingham. *Id.* ¶ 65.

**\*9** Although Willingham's HUD–1 shows cash to borrower of $1,112.18, the HUD–1 forwarded to the Better Business Bureau shows that Willingham received $894.54. *Id.* ¶¶ 50–51. The final check to Willingham was $394.54, a difference of $717.64. *Id.* ¶ 52. Moreover, when Willingham began repaying the loan she discovered that both NovaStar and Economic Advantages were making deductions from her checking account for the same mortgage payment. *Id.* ¶ 83. The Plaintiff asserts that either Economic advantages was not forwarding its deductions to NovaStar or NovaStar was not properly crediting her account, all to the Plaintiff's detriment. *Id.* ¶

The complaint further asserts that:

> The fraud in the settlement statements implicates all Defendants who received funds, oversaw the closing, and/or prepared the closing documents, including but not limited to MFS, Worldwide, Equity Title and NovaStar. Defendant

> NovaStar also participated in the predatory lending scheme, *knowingly funding a loan that had not been properly closed on the date indicated, preventing Plaintiff from canceling her loan by not giving her proper disclosures, benefitting by making the inflated loan with high interest.* Defendant NovaStar currently has the power to collect on the debt or foreclose on Plaintiff's home. All Defendants worked in concert to create a scheme in which all Defendants engaged in a pattern of false representations, some oral and some in writing, to induce Plaintiff to enter into this transaction.

Am. Compl. ¶¶ 107–09 (emphasis added). These allegations of fraudulent misrepresentations satisfy the first element of a claim for mail or wire fraud-the existence of a scheme to defraud. Specifically, the complaint identifies the parties to the alleged fraudulent scheme and the specific dates that certain alleged misrepresentations occurred. Plaintiff asserts that the preparation of the settlement statements and related documents, in addition to Defendants' alleged affirmative actions or material omissions occurred on or around the closing date of May 29, 2001, and disbursements from NovaStar were received on May 31, 2001 or shortly thereafter. Plaintiff also asserts that multiple withdrawals from her account occurred between August, 2001 and October, 2001.

Moreover, the complaint contains sufficient allegations to notify Defendants of the alleged representations they made and how each is alleged to be false or misleading. As noted above, Plaintiff alleges that NovaStar knowingly received false documentation and used the information contained therein to determine the manner in which the loan was to be made, as well as the interest rate and other features of the loan which were allegedly predatory in nature, while leading the Plaintiff to believe that she was engaged in a bona fide transaction. Also, as asserted in the complaint, among the alleged representations and omissions in the HUD–1 that are misleading are 1) the representation that indicates that the monetary sum of $1,112.94 was to be received by Plaintiff, and 2) the omission of fees and costs allegedly paid to some of the defendants, including Economic Advantages' fee of $500. Based on these allegations, Plaintiff "ha[s] sufficiently alleged a misrepresentation or a material omission that was reasonably calculated to deceive persons of ordinary prudence and comprehension ." *Kenty,* 92 F.3d at 390.

**\*10** Likewise, the above assertions made by Willingham sufficiently allege that Defendants' fraudulent intent was to receive and/or take fees and money to which Defendants were not legally entitled and/or did not legally deserve. Additionally, Plaintiff has sufficiently alleged that she relied on Defendants' misrepresentations when she made the loan payments, including paying fees to Defendants which were not indicated on the HUD–1 statement. Finally, the assertions discussed *supra* allege Plaintiff's injury, i.e., payment of fees and costs that may not have been owed by, or disclosed to, Plaintiff and/or nonreceipt of money that may have been owed to Plaintiff. The Court finds that these allegations establish the first element of mail and wire fraud-a scheme to defraud. Moreover, the Court finds that these allegations serve to satisfy the particularity requirement of Rule 9(b).

NovaStar also contends that Willingham has failed to assert the predicate acts of mail and wire fraud because the complaint does not sufficiently allege the use of the mail or interstate electronic communications. To establish the second element of mail fraud, i.e., that the Defendants used the mails in furtherance of the scheme, Plaintiff alleges that

> [a]ll Defendants violated 18 U.S.C. § 1341 multiple times, having devised or intended to devise a scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises as contained in the various loan documents including, without limitation, sales contracts, loan applications and HUD–1 Settlement Statements. For the purpose of executing such scheme or artifice or attempting to do so, *all or some of the Defendants used the U.S. mail or private or commercial interstate carriers* in the furtherance of the predatory lending scheme.

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

8

Am. Compl. ¶ 96 (emphasis added). The Itemization of Amount Financed produced by NovaStar shows that Equity Title received a courier fee of $40. (Pl's Ex. L). This is sufficient to support an inference that the Defendants used U.S. mail or commercial interstate carriers to transmit the fraudulent forms. To establish the second element of wire fraud, i.e., that the Defendants used an interstate electronic communication in furtherance of the alleged scheme, Plaintiff asserts that:

> [a]ll Defendants violated 18 U.S.C. § 1343 multiple times, having devised or intended to devise a scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises transmitted or caused to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice.

Am. Compl. ¶ 97. Specifically, Willingham alleges, that NovaStar wired the funds for the loan to Equity Title on May 31, 2001. *Id.* § 65.

Defendant's argument is premised in part on the omission in the complaint that NovaStar specifically used the mail in furtherance of the alleged scheme. However, the second element of a claim for mail or wire fraud—the use of the mails or an interstate electronic communication to further the fraudulent scheme—does not require personal use. *United States v. Cantrell,* 278 F.3d 543, 546 (6th Cir.2001); *United States v. Brown,* 147 F.3d 477, 488 (6th Cir.1998); *see also United States v. Oldfield,* 859 F.2d 392, 400 (6th Cir.1988) ("Mail fraud only requires that the defendant reasonably anticipate, or as a reasonable person foresee, the use of the mails.") (quoting *United States v. Davidson,* 760 F.2d 97, 99 (6th Cir.1985)); *Echols v. AUSA,* No. 01–2033, Order on Defs.' Mot. to Dismiss, August 29, 2001 at 19 (W.D.Tenn.2001). A complaint alleging mail fraud or wire fraud must, however, at a minimum allege that a mailing or an interstate electronic communication occurred. *United States v. Srulowitz,* 785 F.2d 382, 386–87 (2d Cir.1986) (noting that because the fact of a mailing is an element of the crime, the government

must prove beyond a reasonable doubt that a mailing occurred to convict a defendant for mail fraud). "[L]oose references to mailings and telephone calls in furtherance of a purported scheme to defraud will not do. Instead, the plaintiff must, within reason, describe the time, place, and content of the mail and wire communications, and it must identify the parties to these communications." *Jepson Inc. v. Makita Corp.,* 34 F.3d 1321, 1328 (7th Cir.1994) (internal quotations and citations omitted).

**\*11** With regard to mail fraud, Plaintiff asserts that all or some of the Defendants used the U.S. mail or private or commercial interstate carriers in the furtherance of the predatory lending scheme. Plaintiff further alleges that the scheme could not have succeeded absent mailing the fraudulent loan information among the various defendants. Am. Comp. ¶ 99. Moreover, the HUD–1 statement indicates that a courier fee of $40 was assessed to Plaintiff.

With regard to wire fraud, Plaintiff alleges that Equity Title, acting on behalf of the enterprise, prepared the fraudulent settlement statements and the fraudulent closing documents and used the interstate telephone lines to transfer intentionally and fraudulently altered closing documents on behalf of all defendants and the enterprise. Additionally, Plaintiff asserts that Worldwide used the interstate telephone lines to transfer the fraudulently altered loan application. *Id.* ¶ 106.

These allegations indicate that Defendants used mail and interstate electronic communications in furtherance of the alleged scheme to defraud. Moreover, as previously noted, personal use of the mail or interstate electronic communication is not required to state a claim for mail or wire fraud. As such, Defendant's argument that the complaint does not allege that NovaStar itself used the mail or electronic communication is unavailing. Moreover, Plaintiff's "failure to indicate the exact date of each of these communications does not mandate dismissal of her mail and wire fraud claims because this information likely would be in the exclusive possession of [D]efendants." *Echols,* at 20. The Court therefore finds that the complaint contains sufficient allegations to satisfy the requirement that the mail and interstate electronic communications were used to further the alleged scheme to defraud. Accordingly, the Court finds that Plaintiff sufficiently alleged the predicate offenses of mail fraud and wire fraud.

**b. Enterprise Existence and Participation**

Defendant next argues that Plaintiff's RICO claims should be dismissed because Willingham failed to establish that NovaStar is a part of an "enterprise" and that NovaStar participated in the alleged RICO enterprise.

An enterprise is a "group of persons associated together for a common purpose of engaging in a course of conduct." *United States v. Turkette,* 452 U.S. 576, 583 (1981). Title 18, section 1961(4) of the United States Code further provides that an enterprise is "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals *associated in fact* although not a legal entity." 18 U.S.C. § 1961(4) (emphasis added). Plaintiffs may establish the existence of an enterprise, therefore, by showing an "association-in-fact enterprise." To establish an association-in-fact enterprise, the plaintiff must demonstrate "1) that the associated persons formed an ongoing organization, formal or informal; 2) that they functioned as a continuing unit; and 3) that the organization was separate from the pattern of racketeering activity in which it engaged." *VanDenBroeck,* 210 F.3d at 699.

 **\*12** To satisfy the requirement of an association-in-fact enterprise, the "complaint must contain facts suggesting that the behavior of the listed entities is 'coordinated' in such a way that they function as a 'continuing unit'...." *Begala v. PNC Bank, Ohio, Nat. Ass'n,* 214 F.3d 776, 781–82 (6th Cir.2000). To establish the third element, a plaintiff must show that the alleged enterprise has "a certain amount of organizational structure" or "some sort of 'chain of command' or other evidence of a hierarchy, even a highly limited one" enabling it to exist apart from the alleged pattern of wrongdoing. *Id.* at 699–700; *see also United States v. Rogers,* 89 F.3d 1326, 1337 (7th Cir.1996) (noting that "[a] RICO enterprise is an ongoing structure of persons associated through time, joined in purpose, and organized in a manner amenable to hierarchical or consensual decision-making") (internal quotations and citations omitted); *Echols,* at 22. However, "simply conspiring to commit a fraud is not enough to trigger the [RICO] Act if the parties are not organized in a fashion that would enable them to function as a racketeering organization for other purposes." *VanDenBroeck,* 210 F.3d at 699; *see also Richmond v. Nationwide Cassel, L.P.,* 52 F.3d 640, 645 (7th Cir.1995) (emphasizing that [a]n enterprise must be more than a group of people

who get together to commit a "pattern of racketeering activity," and more than a group of associated businesses that are operated in concert under the control of one family) (internal citations omitted). Instead, an enterprise must have "a structure and goals separate from the predicate activities themselves." *Richmond,* 52 F.3d at 645 (quoting *United States v. Korando,* 29 F.3d 1114, 1117 (7th Cir.1994).

In addition, to establish the third element, the plaintiff must establish a pattern of racketeering, which is defined as at least two acts of racketeering activity occurring within ten years of each other. 18 U.S.C. § 1961(5); *see also Vild v. Visconsi,* 956 F.2d 560, 565 (6th Cir.1992). A pattern of racketeering activity is established by showing 1) a relationship between predicate acts, and 2) the threat of continuity. *See H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 238 (1989). Predicate acts are related if they "have the same or similar purposes, results, participants, victims, or methods of commission, or are otherwise interrelated by distinguishing characteristics and are not isolated events." *H.J., Inc.,* 492 U.S. at 240 (internal quotations and citation omitted). To establish continuity, "plaintiffs can either demonstrate a 'closed-ended' or an 'open-ended' pattern; the former consists of 'a closed period of repeated conduct,' whereas the latter refers to 'past conduct that by its nature projects into the future with the threat of repetition.' " *Echols,* at 25 (citing *H.J., Inc.,* 492 U.S. at 241.). Courts must focus on the predicate racketeering activities, not the events preceding or following those predicate acts. *See Vemco v. Camardella,* 23 F.3d 129, 134 (6th Cir.1994) (refusing to consider events that did not qualify as predicate acts and determining that the predicate acts spanned only seventeen months, a time frame insufficient to show the continuity required for a pattern). In cases involving mail or wire fraud, however, the court should look beyond the actual mailings or transmissions, and examine the scope of the fraudulent schemes which the mailings or transmissions furthered. *Echols,* at 26–27 (citing *Tabas v. Tabas,* 47 F.3d 1280, 1294 (3d Cir.1995) (noting that "[a]lthough the mailing is the actual criminal act, the instances of deceit constituting the underlying fraudulent scheme are more relevant to the continuity analysis")).

 **\*13** In the instant case, Plaintiff alleges that:

[f]rom on or about 2001 through 2003, all Defendants, all of whom are persons within the meaning of RICO, were employed by or associated with an enterprise

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works. 10

whose activities engaged in or affected interstate commerce and conducted or participated, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c); to wit multiple violations of [mail and wire fraud.] The members of the group have the same or similar purposes, results, participants, victims, methods of commission and are interrelated by distinguishing characteristics. These are not isolated events, but represent a pattern of discriminatory and predatory practices.

...

The associated persons formed an ongoing organization, formal or informal, concerning the RICO enterprise, and the various associates functioned as a continuing unit of the RICO enterprise, and the RICO enterprise exists separate and apart from the predicate activities themselves. The facts in the case demonstrate the existence of an association-in-fact RICO enterprise by showing that the enterprise has a certain amount of organizational structure or some sort of chain of command.

Am. Compl. ¶¶ 94, 95, 101. Plaintiff argues that the facts alleged in the complaint "support the existence of an organizational structure encompassing phases from victim recruitment, qualifying for a loan, brokering the loan and closing the loan, to eventual loan assignment." Pl.'s Resp. Opp. Mot. to Dismiss at 14. For the reasons set forth below, the Court finds that Plaintiff's complaint at least allows an inference that the alleged enterprise has a sufficient structure to enable it to function independently of its predicate acts.

The allegations of organizational structure, coordination of the continuing unit, and pattern of racketeering activity of the association-in-fact enterprise are summarized as follows. First, Memphis Financial Services induced individuals into signing up for a mortgage by fraudulent misrepresentations and omissions. Am. Compl. ¶ 102. Once the individuals decided to consolidate their debt or have home repairs made, Memphis Financial Services directed the borrowers through the financing process. *Id.* Economic Advantage worked in tandem with Worldwide to induce borrowers to enter into contracts whereby the borrowers were not informed of the obligations that will be imposed on them or the benefits Economic Advantages would receive. *Id.* ¶ 33. Memphis Financial Services then

routinely listed false information on the loan applications, which NovaStar was aware of. *Id.* ¶ 103. NovaStar wires funds for the loan, in spite of knowledge of the discrepancies, and attaches predatory lending terms. *Id.* ¶ 106. On behalf of all the Defendants, Equity Title then distributes undisclosed portions of the loan to the other Defendants. *Id.* ¶¶ 51, 52, 53, 66. Willingham also alleges that these are not isolated events, but represent a pattern of discriminatory and predatory practices by the Defendants to ensnare unsophisticated African–American homeowners. Plaintiff alleges that this activity has been ongoing from 2001 through 2003, as evidenced by the Defendants' alleged actions and commission of predicate offenses in the instant case and in *Spinks v. Home Tech Serv. Co.,* No. 03–2568; *Carr v. Home Tech Serv. Co.,* No. 03–2569; *Hayes v. Home Tech Serv. Co,* No. 05–02019; and *Lewis v. Memphis Fin. Serv., Inc.,* No 05–02524 which are currently pending in the Western District of Tennessee.

 **\*14** The Court finds that these allegations are sufficient to establish an inference that NovaStar was a part of an ongoing informal, organization. Likewise, allegations in the complaint are sufficient to establish that the behavior of NovaStar was coordinated in such a way that it functioned with at least some of the other defendants as a continuing unit.

Finally, the complaint sufficiently establishes that NovaStar engaged in a pattern of racketeering activity. Despite the fact that this case involves one loan transaction and *Spinks, Carr, Hayes,* and *Lewis* involve different loan transactions, the overlapping actors in the three transactions, as well as the parallel ways that some of the Defendants' actions, including NovaStar's allegedly deceptive practices in these cases, provide unity to the loan transactions. Willingham alleges activities with the same or similar purposes and results, many of the same participants, and nearly identical methods of commission as the plaintiffs in the other cases. When viewed in a light most favorable to Plaintiff, the complaint alleges activities that are "interrelated by distinguishing characteristics and are not isolated events." *H.J., Inc.,* 492 U.S. at 240; *see also Vild,* 956 F.2d at 566 (noting that the relationship test is not a cumbersome requirement for RICO plaintiffs).

Furthermore, the Court finds that Plaintiff has established continuity sufficient to withstand a motion to dismiss. Plaintiff's complaint alleges a scheme and racketeering

WESTLAW © 2018 Thomson Reuters. No claim to original U.S. Government Works.

activity spanning and occurring from 2001 through 2003, including predicate acts occurring in the instant case from approximately April, 2001 through November, 2003 and in the other cases from at least September, 2001 through March, 2002. Thus, the relevant time span is over twenty-three months. In *Echols,* this Court reasoned that

> [a]lthough a period of fourteen months without more would be insufficient to demonstrate a closed-ended continuity, *see Vemco, 23 F.3d at 134* (holding that plaintiff failed to satisfy continuity requirement where he alleged a single fraudulent scheme that lasted seventeen months and involved the construction of a single building contract), plaintiffs allege additional factors not present in *Vemco.* Specifically, the alleged enterprise engaged in a pattern of racketeering activity that targeted three distinct victims and involved three separate real estate transactions. The existence of multiple schemes and victims is relevant to the determination of whether a pattern of racketeering activity exists. *Id.*

*Echols,* at 27–28. In Echols the Court noted that "most cases involving closed-ended continuity involve predicate acts spanning several years." *Id.* at 28 (citing *United States v. Pelullo,* 964 F.2d 193, 209 (3d Cir.1992); *Metromedia v. Fugazy,* 983 F.2d 350, 369 (2d Cir.1992) (holding that a two year time span was sufficient to allege pattern); *Hindes v. Castle,* 937 F.2d 868, 875 (3d Cir.1991) (collecting cases where racketeering activities ranged from four-and-a-half years to seventeen years); *Jacobson v. Cooper,* 882 F.2d 717, 720 (2d Cir.1989) (concluding that predicate acts occurring over an eight year time span satisfied continuity requirement). In *Echols,* Judge Gibbons opined that "the dividing line between conduct occurring just over a year and activities occurring over a number of years is somewhat indefinite." *Id.* The court concluded, however, that "defendants' alleged actions over approximately fourteen months involving multiple schemes and targeting multiple victims satisfy the closed-ended continuity requirement." *Id.* This Court agrees with the reasoning and holding of the Echols Court concerning the issue of continuity. Given the alleged

actions of NovaStar, as well as that of other Defendants, the Court concludes that the complaint sufficiently alleges continuity. Plaintiff therefore has alleged a pattern of racketeering activity. The Court finds therefore that Plaintiff has alleged an "association-in-fact enterprise." Accordingly, Defendants' motion to dismiss on this basis is denied.

**\*15** NovaStar additionally argues that Plaintiff has not adequately alleged its involvement in the association-in-fact enterprise. More specifically, NovaStar contends that Plaintiff's complaint fails to state a RICO claim under 18 U.S.C. § 1962(c) because the complaint contains no indication of how NovaStar "conducted" the affairs of the enterprise.

In *Reves v. Ernst & Young,* 507 U.S. 170 (1993), the Court addressed the issue of participation in a RICO enterprise. The Court held that "in order to 'participate, directly or indirectly, in the conduct of such enterprise's affairs,' one must have some part in directing those affairs." *Id.* at 179 (quoting 18 U.S.C. § 1962(c)). Specifically, "one must participate in the operation or management of the enterprise itself." *Id.* at 185. RICO liability, however, is not limited to those with primary responsibility for the enterprise's affairs. *Id.* at 184. Indeed,

> [a]n enterprise is "operated" not just by upper management but also by lower rung participants in the enterprise who are under the direction of upper management. An enterprise also might be "operated" or "managed" by others "associated with" the enterprise who exert control over it as, for example, by bribery.

*Id.* The *Reves* Court concluded that the defendant, an accounting firm which had audited an allegedly fraudulent enterprise and had issued incorrect financial statements based on information provided by the enterprise, had not "participated" sufficiently in the enterprise's affairs to be liable under § 1962(c). *Id.* at 186.

In *Echols,* the court noted that several courts, when applying *Reves,* have "distinguished between cases involving outsiders, who allegedly participate in an enterprise's affairs by providing advice or services, such as the accounting firm in *Reves,* and cases involving

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works. 12

'association-in-fact' enterprises, where the individuals or entities providing the services constitute the RICO enterprise." *Echols,* at 30 (citing *Goren v. New Vision Int'l, Inc.,* 156 F.3d 721, 728 n. 3 (7th Cir.1998) (emphasizing that the alleged enterprise was not an association-in-fact and that particular defendants were not alleged to be part of the enterprise but were "best characterized as contractors hired by the enterprise to perform specific tasks")); *MCM Partners, Inc. v. Andrews–Bartlett & Assocs., Inc.,* 62 F.3d 967, 978–79 (7th Cir.1995) (holding that defendants were "lower rung participants who are under the direction of upper management" and noting that "[t]he primary fact leading us to this conclusion is the nature of the 'enterprise' [plaintiff] has depicted, as both [defendants] are alleged to be members of an 'association-in-fact' constituting the RICO enterprise") (quoting *Reves,* 507 U.S. at 184)); *United States v. Oreto,* 37 F.3d 739, 750 (1st Cir.1994). The *Echols* Court elaborated on this distinction, stating that

> *Reves* is a case about the liability of outsiders who may assist the enterprise's affairs. Special care is required in translating *Reves'* concern with "horizontal" connections—focusing on the liability of an outside adviser—into the "vertical" question of how far RICO liability may extend within the enterprise but down the organizational ladder. In our view, the reason the accountants were not liable in *Reves* is that, while they were undeniably involved in the enterprise's decisions, they neither made those decisions nor carried them out; in other words, the accountants were outside the chain of command through which the enterprise's affairs were conducted.

**\*16** *Id.* at 31 (quoting *Oreto,* 37 F.3d at 750).

The complaint in *Echols,* similar to the allegations in the instant action, alleged an association-in-fact enterprise, wherein certain defendants, "acting on behalf of the enterprise of which they were members, committed acts of fraud when they prepared the closing documents and settlement statements." *Id.* The *Echols* Court determined that the defendants' "alleged actions [were] not analogous

to outsiders who perform services, albeit with knowledge of illegality, for an enterprise of which they are not members." *Id.* at 31–32. The court concluded that the plaintiff provided sufficient factual allegations from which it could "infer that some of the defendants conducted or participated, either directly or indirectly, in the enterprise's activities." *Id.* at 32.

The Court finds that the holding in *Echols* is applicable to the instant case. Plaintiff alleged an association-in-fact enterprise of which NovaStar was a member. Although NovaStar attempts to analogize itself with the accounting firm in *Reves,* there are striking distinctions. NovaStar established the final allegedly predatory terms of the loan, unlike an accounting firm outside the chain of decision-making. Moreover, NovaStar, unlike an accounting firm, stands to directly benefit from any inflated interest rates and opportunities to foreclose created by the fraudulent omissions and inaccuracies it knowingly used to facilitate the loan. Ultimately, the alleged scheme could not work without NovaStar's monetary contribution which financed each of the other Defendants. The facts alleged in this case are not analogous to those in *Reves,* whereby outsiders performed services, albeit with knowledge of illegality, for an enterprise of which they were not members. The Court finds therefore that the complaint provides sufficient allegations from which to infer that NovaStar sufficiently conducted or participated in the enterprise's activities.

In sum, the Court finds that the complaint contains sufficient allegations to establish that 1) the Defendants committed two or more predicate offenses; 2) an enterprise existed; and 3) NovaStar's activities constitute participation in the alleged RICO enterprise. Accordingly, the Court denies Defendant's motion to dismiss Plaintiff's § 1962(c) claim.

**2. RICO Conspiracy**

NovaStar next contends that Willingham has failed to state a valid RICO claim, therefore she cannot support a RICO conspiracy claim pursuant to 18 U.S.C. § 1962(d). However, as the Court stated in the previous section, Willingham has stated a valid claim under RICO.

NovaStar also relies on *Advocacy Org. for Patients and Providers v. Auto Club Ins. Assoc.,* for the proposition that Plaintiff must "factually specify who agreed to do what and when." 176 F.3d 315 (6th Cir.1999). This

goes too far. The *Advocacy Org* Court stated that under the liberal pleading requirements, plaintiffs must at a minimum allege the time, place, and content of the alleged misrepresentation. *Id.* at 322. However, courts do not require the degree of specificity for which Defendant argues because such specificity is not necessary to enable a defendant to respond to the complaint. See Fed.R.Civ.P. 9(b). As discussed above, Plaintiff has sufficiently alleged the time, place, and content of the misrepresentations which is sufficient to enable Defendants to respond to the complaint. Further, she has also alleged that NovaStar knew of the other Defendants' misrepresentations, and notwithstanding proceeded with the transaction. This is sufficient for the Court to infer that NovaStar agreed to participate in the alleged RICO violations and therefore defeat a 12(b)(6) motion. Accordingly, the Court denies NovaStar's motion to dismiss Plaintiff's claim for violation of 18 U .S.C. § 1962(d).

### 3. Civil Conspiracy

**\*17** Defendant next asserts that Plaintiff has failed to state a claim for civil conspiracy. Tennessee courts have defined a civil conspiracy as "a combination between two or more persons to accomplish by concert an unlawful purpose, or to accomplish a purpose not in itself unlawful by unlawful means." *Dale v. Thomas H. Temple Co.,* 208 S.W.2d 344, 353 (Tenn.1948). Under Tennessee law, to prove a conspiracy to defraud, the plaintiff must establish:

> a common purpose, supported by a concerted action to defraud, that each has the intent to do it, and that it is common to each of them, and that each has the understanding that the other has the purpose. The agreement need not be formal, the understanding may be a tacit one, and it is not essential that each conspirator have knowledge of the details of the conspiracy.

*Id.* (internal quotations and citations omitted). "Because the agreement does not need to be a formal one, plaintiffs can prove the existence of a conspiracy through circumstantial evidence, including inferences from the relationships among the parties." *Echols,* No. 01–2033, August 29, 2001 Order at 47 (citing *Dale,* 208 S.W.2d at 353). If the plaintiff succeeds in proving a conspiracy, "each conspirator is liable for all damages caused by the

actions of any of his co-conspirators in carrying out their common design." *Id.* (citing *Dale,* 208 S.W.2d at 354).

First, NovaStar maintains that the Plaintiff has failed to allege any legally cognizable claim, and therefore cannot support a conspiracy claim. However, the Court has held *supra* that Plaintiff has adequately alleged a RICO claim. Defendant also asserts that the conspirators must be sufficiently described so as to demonstrate a conspiracy and the complaint contains nothing more than legal conclusion. The Court disagrees. NovaStar allegedly participated in the scheme by knowingly accepting falsified loan applications. The Defendant benefitted from the relationship by assessing high interest rates to borrowers while funding its alleged co-conspirators who would in turn, deliver more falsified loan applications to NovaStar. As discussed above each Defendants' role, from soliciting borrowers, to falsifying documents, and knowingly receiving falsified documents has been set out in the complaint. This is more than sufficient to allege a legally cognizable claim and an agreement to defraud the Plaintiff under Tennessee law. Accordingly, Defendant's motion to dismiss Plaintiff's civil conspiracy claim is denied.

### 3. Breach of Fiduciary Duty

NovaStar further asserts that Willingham fails to state a claim for breach of fiduciary duty. In Tennessee, "fiduciary relationships may arise whenever confidence is reposed by one party in another who exercises dominion and influence, [normally] the dealings between a lender and borrower are not inherently fiduciary absent special facts and circumstances." *Oak Ridge Precision Indus. v. First Tenn. Bank Nat'l Assoc.,* 835 S.W.2d 25, 30; *see also Wright v. C & S Family Credit,* No. 01A01–9709–CH–00470, 1998 Tenn.App. Lexis, at \*6 (Tenn. Ct.App. April 24, 1998) (stating "[u]nder Tennessee law, the debtor/creditor relationship does not constitute a fiduciary relationship.). Although a fiduciary relationship can arise when the lending institution knows or has reason to know that the borrower has placed a special trust in the lender to counsel or inform him, the Plaintiff has not alleged this special trust relationship. Accordingly, the Court grants NovaStar's motion to dismiss Plaintiff's claim for breach of fiduciary duty, without legal prejudice.

### 4. The Fair Housing Act

**\*18** Willingham alleges that NovaStar and its alleged co-conspirators were involved in a predatory lending scheme designed to intentionally target African–American homeowners. She contends that Defendants' fraudulent loan practices violate the Fair Housing Act by making housing unavailable to African–Americans and subjecting them to discriminatory terms and conditions. Am.Compl. ¶¶ 129–31. NovaStar argues that Plaintiff's claims for violation of the Fair Housing Act ("FHA") should be dismissed because 1) she owned her home at the time of the loan; 2) NovaStar allowed her to borrow money, so it did not discriminate in making a loan available to her; and 3) because she does not have factual support that NovaStar discriminated against her. Although Plaintiff does not specify the portions of the FHA she relies on in the complaint, she argues under 42 U.S.C. § 3604 and 42 U.S.C. § 3605 in her response brief, which NovaStar filed a reply to. Therefore, the Court will address Plaintiff's claim under sections 3604 and 3605.

### a. Fair Housing Act § 3604

42 U.S.C. § 3604(a) states,

> it shall be unlawful ... to refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or *otherwise make unavailable* or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin.

NovaStar argues that Willingham's claim does not fall under the provisions of this section because Willingham owned her home at the time of the loan, so NovaStar did not make housing unavailable to her. It also argues that it did not make housing unavailable because it did not refuse her request for a mortgage loan, and therefore did not make housing unavailable to her. Underlying these arguments is the threshold matter of the reach of the "otherwise make unavailable" provision of § 3604.

In *Michigan Protection and Advocacy Service, Inc. v. Babin,* the Sixth Circuit grappled with the issue of how broadly the "otherwise make unavailable" provision of § 3604 reaches. 18 F.3d 337 (6th Cir.1994). In *Babin,* neighborhood residents prevented a homeowner from selling her house to a state agency that planned to use the property as group home for mentally disabled adults by

purchasing the home themselves. In the ensuing FHA case against the neighbors, the Sixth Circuit stated:

> We agree with the Third Circuit that Congress's intent in enacting § 3604(f)(1) was to reach property owners and their agents who directly affect the availability of housing for a disabled individual. However, the scope of § 3604(f)(1) may be extended further, to other actors who, though not owners or agents, are in a position directly to deny a member of a protected group housing rights.

*Id.* at 344. Although the Sixth Circuit's analysis pertains to § 3604(f), which covers discrimination because of disability and not § 3604(a) which covers discrimination based upon race, the Court was interpreting the same "otherwise make unavailable" language used in both portions of the statute, therefore its analysis is applicable to this case.

**\*19** The *Babin* Court's analysis focused on two factors to determine whether the defendants "otherwise ma[d]e housing unavailable." The two factors were whether the defendants "directly affect[ed] the availability of housing for a disabled individual" and whether the defendant engaged in "normal economic competition." Therefore, this Court must determine whether the alleged actions of NovaStar and its Co–Defendants "directly affect the availability of housing" and whether their alleged actions constitute "normal economic activity."

Although the Sixth Circuit did not completely articulate a test for direct affect, the Court commented that Congress intended to target "those who owned or disposed of property, and those who, in practical effect, assisted in those transactions of ownership and disposition." *Id.* at 345. As home purchasers, the actions of the neighbors in *Babin* were not found to be direct enough to affect the availability of housing for disabled persons. The Court essentially concluded that the purchase of one home was too attenuated to constitute a violation of § 3605's "otherwise make unavailable" clause.

In this case, however, the Defendants are engaged in the continuous enterprise of soliciting, brokering, and supplying home mortgages. These transactions directly

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works. 15

affect the borrowers availability of housing because the burden of the debt can lead to foreclosure on their home. This is especially relevant when predatory lending is alleged because the intended result of the scheme is to rob borrowers of home ownership by providing high cost loans with payments the borrowers are unable to meet. Therefore, the actions of mortgage lenders are direct enough to fall within the provisions of § 3604.

Furthermore, the actions of predatory lenders do not constitute "normal economic activity." Unlike lenders engaged in legitimate lending practices, predatory lending ultimately leads to considerable deadweight loss and public burden. Deadweight loss is a permanent loss of well being by society that occurs when equilibrium for a good or service is not Pareto optimal. Pareto efficiency (or optimality) occurs when no individual can be made better off without making another worse off. When predatory lending occurs, the borrower is always worse off after the transaction because of either unreasonable finance charges unrelated to risk assumed by the lender, the loss of their home, and when home improvements are involved expenditure on services not provided or defectively performed. Moreover, home foreclosures on those primarily targeted such as the elderly generally lead to an excess public burden to provide housing for newly evicted persons whom were once homeowners. Legitimate lending allows borrowers that would not be able to finance the purchase of a home or home improvements to engage in these socially beneficial activities. The end result of legitimate practices is lenders who benefit from profits generated by interest on loans. However, predatory lending is not "normal economic activity" nor is it desirable economic activity because it does not have any benefit for the borrower. Therefore, because predatory lending practices directly affect the availability of housing and are not "normal economic activity," it falls within the provisions of § 3604 if and when it occurs.

 **\*20** This interpretation is not only consistent with the Sixth Circuit's analysis of § 3604, but it is also consistent with other Circuit's application of § 3604 protection to actions other than a refusal to rent or sell housing. In *United States v. Mitchell,* the Fifth Circuit found that racial steering is prohibited under § 3604. 580 F.2d 789 (5th Cir.1978). The Fifth Circuit also found that discriminatory appraisals constitute violations of § 3604. *Hanson v. Veterans Admin.,* 800 F.2d 1381, 1386 (5th Cir.1986). District courts have also applied § 3604 to

non-traditional real estate related activities that make housing unavailable. *See NAACP v. American Family Mut. Ins.,* 978 F.2d 287, 301 (E.D.Wis.1992) (stating that § 3604 applies to insurance redlining and discriminatory pricing); *Byrd v. Brandenburg,* 922 F.Supp. 60 (N.D.Ohio 1996) (applying § 3604 to racially motivated firebombing); *Williams v. Poretsky Mgm't,* Inc.,955 F.Supp. 490 (D.Md.1996) (finding sexual harassment actionable under § 3604).

In this case, Plaintiff alleges that NovaStar participated in a predatory lending scheme designed to take her home. It is irrelevant whether the scheme to make housing unavailable prevented the Plaintiff from securing housing or made housing that the Plaintiff had already secured uninhabitable. *See Byrd,* 922 F. Supp 60; *Poretsky Mgm't,* 955 F.Supp. 490. Therefore the fact that Plaintiff already owned her home does not preclude application of § 3604. Neither does the fact that NovaStar made a loan available to her does not preclude liability. Although in the usual case, the failure to make a loan available on the basis of race causes the plaintiff injury by preventing the plaintiff from securing housing, predatory lending schemes are unlike the usual method of discrimination. The plaintiff's injury is actually caused by acceptance of a loan designed to fail. Accordingly, because predatory lending schemes are fairly encompassed within the Sixth Circuit's § 3604 precedent along with other courts, and Plaintiff has alleged that NovaStar was a knowing participant in a predatory lending scheme designed to make her home unavailable to her, the facts that she owned her home at the time of the loan and that NovaStar made a loan available to her do not preclude a claim under § 3604.

### b. Fair Housing Act § 3605
42 U.S.C. § 3605 states:

> It shall be unlawful for any person or other entity whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available such a transactions to discriminate against any person in making available such a transaction or in the terms or conditions of such a transaction, because of race, color, religion, sex, handicap, familial status, or national origin.

> (b) "Residential real estate-related transaction" defined

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works. 16

As used in this section, the term "residential real estate-related transaction" means any of the following:

**\*21** (1) The making or purchasing of loans or providing of other financial assistance—

(A) for purchasing, constructing, improving, repairing, or maintaining a dwelling.

(B) secured by residential real estate

(2) The selling, brokering, or appraising of residential real property.

42 U.S.C. § 3605. NovaStar argues that Plaintiff's allegations that the terms of the loan were discriminatory and that the loan was designed to fail are illogical because NovaStar required her to consolidate her other debts. NovaStar states, "the only conceivable reason for requiring the repayment of debts is to enhance the borrower's ability to repay the mortgage loan." Without reaching the merits of the case, the Court notes that one feature of many predatory loans is the requirement that the borrower consolidate other debts. Not only does it allow a lender to assess a higher interest rate because of the higher principle amount, but also when the goal of the lender is to procure the borrowers equity, the increased secured debt raises the chance of foreclosure. [3]

[3]    Take for example a person who has $10,000.00 in credit card debt and takes out a $10,000.00 home improvement loan. Before the home improvement loan the person paid $100.00 a month on the credit card debt. If the person took out the home improvement loan by itself, the payments would be hypothetically $100.00. Therefore, the person would have $100.00 in unsecured debt to pay each month and $100.00 in secured debt to pay each month, for a total of $200.00 each month. If the person fell into financial distress, they could default on $100.00 in unsecured credit card debt without losing their home and suffer only the consequence of damaged credit. However, if the debts are consolidated into the mortgage, the borrower can no longer default on a portion of the debt without the threat of losing his home. He must pay the entire $200.00 each month to keep his home. Even if the payments are lower than $200.00 he still bears the increased risk of losing his home because what was once unsecured debt is now secured debt.

Finally, NovaStar argues that Plaintiff has not proffered sufficient factual evidence to show that NovaStar discriminated against her. However, it is unnecessary for a Plaintiff to proffer evidence to support a claim on a 12(b)(6) motion. The Plaintiff need only show that "a claim has been pleaded in the complaint." *Scheid v. Fanny Farmer Candy Shops, Inc.,* 859 F.2d 434, 436 (6th Cir.1988). Willingham alleges that she had substantially paid her mortgage, with only $554.00 remaining. On Defendants' advice, Plaintiff refinanced her home thereby seriously jeopardizing her ability to enjoy the home for which she had substantially paid. When NovaStar processed her application it knowingly used false information to provide a loan with exorbitant fees and penalties, at least in part because of her race. Because the Court must take the facts of the complaint as true for purposes of a motion to dismiss, the Court finds that the Plaintiff has alleged a valid claim against NovaStar and its alleged co-conspirators. Dismissal is improper at this stage. Accordingly, because Plaintiff has alleged valid claims under 42 U.S.C. § 3504 and § 3605, Defendant's motion to dismiss Plaintiff's FHA claims is denied.

**5. Equal Credit Opportunity Act**

Plaintiff also asserts a claim under the Equal Credit Opportunity Act's ("ECOA") thirty-day notice provision, which requires creditors to give borrowers notice of "adverse actions," including denials and counteroffers. NovaStar contends that because Willingham ultimately used the credit NovaStar offered, there was no "adverse action" that required notice.

ECOA, 15 U.S.C. § 1691(d) states:

(1) Within thirty days ... after receipt of a completed application for credit, a creditor shall notify the applicant of its action on the application.

(2) Each applicant against whom adverse action is taken shall be entitled to a statement of reasons for such action from the creditor....

**\*22** (6) *For purposes of this subsection, the term "adverse action" means* a denial or revocation of credit, a change in the terms of an existing credit arrangement, or a *refusal to grant credit in substantially the amount or on substantially the terms requested.* (emphasis added)

Willingham asserts that she requested a loan for repairs and remodeling estimated at $30,000, but she received a loan that consolidated secured and unsecured debt for a total of $40,500. Plaintiff alleges that this constitutes a refusal to grant credit in substantially the terms requested, and she was therefore entitled to notice of adverse action.

As a threshold matter, NovaStar contends that Plaintiff's ECOA claim should be dismissed because the applicable definition of adverse action is found in 12 C.F.R. § 202.2(c). This definition would exclude Plaintiff's claim because it defines adverse action as "[a] refusal to grant credit in substantially the amount or on substantially the terms requested in an application unless the creditor makes a counteroffer (to grant credit in a different amount or on other terms) and the applicant uses or expressly accepts the credit offered." In this case, Willingham did use the credit NovaStar offered to her, so she would not be entitled to notice under this definition of "adverse action." However, this definition of "adverse action" is not applicable to the case at bar because § 1691 specifically states that the definition given in § 1691(d) is utilized for "purposes of this subsection," and not the general definition listed in 12 C.F.R. § 202.2(c). Therefore, the Court will analyze this motion under the definition found in § 1691(d).

The court in *Newton v. United Companies. Fin. Corp.,* faced the similar task of interpreting adverse action under a strikingly analogous set of facts. 24 F.Supp.2d (E.D.Penn.1998). In *Newton,* four low-income homeowners sought loans for home improvement which were inflated during the application process. For instance, one of the plaintiffs in *Newton,* an elderly woman, sought a home improvement loan for $9,990, but received a final amount of $15,550 which included $3,050 in points, fees, and settlement charges. *Id.* at 446–47. The Lender in *Newton* did not give any of the plaintiffs notice that it had extended credit in "significantly higher amounts." *Id.* at 459. After analyzing the ECOA, the *Newton* Court found that the statute requires lenders to give notice of the higher loan amounts in order to avoid the "bait and switch" tactics the ECOA is designed to protect against. *Id.* at 462. The court stated, "[t]he law was designed to give the borrower fair notice that a counteroffer for a larger loan was in the offing within a reasonable time after the lender knew this, which was before the closing." *Id.*

In this case, Willingham, like the plaintiffs in *Newton,* attempted to obtain a home improvement loan, but received a loan worth $10,000 higher than she originally requested. NovaStar argues that it is unlike the lender in *Newton* because the *Newton* lender received applications for lesser amounts actually requested by borrowers and then rewrote their applications requesting higher amounts. NovaStar argues that unlike the lender in *Newton,* it did not know of any application other than the one forwarded to it by its alleged co-conspirators. However, Willingham has asserted that NovaStar's co-conspirators furnished it with documentation that NovaStar knew was false. Am. Compl. ¶ 14. The Court sees no meaningful distinction between authoring a fraudulent application and knowingly accepting a falsified application from alleged co-conspirators.

**\*23** Finally, NovaStar argues that the reasoning of *Newton* is illogical because if consumer ultimately receives credit, they need no notice of the different terms. Defendant further asserts that "by accepting the substitute loan, the applicant [takes] any adversity out of the lender's failure to grant the applicant's original request." Def. Reply Mem. at 26 (quoting Elwin Griffith, *The Quest for Fair Credit Reporting and Equal Credit Opportunity on Consumer Transactions,* 25 U. Mem. L.Rev. 37, 114–15 (1994)). However, this Court agrees with the reasoning of *Newton.* The mere receipt of funds does not make a loan decision less adverse. A secured loan, by its very nature involves risk to the borrower. It is not solely the receipt of an indeterminate amount of funds that effects the viability of a loan, but also its interest rate, periodic payments, and in these cases the amount of principle is central. When a borrower requests a small loan and receives a large loan without disclosure they are placed in a more risky position. The borrower will be forced to eke out a larger amount out of their monthly income or pay on the loan and its interest for an extended period. To claim that adversity is removed from the loan because the borrower receives and indeterminate amount of money completely ignores these very essential matters that are at the heart of financial transactions. Therefore, the Court agrees with the *Newton* Court that notice of a substantial change in loan terms is necessary, even when the borrower accepts the new loan. Disclosure is important to alert the borrower to exactly what terms they are accepting. Accordingly, Defendant's motion to dismiss Plaintiff's Equal Opportunity Credit Act claim is denied.

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.   18

### 6. Statute of Limitations on TILA, RESPA, and TCPA Claims

NovaStar also contends that Willingham's Truth In Lending Act ("TILA"), Real Estate Settlement Procedures Act ("RESPA"), and Tennessee Consumer Protection Act ("TCPA") claims are barred by one-year statutes of limitation. *See* Truth in Lending Act, 15 U.S.C. § 1640(e); Real Estate Settlement Procedures Act, 12 U.S.C § 2614; Tennessee Consumer Protection Act, Tenn.Code Ann. § 47–18–110. This Court does not agree. The Court finds that the statute of limitations on the TILA and RESPA claims should be tolled. Moreover, NovaStar has not proffered sufficient proof under a 12(b)(6) motion to show that the TCPA claim was filed later than one year after discovery.

The Court will address the statute of limitation issues in this section and address other claims of insufficiency pertaining to each statute individually in the following sections. Federal statutes of limitation, like those under RESPA and TILA, are subject to the equitable tolling doctrine. In *Young v. U.S.,* Justice Scalia, writing for a unanimous Court stated, "[i]t is hornbook law that limitations periods are customarily subject to equitable tolling, unless tolling would be inconsistent with the text of the relevant statute. Congress must be presumed to draft limitations periods in light of this background principle." 35 U.S. 43, 49 (2002) (citations omitted).

**\*24** Although NovaStar relies on *Wachtel v. West* to argue that tolling is never applicable when a required disclosure under TILA has not been provided, this is an incorrect interpretation of the law. 476 F.2d 1062. *Wachtel* exclusively addressed "the narrow question" of when a violation of the duty to disclose under TILA actually occurs. *Id.* at 1063. In *Wachtel,* "the applicability of equitable tolling was neither argued by the parties, discussed by the Court, nor at issue in the case." *Jones v. TransOhio Sav. Assoc.,* 747 F.2d 1037, 1042 (6th Cir.1984). However the Sixth Circuit did address the issue of equitable tolling of TILA in Jones. The Jones Court stated that, "the basic inquiry is whether congressional purpose is effectuated by tolling the statute of limitations in given circumstances." *Id.* at 1040 (quoting *Burnett v. New York Cent. R.R.,* 380 U.S. 424 (1965). After noting that, "TILA is a remedial statute and should be construed liberally in favor of the consumer," the Sixth Circuit affirmed the importance of reading TILA with a less technical view, especially in cases involving unassisted

laymen. *Id.* The *Jones* Court held that TILA "is subject to equitable tolling in appropriate circumstances, and that for application of the doctrine of fraudulent concealment the limitations period runs from the date on which the borrower discovers or had reasonable opportunity to discover the fraud involving the complained of TILA violation."

In Willingham's case, the doctrine of equitable tolling is particularly appropriate. In addition to discrepancies on her HUD–1 Settlement Statements, Plaintiff also alleges that she never received her TILA mandated copies of the Notice of the Right to Cancel. Am. Compl. ¶¶ 42–45, 48. The very purpose of TILA and RESPA documents is to "protect the consumer from divergent and at times fraudulent practices stemming from the uninformed use of credit" and "protect [consumers] from unnecessarily high settlement charges and certain abusive practices that have developed in some areas of the country." 15 U.S.C. § 1601; 12 U.S.C. § 2601. The failure of NovaStar and its alleged co-conspirators to adequately furnish Willingham with the relevant documents and disclose the terms of the loan led to the very "uninformed use of credit" by a layperson without assistance that the statutes were enacted to protect against. Plaintiff alleges that because of her vulnerability, she received unnecessarily high settlement charges and was the victim of abusive lending practices. In light of the purposes of TILA and RESPA and the circumstances of Willinghams's case, this Court holds that the statute of limitations is tolled as required by *Jones*.

Defendant also asserts that even if the statutes of limitation are tolled until one year after discovery, Willingham filed her claims later than one year after she discovered or should have discovered the Defendants' alleged TILA and RESPA violations. This argument also applies to Plaintiff's TCPA claim which would also be barred under Tenn.Code Ann. § 47–18–110. Section 47–18–110 states that, "[a]ny action commenced pursuant to [TCPA] shall be brought within one (1) year from a person's discovery of the unlawful act or practice." TCA § 47–18–110. Therefore, the Court will address the issue of whether Plaintiff discovered or should have discovered her RESPA, TILA, and TCPA claims before they were foreclosed by a one year after discovery statute of limitations.

**\*25** In reviewing a defendant's Rule 12(b)(6) motion to dismiss, a district court should construe the complaint in

the light most favorable to the plaintiff and determine whether the plaintiff undoubtedly can prove no set of facts in support of her claims that would entitle her to relief. *Meador v. Cabinet for Human Res.,* 902 F.2d 474, 475 (6th Cir.1990), *cert. denied,* 498 U.S. 867 (1990). If an allegation is capable of more than one inference, it must be construed in the plaintiff's favor. *Sinay v. Lamson & Sessions Co.,* 948 F.2d 1037, 1039–40 (6th Cir.1991).

Defendant only asserts that plaintiff was aware that her loan proceeds were excessive and that she does not allege any facts demonstrating that she was unaware of Defendants' unlawful scheme until a later time. This cannot fulfill the Defendant's burden of showing that no set of facts exists which would entitle the plaintiff to recover under the liberal pleading standards. Fed.R.Civ.P. 8. It is not Plaintiff's duty to show what she could not have known, but the Defendant's burden to show that the Plaintiff did know, or should have known about the excess funds is insufficient. An inquiry into what Plaintiff actually knew is especially relevant in this case after considering the alleged frauds perpetrated by the Defendant and its alleged co-conspirators. For instance, Plaintiff was advised in her HUD–1 that she would receive $1,112.18; however, she only received a check for $394.54. She could have expected to receive more of the proceeds in the future. Discrepancies such as that could lead to confusion that most likely would not be resolved until someone with legal or financial expertise examined the relevant documents and law to determine if there had been a violation of these highly technical statutes. *See Jones,* 747 F.2d 1037 (tolling statute 11 years even though Plaintiffs had read promissory note and could have initially recognized discrepancies in the disclosure statement because "[t]he promissory note is one page long, written in fine print difficult to read, let alone to understand, and would *require someone with legal training and experience to interpret as well as to apply.*") (emphasis added). Accordingly, because NovaStar has not alleged sufficient facts to show that Willingham was aware, or should have been aware of the alleged TILA, RESPA, or TCPA violations before the one year statute of limitations was tolled, Willingham's claims are not barred.

### 7. Truth In Lending Act Claim

Willingham alleges that Defendants violated the TILA sections 1635 and 1639. The TILA section 1635 provides borrowers with a right of rescission when certain TILA provisions are violated. *See* 15 U.S.C. § 1635. NovaStar

contends that Willingham should be estopped from asserting a right of rescission under the TILA because of her Chapter 13 bankruptcy confirmation. It also argues that Willingham does not qualify for the heightened protections of TILA § 1639, also known as the Home Ownership Equity Protection Act ("HOEPA"), because her loan is not "high cost" as defined by the statute. The Court has previously addressed the issue of judicial estoppel in this Order, finding that Willingham's claims are not precluded by her Chapter 13 confirmation. Therefore, the Court will proceed to address whether Willingham's loan qualifies as a "high cost" mortgage entitled to additional protections under TILA § 1639.

**\*26** In 1994, the TILA, including § 1639, was amended to define what types of mortgage loans qualify for additional protection. 15 U.S.C. §§ 1602(aa), 15 U.S.C. §§ 1610, 1639, 1640. The 1994 amendments are commonly referred to as the HOEPA amendments. A mortgage is a "high cost" loan covered by the HOEPA if it fits one of two categories listed in 12 C.F.R. § 226.32. The two categories are: 1) loans with an APR exceeding 8% if it is a first-lien loan and 10% if it is a subordinate loan; and 2) loans in which, "[t]he total points and fees payable by the consumer at or before loan closing will exceed the greater of 8 percent of the total amount, or $400." 15 U.S.C. § 1602(aa)(1)(B). Willingham asserts that her loan qualifies as "high cost" because it fits into the second category. Therefore, the Court must perform a two-step calculation. The Court must first determine the "total points and fees" Willingham paid for her loan as defined by HOEPA. Then, the Court must determine eight percent of the "total loan amount."[4] If Willingham's points and fees are greater than the HOEPA trigger, her loan qualifies as a HOEPA loan.

[4]     Eight percent of the total loan amount is also known as the "HOEPA Trigger" the linear calculation appears:
      [Total Loan Amount x .08 = HOEPA Trigger]

The first step is determining total points and fees. Total points and fees is defined as:

(i) All items required to be disclosed under § 226.4(a) and 226.2(b), except interest or the time-price differential;

(ii) All compensation paid to mortgage brokers;

(iii) All items listed in § 226.4(c)(7) (other than amounts held for future payment of taxes) unless the charge is reasonable, the creditor receives no direct or indirect compensation in connection with the charge, and the charge is not paid to an affiliate of the creditor; and

(iv) Premiums or other charges for credit life, accident, health, or loss-of-income insurance, or debt-cancellation coverage (whether or not the debt-cancellation coverage is insurance under applicable law) that provides for cancellation of all or part of the consumer's liability in the event of the loss of life, health, or income or in the case of accident, written in connection with the credit transaction.

12 C.F.R. § 226.32(b)(1). Willingham includes her loan origination fee, underwriting fee, tax service fee, flood certification fee, yield spread premium, notary fee, document preparation fee, and closing fee in her calculation of total points and fees. Willingham's HOEPA calculation of points and fees is as follows:

| $ 1,900.00 | - | Loan Origination Fee |
|---|---|---|
| 595.00 | - | Underwriting Fee |
| 65.00 | - | Tax Service Fee |
| 16.00 | - | Flood Certification Fee |
| 810.00 | - | Yield Spread Premium |
| 40.00 | - | Notary Fee |
| 160.00 | - | Document Preparation |
| 160.00 | - | Closing Fee |
| $ 3,746.00 | - | Total HOEPA Points and Fees |

The calculation for deriving the total loan amount, which must be multiplied by eight percent to derive the HOEPA trigger, is found in 12 C.F.R. § 226.32 (Supp. 1 Para. 32(a)(1)(ii)) which states,

> For purposes of the "points and fees" test, the total loan amount is calculated by taking the amount financed, as determined according to § 226.18(b) [5], and deducting any cost listed in § 226.32(b)(1)(iii) and § 226.32(b)(1)(iv) that is both included as points and fees under § 226.32(b)(1) and financed by the creditor.

[5] 12 C.F.R. § 226.18(b) states:

> (b) Amount financed ... The amount financed is calculated by:
> (1) Determining the principle loan amount or the cash price (subtracting any down payment);
> (2) Adding any other amounts that are not financed by the creditor and are not part of the finance charge; and
> (3) Subtracting any prepaid finance charge.

**\*27** Willingham alleges that the following calculation is necessary to derive the total loan amount for her loan and her HOEPA Trigger:

| $ 40,500.00 | - | Principal Amount of loan |
|---|---|---|
| 3,746.00 | - | Finance Charges Under § 226.32(b)(1)(iii) and § 226.32(b)(1)(iv) |
| $ 36,754.00 | = | Total Loan Amount |
| x 8% | | |

$ 2,940.32         =      HOEPA Trigger

Therefore, under Willingham's calculation, because points and fees of $3,746 exceed the HOEPA Trigger of $2,940.32, she would be entitled to the additional protections of HOEPA. NovaStar, however, contends that Willingham's calculation of points and fees is incorrect. To determine whether the calculation is consistent with the HOEPA, the Court must look to the text and the purpose of the statute.

The HOEPA was enacted to curb predatory lending practices aimed at low-income borrowers like Willingham. Many predatory loans are brokered by companies that, along with other participants like fictitious notaries and appraisers, extract exorbitant fees from borrowers. *See* HUD—Treasury Joint Report, at 6, *available at* http://www.hud.gov/library/bookshelf18/pressrel/treasrpt.pdf. The HOEPA § 226.32(a)(ii) especially targets this behavior by labeling these loans "high cost" when "[t]he total points and fees payable by the consumer at or before closing will exceed ... 8 percent of the total loan amount." Like other sections of TILA, this portion of HOEPA is liberally construed in favor of the consumer. *Pending v. Household Credit Serv., Inc.,* 286 F.3d 340, 344 (6th Cir.2002).

In this case, NovaStar specifically contends that the yield spread premium should not be included in Willingham's § 226.32 calculation of high cost because it is not "payable by the consumer *at or before closing.*" Essentially, NovaStar contends that it paid the yield spread premium at closing and would later recoup it from Willingham by charging a higher interest rate, therefore the charge was not "*at or before closing*" but over the course of the loan. However, this interpretation of § 226.32 is inconsistent with the purpose of the statute and implies an "indirect/direct payment" relationship that is not within the text of HOEPA.

The yield spread premium is the difference between the interest rate at which the broker originates the loan and the par, or market, rate offered by the lender. The lender gives this amount to the broker at closing and then recoups it from the borrower in the form of a higher interest rate. Therefore, although the lender pays this fee at the time of closing, the expense is ultimately born by the borrower. Because the fee is payable at the time of closing and the ultimate expense is born by the consumer, these expenses

fit squarely within the text of "payable by the consumer at or before the time of closing." In the context of § 226.32, it is irrelevant whether the borrower withdrew the money from her own savings account or borrowed the money from the lender; the expense is still payable at the time of closing and the consumer bears the ultimate expense. The logical import of the phrase "at or before closing," however, is that expenses incurred after payments begin, like late charges and default fees, are not included in calculation of points and fees because the lender cannot predict whether the borrower will incur them. However, with fees like the yield spread premium, the lender knows exactly how much it will cost the consumer up front. To infer a direct/indirect distinction into the "payable by the consumer at or before closing" text is not the role of the courts and this Court will not do so.

**\*28** Although courts have in fact incorporated a directly/indirectly payable analysis into the § 226.32 framework, the Court believes that an interpretation that includes amounts financed over the term of the loan in points and fees is not only consistent with the text, but also more consistent with the purpose and structure of HOEPA. [6] The purpose of the statute is to protect low-income consumers who are most vulnerable to predatory lending practices. Most borrowers with low incomes, like Willingham, do not have reserves to pay the exorbitant fees attached to these loans. If the statute did not include costs and fees financed over the term of the loan, the very people who are most susceptible would be penalized for the behavior the statute was enacted to protect. This reasoning is also consistent with NovaStar's own calculations, which include Willingham's loan origination fee, underwriting fee, tax service fee, and flood certification fee even though these fees were also financed over the term of the loan. Accordingly, because Willingham bears the ultimate expense of the yield spread premium and it was payable to Memphis Financial Services at the time of closing, it is properly considered within the points and fees calculation along with Willingham's other closing fees. Therefore, this Court finds that Willingham's loan is properly considered "high cost" under HOEPA and her § 1639 claim should not be dismissed.

[6]     In *Terry v. Cmty. Bank of N. Virginia* this Court held that a mortgage does not qualify for TILA

protections where certain points and fees are paid over the course of the loan. 255 F.Supp.2d 811 (W.D. Tenn 2003). However, upon review, the Court finds that the holding of *Terry* is inconsistent with the text and policy of the Act.

## 8. RESPA

Willingham also alleges a cause of action under the RESPA 12 U. S .C. § § 2604(c) and 2607. NovaStar contends that Willingham's RESPA claims should be dismissed because 1) § 2604(c) does not provide a private damages remedy, and 2) Willingham does not allege that excessive or unearned fees were illegally split. The Court will address each of these contentions separately.

The Court of Appeals for the Eleventh Circuit has held that no implied private right of action exists for violations of § 2604(c). *Collins v. FHHA–USDA,* 105 F.3d 1366, 1367–68 (11th Cir.1997). In so ruling, the *Collins* Court reasoned that § 2604(c) replaced the prior § 2605, which explicitly provided for an action for damages for its violations, and that other provisions of RESPA explicitly provide civil remedies. *Id.* at 1368. The court concluded that "there is no private civil action for a violation of 12 U.S.C. § 2604(c), or any regulations relating to it" because no evidence exists to establish that Congress intended to create a private right of action, which is one of the prerequisites to finding an implied right of action under *Cort v. Ash,* 422 U.S. 66, 78 (1975). *Id.* at 1368. The Court finds that the reasoning in *Collins* is persuasive and, as such, holds that no private right of action exists for violations of § 2604(c). Accordingly, Defendants' motions to dismiss Plaintiff's claim for violation of 12 U.S.C. § 2604(c) is granted.

NovaStar also asserts that Willingham's claim for a violation of 12 U.S.C. § 2607(a) should be dismissed. Section 2607(a)-(b) states:

**\*29** (a) Business referrals

No person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person.

(b) Splitting charges

No person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed.

The Department of Housing and Urban Development (HUD) has set out implementing regulations which clarify RESPA. HUD has stated that:

> it may violate Section 8(b) and HUD's implementing regulations: (1) for two or more persons to split a fee for settlement services, any portion of which is unearned; or (2) for one settlement service provider to mark-up the cost of services performed or goods provided by another settlement service provider without providing additional actual, necessary, and distinct services, goods, or facilities to justify the additional charge; or (3) for one settlement service provider to charge the consumer a fee where no, nominal, or duplicative work is done, or the fee is in excess of the reasonable value of goods or facilities provided or the services actually performed.

RESPA Statement of Policy 2001–1: Clarification of Statement of Policy 1999–1 Regarding Lender Payments to Mortgage Brokers, and Guidance Concerning Unearned Fees Under Section 8(b), 66 Fed.Reg. 53052 (Oct. 15, 2001). In the complaint Willingham asserts, that, "Defendants paid or received referral fees, or kickbacks, and split fees in violation of 12 U.S.C. 2607(a) and (b)." Plaintiff alleges that she was steered into a contract with NovaStar's alleged co-conspirator, Economic Advantages, which charged her a five-hundred dollar fee and a servicing fee each time a biweekly payment was made, even though there is no indication that Economic Advantages provided a viable service to Willingham.

Willingham also alleges that the yield spread premium Memphis Financial Services received was not reasonable

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works. 23

and *bona fide.* HUD has stated that yield spread premiums are not *per se* legal or *per se* illegal. Determining whether payment of the yield spread premium was permissible under RESPA involves a two part test. The Court must determine 1) "whether goods or facilities were actually furnished or services were actually performed for the compensation paid" and 2) "whether the payments are reasonably related to the value of the goods or facilities that were actually furnished or services that were actually performed." *Id.* HUD has further stated that "simply delivering a loan with a higher interest rate is not a compensable service." In this case, Willingham paid a yield spread premium of $810.00 in addition to a loan origination fee of $1,900.00. NovaStar argues that it did not split the yield spread premium with the other defendants, which does not address the reasonableness requirements of RESPA. NovaStar does not argue that the yield spread premium was paid for compensable services or that it was reasonable in light of Willingham's transaction. Therefore, because Willingham alleges that at least five-hundred dollars of her proceeds were paid to Economic Advantages by NovaStar and its alleged co-conspirators as unearned compensation or for unnecessary services and that an unearned or unreasonable yield spread premium was added to her cost, she has sufficiently stated a claim for violation of RESPA § 2607(a)-(b).

### 9. Tennessee Consumer Protection Act

**\*30** Defendant maintains that the Court should dismiss Plaintiff's claim against it for violation of the Tennessee Consumer Protection Act. The TCPA provides for a private cause of action as follows:

> Any person who suffers an ascertainable loss of money or property, real, personal, or mixed, ... as a result of the use or employment by another person of an unfair or deceptive act or practice declared to be unlawful by this part, may bring an action individually to recover actual damages.

Tenn.Code Ann. § 47–18–109(a).

NovaStar contends that Willingham's Tennessee Consumer Protection Act (TCPA) claim should be dismissed because mortgage terms are specifically

excluded from the TCPA's protection by Tenn.Code Ann. § 47–18–111(3). This provision states that the TCPA does not apply to, "[c]redit terms of a transaction which may be otherwise subject to the provisions of this part, except insofar as the Tennessee Equal Consumer Credit Act of 1974, compiled in part 8 of this chapter may be applicable." Because Willingham's claim involves the credit terms of her mortgage transaction and she does not argue that her claims are covered under the Tennessee Equal Consumer Credit Act her claim is precluded under § 47–18–111(3). Accordingly, The Court grants NovaStar's motion to dismiss Plaintiff's claim under the TCPA without legal prejudice.

### 10. Fraud

NovaStar asserts that Willingham's claim for fraud should be dismissed because she has failed to allege fraud with particularity and because she did not make specific allegations concerning NovaStar's role in the alleged fraud. Under Tennessee law, to establish a claim for fraud, the plaintiff must show:

> (1) an intentional misrepresentation with regard to a material fact, (2) knowledge of the representation['s] falsity—that the representation was made "knowingly" or "without belief in its truth," or "recklessly" without regard to its truth or falsity, (3) that the plaintiff reasonably relied on the misrepresentation and suffered damage, and (4) that the misrepresentation relates to an existing or past fact, or, if the claim is based on promissory fraud, then the misrepresentation must "embody a promise of future action without the present intention to carry out the promise."

*Shahrdar v. Global Housing, Inc.,* 983 S.W.2d 230, 237 (Tenn.Ct . App.1998) (quoting *Stacks v. Saunders,* 812 S.W.2d 587, 592 (Tenn . Ct.App.1990)). As noted in the forgoing section of this opinion involving Plaintiff's RICO allegations, the Federal Rules of Civil Procedure require a plaintiff to plead fraud with particularity. Fed.R.Civ.P. 9(b). However, in ruling upon a motion to dismiss pursuant to Rule 9(b), a court must consider the policy of simplicity in pleading embodied in Rule 8. *Michaels Bldg. Co.,* 848 F.2d at 679.

As previously discussed, Willingham's complaint asserts, in effect, that the Defendants prepared a fraudulent settlement statement and other documents; and, as a result, Plaintiff was not advised or aware of various fees

and costs associated with the mortgage loan. Moreover, the complaint alleges that Defendant had knowledge that the documents and other representations were false. Am. Compl. ¶ 87. Furthermore, Plaintiff alleges that she relied on the documents prepared by Defendants, which resulted in her entering into a mortgage agreement that was to her detriment, in that it deprived her of money or property. The Court finds that these allegations are sufficient to satisfy Fed.R.Civ.P. 9(b).

**\*31** Moreover, although NovaStar contends that Willingham's fraud claim should be dismissed because she has not alleged that NovaStar specifically made any misrepresentations, this assertion ignores the nature of Willingham's claims. In Willingham's allegations of civil conspiracy she states that, "[a]ll Defendants combined and acted in concert to obtain money from Plaintiff and other consumers by engaging in a series of fraudulent transactions." Am. Compl. ¶ 115. In the leading case of *Brumley v. Chattanooga Speedway & Motordrome Co.* the Tennessee Supreme Court declared "it is basic principle that each conspirator is responsible for everything done by his confederates." 198 S.W. 775 (Tenn.1917). Because Willingham has sufficiently alleged misrepresentations by NovaStar's alleged co-conspirators, she need not show that NovaStar itself made any direct misrepresentations, only that NovaStar acted with the intention that the conspiracy be carried out.

## 11. Conversion

NovaStar next asserts that Willingham has failed to state a claim for conversion. To establish a claim for conversion under Tennessee law, a plaintiff must show that the defendant has "1) appropriated something belonging to the plaintiff to its own use and benefit, 2) by the exercise of dominion over it, 3) in defiance of the plaintiff's right." *Mammoth Cave Credit Ass'n v. Oldham,* 569 S.W.2d 833, 836 (Tenn.Ct.App.1977) (internal quotations and citations omitted). The complaint alleges that "each Defendant unlawfully took and/or converted to his/her/its own use certain property of the Plaintiff, to wit: loan proceeds on the subject properties." Am. Compl. ¶ 151. Moreover, among other things, Willingham alleges that NovaStar failed to properly credit her account for payments drawn from her checking account and Defendant Equity Title only sent her $394.54 of the $1,112.18 to which she was entitled from loan proceeds. *Id.* ¶¶ 86, 50–52. Although NovaStar argues that it did not take or convert any of the loan proceeds

itself, Willingham avers that NovaStar was a knowing participant in a conspiracy to defraud her and take her property. *Id.* ¶ 87. As stated above, each conspirator is responsible for the actions of its alleged co-conspirators. Therefore, even if NovaStar did not convert any funds from the loan proceeds, it can still be liable for the other Defendants' actions under co-conspirator liability if it was a participant in a scheme to defraud Plaintiff. In this case, Plaintiff alleges that NovaStar provided proceeds to facilitate the scheme for its own benefit. Although NovaStar supplied the proceeds of the loan, it expected to recoup these funds from Willingham through her payments of the principal plus interest or by proceeds from foreclosure on her home. Therefore, although NovaStar did not derive any initial benefit at distribution of the loan proceeds, Willingham has successfully stated a claim for conversion in which NovaStar is alleged to be a participant.

**\*32** As an additional argument against Willingham's conversion claim, NovaStar asserts that Willingham voluntarily gave up the rights to the fees Defendants collected from her during the loan transactions by signing various documents. Although it is true that if Willingham gave up control of the proceeds voluntarily, she could not bring a claim for conversion. It is clear, however, that Willingham has alleged that Defendants exceeded the scope of her consent. *See Gen. Elec. Credit Corp. of Tenn. v. Kelly & Dearing Aviation,* 765 S.W.2d 750, 754 (Tenn.App.1988) (explaining that although defendant had permission to use plaintiff's property, the scope of the consent had been exceeded by plaintiff's actions and defendant could therefore be liable for conversion). Willingham consented to Defendants collection of "reasonable fees" for their services, but contends that that Defendants not only collected unreasonable fees, but also collected portions of the money that she was expressly told she would receive. Am. Compl. ¶¶ 50–52. Therefore, although Willingham did consent to the Defendants collection of fees, she has properly alleged that Defendants exceeded the scope of that consent. Thus, permission is no conclusive defense for the tort of conversion in this 12(b)(6) motion.

## 12. Negligent Misrepresentation

NovaStar also argues that Willingham's claim for negligent misrepresentation should be dismissed because Willingham did not allege any misrepresentations specifically made by NovaStar. Tennessee has adopted

the definition of negligent misrepresentation that appears in section 552 of the Restatement (Second) of Torts. *Robinson v. Omer,* 952 S.W.2d 423, 427 (Tenn.1997). Pursuant to this definition, the plaintiff can recover by establishing that:

> (1) the defendant is acting in the course of his business, profession, or employment, or in a transaction in which he has a pecuniary (as opposed to gratuitous) interest; and

> (2) the defendant supplies faulty information meant to guide others in their business transactions; and

> (3) the defendant fails to exercise reasonable care in obtaining or communicating the information; and

> (4) the plaintiff justifiably relies upon the information.

*Id.* (internal quotations omitted) (emphasis omitted). Willingham's complaint alleges that "all Defendants had a duty of due care to her and that the Defendants breached such duty by omitting or misrepresenting material information to Plaintiff; the negligent misrepresentation of Defendants was the proximate cause of damages suffered by Plaintiff." Am. Compl. ¶ 152. NovaStar argues that Willingham failed to identify any representations made by them upon which she justifiably relied. As discussed previously, however, the complaint alleges that, to obtain the mortgage loan, Willingham relied on the fraudulent settlement statement and other documents prepared by NovaStar's alleged co-conspirators. As the Court has stated previously, because Willingham has properly alleged a claim for civil conspiracy of which NovaStar was a knowing participant, NovaStar is held liable for the actions of each of its co-conspirators. Plaintiff has stated a claim for relief as to NovaStar. Accordingly, the Court denies NovaStar's motion to dismiss Plaintiff's claim for negligent misrepresentation.

### 13. Breach of Contract

**\*33** NovaStar asserts that Willingham has not identified a contract between herself and NovaStar. Willingham's complaint alleges that "all Defendants had contractual relationships with the Plaintiff, either directly or implicitly; Defendants, either directly or through agents, breached such contracts with Plaintiffs; and that the breaching of such contracts by Defendants was the proximate cause of damages suffered by Plaintiff." Am. Compl. ¶ 145. Under Tennessee law, a plaintiff

alleging breach of contract must plead sufficient facts to establish "(1) the existence of a contract, (2) breach of the contract, and (3) damages which flow from the breach." *Life Care Centers v. Charles Town Assoc.,* 79 F.3d 496, 514 (6th Cir.1996). It is also well settled that lender/borrower relationships are contractual. *See Family Loan Co. v. Hickerson,* 168 Tenn. 36 (1934). Therefore, because lender/borrower relationships constitute contractual relationships and Willingham entered into such a relationship with NovaStar, she has sufficiently identified the existence of a contract. Accordingly, NovaStar's motion to dismiss Plaintiff's breach of contract claim is denied.

### 14. Unconscionability

NovaStar finally asserts that Willingham's claim for unconscionability should be dismissed because the doctrine of unconscionability may only be used as a defense. In *Wallace v. Nat'l Commerce Bancorporation,* the Tennessee Court of Appeals stated, "[w]e agree with the decisions in *Sanders v. Colonial Bank of Alabama,* 551 So.2d 1045 (Ala.1989) and *Cowin Equipment Co. v. General Motors Corp.,* 734 F.2d 1581 (11th Cir.1984), which hold that the doctrine of unconscionability is not available to obtain affirmative relief, but is available only as a defense." No. 02A01–9205–CV–00143, 1993 Tenn.App. LEXIS 152, at \*8–9 (Tenn.Ct.App. Feb. 23, 1993). Accordingly, because this doctrine cannot be used as the basis for affirmative relief in the State of Tennessee, Plaintiff's claim for unconscionability is dismissed.

### CONCLUSION

For the reasons stated herein, the Court grants Defendant NovaStar's motion to dismiss Plaintiff's claims for breach of fiduciary duty, and unconscionability claims, and her claim under Tenn.Code Ann. § 47–18–109(a). The Court also grants Defendant's motion to dismiss Plaintiff's claim for violation of 12 U.S.C. § 2604. The Court, however, denies Defendant's motion to dismiss Plaintiff's claims for violation of 12 U.S.C. § 2607(b); 15 U.S.C. §§ 1635 and 1639; 15 U.S.C. § 1691(d); 18 U.S.C. § 1962(c) and (d); and 42 U.S.C. §§ 3604 and 3605. Likewise, the Court denies Defendant's motion to dismiss Plaintiff's claims for fraud, conversion, breach of contract, conspiracy, and negligent misrepresentation. Furthermore, the Court grants Plaintiff until January 29, 2006 to amend her complaint with respect to the standing defect as set forth in this order.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2006 WL 6676801

**End of Document**

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

WestlawNext © 2017 Thomson Reuters. No claim to original U.S. Government Works. 27